1  Stuart M. Richter (State Bar No. 126231)
   William R. Waldman (State Bar No. 198878)
2  KATTEN MUCHIN ROSENMAN LLP
   2029 Century Park East, Suite 2600
3  Los Angeles, CA 90067-3012
   Telephone: 310.788.4400
4  Facsimile: 310.788.4471

5  Attorneys for Plaintiff WestLB AG, New York
   Branch

6

7

**ORIGINAL FILED**

FEB - 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*E-filing*

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**  EMC

10

11  WESTLB AG, NEW YORK BRANCH, )  CASE NO. **CV 08 0890**
    a German banking corporation,    )
12                                   )
              Plaintiff,             )  **COMPLAINT FOR:**
13                                   )
       vs.                          )  **(1)  JUDICIAL FORECLOSURE**
14                                   )  **UNDER DEED OF TRUST AND**
    LANTANA MENDOCINO, LLC, a        )  **FORBEARANCE AGREEMENT;**
15  Delaware limited liability company, )  **AND**
                                     )  **(2)  SPECIFIC PERFORMANCE OF**
16            Defendant.             )  **ASSIGNMENT OF RENTS AND**
                                     )  **APPOINTMENT OF RECEIVER**
17                                   )  **CLAUSES, INJUNCTIVE RELIEF;**
                                     )
18                                   )
                                     )  **DEMAND FOR JURY TRIAL**
19                                   )

20

21      Plaintiff WestLB AG, New York Branch, alleges as follows:

22                    **THE PARTIES**

23      1.    Plaintiff WestLB AG, New York Branch, is and at all times herein was a

24  German banking institution, formed in accordance with the laws of the Country of

25  Germany, with its principal place of business in Duesseldorf, Germany ("Plaintiff").

26      2.    On information and belief, Defendant Lantana Mendocino, LLC

27  ("Lantana") is a Delaware limited liability company doing business in Mendocino,

28  California.  Lantana is the owner of certain real property, and is in the business of

31419458v2                        COMPLAINT

1  running the Heritage House hotel, which is located in Mendocino, California. On

2  information and belief, the two principals of Lantana are David J. Wilk ("Wilk") and

3  Duane D. Werb ("Werb").

**JURISDICTION AND VENUE**

5      3.    This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)

6  because there is complete diversity between Plaintiff and defendants and the amount

7  in controversy exceeds $75,000, exclusive of interest and costs. This Court has

8  jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367(a) in that the

9  claims are so related to the federal claims that they form part of the same case or

10  controversy.

11      4.    This Court has personal jurisdiction over defendants in that the acts

12  complained of herein occurred in the County of Mendocino, State of California.

13      5.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and

14  (c) in that a substantial part of events giving rise to the claims asserted herein occurred

15  in this judicial district and the defendants are subject to personal jurisdiction in this

16  judicial district.

**THE LOAN DOCUMENTS**

18      6.    On or about August 26, 2005, Plaintiff and Lantana entered into a Loan

19  and Security Agreement (as amended, the "Loan Agreement") pursuant to which

20  Plaintiff agreed to, and did, loan Lantana $19,500,000 to be used for the purchase,

21  renovation and development of certain real property in Mendocino, California upon

22  which Lantana operates a hotel commonly known as "The Heritage House" (the

23  "Property"). A true and correct copy of the Loan Agreement is attached hereto as

24  Exhibit A.

25      7.    In connection with the Loan Agreement, on or about August 26, 2005,

26  Lantana made to Plaintiff a promissory note in the face amount of $19,500,000 (as

27  amended, the "Note"). A true and correct copy of the Note is attached hereto as

28  Exhibit B.

2

COMPLAINT

31419458v2

8.    As security for, among other things, payment of principal and interest due under the Note, on or about August 26, 2005, Lantana executed a Deed of Trust and Leasehold Deed of Trust With Security Agreement, Assignment of Leases and Rents and Fixture Filing in favor of Plaintiff (as amended, the "Deed of Trust"). A true and correct copy of the Deed of Trust is attached hereto as Exhibit C. The Property is the real property that is the subject of the Deed of Trust.

9.    On August 26, 2005, Wilk and Werb made a Completion Guaranty in favor of Plaintiff in relation to the Note, Deed of Trust and Loan Agreement.

10.    The Loan Agreement, the Note, the Deed of Trust, the Completion Guaranty, and all other documents arising from or related thereto, including, without limitation, the Forbearance Agreement (as defined below), shall be collectively referred to herein as the "Loan Documents."

11.    After August 26, 2005, certain "Events of Default" occurred under the Loan Agreement and certain "Recourse Liability Events" occurred under the Recourse Agreement by Lantana. Moreover, after August 26, 2005, Lantana, Wilk and Werb also defaulted under the Completion Guaranty for their failure to satisfy their respective obligations thereunder (collectively, the "Default Events"). As a result of the Default Events, Plaintiff was, and is, entitled to foreclose on the Property.

12.    At the request of Lantana, and pursuant to that certain August 2, 2007 Global Settlement and Forbearance Agreement by and among Plaintiff, Lantana, Wilk and Werb ("Forbearance Agreement"), Plaintiff, among other things, agreed to forbear from exercising its rights and remedies against Lantana until December 31, 2007, including, without limitation, foreclosing on the Property, provided that Lantana adhered to the terms and conditions of the Forbearance Agreement (which it did not as set forth herein), and also agreed to increase the amount of its loan to Lantana by $4,500,000 to a total of $24,000,000. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit D. Pursuant to the Forbearance Agreement, Lantana, among other things, acknowledged and agreed that:

COMPLAINT

31419458v2

1      A.      The monies lent to Lantana from Plaintiff "are due and payable in

2  full" (Exhibit D, ¶ 2(a));

3      B.      The Default Events are "true and correct" (Exhibit D, ¶ 2(b));

4      C.      As a result of the Default Events, Plaintiff can exercise all of its

5  rights and remedies under the Loan Documents, including but not limited to, the right

6  to foreclose on the Property and for the immediate appointment of a receiver for the

7  Property (Exhibit D, ¶ 2(c));

8      D.      Plaintiff has fully performed all of its obligations and duties under

9  the Loan Documents (Exhibit D, ¶ 2(d));

10      E.      Lantana, Wilk and Werb do not have any claims, defenses or

11  counterclaims in relation to their obligations under the Loan Documents (Exhibit D,

12  ¶ 2(g));

13      F.      If Lantana, Wilk or Werb breach or default under the Forbearance

14  Agreement, any such breach would be an "Event of Default," thus, among other

15  things, entitling Plaintiff to foreclose on the Property and for the appointment of a

16  receiver (Exhibit D, ¶ 2(l));

17      G.      Upon the occurrence of an "Event of Default," Lantana, Wilk and

18  Werb, among other things, consent to and support the immediate appointment of a

19  receiver for the Property, without notice, and to not object or otherwise oppose such

20  appointment (Exhibit D, ¶ 13(a)); and

21      H.      Upon the occurrence of an "Event of Default," Lantana, Wilk and

22  Werb consent to and support Plaintiff's judicial or non-judicial foreclosure of the

23  Property and to not object or otherwise oppose such action (Exhibit D, ¶ 13(c)).

24      13.      Pursuant to the Forbearance Agreement, Lantana executed a First

25  Amendment to Deed of Trust and Leasehold Deed of Trust With Security Agreement,

26  Assignment of Leases and Rents and Fixture Filing in favor of Plaintiff (the

27  "Amendment to Deed of Trust"). A true and correct copy of the First Amendment to

28  Deed of Trust is attached hereto as Exhibit E.

4

COMPLAINT

## LANTANA'S BREACHES OF THE LOAN DOCUMENTS

14.    Since the date of the Forbearance Agreement on August 2, 2007, there have been numerous "Events of Default" committed by Lantana, Wilk and Werb, including but not limited to:

A.    breaching section 5 of the Forbearance Agreement as a result of General Hotel Management LTD no longer managing or otherwise being affiliated with Lantana;

B.    breaching section 7(b) of the Forbearance Agreement as a result of Lantana's failure to pay its taxes;

C.    breaching section 8(i) of the Forbearance Agreement as a result of Lantana's failure to enter into a letter of intent or commitment letter on or before October 1, 2007;

D.    breaching section 8(ii) of the Forbearance Agreement as a result of Lantana's failure to enter into definitive documents in connection with a liquidity plan on or before November 30, 2007;

E.    breaching section 6.4(c) of the Loan Agreement as a result of Lantana's failure to pay occupancy taxes; and

F.    breaching both the Loan Agreement and the Forbearance Agreement as a result of Lantana's failure to fully satisfy the Obligations (as defined in the Settlement Agreement) on or before December 31, 2007, i.e., the maturity date of the Note (collectively, "Forbearance Defaults").

15.    True and correct copies of the October 10, 2007, December 5, 2007, and January 16, 2008 notice letters from Plaintiff to Lantana regarding the aforementioned breaches are attached collectively hereto as Exhibit F.

31419458v2

## FIRST CAUSE OF ACTION

### (For Judicial Foreclosure Under Deed of Trust And Forbearance Agreement Against Lantana)

16.    Plaintiff incorporates by reference paragraphs 1 through 15 above, as though fully set forth herein.

17.    Lantana has defaulted under the terms of the Forbearance Agreement through the Forbearance Defaults.

18.    Plaintiff has performed all of its obligations under the terms of the Forbearance Agreement, except those obligations it has been prevented or excused from performing by the acts of Lantana or by law.

19.    As a result of Lantana's failure to fully satisfy the Obligations (as defined in the Settlement Agreement) on or before December 31, 2007, the Note has been accelerated.  As of February 7, 2008, the total unpaid principal balance of the Note (i.e., $23,970,558.93) plus all accrued and unpaid interest thereon ($461,466.55) plus all amounts due and owing under (i) that certain November 8, 2005 ISDA Master Agreement by and between Plaintiff and Lantana Mendocino, LLC, and (ii) that certain November 8, 2005 Collateral Assignment of Interest Rate Protection Agreement by and between Plaintiff and Lantana Mendocino, LLC (i.e., $1,084,774.53) plus all other amounts due and owing under the Loan Documents is due and payable.  The foregoing amounts may change as a result of Lantana's continuing defaults.  Plaintiff will seek leave to amend this Complaint to allege the exact amounts owing at the time of the trial in this action.

20.    In addition, Plaintiff has been required to retain attorneys for purposes of enforcing its rights under the Loan Documents.  As a result, Plaintiff has incurred and will continue to incur attorneys' fees and expenses, which are recoverable by Plaintiff pursuant to the terms and conditions thereunder.  Such fees and expenses are no less than $467,108 as of the date hereof.

COMPLAINT

31419458v2

21.    Plaintiff may hereafter be required to expend additional sums to protect its security in the Property.  Under the terms of the Deed of Trust and Forbearance Agreement, Lantana has agreed to pay such sums.  Plaintiff will seek leave to amend this Complaint to allege the nature and amount of such sums if Plaintiff is required to make such expenditures.

22.    By reason of Lantana's defaults, as described above, and in accordance with the terms of the Deed of Trust and Forbearance Agreement, Plaintiff is entitled to a judgment that (i) the rights, claims, ownership, liens, titles and demand of Lantana and all persons or entities claiming under Lantana are subject to the Deed of Trust, (ii) the Deed of Trust is foreclosed and the Property shall be sold according to law by a commissioner or a trustee appointed by the Court, and the commissioner or trustee shall execute and deliver a deed to the purchaser(s) of the Property at the foreclosure sale, and (iii) that said purchaser(s) may be put into possession of the Property upon delivery of such deed.

23.    None of the rents collected by Lantana have been turned over to Plaintiff and none of the outstanding taxes have been paid.  Plaintiff has no adequate remedy at law to prevent these continuing and ongoing violations of the Loan Documents.  Accordingly, Plaintiff is entitled to the appointment of a receiver to manage the Property and collect the rents and profits generated by the Property.  Moreover, Lantana has already stipulated and agreed (i) to the appointment of such a receiver and the other relief requested herein in the Forbearance Agreement, and (ii) to not object or otherwise oppose the foregoing.

## SECOND CAUSE OF ACTION

### (For Specific Performance Under Deed of Trust

### And Forbearance Agreement Against Lantana)

24.    Plaintiff incorporates by reference paragraphs 1 through 23 above, as though fully set forth herein.

7

COMPLAINT

25.    The Deed of Trust provides that Lantana has assigned to Plaintiff all rents, issues and profits of the Property and in the event of Lantana's default, authorizes Plaintiff to collect same.  Exhibit C, ¶ 4.  Plaintiff seeks specific performance of this provision of the Deed of Trust.

26.    The Deed of Trust and Forbearance Agreement also provide that Plaintiff may take possession of the Property through a receiver appointed by the court. Plaintiff has no adequate remedy at law and therefore seeks the appointment of a receiver to operate and manage the Property and to collect Plaintiff's rents and profits.

27.    Plaintiff further seeks a preliminary and permanent injunction restraining Lantana from interfering with the receiver's performance of any and all acts authorized by the Court and requiring Lantana to turn over all rents and profits derived from the Property.

28.    As a result of Lantana's breach of the Deed of Trust and Forbearance Agreement, and the other Loan Documents, Plaintiff has been required to retain attorneys for purposes of prosecuting this action.  Plaintiff therefore has incurred and will continue to incur attorneys' fees and expenses, all of which are recoverable under the terms of the Deed of Trust, Forbearance Agreement, and the other Loan Documents.

WHEREFORE, Plaintiff prays for judgment as follows:

## ON THE FIRST CAUSE OF ACTION

1.    For damages on the amount of the total unpaid principal balance of the Note (i.e., $23,970,558.93) plus all accrued and unpaid interest thereon ($461,466.55) plus all amounts due and owing under (i) that certain November 8, 2005 ISDA Master Agreement by and between Plaintiff and Lantana Mendocino, LLC, and (ii) that certain November 8, 2005 Collateral Assignment of Interest Rate Protection Agreement by and between Plaintiff and Lantana Mendocino, LLC (i.e.,

31419458v2

1   $1,084,774.53) plus all other amounts due and owing under the Loan Documents (all

2   such amounts are as of February 7, 2008);

3            2.    Additional sums, if any, that Plaintiff hereafter expends to protect

4   its security interest in the Property;

5            3.    For a judgment that the Deed of Trust be foreclosed, and that

6   judgment be entered for the foreclosure sale of the Property according to law by a

7   commissioner or trustee appointed by the Court and that the proceeds of the sale be

8   applied in payment of the amounts due to Plaintiff;

9            4.    For a judgment that the rights, claims, ownership, liens, title, and

10  demands of Lantana are subject to the lien of the Deed of Trust;

11           5.    For an order permitting Plaintiff, or any other related or affiliated

12  entities, to become a purchaser at the foreclosure sale;

13           6.    For trustee's fees, attorneys' fees and costs of collection as

14  provided in the Loan Documents;

15           7.    For all costs, charges and expenses incurred in connection with

16  Plaintiff's sale and foreclosure;

17           8.    That the commissioner or trustee execute a deed to the party who

18  purchases the Property at the foreclosure sale, and that the purchaser be put into

19  possession of the Property upon production of said deed and that Lantana and all

20  persons claiming under them subsequent to the execution of the Deed of Trust, be

21  barred and foreclosed from all rights, claims, interests to redemption in the Property;

22           9.    For an order appointing a receiver to collect any and all rents and

23  profits from the Property pending future order of this Court, and to have such other

24  powers and duties as are authorized by law and/or contained in the Deed of Trust to

25  ensure the proper management of the Property for Plaintiff's benefit; and

26

27

28

COMPLAINT

31419458v2

## ON THE SECOND CAUSE OF ACTION

1.      For a decree ordering the specific performance of the terms, conditions and covenants contained in the Deed of Trust, including, but not limited to, an order that Plaintiff is entitled to receive the rents, issues and profits of the Property;

2.      For an order appointing a receiver to collect any and all rents and profits from the Property pending future order of this Court, and to have such other powers and duties as are authorized by law and/or contained in the Deed of Trust to ensure the proper management of the Property for Plaintiff's benefit;

3.      For a preliminary and permanent injunction enjoining and restraining Lantana and any person or entity acting directly or indirectly on its behalf as an agent, servant, employee or representative, and any and all persons acting under, in concert or participation with Lantana, from interfering with the receiver and his possession and in the performance and administration of his duties and activities in connection with the Property; and

4.      For reasonable attorneys' fees, costs and expenses as provided for under the terms of the Deed of Trust.

## ON ALL CAUSES OF ACTION

1.      For interest on all amounts owing to Plaintiff at the maximum legal rate;

2.      For costs of suit incurred herein;

3.      For attorneys' fees, costs and expenses; and

///
///
///
///
///
///
///

COMPLAINT

31419458v2

1          4.    For such other and further relief as the Court may deem just and

2  proper.

3

4  Date:  February 8, 2008

**KATTEN MUCHIN ROSENMAN**
Stuart M. Richter
William R. Waldman

By: _____
      William R. Waldman

**Attorneys for Plaintiff WestLB AG, NEW YORK BRANCH**

COMPLAINT

31419458v2

1

## DEMAND FOR JURY TRIAL

2

3        WESTLB AG, NEW YORK BRANCH, hereby demands a trial by jury.

4

5    Dated:  February 8, 2008

6                                    KATTEN MUCHIN ROSENMAN LLP

7

8                                    Stuart M. Richter
                                     William R. Waldman
9

10   By: _____
                                     William R. Waldman
11                                   Attorneys for Plaintiff WestLB AG, New York
                                     Branch
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

31419458v2

EXHIBIT A

# LOAN AND SECURITY AGREEMENT

between

**LANTANA MENDOCINO, LLC**
One Riverwalk Center
Suite 100
110 South Poplar Street
Wilmington, Delaware  19801
(*Borrower*)

and

**WESTLB AG,**
New York Branch
1211 Avenue of the Americas
New York, New York  10036
(*Administrative Agent* and *Lender*)

Dated as of August 26, 2005

84069529

# TABLE OF CONTENT

Page

1

ARTICLE 1 TERMS AND DEFINITIONS

Section 1.1    Definitions................................................................................................1

*Purchase Agreement* means any purchase and sale agreement with respect to any interest in a
22
Fractional Ownership Unit...................................................................................26

Section 1.2    Terms Generally.........................................................................................26

Section 1.3    Approval ...................................................................................................26

ARTICLE 2 AGREEMENT TO LEND AND PAYMENT OF LOAN

27

Section 2.1     Making of the Loan......................................................................................27

Section 2.2     Advances; Method of Disbursement of Loan Proceeds....................................32

Section 2.3     Payment of Interest......................................................................................33

Section 2.4     Conversion and Continuation Options.............................................................33

Section 2.5     Minimum Amounts and Maximum Number of Interest Periods ...........................33

Section 2.6     Computation of Interest and Fees ..................................................................33

Section 2.7     Increased Costs ..........................................................................................34

Section 2.8     Illegality or Inability to Determine LIBO Rate...................................................35

Section 2.9     Payment of Outstanding Principal ..................................................................35

Section 2.10    Prepayment .................................................................................................36

Section 2.11    Late Charge .................................................................................................36

Section 2.12    Payments .....................................................................................................37

Section 2.13    Taxes ..........................................................................................................38

Section 2.14    Distribution to Lenders ..................................................................................39

Section 2.15    Conversion of Loan.......................................................................................40

Section 2.16    Interim Loan Extension...................................................................................41

Section 2.17    Cash Reserve...............................................................................................42

Section 2.18    Miscellaneous ..............................................................................................42

ARTICLE 3 CONDITIONS PRECEDENT TO DISBURSEMENT OF LOAN PROCEEDS    42

84069529

Section 3.1    Conditions Precedent to Initial Advance .................................................................42

Section 3.2    Conditions Precedent to Initial Construction Advance...................................46

Section 3.3    Conditions Precedent to Each Advance ...............................................................47

Section 3.4    Conditions of Final Advance ...................................................................................50

ARTICLE 4 ACCOUNTS/CASH MANAGEMENT ...........................................................51

Section 4.1    Accounts/Cash Management ...................................................................................51

Section 4.2    Collection of Gross Revenues .................................................................................53

Section 4.3    Disbursement of Funds from Lockbox Account...............................................55

Section 4.4    Disbursements after a DSCR Trigger ..................................................................55

Section 4.5    Disbursements During an Event of Default .......................................................56

Section 4.6    Funding Reserve Accounts .....................................................................................57

Section 4.7    Disbursements from Tax and Insurance Account ............................................57

Section 4.8    Disbursements from FF&E Reserve Account .....................................................57

Section 4.9    Obligations Unaffected ............................................................................................58

Section 4.10   Withdrawals...............................................................................................................58

Section 4.11   Creation of Security Interest in Accounts............................................................58

Section 4.12   Certain Matters Regarding Lender following an Event of Default.................59

Section 4.13   Representations and Warranties Regarding Account Collateral.....................60

Section 4.14   Covenants Regarding Account Collateral............................................................60

Section 4.15   Further Assurances....................................................................................................61

Section 4.16   Administrative Agent's Duties ..............................................................................61

Section 4.17   Cash Collateral...........................................................................................................62

Section 4.18   Cash Management Fees ............................................................................................62

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE BORROWER ......62

Section 5.1    Organization, Status and Authority....................................................................62

Section 5.2    Validity of Loan Documents...................................................................................62

Section 5.3    Absence of Conflicts .................................................................................................63

Section 5.4    Pending Litigation.....................................................................................................63

Section 5.5    Financial Statements .................................................................................................63

84069529

...............................................................................................................63
Section 5.6      Taxes .......................................................................................63
Section 5.7      Title to Property .........................................................................64
Section 5.8      Compliance with Laws ...................................................................64
Section 5.9      Zoning .....................................................................................64
Section 5.10     Separate Lots .............................................................................64
Section 5.11     Assessments ..............................................................................64
Section 5.12     Flood Zone ...............................................................................64
Section 5.13     Boundaries ...............................................................................64
Section 5.14     Availability of Utilities .................................................................64
Section 5.15     Access .....................................................................................64
Section 5.16     Condition of the Property ..............................................................65
Section 5.17     Insurance .................................................................................65
Section 5.18     Agreements .............................................................................67
Section 5.19     Liquor License; Assignment of Liquor License and other Licenses and Permits .67
Section 5.20     No Default ...............................................................................67
Section 5.21     FIRPTA ...................................................................................67
Section 5.22     SPE Provisions ..........................................................................67
Section 5.23     Organizational Structure ...............................................................67
Section 5.24     Offices; Location of Books and Records ..............................................67
Section 5.25     Filing and Recording Taxes ............................................................68
Section 5.26     No Illegal Activity as Source of Funds ...............................................68
Section 5.27     Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money
                 Laundering Laws .......................................................................68
Section 5.28     Employees ..............................................................................68
Section 5.29     Debt ......................................................................................68
Section 5.30     Business Loan ..........................................................................68
Section 5.31     Federal Reserve Regulations ..........................................................68
Section 5.32     Bank Holding Company ...............................................................69
Section 5.33     Investment Company Act .............................................................69
Section 5.34     No Plan Assets .........................................................................69
Section 5.35     Accuracy of Documents ...............................................................69
Section 5.36     Brokerage Commissions ...............................................................69
Section 5.37     Continuing Effectiveness

84069529

.................................................................................................................69

Section 5.38    Effect of Draw Request ...................................................... 70

ARTICLE 6 COVENANTS OF THE BORROWER

.............................................................................................................70

Section 6.1    Affirmative Covenants.................................................................78
Section 6.2    Construction Covenants...............................................................83
Section 6.3    Reporting Requirements .............................................................85
Section 6.4    Negative Covenants .....................................................................87
Section 6.5    Single Purpose Entity ................................................................ 88

ARTICLE 7 MEMBERSHIP CLUB UNITS

.............................................................................................................88

Section 7.1    Membership Club Conversion Requirements...............................90
Section 7.2    Membership Club Interests Marketing and Conversion................90
Section 7.3    Sale of Units.................................................................................92
Section 7.4    Release of Fractional Ownership Units ........................................92
Section 7.5    Purchaser Deposits ......................................................................93
Section 7.6    Additional Condominium Specific Covenants ........................... 95

ARTICLE 8 ADMINISTRATIVE AGENT

.............................................................................................................95

Section 8.1    Authorization and Action...............................................................96
Section 8.2    Administrative Agent's Reliance, Etc...........................................96
Section 8.3    WestLB AG and Affiliates.............................................................96
Section 8.4    Lender Credit Decision..................................................................97
Section 8.5    Indemnification of Administrative Agent.......................................97
Section 8.6    Successor Administrative Agents...................................................98
Section 8.7    Collateral Documents; Secured Party Action ...............................99
Section 8.8    Certain Actions After an Event of Default .....................................99
Section 8.9    Defaulting Lender ..................................................................... 100

ARTICLE 9 EVENTS OF DEFAULT

...........................................................................................................100

Section 9.1    Events of Default ........................................................................100

104

ARTICLE 10 RIGHTS AND REMEDIES .......................................................................104

Section 10.1    Remedies .....................................................................................107
Section 10.2    Power of Attorney .......................................................................107
Section 10.3    Remedies Cumulative ..................................................................107
Section 10.4    Waivers ........................................................................................107
Section 10.5    Course of Dealing, Etc. ...............................................................107
Section 10.6    Limitation of Liability .................................................................109

ARTICLE 11 GENERAL CONDITIONS ........................................................................109

Section 11.1    Rights of Third Parties .................................................................109
Section 11.2    Relationship .................................................................................109
Section 11.3    Evidence of Satisfaction of Conditions ........................................109
Section 11.4    Notices .........................................................................................111
Section 11.5    Assignment ..................................................................................114
Section 11.6    Usury Savings ..............................................................................114
Section 11.7    Counterparts .................................................................................114
Section 11.8    Indemnification ............................................................................115
Section 11.9    Successors and Assigns Included in Parties ..................................115
Section 11.10   Headings ......................................................................................115
Section 11.11   Invalid Provisions to Affect No Others ........................................116
Section 11.12   Computation of Time Periods .....................................................116
Section 11.13   Governing Law ............................................................................116
Section 11.14   Consent to Jurisdiction ................................................................116
Section 11.15   Amendments ................................................................................117
Section 11.16   Right of First Refusal ..................................................................117

ARTICLE 12 CASUALTY/CONDEMNATION PROCEEDS ..........................................117

Section 12.1    Casualty; Condemnation; Assignment of Proceeds ......................119
Section 12.2    Disbursement of Net Proceeds

84069529

| EXHIBIT A | Description of Land |
| EXHIBIT B | Assignment and Acceptance |
| EXHIBIT C | Form of Note |
| EXHIBIT D | Intentionally Omitted |
| EXHIBIT E | Form of Collateral Assignment of Interest Rate Protection Agreement |
| EXHIBIT F | Intentionally Omitted |
| EXHIBIT G | Intentionally Omitted |
| EXHIBIT H | Form of Environmental Indemnity |
| EXHIBIT I | Form of Equity Pledge |
| EXHIBIT J | Intentionally Omitted |
| EXHIBIT K | Minimum Release Prices |
| EXHIBIT L | Permitted Exceptions |
| EXHIBIT M | Preliminary Project Budget |
| EXHIBIT N | Form of Recourse Liability Agreement |
| EXHIBIT O | Intentionally Omitted |
| EXHIBIT P | Supplemental Construction Representations and Warranties |
| EXHIBIT Q | Form of Intercreditor Agreement |
| EXHIBIT R | Intentionally Omitted |
| EXHIBIT S | Intentionally Omitted |
| EXHIBIT T | Intentionally Omitted |
| EXHIBIT U | Schedule of Leases |
| EXHIBIT V | Schedule of Material Operating Agreements |
| EXHIBIT W | Organizational Chart |
| EXHIBIT X | Borrower's Office Location |
| EXHIBIT Y | Required Insurance |

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (as amended, modified or supplemented from time to time, collectively, this *Agreement*) is made and entered into as of August 26, 2005, by and between WESTLB AG, a German banking corporation acting through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036, as agent (including any of its successors and assigns in such capacity, the *Administrative Agent*) for itself, and such other co-lenders as may exist from time to time (collectively, the *Lenders* and each individually, a *Lender*), and LANTANA MENDOCINO, LLC, a Delaware limited liability company (the *Borrower*), having an address at One Riverwalk Center, Suite 100, 110 South Poplar Street, Wilmington, Delaware 19801.

**WHEREAS**, the Borrower wishes to acquire certain land in the County of Mendocino in the State of California and more particularly described on **Exhibit A** and the existing improvements located on such land, comprised of a 68 guestroom hotel resort (collectively, the *Existing Improvements*);

**WHEREAS**, the Borrower desires, upon acquisition of the Property, to undertake renovate and re-position the Existing Improvements as a luxury, full-service resort comprised of 35 suites (including twelve Membership Club Units (as hereinafter defined), two restaurants, a medical wellness and pampering spa, an event center and related amenities;

**WHEREAS**, the Borrower desires to borrow from the Lenders a loan in a maximum principal amount equal to the Loan Amount (as hereinafter defined), the proceeds of which the Borrower will use to fund a portion of the Total Project Costs (as hereinafter defined); and

**WHEREAS**, upon the terms and subject to the conditions hereinafter set forth, the Lenders are willing to make the Loan (as hereinafter defined) to the Borrower.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties covenant, agree, represent and warrant as follows:

## ARTICLE 1

## TERMS AND DEFINITIONS

Section 1.1    Definitions.

As used in this Agreement, the following terms have the meanings specified below:

*Accounting Rules* means GAAP, and where applicable, USAL, in each case, consistently applied.

*Account Collateral* has the meaning given to such term in **Section 4.9**.

*Accounts* has the meaning given to such term in **Section 4.1(a)**.

*Acquisition Costs* means the purchase price for the Land and Existing Improvements together with any adjustments thereto (in each case, to the extent previously Approved by the Administrative Agent) shown on the acquisition settlement statement delivered to and Approved by the Administrative Agent to reflect any credits received by the Borrower and any prorations and recording and transfer taxes incurred plus standard and commercially reasonable third-party closing costs and expenses (including the cost of a title premium, survey and attorneys' fees and disbursements).

*ADA* means the federal Americans With Disabilities Act of 1990. Pub. L. No. 89-670, 104 Stat. 327 (1990), as such law may be amended from time to time, and the regulations promulgated and rulings issued thereunder.

*Additional Improvements* means, collectively, (a) complete renovation of the existing guestrooms and (b) construction of an event center, two (2) restaurants and a medical wellness and pampering spa, in each case, to be constructed in accordance with the Plans and Specifications.

*Administrative Agent* has the meaning set forth in the preamble to this Agreement.

*Advance* or *Advances* means any disbursement of the proceeds of the Loan by Lenders pursuant to the terms of this Agreement.

*Affiliate* means, as to any Person, any other Person:

(a)     that directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or

(b)     that, directly or indirectly, beneficially owns or holds five percent (5%) or more of any class of stock or any other ownership interest in such Person; or

(c)     five percent (5%) or more of the direct or indirect ownership of which is beneficially owned or held by such Person; or

(d)     that is a member of the family (as defined in Section 267(c)(4) of the IRC) of such Person or which is a trust or estate, the beneficial owners of which are members of the family (as defined in Section 267(c)(4) of the IRC) of such Person; or

(e)     that directly or indirectly is a partner, shareholder, member, officer, director or employee of such Person.

*Agreement* has the meaning set forth in the preamble to this Agreement.

2

84069529

*Amortization Amount* means with respect to the Loan, a monthly amount equal to the principal payment that would be sufficient to fully amortize the entire Outstanding Principal balance of the Loan in accordance with a twenty (20) year, mortgage-style amortization schedule, with an interest rate equal to the Amortization Rate.

*Amortization Rate* means the greater of (a) the Hedge Rate and (b) the Treasury Rate plus three hundred basis points (3.00%).

*Applicable Margin* means: (a) with respect to any Base Rate Loan, 150 basis points (1.50%); or (b) with respect to any LIBOR Loan, 275 basis points (2.75%).

*Appraisal* means a written appraisal report of the Property as the term "appraisal" is defined in the Code of Professional Ethics of the American Institute of Appraisers, meeting the requirements of the Federal Institutions Reform, Recovery and Enforcement Act of 1989, prepared by a professional appraiser retained by the Administrative Agent at the Borrower's expense, who is a member of the Appraisal Institute (*MAI*), addressed to the Administrative Agent and in form, scope and substance satisfactory to the Administrative Agent, setting forth such appraiser's determination of the Appraised Value.

*Appraised Value* means the fair market value of the Property, which would be obtained in an arms'-length transaction between an informed and willing buyer and an informed and willing seller, under no compulsion to buy or sell, respectively, on the appraisal date of the Appraisal.

*Approval* or *Approved* means, as the context so determines, an approval in writing given to the party seeking approval after full disclosure to the party giving Approval of all material facts reasonably necessary in order to determine whether approval should be granted.

*Approved Accountant* means any of the top tier accounting firms or other independent, third-party certified public accountant of comparable standing Approved by the Administrative Agent.

*Architect* means the architect retained by the Borrower with respect to the Additional Improvements, and Approved by the Administrative Agent.

*Architect's Certificate* means a certificate of the Architect in form and substance reasonably satisfactory to the Agent.

*Architect's Contract* means the contract for architectural services between the Borrower and the Architect relating to the Project in form and substance Approved by the Administrative Agent

*As-Built Survey* has the meaning given to such term in **Section 3.3(d)**.

*Assignment and Acceptance* means an assignment and acceptance entered into by a Lender and an Eligible Assignee and accepted by the Administrative Agent in accordance with **Section 11.5(b)** in the form set forth on **Exhibit B**.

3

84069529

*Bankruptcy Code* means 11 U.S.C §101 et seq., as the same may be amended from time to time.

*Bankruptcy Event* means, with respect to any Person, the occurrence of any of the following: (a) the entry of a decree or order for relief by a Governmental Authority in an involuntary case under any applicable bankruptcy, insolvency or other similar Law now or hereafter in effect, or the appointment by a Governmental Authority of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of its property or the ordering of the winding up or liquidation of its affairs by a Governmental Authority; or (b) the commencement against such Person of an involuntary case under any applicable bankruptcy, insolvency or other similar Law now or hereafter in effect, or of any case, proceeding or other action for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of its property or for the winding up or liquidation of its affairs, and such involuntary case or other case, proceeding or other action shall not have been dismissed within sixty (60) days, or the repossession or seizure by a creditor of such Person of a substantial part of its property; or (c) the commencement by such Person of a voluntary case under any applicable bankruptcy, insolvency or other similar Law now or hereafter in effect, or consent to the entry of an order for relief in an involuntary case under any such Law, or consent to the appointment of or the taking possession by a receiver, liquidator, assignee, creditor in possession, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of its property or make any general assignment for the benefit of creditors; or (d) such Person shall be unable to, or shall admit in writing its inability to, pay its debts generally as they become due.

*Base Rate* means the greater of

(a)     a fluctuating interest rate, for any period, equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three (3) Federal Funds brokers of recognized standing selected by the Administrative Agent, plus three-quarters of one percent (0.75%); and

(b)     a fluctuating interest rate per annum announced publicly by the Administrative Agent in New York, New York, from time to time, as its "Prime Rate". The Prime Rate is not intended to be the lowest rate of interest charged by the Administrative Agent in connection with extensions of credit to debtors.

*Bona Fide Sales Contract* means a bona fide, unconditional (except for customary title and financing conditions, rights of rescission required by Law, and other matters contained in the Bona Fide Sales Contract form Approved by the Administrative Agent) contract in the form included in the Offering Plan for the sale of a Membership Club Interest to a Person.

*Borrower* has the meaning set forth in the preamble to this Agreement.

4

84069529

*Borrower's Equity Investment* means an amount not less than $10,500,000, subject to the loan balancing requirement set forth herein.

*Borrower's Member* means, collectively, GHM (USA) Hotels, LLC, a Delaware limited liability company, David J. Wilk, Duane D. Werb, Laird Bunch and Jerold K. Karabensh.

*Borrower's Requisition* has the meaning given to such term is Section 2.2(b).

*Business Day* means (a) a day other than (i) Saturday, (ii) Sunday, or (iii) a day on which commercial banks in New York, California, or Germany are authorized or required by law to close or, (b) only with respect to the determination of or notices related to LIBO Rates, a day on which dollar deposits are carried out in the Loan interbank market and commercial banks are open for business in London, England.

*Capitalized Leases* means, with respect to any Person, any leases of any property by such Person, as lessee, which, in accordance with Accounting Rules, is required to be accounted for as a capital lease on the balance sheet of such Person.

*Cash Reserve Escrow* has the meaning given to such term in Section 2.17.

*Casualty Retainage* has the meaning given to such term in Section 12.2(a)(iv).

*Certificate of Occupancy* means a certificate or permit issued by the County of Mendocino (or other applicable Governmental Authority), pursuant to which the improvements that are the subject of such certificate have been approved for occupancy and issued by the applicable Governmental Authority.

*Certification* has the meaning given to such term in 4.4.

*Change of Control* means any event (including, without limitation, the sale, transfer or issuance, in one or more transactions, of any direct or indirect beneficial ownership interest in or right to distributions from the Borrower) following which the Borrower ceases to be controlled by the Sponsors.

*Change Order* has the meaning given to such term in Section 6.2(h).

*Claim* has the meaning given to such term in Section 11.8(a).

*Closing Date* means August 31, 2005.

*CO Date* has the meaning given to such term in the definition of Substantial Completion.

*Collateral* means all property that is or is intended to be subject to any Lien in favor of the Administrative Agent for the benefit of the Lenders.

84069529

*Collateral Assignment of Interest Rate Protection Agreement* means that certain Collateral Assignment of Interest Rate Protection Agreement, in substantially the form of **Exhibit E,** to be entered into between the Borrower and the Administrative Agent pursuant to **Section 6.1(t).**

*Completion Date* means March 31, 2007.

*Completion Guaranty* means the Completion Guaranty from the Sponsors in favor of the Administrative Agent for the benefit of the Lenders, dated as of the Closing Date.

*Condemnation Proceeds* has the meaning given to such term in the definition of Net Proceeds.

*Consent and Subordination Agreement* means, with respect to the Loan, that certain consent and subordination agreement dated as of the Closing Date by and among the Borrower, the Administrative Agent and the Hotel Operator.

*Consents to Assignments* means those certain consents required pursuant to the Omnibus Assignment.

*Construction Advance* means any Advance other than the Initial Advance.

*Construction Contracts* means those contracts material to the construction of the Additional Improvements, including, without limitation, the Architect's Contract and the General Contractor's Agreement.

*Construction Consultant* means Merrit & Harris, Inc. or, at the Administrative Agent's option upon notice to the Borrower, any other consulting architect, engineer or other consultant appointed by the Administrative Agent.

*Construction Contingency* means the amount allocated as contingency reserve in the Project Budget.

*Construction Loan Term* has the meaning given to such term in the definition of Maturity Date.

*Construction Schedule* means the schedule, broken down by trade, of the estimated dates of commencement and completion of each component of the Project certified by the Borrower and Approved by the Administrative Agent.

*Control* means with respect to any Person, the possession of the power (directly or indirectly) to direct or cause the direction of the management and policies of such Person, whether through the ownership of stock, by contract or otherwise. *Controlling* and *Controlled* have meanings correlative thereto.

*Conversion Date* has the meaning given to such term in **Section 2.15.**

6

84069529

*Counterparty* means any obligor under an Interest Rate Protection Agreement, other than the Borrower.

*Counterparty Consent* has the meaning given to such term in **Section 6.1(t)**.

*Credit Card Companies* has the meaning given to such term in **Section 4.2(b)**.

*Credit Card Company Agreement* shall mean any contract or other agreement to which the Borrower or the Hotel Operator is a party relating to any credit cards accepted by the Borrower in connection with the operation of the Property.

*Credit Card Receivables* shall mean all cash, checks, drafts, receipts, items and other instruments for the payment of money which the Borrower or the Hotel Operator has or may hereafter receive pursuant to the terms of any Credit Card Company Agreement or otherwise in connection with the Hotel.

*Debt* of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all Obligations of such Person for the deferred purchase price of property or services, (c) all Obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all Obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default may be limited to repossession or sale of such property), (e) all Obligations of such Person as lessee under Capitalized Leases, (f) all Obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all Obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any capital stock of or other ownership or profit interest in such Person or any other Person, (h) all Debt of any other Person referred to in clauses (a) through (g) above or clause (i) below to the extent guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss, in each case only to the extent of the maximum potential Obligations of such Person under such agreement, and (i) the amount of any Debt referred to in clauses (a) through (h) above of another Person secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

*Debt Service Coverage Ratio* means, for any period, the ratio of (a) Net Operating Income for the applicable period to (b) the sum of (i) monthly interest payments due under the Notes during such period based on a rate of interest as calculated at the greater of (A) the then prevailing 10-year Treasury Rate plus three hundred basis points (3.00%) and (B) the Interest

7

Rate plus any net payments due by the Borrower under any swap agreement, less any net payments received by the Borrower under any interest rate swap or cap agreement, and (ii) principal amortization payments during the applicable period in an amount per month equal to the Amortization Amount. The Debt Service Coverage Ratio shall be calculated on a trailing 12-month basis.

*Debt Service Reserve Account* has the meaning given to such term in **Section 4.1(b)(iii).**

*Default* means any event which, but for the passage of time or giving of notice, would constitute an Event of Default.

*Default Rate* means a rate of interest per annum equal at all times to the lesser of (i) the maximum non-usurious rate permitted by Law and (ii) four percent (4.0%) above the Base Rate plus the Applicable Margin.

*Defaulting Lender* has the meaning given to such term in **Section 8.9(a).**

*Deficiency* has the meaning given to such term in **Section 8.9(b).**

*Depository* means the bank reasonably acceptable to the Administrative Agent at which bank the Accounts shall be maintained and that shall be party to the Depository Agreement.

*Depository Agreement* means a depository agreement, in a form acceptable to the Administrative Agent, by and among the Borrower, the Administrative Agent and the Depository and providing for the establishment and maintenance of the Accounts in accordance with **Section 6.1(aa).**

*Determination Date* has the meaning given to such term in the definition of LIBO Rate.

*Disbursement Schedule* means a schedule approved by the Administrative Agent showing the amount of Advances anticipated to be requisitioned by the Borrower each month during the Construction Loan Term.

*Draw Request* means, with respect to each Advance, the Borrower's request for such Advance, together with the documents and deliveries required by this Agreement to be furnished to the Administrative Agent as a condition to such Advance.

*DSCR Trigger* has the meaning given to such term in **Section 4.4.**

*Earnest Money Deposit* has the meaning given to such term in **Section 7.5.**

*Eligible Account* means (a) a segregated account maintained with a federal or state chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with the corporate

84069529

8

trust department of a federal depository institution or state chartered depository institution which has an investment grade rating and is subject to regulations regarding fiduciary funds on deposit under, or similar to, Title 12 of the Code of Federal Regulations Section 9.10(b) which, in either case, has corporate trust powers, acting in its fiduciary capacity.

*Eligible Assignee* means any Person other than a Loan Party or an Affiliate of a Loan Party which is: (a) a Lender; (b) an Affiliate of a Lender; (c) a commercial bank organized under the laws of the United States, or any state thereof, and having a combined capital and surplus of at least FOUR HUNDRED MILLION and 00/100 DOLLARS ($400,000,000.00); (d) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least FOUR HUNDRED MILLION and 00/100 DOLLARS ($400,000,000.00); (e) a commercial bank organized under the laws of any other country that is a member of the Organization for Economic Cooperation and Development or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least FIVE HUNDRED MILLION and 00/100 DOLLARS ($500,000,000.00), so long as such bank is acting through a branch or agency located in the United States or (f) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise investing in commercial loans in the ordinary course of its business and having a combined capital and surplus of at least TWO HUNDRED FIFTY MILLION and 00/100 DOLLARS ($250,000,000.00).

*Eligible Institution* means an institution (i) whose commercial paper, short term debt obligations or other short term deposits are rated at least A–1, Prime-1 or F-1, as applicable, by each of the Rating Agencies and whose long term senior unsecured debt obligations are rated at least AA- or Aa2, as applicable, by each of the Rating Agencies, and whose deposits are insured by the FDIC or (ii) Approved by the Administrative Agent.

*Environmental Indemnity* means the Environmental Indemnity in substantially the form of **Exhibit H** granted jointly and severally by the Borrower and the Sponsors in favor of the Administrative Agent and the Lenders, dated of even date herewith.

*Environmental Report* means, that certain Phase I Environmental Site Assessment Heritage House Inn, North Highway 1, Little River, California, dated July 29, 2005 prepared by PES Environmental, Inc..

*Equity Pledge and Security Agreement* means that certain Equity Pledge and Security Agreement in substantially the form of **Exhibit I**, dated as of even date herewith, entered into by each Person comprising Borrower's Member in favor of the Administrative Agent and pursuant to which Borrower's Members shall pledge 100% of the member interests in the Borrower to the Administrative Agent as additional security for the Obligations of the Borrower under the Loan Documents.

*ERISA* means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

9

84069529

*ERISA Affiliate* means any Person, that for purposes of Title IV of ERISA, is a member of the controlled group of any Loan Party, or under common control with any Loan Party, within the meaning of Section 414 of the Internal Revenue Code.

*ERISA Event* means (a) (i) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the thirty (30) day notice requirement with respect to such event has been waived by the PBGC; or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA (without regard to subsection (2) of such Section) are met with respect to a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following thirty (30) days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of any Loan Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by any Loan Party or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (g) the adoption of an amendment to a Plan requiring the provision of security to such Plan, pursuant to Section 307 of ERISA; or (h) the institution by the PBGC of proceedings to terminate a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, such Plan.

*Eurocurrency Liabilities* has the meaning given to such term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time and including any successor regulation thereto.

*Event of Default* has the meaning given to such term in **Section 9.1.**

*Exculpated Parties* has the meaning given to such term in **Section 10.6.**

*Existing Improvements* has the meaning set forth in the preamble to this Agreement.

*Extension Date* has the meaning given to such term in **Section 2.16.**

*FF&E* has the meaning given to such term in the Security Instrument.

*FF&E Deposit* has the meaning given to such term in **Section 4.3(b)(ii).**

*FF&E Reserve Account* has the meaning given to such term in **Section 4.1(b)(ii).**

*Final Completion* means the date when Substantial Completion shall have occurred, all Punchlist Items shall have been completed, a final Certificate of Occupancy shall have been issued for the each element of the Improvements (including the restaurants and the

spa) and all other conditions precedent to the final Advance in respect of Retainage shall have been satisfied.

*Financing Statements* means UCC Financing Statement(s) in favor of the Administrative Agent giving notice of a security interest, which Financing Statement(s) are to be filed in the appropriate public records on or about the Closing Date.

*Fitch* means Fitch, Inc. and its successors.

*Force Majeure Event* means any of the following:  (a) acts of terrorism or declared or undeclared war by a foreign enemy; (b) riots or sabotage; (c) casualty or condemnation; (d) floods; (e) earthquakes or other acts of God; (f) unforeseeable material shortages beyond the Borrower's control and (g) labor strikes not specific to the Project.

*GAAP* means generally accepted accounting principles in effect in the United States of America from time to time, consistently applied.

*General Contractor* means an experienced general contractor retained by the Borrower to construct the Additional Improvements and Approved by the Administrative Agent (which approval shall be based in part on a review of such general contractor's financial statements which must be acceptable to the Administrative Agent in all respects).

*General Contractor's Agreement* means a guaranteed maximum price contract for the renovation of the Existing Improvements and the construction of the Additional Improvements in accordance with the Plans and Specifications and as contemplated herein, between the Borrower and the General Contractor and in form and substance acceptable to the Administrative Agent.

*General Contractor's Certificate* means a certificate of the General Contractor in acceptable to, and certifying as to such matters as shall be requested by, the Administrative Agent.

*GHM* means GHM Services Limited a British Virgin Islands limited liability company.

*Governmental Authority* means any nation or government, any state or other political subdivision thereof, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to such government, including, without limitation, the United States of America and Germany, the state in which the Property is located and the state in which any Loan Party resides or is located or organized, any political subdivision thereof, municipalities in which the Property is located, and any agency, authority, department, commission, board, bureau or instrumentality of any of them.

*Gross Revenues* means, for any period of determination, all Rents and Profits (as such term is defined in the Security Instrument) from the Property for such period; provided, that Gross Revenues shall not include (i) gratuities or service charges or other similar receipts which are to be paid over to any Property employees or Persons occupying similar positions for

84069529

performing similar duties; (ii) proceeds of insurance or other money or credits received in settlement for loss, theft or damage to property relating to or used in the Property (other than the proceeds of any business interruption insurance received with respect to the Property); (iii) excise taxes, sales taxes, use taxes, bed taxes, admission taxes, tourist taxes, gross receipts taxes, value added taxes, entertainment taxes, or other taxes or similar charges payable to Governmental Authorities; (iv) any amounts otherwise included in Gross Revenues to the extent such amounts are refunded to guests and patrons; (v) such other exclusions requested by the Borrower and Approved by the Administrative Agent in its sole and absolute discretion; and (vi) any amounts recovered in any legal actions or proceedings, or settlements thereof, arising out of the operation of the Property except to the extent such amounts would otherwise have been included in Gross Revenues.

*Hedge Breakage* means any losses, costs, charges or damages (other than consequential or exemplary damages) incurred by the Counterparty as a result of any early termination, breach or default of any Interest Rate Protection Agreement or the entering into a new Interest Rate Protection Agreement.

*Hedge Payments* means any payments which the Borrower is required to make pursuant to any Interest Rate Protection Agreement other than Hedge Breakage.

*Hedge Rate* means the rate specified in any Interest Rate Protection Agreement.

*Hotel* means a full-service, luxury resort hotel located on the Land, which will consist of the Existing Improvements, as modified and supplemented by the Additional Improvements to be constructed on the Land in accordance with the Plans and Specifications (together with any and all permitted additions thereto and replacements thereof), and which shall be known as "The Heritage House Spa & Resort" or such other name that is reasonably acceptable to the Administrative Agent; **provided** that from and after the Membership Club Conversion, the "Hotel" shall not include the Membership Club Units.

*Hotel Management Agreement* means, collectively, (a) the Development Agreement, dated as of December 20, 2004 between the Borrower and GHM pursuant to which GHM shall provide development, sales and marketing services for the design, development and sale of the Fractional Ownership Units, (b) that certain Management Agreement dated as of June 24, 2005, pursuant to which the Borrower has retained the Hotel Operator to manage and operate the Property and (c) that certain Technical Assistance Agreement dated as of July 15, 2005 pursuant to which the Borrower has retained the Manager to provide consultancy services for technical aspects of the Project.

*Hotel Operator* means General Hotel Management LLC.

*Hurdle DSCR* means, for any Test Period, a Debt Service Coverage Ratio of 1.30 to 1.00 or better.

*Impositions* means and includes all taxes, assessments for public improvements or benefits and any payments in lieu thereof, whether or not commenced or completed prior to

12

84069529

the Closing Date or while any portion of the Outstanding Principal is outstanding, water rates and sewer rents, charges, license fees, permit fees, inspection fees and other governmental levies or payments, of every kind and nature whatsoever, general and special, foreseen or unforeseen, ordinary and extraordinary, which now or at any time hereafter may be assessed, levied, confirmed, imposed or which may become a lien upon the Property, or any portion thereof, or which are payable with respect thereto, or upon the rents, issues, revenue, income, proceeds or profits thereof, or on the occupancy, operation, use, possession or activities thereof, whether any or all of the same be levied directly or indirectly or as excise or income or franchise taxes in lieu of taxes which are otherwise imposed upon property of the same type as the Property, together with any penalties or other charges with respect to the late payment or non-payment thereof.

*Improvements* shall mean any building (including footings and foundations), furniture, fixtures and equipment and other improvements and appurtenances of every kind and description now existing or hereafter erected, renovated, constructed or placed upon the Land (whether temporary or permanent) and any and all alterations and replacements thereof, additions thereto and substitutions therefor, including, without limitation, the Existing Improvements and the Additional Improvements.

*Indemnified Costs* has the meaning given to such term in **Section 8.5(a)**.

*Indemnified Party* has the meaning given to such term in **Section 11.8(a)**.

*Indemnitor* has the meaning given to such term in **Section 11.8(a)**.

*Initial Advance* has the meaning given to such term in **Section 3.1**.

*Insufficiency* means, with respect to any Plan, the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

*Insurance Proceeds* has the meaning given to such term in the definition of Net Proceeds.

*Intercreditor Agreement* means an Intercreditor Agreement between the Administrative Agent, the Subordinate Lender and the Borrower in the form of **Exhibit Q**.

*Interest* means all interest payable pursuant to the Notes or any of the other Loan Documents.

*Interest Period* means, for any LIBOR Loan, the time during which the applicable LIBO Rate is in effect with respect to such LIBOR Loan, which period and shall be the period commencing, (a) with respect to the initial Interest Period, on the date on which the Initial Advance is funded by the Lenders or (b) with respect to each subsequent Interest Period, on the first day of each calendar month occurring after the date of the Initial Advance and ending one month thereafter provided that (i) whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day unless such extension would cause the last day of such Interest Period to occur in the next following calendar month, in which case the last day of

13

such Interest Period shall occur on the immediately preceding Business Day, and (ii) no Interest Period shall commence or end after the Maturity Date.

*Interest Rate* means, for any Interest Period, at the Borrower's election pursuant to a Rate Request, (a) the Base Rate plus the Applicable Margin or (b) the LIBO Rate plus the Applicable Margin.

*Interest Rate Protection Agreement* means an interest rate protection agreement entered into by the Borrower with the Administrative Agent or any Lender in a notional amount equal to the principal amount of the Loan, and otherwise in form and substance reasonably acceptable to the Administrative Agent and with a Hedge Rate acceptable to the Administrative Agent in its sole discretion.

*Interest Shortfall* has the meaning given to such term in **Section 2.17**.

*Interim Loan* means the Loan in the event of and after conversion as set forth in **Section 2.15**.

*Land* means the real property owned by the Borrower and more particularly described on **Exhibit A**, together with all rights and appurtenances thereto.

*Late Charge* has the meaning given to such term in **Section 2.11**.

*Law* or *Laws* means all present and future laws, statutes, treaties, codes, permits, decrees, ordinances, orders, rules, regulations, determinations or requirements of any governmental authority, arbiter or court, including, without limitation, any environmental laws, any building, use, zoning and land use laws or regulations (including set back requirements), the ADA and any applicable covenants and restrictions pursuant thereto relating in any way to the Property, any Loan Party, any Lender or the Administrative Agent.

*Lease* means any lease, sublease or occupancy agreement for any portion of the Property, including, without limitation, retail space, restaurant space, health spa and garage, whether entered into by the Borrower or the Hotel Operator.

*Lenders* has the meaning set forth in the preamble to this Agreement.

*LIBOR Breakage Costs* has the meaning given to such term in **Section 2.10(a)**.

*LIBOR Loan* means any portion of the Outstanding Principal of the Loan, designated by the Borrower, at least three (3) Business Days before the end of the then current Interest Period to bear interest at the LIBO Rate plus the Applicable Margin.

*LIBO Rate* means, as to any LIBOR Loan with respect to the applicable Interest Period, (a) the rate per annum equal to the offered rate for one month deposits in United States Dollars for amounts comparable to the applicable LIBOR Loan, that appears on Dow Jones Markets Service (formerly known as Telerate) display page 3750 as of 11:00 A.M. (London time) two (2) Business Days prior to the first day of the applicable Interest Period (the

14

*Determination Date*) divided by (b) one minus the LIBO Reserve Percentage. "Dow Jones Markets Service display page 3750" means the display designated as "page 3750" on the Dow Jones Markets Service (or such other page as may replace page 3750 on that service or such other service as may be nominated by the British Bankers' Association as the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for U.S. Dollar deposits). If such rate does not appear on Dow Jones Markets Service page 3750 as of approximately 11:00 A.M. (London time) on the Determination Date, the LIBO Rate for the Interest Period will be determined by the Administrative Agent on the basis of the offered rates for deposits in U.S. Dollars for an amount comparable to the principal amount of the applicable LIBOR Loan for the same period of time as such Interest Period that are offered by four (4) major banks in the London interbank market at approximately 11:00 A.M. (London time) on the Determination Date. The Administrative Agent will request that the principal London office of each of the four (4) major banks provide a quotation of its U.S. Dollar deposit offered rate. If at least two such quotations are provided, the LIBO Rate will be the arithmetic mean of the quotations. If fewer than two (2) quotations are provided as requested, the LIBO Rate will be determined by the Administrative Agent on the basis of the rates quoted for loans in U.S. Dollars to leading European banks for amounts comparable to the principal amount of the applicable LIBOR Loan for the same period of time as such Interest Period offered by major banks in New York, New York at approximately 11:00 a.m. (New York time) on the Determination Date. If at least two (2) such rates are so provided, the LIBO Rate will be the arithmetic mean of the quotations. If fewer than two (2) rates are provided, the LIBO Rate which was used to determine the last LIBO Rate in effect with respect to the applicable LIBOR Loan shall be deemed to be the LIBO Rate.

*LIBO Reserve Percentage* means the percentage representing the reserve requirement applicable to Eurocurrency Liabilities pursuant to Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto). In determining the LIBO Reserve Percentage, the Administrative Agent shall take into account any transitional adjustment or phase-in provisions of the reserve requirements otherwise applicable to Eurocurrency Liabilities during the applicable Interest Period, and, in the event of any change or variation in the reserve requirements during the applicable Interest Period, the Administrative Agent may use any reasonable averaging or attribution methods which it deems appropriate. The determination by the Administrative Agent of any applicable LIBO Reserve Percentage shall be conclusive, absent manifest error. Failure by the Administrative Agent to take into account the LIBO Reserve Percentage when calculating Interest due with respect to a LIBOR Loan shall not constitute, whether by course of dealing or otherwise, a waiver by the Administrative Agent of its right to collect such amounts for any future period.

*Lien* means any lien, security interest, deed or other charge or encumbrance of any kind, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property.

*Liquor License* has the meaning given to such term in **5.21.**

*LLC Agreement* means that certain Limited Liability Company Agreement of the Borrower, dated as of August 24, 2005.

84069529

15

*Loan* means that certain loan in a maximum principal amount equal to the Loan Amount, together with interest thereon, to be advanced by the Lenders pursuant to the terms and conditions of this Loan Agreement and evidenced by the Notes.

*Loan Amount* means an amount equal to the lesser of (i) Sixty-Five Percent (65.0%) of the Total Project Costs, (ii) Sixty-Five Percent (65.0%) of the Appraised Value of the Property upon Final Completion of the Project and (iii) NINETEEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($19,500,000.00).

*Loan Documents* means, collectively, this Agreement, all documents referred to in **Section 3.1**, the Interest Rate Protection Agreement, the Depository Agreement, the Mandate Letter and all other agreements and documents evidencing, securing or otherwise executed and delivered in connection with the Loan.

*Loan Party* means, collectively, the Borrower, the Borrower's Member and the Sponsors.

*Loan Year* means the period commencing on the date of this Agreement to and including December 31, 2005, and thereafter each twelve (12) month period commencing on each January 1 during the term of the Loan; **provided**, that the last Loan Year shall end on the Maturity Date of the Loan.

*Lockbox Account* has the meaning given to the term in **Section 4.1**.

*Losses* has the meaning given to such term in **Section 11.8(a)**.

*MAI* has the meaning given to such term in the definition of Appraisal.

*Major Contracts* means any contract or subcontract for labor or materials in connection with the Project that provides for an aggregate contract price equal to or greater than ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00), whether pursuant to one (1) contract or agreement or multiple contracts or agreements, after taking into account all Change Orders.

*Major Contractor* means any contractor under a Major Contract, including, without limitation, the General Contractor.

*Major Subcontractor* means any subcontractor under a subcontract that constitutes a Major Contract.

*Mandate Letter* means that certain letter agreement, dated as of June 14, 2005, between the Administrative Agent, the Borrower and Borrower's Member regarding, among other items, payment of Loan fees by the Borrower.

*Material Adverse Effect* means any fact, event or circumstance which, individually or in the aggregate, in the reasonable determination of the Administrative Agent, materially and adversely affects (a) the physical condition or value of the Property, (b) the ability

84069529

16

of the Borrower to complete the Additional Improvements on or before the Completion Date, (c) the ability of any Loan Party to perform its obligations under the Loan Documents to which it is a party, (d) the licenses, authorizations or approvals applicable to any Loan Party or the Improvements necessary for the Project or the ownership and operation of the Hotel or (e) the validity or enforceability of the Loan Documents or the rights, remedies, options or benefits of the Lenders thereunder.

"*Material Operating Agreement*" means any Operating Agreement which (a) imposes an obligation on the Borrower or any Affiliate of the Borrower to pay more than fifty thousand dollars ($50,000) per annum or (b) has a term of greater than one (1) year and may not be terminated by the Borrower or the applicable Affiliate of the Borrower without cause or material penalty or premium upon thirty (30) or fewer days' notice.

*Maturity Date* means the earlier to occur of the following:

(a)     the date upon which the entire Outstanding Principal balance, together with all unpaid interest thereon and other amounts due to the Lenders under the Loan Documents, shall be due and payable in immediately available funds due to the occurrence of an Event of Default under the Loan Documents; and

(b)     the date that is thirty-six (36) months after the date hereof (the *Construction Loan Term*); unless the Loan is converted into the Interim Loan pursuant to **Section 2.15**, in which event, the date that is forty-eight (48) months after the date hereof, unless the Interim Loan is extended pursuant to **Section 2.16**, in which event, the date that is sixty (60) months after the date hereof.

*Membership Club* means the organization or entity to be formed by the Borrower pursuant to the Membership Club Documents to hold a leasehold or other possessory interest in the Membership Club Units and issue the Membership Club Interests representing, *inter alia*, the right to use the Membership Club Units.

*Membership Club Conversion* means the time at which (a) the Membership Club shall have been duly formed, (b) those Membership Club Documents requiring approval from or registration with any applicable Governmental Authorities have received such approvals and/or have been registered, as applicable, and are in full force and effect in accordance with applicable Law, and to the extent required, have been recorded in the land records and/or filed with the applicable Governmental Authorities and (c) the Membership Club Interests can be offered for sale to the public and the Borrower is authorized in accordance with applicable Law to enter into binding Purchase Agreements with Purchasers for the sale of Membership Club Interests.

*Membership Club Conversion Requirements* shall have the meaning set forth in **Section 7.1**.

*Membership Club Documents* means (a) the Offering Plan and all of the exhibits attached thereto, including, without limitation, the form of purchase and sale agreement for the sale of the membership Club Interests, (b) the organizational documents for the Membership

Club and by-laws of the Membership Club, (c) any rules and regulations for the membership Club or governing the Membership Club Interests, (d) documents necessary to any service, management, common areas, restrictions and maintenance obligations between the Hotel and the Membership Club Units, and (f) any other documents relating to the formation or organization of the Membership Club.

*Membership Club Interest* means the interest of any Person in the Membership Club, including such Person's right to use and occupy a Membership Club Unit, the terms and condition of which interest shall be established by the membership Club Documents.

*Membership Club Unit* has the meaning given to such term in **Section 7.1.**

*Minimum Release Price* means the minimum sales price required for the release of each Membership Club Interest as provided on **Exhibit K.**

*Monthly Budgeted Amount* has the meaning given to such term in **Section 4.6.**

*Monthly Debt Service Amount* has the meaning given to such term in **Section 4.4(b)(i).**

*Moody's* means Moody's Investors Services, Inc. and its successors.

*Mortgaged Property* has the meaning given to such term in the Security Instrument.

*Multiple Employer Plan* means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and at least one Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

*Net Operating Income* for any period means Gross Revenues for the applicable period minus Operating Expenses for such period.

*Net Proceeds* means: (y) the net amount of all insurance proceeds received by the Administrative Agent as a result of any damage or destruction to the Property, after deduction of the Administrative Agent's reasonable out-of-pocket costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same (*Insurance Proceeds*); or (z) the net amount of all condemnation awards, proceeds and payments received by the Administrative Agent with respect to any Partial Condemnation or Total Condemnation (as applicable), after deduction of the Administrative Agent's reasonable out-of-pocket costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same (*Condemnation Proceeds*), whichever the case may be.

*Net Proceeds Deficiency* has the meaning given to such term in **Section 12.2(a)(vi).**

84069529

18

*Net Sales Proceeds* means, for any Membership Club Interest, an amount equal to the gross sales price and all other consideration from whatever source derived from the sale of such Membership Club Interest by the Borrower, minus actual and customary closing costs and brokerage commissions incurred by the Borrower and paid to parties other than Affiliates of the Borrower in connection with such sale.

*Notes* means each of the promissory notes issued by the Borrower to the Lenders to evidence the Loan, each of which shall be substantially in the form of **Exhibit C.**

*Obligation* means, with respect to any Person, any payment, performance or other obligation of such Person of any kind, including, without limitation, any liability of such Person on any claim, whether or not the right of any creditor to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in **Section 9.1(f)**. Without limiting the generality of the foregoing, the Obligations of the Borrower under the Loan Documents include (a) the obligation to pay principal, interest, Hedge Payments, Hedge Breakage, LIBO Breakage Costs, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by the Borrower under any Loan Document and (b) the obligation of the Borrower to reimburse any amount in respect of any of the foregoing that the Administrative Agent, in its sole discretion, may elect to pay or advance on behalf of the Borrower in accordance with the Loan Documents.

*OFAC List* means the list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Law, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

*Offering Plan* means the public offering memorandum, statement or plan to be approved by the Administrative Agent and filed with the applicable Governmental Authority for the sale of Membership Club Interests.

*Omnibus Assignment* shall mean that certain Omnibus Assignment dated as of the date hereof, by the Borrower in favor of the Administrative Agent.

*Operating Account* shall have the meaning given to such term in **Section 4.1.**

*Operating Agreement* means any agreement entered into by the Borrower or any Affiliate of Borrower, other than the Hotel Management Agreement, the Leases and the Construction Contracts, which agreement relates to the ownership, operation or maintenance of, or the use, licensing or leasing of, any personal property or equipment in connection with the operation and maintenance of, the Property.

19

*Operating Budget* has the meaning given to such term in **Section 6.1(s).**

*Operating Expenses* means, during any period of determination, without duplication, with respect to the Property, (a) any and all actual cash operating expenses relating to the operation of the Property during such period, (b) the costs incurred for ordinary maintenance and repairs of, and necessary capital improvements to, such Property during such period, but, in the case of necessary capital improvements, only to the extent that such costs are treated as current expenses in accordance with the Accounting Rules, (c) other than Taxes paid out of the Tax and Insurance Account, Taxes (other than income taxes) paid during such period, (d) all amounts paid to the Hotel Operator pursuant to the Hotel Management Agreement, (e) all amounts deposited during such period into the Tax and Insurance Account; and (f) any and all fees charged by credit card servicing companies. Operating Expenses shall not include any, (i) expenses which are extraordinary in nature and which would, under the Accounting Rules, be considered "non-recurring," (ii) payments of interest and principal on the Loan, and (iii) depreciation and amortization. Generally, Operating Expenses will not include amounts paid with funds from any reserve to the extent deposits into such reserves are included as an Operating Expense.

*Outstanding Principal* means, with respect to the Loan, the aggregate principal amount of Advances remaining unpaid under the Notes from time to time.

*Partial Condemnation* means any condemnation or eminent domain proceeding or action (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking) by any Governmental Authority, whether for any permanent or temporary use, occupancy or other interest affecting such portion of the Property other than a Total Condemnation.

*Payment Date* means the first Business Day of each calendar month during the term of the Loan.

*Performance Bonds* means dual-obligee performance bond (with a dual obligee rider naming the Administrative Agent as such dual obligee) covering the General Contractor's obligations under the General Contractor's Agreement in form and substance and issued by a surety company or companies acceptable to the Administrative Agent in its sole discretion, in each case in an amount not less than the full contract price.

*Permits* means all material licenses, approvals, authorizations, accreditations, consents, permits, variances and certificates required under applicable Laws in connection with the design, development, construction, ownership, operation, use or occupancy of the Property (including, without limitation, business licenses, state health department licenses, liquor licenses, certificates of completion and occupancy permits and all such other permits, licenses and rights, obtained from any Governmental Authority or private Person concerning the design, development, construction, ownership, operation, use or occupancy of the Property) as the same may be modified, amended, extended, supplemented and/or assigned from time to time, but excluding licenses, approvals, authorizations, accreditations, consents, permits, variances and certificates, the responsibility for which is solely that of any Tenant.

*Permitted Exceptions* means those matters listed in **Exhibit L** and any other matter Approved by the Administrative Agent.

*Permitted Investments* shall have the meaning given to such term in the Depository Agreement.

*Person* means an individual, corporation, limited liability company, business trust, partnership, limited partnership, joint venturer, joint tenant or tenant-in-common, trust, unincorporated organization, or any other entity of whatever nature, or Governmental Authority.

*Personal Property* means materials, furnishings, fixtures, machinery, equipment and all items of tangible and intangible personal property now or hereafter owned by the Borrower, wherever located, and: (a) to be incorporated into the Improvements; (b) used in connection with the construction of the Improvements; or (c) to be used in connection with the operation of the Property.

*Plan* means a Single Employer Plan or a Multiple Employer Plan.

*Plans and Specifications* means the plans and specifications for the development and construction of the Additional Improvements prepared by the Architect and other design professionals and Approved by the Administrative Agent.

*Preliminary Project Report* means the report prepared by the Construction Consultant of its review of the Plans and Specifications, the Construction Schedule, the General Contractor's Agreement and the Major Contracts.

*Project* means, collectively, the acquisition of the Land and Existing Improvements, the renovation of the Existing Improvements and the development and construction of the Additional Improvements in accordance with the Plans and Specifications.

*Project Budget* means the budget for the acquisition, development and construction of each component of the Project, as amended from time to time pursuant to **Section 6.2(h)**, and which reflects all estimated Project Costs, certified by the Borrower and Approved by the Administrative Agent. A copy of the preliminary Project Budget is attached as **Exhibit M**.

*Project Costs* means all costs and expenses incurred by the Borrower to complete the Project.

*Property* means the Land, Improvements and Personal Property.

*Proposed Default Response* has the meaning given to such term in Section **8.8**.

*Protective Advance* means any advance by the Administrative Agent or any Lender with respect to (a) the payment of any delinquent Taxes or insurance premiums owed by the Borrower with respect to the Property, (b) the removal of any Lien or encumbrance on the Property or the defense of the Borrower's title thereto or of the validity, enforceability,

perfection or priority of the liens and security interests granted pursuant to the Loan Documents, (c) the payment of the cost of completing the Project or (d) preservation of the value of the Property, including, without limitation, for payment of heating, gas, electric and other utility bills.

*Punchlist Items* means details of construction, decoration and mechanical and electrical adjustment which, in the aggregate, are minor in character and do not materially interfere with the use or enjoyment of the Additional Improvements.

*Purchase Agreement* means any purchase and sale agreement with respect to any interest in a Fractional Ownership Unit.

*Purchaser* means any purchaser under a Purchase Agreement.

*Ratable Share* or *Ratably* means, with respect to any Lender, its share of Advances of the Loan based on the proportion of the outstanding principal of the Loan advanced by such Lender to the total outstanding principal of the Loan.

*Rate Request* means the Borrower's irrevocable written notice by facsimile given by the Borrower to the Transaction Management department of the Administrative Agent, Attention Arcadio Diaz, at (212) 852-6232 (or such other parties as the Administrative Agent may from time to time designate in writing) at the Administrative Agent's New York, New York office not later than 11:00 A.M. (New York City time) three Business Days prior to the commencement of the applicable Interest Period, of its intention to have all or any portion of the principal amount of the Loan bear interest as either a Base Rate Loan or a LIBOR Loan.

*Rating Agencies* means each of S&P, Moody's and Fitch.

*Recourse Liability Agreement* means that certain Recourse Liability Agreement by the Sponsors in favor of the Administrative Agent and the Lenders, in the form of **Exhibit N**.

*Register* has the meaning given to such term in **Section 11.5(f)**.

*Rents* has the meaning given to such term in **Section 4.2(c)**.

*Rents and Profits* has the meaning specified in the Security Instrument.

*Re-Opening* means with respect to the Hotel, that the Additional Improvements are sufficiently complete such that 75% of the renovated guest rooms are open and available for occupancy by guests and the restaurants and the spa are each open and operating, in each case, in accordance with applicable Laws.

*Reporting Period* means with respect to any date of determination the twelve (12) month period ending on such date.

*Requested Advance Date* has the meaning given to such term in **Section 2.2(e)**.

*Required Release Payments* has the meaning given to such term in **Section 7.4(a)**.

*Requisite Lenders* means, at any time, Lenders owed more than sixty-six and two-thirds percent (66 2/3 %) of the then aggregate unpaid principal amount of the Loan.

*Required Insurance* has the meaning given to such term in **Section 6.1(j)**.

*Reserve Account* has the meaning given to such term in **Section 4.1(b)**.

*Restoration* means the repair and restoration of the Property as nearly as reasonably possible to the condition that the Property was in immediately prior to such casualty, Partial Condemnation or Total Condemnation (as applicable) together with such alterations as may be Approved by the Administrative Agent.

*Retainage* means, for each construction contract and subcontract, the greater of (a) ten percent (10%) of all amounts (excluding general conditions) to be paid to the contractor or subcontractor under the contract or subcontract until such time as fifty percent (50%) of the work to be performed or materials supplied under such contract or subcontract has been performed or supplied, as certified by the Construction Consultant, and thereafter five percent (5%) of all amounts (excluding general conditions) to be paid to such contractor or subcontractor; **provided**, the Retainage being held with respect to any contractor, subcontractor or materialman may be released as of the date upon which the Construction Consultant certifies to the Administrative Agent that such contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman; and (b) the actual Retainage required under such contract or subcontract.

*Sales Proceeds Account* has the meaning given to such term in **Section 4.1(a)**

*Security Instrument* means the Deed of Trust and Leasehold Deed of Trust With Security Agreement, Assignment of Leases and Rents and Fixture Filing from the Borrower to Redwood Empire Title Company of Mendocino County, as trustee, for the benefit of the Administrative Agent, dated of even date herewith, encumbering the Mortgaged Property, together with all spreaders, splitters, consolidations, extensions, restatements, replacements, modifications and supplements thereof.

*Shortfall* has the meaning given to such term in **Section 2.2(d)**.

*Single Employer Plan* means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of any Loan Party or any ERISA Affiliate and no Person other than the Loan Parties and the ERISA Affiliates or (b) was so maintained and in respect of which any Loan Party or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

*Solvent* and *Solvency*, with respect to any Person on a particular date, has the meaning ascribed to such term (or any similar term, including "Insolvency") in the Bankruptcy Code and any applicable state fraudulent conveyance laws, to include, without limitation, the following, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

*Sponsor Documents* means the Completion Guaranty, the Environmental Indemnity and the Recourse Liability Agreement.

*Sponsors* means Duane D. Werb and David J. Wilke.

*S&P* means Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., and its successors.

*Stored Materials* has the meaning given to such term in **Section 2.2(m)**.

*Subordinate Lender* means HH LLC.

*Subordinate Loan* means that certain loan granted by HH LLC to the Borrower in the principal amount of $7,000,000 in connection with the acquisition of the Property by the Borrower.

*Subordinate Loan Documents* has the meaning given to such term in the Intercreditor Agreement.

*Substantial Completion* means, as applied to the Additional Improvements, the date when (a) except for Punchlist Items, all work required by the Plans and Specifications and the other Loan Documents has been completed (including, without limitation, all installation of all FF&E), as certified by the Architect and approved by the Construction Consultant, (b) all permits required for the normal use and occupancy of the Property (including delivery of a valid TCO for all Improvements (together with (i) a written determination of the Borrower setting forth the date by which the Borrower expects that a permanent Certificate of Occupancy should be issued for the Improvements (the *CO Date*), which CO Date shall be reasonably acceptable to the Administrative Agent and (ii) a written statement of the Construction Consultant substantially supporting the Borrower's determination of the CO Date)) as set forth in the Plans and Specifications and otherwise necessary for the Property to function as a luxury hotel with related services (including, without limitation, an event center, restaurants and a medical

wellness and pampering spa), have been issued by the appropriate Governmental Authority and are in full force and effect and (c) all required utilities are supplied to the Property and are fully operating, as certified by the Architect and approved by the Construction Consultant.

*Tax and Insurance Account* has the meaning given to such term in **Section 4.1(b)(i).**

*Taxes* has the meaning given to such term in **Section 2.13.**

*Tenants* has the meaning given to such term in **Section 4.2(c).**

*Test Period* means, as of any applicable date of determination, the twelve (12) month period ending on the last day of the calendar month immediately prior to such date.

*TCO* means a temporary certificate of occupancy for the Improvements allowing for the operation of the Hotel for its intended purposes and issued by the proper Governmental Authority(ies).

*Time Share Act* means the Vacation Ownership and Time-Share Act of 2004, California Business and Professions Code §11210 et. seq.

*Title Company* means Old Republic Title Insurance Company and/or any other title insurance company Approved by the Administrative Agent.

*Title Insurance Policy* has the meaning given to such term in **3.1(i).**

*Total Condemnation* means any condemnation or eminent domain proceeding or action (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking) by any Governmental Authority, whether for any permanent or temporary use, occupancy or other interest affecting such portion of the Property as, when so taken or condemned, would leave, in the Administrative Agent's sole determination, a balance of the Property that, due either to the area so taken or the location of the part so taken in relation to the part not taken, would not, under economic conditions, physical constraints, zoning laws, building regulations and other Laws then existing, readily accommodate a new or reconstructed building or buildings and other improvements of a type comparable in all material respects to the Improvements existing as of the date of such taking or condemnation.

*Total Project Costs* means the aggregate amount of Project Costs set forth on the Project Budget.

*Trade Contractor* means each contractor, subcontractor, laborer, supplier, vendor, mechanic and materialman, providing labor, materials or services in connection with the construction of the Additional Improvements.

*Treasury Rate* means as of any applicable date of determination, the annualized yield on securities issued by the United States Treasury having a maturity closest to, but not earlier than, a date ten (10) years from the date of the applicable date of determination, as quoted

25

84069529

in Federal Reserve Statistical Release [H. 15 (519)] under the heading "U.S. Government Securities – Treasury Constant Maturities" for the date most nearly two (2) weeks before the date of determination (or a comparable rate if the rate is no longer published).

*UCC* means the Uniform Commercial Code as adopted by the State of California.

*Unused Fee* means from and after the date hereof and until the Loan Amount has been advanced in a full, non-refundable fee, in the amount of THREE-EIGHTHS OF ONE PERCENT (.0375%) per annum of the then-unfunded portion of the Loan, which amount shall accrue on the daily average unfunded portion of the Loan and shall be payable monthly in arrears.

*USAL* means the Ninth Revised Edition (1996) of the Uniform System of Accounts for the Lodging Industry jointly published by the Hotel Association of New York City and The Educational Institute of the American Hotel and Motel Association.

*Withdrawal Liability* has the meaning specified in Part I of Subtitle E of Title IV of ERISA.

Section 1.2    Terms Generally.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". The word "or" shall be construed to be inclusive. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.3    Approval.    All references in any of the Loan Documents to Lenders' approval or the Administrative Agent's approval, or similar words requiring any such approval of a Lender or the Administrative Agent, shall be construed to include approval by such Lenders' or the Administrative Agent's (as the case may be) legal counsel and other consultants.

## ARTICLE 2

## AGREEMENT TO LEND AND

26

## PAYMENT OF LOAN

Section 2.1    Making of the Loan.  (a)  Upon the terms and subject to the conditions set forth in this Agreement, each Lender severally and not jointly agrees to make such Lender's Ratable Share of Advances of the Loan to the Borrower from time to time, in accordance with the provisions hereof, during the Construction Loan Term, in an aggregate principal amount of up to the Loan Amount. Upon the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions in **Article 3**, the Administrative Agent will make such funds available to the Borrower by wire transfer of immediately available funds to an account of the Borrower designated in writing by the Borrower to the Administrative Agent and otherwise in accordance with the terms hereof.    Amounts borrowed under this **Section 2.1(a)** and repaid or prepaid may not be re-borrowed.

(b)    The obligations of the Lenders hereunder are several and not joint.  Failure of any Lender to fulfill its obligations hereunder shall not result in any other Lender becoming obligated to advance more than its Ratable Share nor shall such failure release or diminish the obligations of any Lender to fund its Ratable Share.

(c)    The Loan shall be secured by (i) the Mortgaged Property pursuant to the Security Instrument and (ii) the other security interests and Liens granted in the Collateral pursuant to this Agreement and in the other Loan Documents.

(d)    The proceeds of the Loan shall be used only to pay (or reimburse the Borrower for) a portion of (i) Total Project Costs and (ii) transaction costs related to the making of the Loan.

Section 2.2    Advances; Method of Disbursement of Loan Proceeds.    (a)  Advances.  The Project Budget shall separately reflect, by category and line items, the purposes and the amounts for which funds to be advanced by the Lenders under this Agreement are to be used.  The Lenders shall not be required to disburse for any category or line item of Project Costs any amount in excess of the amount specified therefor in the Project Budget, subject to **Sections 2.2(d), 2.2(k) and 6.2(h)** (or other reallocations approved by the Administrative Agent in its sole discretion). Any such fees or payments to be made pursuant to any agreement (certified true, accurate and complete copies of such agreements shall promptly be delivered to the Administrative Agent upon execution) shall only be disbursed hereunder at such times provided under and otherwise in accordance with said agreement. No Lender shall be obligated to fund, either in the aggregate or in respect of any Advance, amounts in excess of its Ratable Share of the Loan Amount as set forth on **Schedule 1**, but if the Loan Amount is increased or the Administrative Agent makes funds available in excess of the Loan Amount, each Lender shall have the right to elect at its own discretion whether to provide funds to the Administrative Agent to fund amounts in excess of its Ratable Share of the Loan Amount. Notwithstanding the foregoing and anything herein to the contrary, each Lender shall be obligated to fund its Ratable Share of any and all Protective Advances in the event such Protective Advances are deemed necessary by the Administrative Agent (in its sole and absolute discretion) to preserve the Lien of the Security Instrument, the Collateral or any of Lenders' rights under any of the Loan

27

84069529

Documents. If and to the extent any Lender shall fund amounts in excess of the Loan Amount for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan.

      (b)    Draw Request.  At such time as the Borrower shall desire to obtain an Advance, the Borrower shall complete, execute and deliver to the Administrative Agent a requisition in the form required by the Administrative Agent (*Borrower's Requisition*), such Borrower's Requisition constituting an integral part of each Draw Request. Each Draw Request shall constitute the Borrower's representation and warranty to the Lenders that: (A) any completed construction is substantially in accordance with the Plans and Specifications; (B) all Project Costs for the payment of which Lenders have previously advanced funds have in fact been paid; (C) all the representations and warranties of each Loan Party contained in the Loan Documents, including those set forth in **Article 3**, were true, correct and complete in all material respects as of the date of execution of this Agreement, as of the date of any previous Advance and continue to be true and correct in all material respects as of the date of such Draw Request; (D) no Default or Event of Default shall have occurred and be continuing hereunder; and (E) the Borrower continues to be in compliance in all material respects with all of the other terms, covenants and conditions contained in this Agreement. Each Draw Request shall be (i) in accordance with the Disbursement Schedule and (ii) accompanied by:

      (i)    if the Draw Request includes amounts to be paid to the General Contractor under the General Contractor's Agreement, a completed and itemized Application and Certificate for Payment (AIA Document No. G702) or similar form Approved by the Administrative Agent, containing the certification of the General Contractor and the Architect as to the accuracy of same, together with invoices relating to all items of Project Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Improvements to the date of the Draw Request; the cost breakdown shall also show the percentage of completion of each line item on the Project Budget, and the accuracy of the cost breakdown shall be certified by the Borrower and by the Architect; all such applications for payment shall also show all contractors and subcontractors, including Major Contractors and Major Subcontractors, by name and trade, the total amount of each contract or subcontract, the amount theretofore paid to each contractor and subcontractor as of the date of such application, and the amount to be paid from the proceeds of the Advance to each contractor and subcontractor;

      (ii)    a report of the Construction Consultant, certifying to the Administrative Agent as to the value of completed construction, percentage of completion, compliance with Plans and Specifications, and whether there are sufficient funds in the Project Budget to pay remaining Total Project Costs and complete construction of the Additional Improvements; **provided**, that if the Initial Advance is used solely to reimburse the Borrower for a portion of its Acquisition Costs of the Land and the Existing Improvements then a fully executed copy of the settlement statement (in form and substance acceptable to the Administrative Agent and certified by the Borrower as being true, correct and

84069529

28

complete) from the closing of the acquisition of the Land and the Existing Improvements shall be required instead;

(iii)   except with respect to the Initial Advance, lien waivers from all Major Contractors and all Subcontractors for work done and materials supplied by them which were paid for pursuant to any prior Draw Request, if any;

(iv)   for each Construction Advance, a written request of the Borrower for any necessary changes in the Plans and Specifications, the Project Budget, the Disbursement Schedule or the Construction Schedule;

(v)   copies of all executed Change Orders, contracts and subcontracts, and, to the extent requested by the Administrative Agent or the Construction Consultant, of all inspection or test reports and other documents relating to the construction of the Improvements not previously delivered to the Administrative Agent, if any; and

(vi)   such other information, documentation and certification as the Administrative Agent shall reasonably request.

(c)   Amount of Advances.  In no event shall any Advance be less than ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) or exceed the full amount of Project Costs theretofore paid or to be paid with the proceeds of such Advance minus the applicable Retainage for each contract and subcontract. No Advance by the Lenders shall be deemed to be an approval or acceptance by the Lenders of any work performed thereon or the materials furnished with respect thereto.

(d)   Insufficiency of Loan Proceeds/Cost Overruns.  Notwithstanding anything contained herein to the contrary, if at any time or from time to time during the term of this Agreement, in the Administrative Agent's reasonable opinion, the cost of completing any line item in the Project Budget exceeds the remaining un-disbursed portion of the Loan allocated to such line item in the Project Budget (the amount of such deficiency being a *Shortfall*), no further Advances of the Loan shall be made by the Lenders until the Borrower either individually or in combination: (i) deposits with the Administrative Agent the Shortfall; (ii) compensates for the Shortfall by payment of Project Costs in cash or other manner satisfactory to the Administrative Agent in its sole discretion and delivers to the Administrative Agent evidence thereof satisfactory to the Administrative Agent; (iii) provides the Administrative Agent with other assurance satisfactory to the Administrative Agent that the Shortfall will be funded as and when needed; (iv) to the extent permitted under **Section 2.2(k)**, allocates the Construction Contingency to the Shortfall or (v) to the extent permitted under **Section 6.2(h)**, reallocates cost savings from the Project Budget in respect of the Loan in accordance with the terms of this Agreement.  Any amount deposited with the Administrative Agent pursuant to clause (i) of this **Section 2.2(d)** shall: (A) be held by the Administrative Agent or its designee pursuant to a pledge and assignment agreement in a form reasonably satisfactory to the Administrative Agent, which agreement the Borrower shall execute and deliver to the Administrative Agent simultaneously with such deposit; and (B) constitute additional Collateral for the Loan. If the Borrower deposits

cash with the Administrative Agent, such amount will be advanced to the Borrower only after all Loan proceeds have been advanced and, in the case of cash or other assurances, the same will be returned to the Borrower or terminated, as the case may be, if there is no longer a Shortfall in such line item by reason of (1) allocation of the Construction Contingency, (2) reallocation of costs savings (or other reallocations approved by the Administrative Agent, in its sole discretion) or (3) such amount deposited being no longer necessary in the Administrative Agent's discretion. Any reallocation of any category or line item in the Project Budget in connection with cost overruns shall be subject to the Administrative Agent's approval in the Administrative Agent's discretion except as set forth in **Sections 2.2(k)** or **Section 6.2(h); provided,** that any reallocation relating to interest, general contractor fees, overhead, development fees and any fee to an Affiliate, or between the Improvements shall require the approval of the Administrative Agent, in its sole discretion.

(e)    Procedure for Advances.  Each Draw Request shall be submitted to the Administrative Agent (who shall forward such document to each Lender) at least fifteen (15) days prior to the date of the requested Advance (the **Requested Advance Date**), and no more frequently than once per month. Not less than three (3) Business Days prior to the Requested Advance Date, the Administrative Agent shall deliver written notice to each Lender at the address specified by each Lender from time to time setting forth the Requested Advance Date and such Lender's Ratable Share of such Advance. The Lenders shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied. Unless otherwise notified by the Administrative Agent, each Lender may assume that all conditions to such Advance are satisfied on the Requested Advance Date. Not later than 11:00 a.m. New York time, on the date set forth in Borrower's Requisition, each Lender shall make available for the account of the Administrative Agent at its address referred to in **Section 11.4,** in immediately available funds, such Lender's Ratable Share of such Advance. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions in **Article 3,** the Administrative Agent will make such funds available to the Borrower in accordance with the terms of this **Article 2.**

(f)    Funds Advanced.  Except as otherwise provided in this Agreement, each Advance shall be made by the Administrative Agent by wire transfer to the account of the Borrower in accordance with wiring instructions provided by the Borrower. All proceeds of all Advances shall be used by the Borrower only for the purposes for which such Advances were made. The Borrower shall not commingle such funds with other funds of the Borrower.

(g)    Advances to General Contractor.  At the Administrative Agent's option, the Administrative Agent may make any or all Advances directly to the General Contractor for construction expenses which shall theretofore have been Approved by the Administrative Agent and for which the Borrower shall have failed to timely make payment (subject to written notice from the Administrative Agent and failure of the Borrower to cure within ten (10) Business Days of such notice) and the execution of this Agreement by the Borrower shall, and hereby does, constitute an irrevocable authorization to the Administrative Agent to advance the proceeds of the Loan directly to the General Contractor as amounts become due and payable to them. No further authorization from the Borrower shall be necessary to warrant such direct Advances to the General Contractor and all such Advances shall satisfy *pro tanto* the obligations of the

Lenders hereunder and shall be secured by the Security Instrument and the other Loan Documents as fully as if made directly to the Borrower. Notwithstanding the foregoing, the Administrative Agent shall not (i) take any of the actions permitted under this **Section 2.2(g)** if the Borrower is contesting such amounts in accordance with **Section 6.2(d)** or (ii) fund any Advance over Liens unless such Liens are adequately bonded or, if such Liens are less than FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) in the aggregate, affirmatively insured by the Title Company.

(h)    <u>Direct Advances</u>. At the Administrative Agent's option, the Administrative Agent may make Advances of portions of the proceeds of the Loan (i) to any Person to which the Administrative Agent in good faith determines payment is due and (ii) to the Lenders in payment of interest thereunder or to payment of the Unused Fee, and any portion of the Loan so disbursed by the Lenders shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same. The execution of this Agreement by the Borrower shall, and hereby does, constitute an irrevocable authorization to the Administrative Agent to Advance the proceeds of the Loan. No further authorization from the Borrower shall be necessary to warrant such direct Advances and all such Advances shall satisfy pro tanto the obligations of the Lenders hereunder and shall be secured by the Security Instrument and the other Loan Documents as fully as if made directly to the Borrower.

(i)    <u>Advances Do Not Constitute a Waiver</u>.  No Advance shall constitute a waiver of any of the conditions of the Lenders' Obligation to make further Advances nor, in the event the Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding the Administrative Agent from thereafter declaring such inability to be an Event of Default hereunder.

(j)    <u>Quality of Work</u>.  The Lenders shall not be obligated to make any Advance or any portion thereof with respect to defective work or to any contractor that has performed work that is defective and that has not been cured, as specified in and confirmed by the report of the Construction Consultant; **provided**, that the Lenders may disburse all or any part of any Advance before the sum shall become due if the Administrative Agent believes it advisable to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

(k)    <u>Contingency Reserve; Reallocation of Line Items</u>.  The amount allocated as Construction Contingency in the Project Budget shall be disbursed from time to time upon request by the Borrower and upon reasonable approval by the Administrative Agent and may be used only for Project Costs to which such Construction Contingency relates. Reductions in line items may be made, and the savings may be reallocated by the Borrower at such time as the Administrative Agent and the Construction Consultant reasonably concur that all work covered by a particular line item has been or will be completed and paid for in full and such savings are or will be realized. In any event, there shall be no prohibition on the reallocation or expenditure of the General Contractor's contingency line item pursuant to the General Contractor's Agreement.

(l)    Stored Materials.  The Lenders shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Improvements (*Stored Materials*), unless the Administrative Agent receives satisfactory evidence that: (i) the Stored Materials are components in substantially final form ready for incorporation into the Improvements; (ii) the Stored Materials are stored at the Property, in a bonded warehouse in the State of California, or at such other site as the Administrative Agent shall reasonably approve, and are protected against theft and damage; (iii) the Stored Materials will be paid for in full with the funds to be disbursed, and all Lien rights or claims of the supplier will be released upon full payment; (iv) the Administrative Agent shall have received, or will receive upon payment of such Advance, UCC¬I financing statements, warehouseman's receipts or other evidence satisfactory to the Administrative Agent of the Lenders' first priority security interest in such materials; (v) the Borrower shall provide proof satisfactory to the Administrative Agent that such materials are insured against loss by casualty or theft for their full replacement cost; (vi) the aggregate cost of Stored Materials stored at the Property is certified by the Construction Consultant; and (vii) the cost of Stored Materials not stored at the Property, in the aggregate at any time, is not more than TWO MILLION AND 00/100 DOLLARS ($2,000,000.00).  In the event that the Borrower shall at any time store materials at any one location other than the Property, the cost of which exceeds the maximum amount permitted under clause (vii) above, the Borrower shall pay the excess cost of such materials with its own funds and shall not be entitled to any proceeds from an Advance in respect of such excess until such time as such excess is relocated to the Property.

Section 2.3    Payment of Interest.  (a)  Base Rate Loans and LIBOR Loans.  The Borrower shall pay interest on the Outstanding Principal at the following rates per annum:

(i)    Base Rate Loans.  During Interest Periods during which the Loan or any portion thereof shall be a Base Rate Loan, with respect thereto, a rate per annum equal at all times during such Interest Periods to the sum of (A) the Base Rate in effect from time to time plus (B) the Applicable Margin.

(ii)    LIBOR Loans.  During Interest Periods during which the Loan or any portion thereof shall be a LIBOR Loan, with respect thereto, a rate per annum equal at all times to the sum of (A) the LIBO Rate for such Interest Period plus (B) the Applicable Margin.

Interest on the Outstanding Principal (including, without limitation, on each LIBOR Loan) shall be due and payable in arrears on the first Business Day of each calendar month.

(b)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the Borrower shall pay on demand interest on (i) the Outstanding Principal and (ii) the unpaid amount of any interest, fee or other amount payable hereunder that is not paid when due, from the date such amount shall be due until such amount shall be paid in full, whether before or after maturity or acceleration of the applicable Notes, at a rate per annum equal to the Default Rate.

Section 2.4    Conversion and Continuation Options.  (a)  Base Rate Loan to LIBOR Loan.  Subject to **Section 2.8**, the Borrower may elect pursuant to a Rate Request to convert all or any portion of any outstanding Base Rate Loan to a LIBOR Loan; **provided** that no Base Rate Loan may be converted to a LIBOR Loan if any Event of Default has occurred and is continuing and the Administrative Agent has determined in its sole discretion that such a conversion is not appropriate.

(b)    LIBOR Loan to Base Rate Loan.  The Borrower may elect pursuant to a Rate Request to convert all or any portion of any outstanding LIBOR Loan to a Base Rate Loan; **provided** that the Borrower may not make such an election if at the time of such election a Interest Rate Protection Agreement is in effect.  Notwithstanding the foregoing, during the last thirty (30) days prior to the Maturity Date, Borrower may elect pursuant to a Rate Request to convert all outstanding LIBOR Loans to a single Base Rate Loan.

(c)    LIBOR Loan to LIBOR Loan.  Any LIBOR Loan may be continued upon the expiration date of its then current Interest Period by Borrower pursuant to a Rate Request; provided that no LIBOR Loan may be continued when any Event of Default has occurred and is continuing.  If the Borrower fails to submit a Rate Request to the Administrative Agent in accordance with the provisions of this **Section 2.4(c)** with respect to any outstanding LIBOR Loan, such outstanding LIBOR Loan shall automatically be continued as a LIBOR Loan.

Section 2.5    Minimum Amounts and Maximum Number of Interest Periods.  All borrowings, conversions and continuations of the Loan shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of any LIBOR Loan shall be at least equal to ONE MILLION AND 00/100 DOLLARS ($1,000,000.00).  So long as an Interest Rate Protection Agreement is in effect and payments by the Counterparty under such Interest Rate Protection Agreement are based upon particular interest periods, the Borrower shall be deemed to elect that the Loan be designated as a single LIBOR Loan with an Interest Period corresponding to the interest period utilized in computations of payments due with respect to such Interest Rate Protection Agreement.

Section 2.6    Computation of Interest and Fees.  All interest and fees shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed, including the first day and excluding the last day of each Interest Period.  If the Loan is repaid on the same day on which it is made, one day's interest shall be paid on the Loan.  Any change in the Administrative Agent's "Prime Rate" or the Federal Funds Rate shall be effective as of the day on which such change in rate occurs.  Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower in the absence of manifest error.

Section 2.7    Increased Costs.  (a)  If, during any Interest Period with respect to any LIBOR Loan due to either (i) the introduction of or any change in or in the judicial or regulatory interpretation of any Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), there shall be any increase in the cost to any Lender of maintaining such LIBOR Loan (including, but not limited to, a reserve requirement), then the Borrower shall from time to time, within ten (10)

days after demand therefor by the Administrative Agent, pay to the Administrative Agent additional amounts sufficient to compensate any such Lender for such increased cost. A certificate as to the amount of such increased cost, submitted to the Borrower by the Administrative Agent or the affected Lender, shall be conclusive and binding for all purposes in the absence of manifest error.

(b)    If the Administrative Agent determines that compliance with any Law or any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law) affects or would affect the amount of capital required or expected to be maintained by any Lender or any corporation controlling any Lender and that the amount of such capital is increased by or based upon the existence of any of the Notes, then, within ten (10) days after demand therefor by the Administrative Agent, the Borrower shall pay to the Administrative Agent, from time to time as specified by the Administrative Agent, additional amounts sufficient to compensate each Lender or such corporation in the light of such circumstances, to the extent that the Administrative Agent reasonably determines such increase in capital to be allocable to the existence of any of the Notes. A certificate as to such amounts, explaining the reason for and showing the calculation of such amounts, all in reasonable detail, submitted to the Borrower by the Administrative Agent or the affected Lender, shall be conclusive and binding for all purposes in the absence of manifest error.

(c)    The provisions of this **Section 2.7** shall survive the payment of all amounts payable under the Notes or the other Loan Documents.

Section 2.8    <u>Illegality or Inability to Determine LIBO Rate</u>.    (a) Notwithstanding any other provision of this Agreement or the Notes, if the Administrative Agent shall notify the Borrower that the introduction of or any change in or in the interpretation of any Law makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for the Administrative Agent to perform its obligations hereunder to make or maintain any LIBOR Loan, the Interest Rate in effect for the Outstanding Principal shall automatically convert to the Base Rate plus the Applicable Margin.

(b)    If the Administrative Agent notifies the Borrower that (i) the Administrative Agent is unable to determine the LIBO Rate or (ii) due to circumstances affecting the London interbank market generally, the LIBO Rate for any Interest Period will not adequately reflect the cost to Lenders of making or maintaining LIBOR Loans in effect for such Interest Period, the Interest Rate applicable to the Outstanding Principal shall automatically convert to the Base Rate plus the Applicable Margin, unless, in the case of clause (ii) of this **Section 2.8(b)**, within five (5) Business Days of notice from the Administrative Agent thereof, the Borrower pays the difference in cost to the Administrative Agent of maintaining such LIBOR Loan in effect for such Interest Period.

(c)    If the illegality of or the Administrative Agent's inability to determine the LIBO Rate as described in **Sections 2.8(a)** or **Section 2.8(b)** is eliminated, the Interest Rate shall automatically convert to the LIBO Rate plus the Applicable Margin.

Section 2.9 . <u>Payment of Outstanding Principal</u>. (a) Commencing with the first Payment Date after the third anniversary of the Closing Date, and on each Payment Date thereafter until the Maturity Date, together with its payments of Interest hereunder, the Borrower shall pay to the Administrative Agent for the ratable account of the Lenders an amount for the repayment of the Outstanding Principal of the Loan equal to the Amortization Amount for such period.

(b)     The Borrower shall repay to the Administrative Agent for the ratable account of the Lenders the Outstanding Principal balance of the Loan in full on the Maturity Date, together with all accrued and unpaid interest thereon to (and including) the date of repayment and all other amounts due to the Lenders or the Administrative Agent under this Agreement, the Notes or any other Loan Document.

Section 2.10 <u>Prepayment</u>. (a) <u>Optional Prepayment</u>. Upon not less than thirty (30) days' prior written notice to the Administrative Agent, the Borrower, following the first anniversary of the Closing Date, may prepay in full (but not in part) the entire Outstanding Principal balance of the Loan without premium or penalty, but subject to **Sections 2.10(d)** and **(e)**.

(b)     <u>Prepayment upon Sale of Membership Club Interests</u>. On each Payment Date, the Borrower shall make a prepayment of the Outstanding Principal balance of the Loan on account of the aggregate amount of Required Release Payments that are received in connection with the sale of any Membership Club Interests (or interests therein) in an amount equal to the sums then on deposit in the Sales Proceeds Account, including any interest earned thereon. Such prepayment shall be applied (i) first, to any outstanding Base Rate Loans, (ii) second, to any outstanding LIBOR Loans.

(c)     <u>Mandatory Prepayment</u>. If, as provided in **Section 4.3**, the Borrower fails to achieve the Hurdle DSCR within 12 months after the occurrence of a DSCR Trigger, all amounts standing to the credit of the Debt Service Reserve Account from time to time shall be applied by the Administrative Agent to reduce the Outstanding Principal balance of the Loan in accordance with **Section 4.3**. In addition to the foregoing and notwithstanding any other provision of this Agreement, the entire Outstanding Principal balance, together with all unpaid interest thereon and other amounts due to the Lenders under the Loan Documents shall become immediately due and payable upon the occurrence of any of the following:

(i)     a sale, transfer or conveyance of any interest in the Property (other than as expressly permitted by this Agreement or the other Loan Documents);

(ii)     the issuance of debt securities by Borrower; or

(iii)     a direct or indirect sale, transfer or conveyance of any interest in Borrower's Member (other than as expressly permitted by this Agreement or other Loan Documents).

84069529

35

(d)    Funding Losses.  Upon demand of the Administrative Agent from time to time, the Borrower shall promptly compensate the Lenders for and hold the Lenders harmless from any actual loss, cost or expense incurred by them as a result of (all such amounts referenced in this Section 2.10(d) being referred to herein, collectively, as *LIBO Breakage*):

(i)    any continuation, payment or prepayment of any LIBOR Loan on a day other than the last day of the Interest Period for such LIBOR Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(ii)    any failure by the Borrower to prepay or continue any LIBOR Loan on the date or in the amount notified by the Borrower; or

(iii)    any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such LIBOR Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrower to the Lender under this **Section 2.10(d)**, each Lender shall be deemed to have funded each LIBOR Loan at the LIBO Rate by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Loan was in fact so funded.

(e)    Prepayments Generally.   Any prepayment must be accompanied by payment by the Borrower of all accrued and unpaid interest on the Outstanding Principal balance of the Loan and any Hedge Breakage.  Except as otherwise expressly permitted or required in this Agreement, the Outstanding Principal balance of the Loan may not be prepaid, in whole or in part.

Section 2.11   Late Charge.    Any and all regularly scheduled amounts due hereunder and under the Notes, the Security Instrument and any other Loan Document which remain unpaid more than five (5) days after the date said amount was due and payable shall incur a fee (the *Late Charge*) of five percent (5%) of said amount, which Late Charge shall be payable by the Borrower on demand by the Administrative Agent.  The Administrative Agent's rights to collect the Late Charge shall be in addition to all other rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

Section 2.12   Payments.    (a)    Payments and prepayments of Outstanding Principal, and interest on, the Notes and all fees, expenses and other obligations under this Agreement payable to the Administrative Agent or the Lenders shall be made without setoff or counterclaim in immediately available funds not later than 12:00 P.M. (New York City time) on the dates called for under this Agreement and the Notes to the Administrative Agent by wire transfer to the following account of the Administrative Agent (or to such other account as may be specified in writing from time to time by the Administrative Agent): Bank: JPMorgan Chase Bank (Swift ID: CHASUS33XXX), Account #: 920-1-060663, Local Clearing Code: FW021000021, Account Name: WESTLB AG, NY Branch (Swift ID: WELAUS3XXXX),

36

Reference: Heritage House Resort. Funds received after such time shall be deemed to have been received on the next Business Day.

(b)     The Borrower hereby authorizes the Administrative Agent, if and to the extent payment due by the Borrower under any Loan Document is not made when due (subject to any applicable grace periods) under any Loan Document, to charge from time to time against any and all of the Borrower's accounts with either the Administrative Agent and/or any of the Lenders any amount so due.

(c)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, as applicable, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest; provided, if such extension would extend beyond the end of an Interest Period, such payment shall be made on the next preceding Business Day.

(d)     All payments received by the Administrative Agent upon the Loan, while an Event of Default is continuing, may be applied to accrued interest, Outstanding Principal of the Loan, Hedge Payments, Hedge Breakage and/or any other Obligations evidenced or secured by the Loan Documents in such order and amounts as the Administrative Agent may in its sole discretion elect.

Section 2.13   Taxes. All payments made by the Borrower to the Administrative Agent or any Lender shall be made without any setoff or counterclaim, and free and clear of, and without deduction for any withholdings on account of, any present or future income, excise and other taxes of whatever nature (other than taxes generally assessed on net income or receipts of any Lender or any franchise taxes imposed upon any Lender by the jurisdiction in which it is organized or in which it maintains an agency, it being understood that the preceding clause shall not apply to withholding taxes), or any levies, imposts, duties, charges or fees of any nature now or hereafter imposed by any Governmental Authority (collectively, *Taxes*). If the Borrower is compelled by any Law to make any such deductions or withholdings, it will pay such additional amounts as may be necessary in order that the net amount received by the Administrative Agent or such Lender after such deductions or withholdings (including any required deduction or withholding on such additional amounts) shall equal the amount each Lender would have received had no such deductions or withholdings been made, and it will promptly provide the Administrative Agent with evidence satisfactory to the Administrative Agent that it has paid such deductions or withholdings. Moreover, if any Taxes are directly assessed against any Lender, such Lender may pay such Taxes and the Borrower shall, within ten (10) days after the Administrative Agent's demand therefor, pay such additional amount as may be necessary in order that the net amount received by such Lender after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Lender would have received had not such Taxes been assessed. The provisions of this **Section 2.13** shall survive payment of all other amounts payable under the Loan Documents. Each Lender shall, on or prior to the Closing Date, if required by any Law, provide the Borrower with Internal Revenue Service Form W8BEN or W8ECI, as appropriate, or any successor form prescribed by the Internal Revenue Service, certifying that such Lender is entitled to benefits under an income tax treaty to which the United States is a party that eliminates withholding tax on payments under the Notes or

certifying that the income receivable pursuant to the Notes is effectively connected with the conduct of a trade or business in the United States. If any form or document referred to in this **Section 2.13** requires the disclosure of information, other than information necessary to compute the tax payable and information required on the date hereof by Internal Revenue Service Form W8BEN or W8ECI, that each such Lender reasonably considers to be confidential, such Lender shall give notice thereof to the Borrower and shall not be obligated to include in such form or document such confidential information.

        Section 2.14    <u>Distribution to Lenders</u>. (a) In the event the Administrative Agent receives current funds, in payment of principal, interest or any other sums due hereunder, on or prior to 12:00 P.M. (New York time) on any Business Day, then, on such date, the Administrative Agent will notify Lenders of the same and will distribute like funds by wire transfer of immediately available funds to the Lenders Ratably to such accounts at such places as have been designated by the respective Lenders in writing from time to time. If such funds are received after 12:00 P.M. (New York time) on any Business Day, then the Administrative Agent shall distribute such funds no later than the next succeeding Business Day. Upon the Administrative Agent's receipt of any other amounts payable by the Borrower or any other Person for items other than principal or Interest, the Administrative Agent shall promptly cause the payment to be applied in accordance with this Agreement. The Administrative Agent shall promptly remit to the Lenders their Ratable Shares of any payment received from the Borrower or from another source on account of sums payable by the Borrower. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Lenders hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent the Borrower shall not have so made such payment in full to the Administrative Agent, each Lender shall repay to the Administrative Agent forthwith on demand the portion of such amount distributed to such Lender for which the Administrative Agent did not in fact receive payment from or on account of the Borrower, together with interest thereon, for each day from the date such amount is distributed to such Lender until the date such Lender makes such repayment to the Administrative Agent, at the overnight Federal Funds Rate.

        (b)    If any Lender obtains any payment (whether voluntary or involuntary, through the exercise of any right of set-off, or otherwise) on account of the Loan owing to it in excess of its Ratable Share of payments on account of the Loan obtained by all of the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in the Loan owing to them as shall be necessary to cause such purchasing Lender to share the excess payment Ratably with each of them; provided, that if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each other Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's Ratable Share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered. The Borrower

38

agrees that any Lender so purchasing a participation from another Lender pursuant to this **Section 2.14(b)** may, to the fullest extent permitted by Law, exercise all its rights of payment (including the right of set-off) with respect to such participation as fully as if such Lender were the direct creditor or the Borrower in the amount of such participation.

(c)    The Lenders agree, among themselves, that unless otherwise agreed to by the Administrative Agent and the Requisite Lenders, all monies collected or received by the Administrative Agent after the occurrence of an Event of Default in respect of any security for the Loan shall be applied first to (a) the fees and costs of collection and maintenance of the Collateral, and then (b) *pari passu* to (i) either Interest or principal of the Loan as recommended by the Administrative Agent and approved by the Requisite Lenders and (ii) the amounts owed under any Interest Rate Protection Agreement.

Section 2.15    Conversion of Loan.    (a)  Borrower shall have the option as of the third (3rd) anniversary of the Closing Date (the *Conversion Date*) to convert the Loan into the Interim Loan, which option shall be exercisable by written notice to the Administrative Agent delivered no later than 30 days prior to the Conversion Date and shall be subject to full satisfaction of the following conditions precedent:

(i)    The Borrower shall have delivered to the Administrative Agent evidence in form and substance acceptable to the Administrative Agent, that each of Final Completion, Re-Opening and the Membership Club Conversion has occurred and that the title to the Property is free and clear of all Liens, other than Permitted Encumbrances;

(ii)    The Borrower shall have delivered to the Administrative Agent evidence in form and substance acceptable to the Administrative Agent, that the term of the Subordinate Loan has been extended to a date no earlier than the Maturity Date of the Interim Loan;

(iii)    No Default or Event of Default shall have occurred and be continuing on the date of such notice and on the Conversion Date;

(iv)    The Borrower shall have delivered to the Administrative Agent a certificate executed by an authorized officer of the Borrower certifying in form acceptable to the Administrative Agent that each of the representations and warranties of the Loan Parties contained in the Loan Documents is true, complete and correct in all material respects as of the Conversion Date;

(v)    The Sponsors shall have executed and delivered to the Administrative Agent a reaffirmation of its obligations under the Non-Recourse Carve-outs Guaranty in form acceptable to the Lenders affirming that the Obligation of the Sponsors under the Non-Recourse Carve-outs Guaranty shall extend to the Maturity Date, as extended as a consequence of the conversion of the Loan to the Interim Loan pursuant to this Section;

(vi)    The Borrower and the Administrative Agent shall have entered into either (A) an extension or renewal of the Interest Rate Protection Agreement in form acceptable to the Administrative Agent extending or renewing the term of the Interest Rate Protection Agreement to the Maturity Date (as extended pursuant to this Section) or (B) a new Interest Rate Protection Agreement in form acceptable to the Administrative Agent for a term commencing on the original (or, if applicable, the then effective extended) Maturity Date through the Maturity Date (as extended pursuant to this Section);

(vii)    The Outstanding Balance shall not exceed Sixty-Five Percent (65%) of the stabilized value of the Property then securing the Loan as determined by an Appraisal of the Property dated no later than one hundred and twenty (120) days prior to the date of conversion;

(viii)    No event, circumstances or state of facts shall have occurred or exist resulting in a Material Adverse Effect; and

(ix)    The Borrower shall pay all of the Administrative Agent's out-of-pocket costs and expenses incurred by the Administrative Agent in connection with such request for conversion, regardless of whether or not such conversion is consummated.;

(b)    In no event shall any Advances be made with respect to the Loan after the Conversion Date, and the Lenders shall have no obligation to fund any portion of the Loan Amount not previously Advanced prior to the Conversion Date.

Section 2.16    Interim Loan Extension.  The Borrower shall have the option as of the fourth (4th) anniversary of the Closing Date (the *Extension Date*) to extend the term of the Interim Loan for an additional twelve (12) months, which option shall be exercisable by written notice to the Administrative Agent delivered no later than 30 days prior to the Extension Date anniversary and shall be subject to full satisfaction of the following conditions precedent:

(i)    The Borrower shall have delivered to the Administrative Agent evidence in form and substance acceptable to the Administrative Agent, that the term of the Subordinate Loan has been extended to a date no earlier than the extended Maturity Date of the Loan;

(ii)    No Default or Event of Default shall have occurred and be continuing on the date of such notice and on the Extension Date;

(iii)    The Borrower shall have delivered to the Administrative Agent a certificate executed by an authorized officer of the Borrower certifying in form acceptable to the Administrative Agent that each of the representations and warranties of the Loan Parties contained in the Loan Documents is true, complete and correct in all material respects as of the effective date of such extension;

40

(iv)  The Sponsors shall have executed and delivered to the Administrative Agent a reaffirmation of its obligations under the Recourse Liability Agreement in form acceptable to the Lenders affirming that the Obligation of the Sponsors under the Recourse Liability Agreement shall extend to the Maturity Date, as extended as a consequence of the extension of the Interim Loan pursuant to this Section;

(v)  The Borrower and the Administrative Agent shall have entered into either (A) an extension or renewal of the Interest Rate Protection Agreement in form acceptable to the Administrative Agent extending or renewing the term of the Interest Rate Protection Agreement to the Maturity Date (as extended pursuant to this Section) or (B) a new Interest Rate Protection Agreement in form acceptable to the Administrative Agent for a term commencing on the original (or, if applicable, the then effective extended) Maturity Date through the Maturity Date (as extended pursuant to this Section);

(vi)  The Outstanding Balance shall not exceed Sixty-Five Percent (65%) of the stabilized value of the Property then securing the Loan as determined by an Appraisal of the Property dated no later than one hundred and twenty (120) days prior to the Extension Date;

(vii)  (vii)  No event, circumstance or state of facts shall have occurred or exist resulting in a Material Adverse Effect;

(viii)  The Borrower shall pay all of the Administrative Agent's out-of-pocket costs and expenses incurred by the Administrative Agent in connection with such request for extension, regardless of whether or not such extension is consummated; and

(ix)  The Debt Service Coverage Ratio for the Test Period ending on the last day of the calendar month immediately preceding delivery by the Borrower of its notice to extend the term shall not be less than the Hurdle DSCR.

Section 2.17  Cash Reserve.  (a)  From the proceeds of the Initial Advance, the Agent shall reserve and hold an amount equal to twelve (12) month's Interest on the Loan Amount, as estimated by the Administrative Agent in its good faith discretion, which amount (the *Cash Reserve Escrow*) will be held by the Administrative Agent in an interest bearing account as additional security for the Debt.  The Administrative Agent shall not be required to hold the Cash Reserve Escrow in a segregated account and shall not be responsible for any investment losses.

(b)  From and after the Re-Opening and so long as no Event of Default shall have occurred and be continuing, to the extent that the Gross Revenues from the Property for any period are insufficient to (i) fund the Reserve Accounts in accordance with **Article 4**, (ii) pay Operating Expenses for such period and (iii) pay Interest for such period (an *Interest Shortfall*) the Administrative Agent shall apply funds in the Cash Reserve Escrow to pay Interest for such

period and provided that there are sufficient funds then on deposit in the Cash Reserve Escrow to fully pay such Interest, no Event of Default shall result from such Interest Shortfall.

(c)    So long as no Event of Default shall have occurred and be continuing, any funds remaining in the Cash Reserve Escrow shall be released and funded into the Lockbox Account if the Property shall achieve for any Test Period commencing after the Re-Opening, a Debt Service Coverage Ratio of 1.20 to 1.00 or better.

(d)    Upon the occurrence of an Event of Default, the Administrative Agent may, in its sole discretion, apply the Cash Reserve Escrow toward the satisfaction of the Borrower's Obligations under the Loan Documents in such manner as the Administrative Agent shall elect in its sole discretion.

Section 2.18    Miscellaneous.    (a)    From and after the date hereof and until the Loan Amount has been advanced in a full, on each Payment Date the Borrower shall pay to the Agent for the ratable benefit of the Lenders the accrued Unused Fee, which shall accrue on the daily average unfunded portion of the Loan.

(b)    All administrative fees shall be paid by the Borrower to the Administrative Agent in the amounts and manner set forth in the Mandate Letter as such fees become due and payable.

(c)    Notwithstanding anything to the contrary contained in this Agreement, at all times the Administrative Agent shall be permitted to make any Protective Advance that the Administrative Agent may determine in good faith to be necessary or appropriate to protect the Collateral.

## ARTICLE 3

## CONDITIONS PRECEDENT TO

## DISBURSEMENT OF LOAN PROCEEDS

Section 3.1    Conditions Precedent to Initial Advance.    The Obligation of each Lender to make the initial Advance of the Loan (the *Initial Advance*) shall be subject to the following conditions precedent and each of such conditions shall be completed to the Administrative Agent's satisfaction:

(a)    Loan Documents.    The Administrative Agent shall have received an executed original of each of the Loan Documents, including, without limitation each of the following documents and items in form and substance satisfactory to the Administrative Agent:

(i)    the Notes duly executed by the Borrower;

(ii)    the Security Instrument duly executed by the Borrower;

84069529

42

(iii)    the Equity Pledge and Security Agreement duly executed by Borrower's Member;

(iv)    the Completion Guaranty duly executed by the Sponsors;

(v)    the Environmental Indemnity duly executed by the Borrower and the Sponsors;

(vi)    the Recourse Liability Agreement duly executed by the Sponsors;

(vii)    the Omnibus Assignment duly executed by the Borrower;

(viii)    Intentionally Omitted;

(ix)    the Financing Statements;

(x)    the Borrower's Certificate duly executed by the Borrower; and

(xi)    Any other documents, instruments, affidavits and agreements reasonably required to be executed in connection herewith or with respect to the Loan.

(b)    <u>Interest Rate Protection: Interest Rate Protection Agreement, and Collateral Assignment</u>. The Interest Rate Protection Agreement with respect to the Loan shall be in full force and effect pursuant to **Section 6.1(t)**, and a copy thereof together with the Collateral Assignment of Interest Rate Protection Agreement, Counterparty Consent and the opinion and any other items required pursuant to **Section 6.1(t)** shall have been delivered to the Administrative Agent.

(c)    <u>Subordinate Loan</u>. The Administrative Agent shall have received a fully execute original of the Intercreditor Agreement together with true and complete copies of each of the Subordinate Loan Documents.

(d)    <u>Organizational Documents</u>. The Administrative Agent shall have received certified copies of the following in respect of each of the Borrower, each Sponsor and each Person comprising the Borrower's Member: (i) certificate of incorporation, certificate of formation, certificate of limited partnership, certificate of authority to conduct business, or other similar document, as applicable, (ii) bylaws, partnership agreement, operating agreement or other corporate or operating agreement or document, as the case may be, (iii) resolutions or consents of each entity authorizing the consummation of the transactions contemplated hereby and by the other Loan Documents, (iv) certificate of good standing of each entity in the state in which such entity is organized, and qualified to do business and (v) incumbency certificate certifying the signatures of those individuals executing any of the Loan Documents on behalf of the Borrower, each Sponsor and the Borrower's Member, in each case, in form and substance satisfactory to the Administrative Agent.

84069529

43

(e) <u>Consents and Approvals</u>. The Administrative Agent shall have received copies or other evidence of all material consents, licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower and the validity and enforceability, of the Loan Documents, and such consents, licenses and approvals shall be in full force and effect.

(f) <u>Legal Opinions</u>. The Administrative Agent shall have received legal opinions from counsel satisfactory to the Administrative Agent with respect to (i) the due organization and existence of each of the Borrower, each Sponsor and the Borrower's Member, (ii) the due execution, delivery, authority, enforceability of this Agreement, the Notes, the Security Instrument, the Sponsor Documents and each of the other Loan Documents, (iii) non-consolidation matters, and (iv) such other matters as the Administrative Agent or its counsel may require, all such opinions shall be in form, scope and substance satisfactory to the Administrative Agent and the Administrative Agent's counsel in their sole discretion.

(g) <u>Payment of Fees</u>. The Borrower shall have paid all fees and expenses required to be paid on or prior to the Requested Advance Date by the Borrower under this Agreement, the Mandate Letter and all other Loan Documents, including, without limitation, all out-of-pocket expenses of the Administrative Agent (including, without limitation, all attorneys' fees and disbursements, Appraisal fees, fees relating to review of all environmental, engineering, insurance and other reports, consultant fees) recording and filing fees, mortgage taxes and other fees and taxes, survey fees, title search fees, title insurance premiums, all origination fees and brokerage commissions, excluding all costs incurred in connection with the syndication of the Loan as provided herein, as applicable.

(h) <u>Insurance</u>. The Administrative Agent shall have received copies of all policies relating to the Required Insurance and valid certificates of insurance for such policies, satisfactory to the Administrative Agent in its reasonable discretion, and evidence of the payment of all premiums then due and payable for the existing policy period.

(i) <u>Title Insurance Policy</u>. The Administrative Agent shall have received a paid ALTA Mortgagee Policy of Title Insurance, issued by the Title Company, naming the Administrative Agent as the insured party, insuring the lien of the Security Instrument as a first lien on the Mortgaged Property, insuring any reciprocal easements and all utility, access, support and other easements necessary for the operation of the Property, subject only to the Permitted Exceptions (the *Title Insurance Policy*).

(j) <u>Searches</u>. The Administrative Agent shall have received such UCC, bankruptcy, judgment, federal tax lien, building code violation and other searches of public records with respect to the Borrower, the Sponsors, the Borrower's Member and the Property, as the Administrative Agent has requested, showing results satisfactory to the Administrative Agent.

(k) <u>Survey</u>. The Administrative Agent shall have received a survey, dated or certified as being correct as of a date no earlier than one hundred twenty (120) days prior to the

44

Closing Date, satisfactory to the Administrative Agent and certified by a land surveyor registered in the State of California.

(l)    Environmental and Engineering Reports.  The Administrative Agent shall have received a reliance letter addressed to the Administrative Agent entitling the Administrative Agent and the Lenders to rely on the Environmental Reports and an engineering report (or reports) of one or more qualified inspection firms Approved by the Administrative Agent (and either addressed to the Administrative Agent or accompanied by a reliance letter entitling the Administrative Agent and the Lenders to rely on such engineering report), indicating the environmental and engineering condition, respectively, of the Property, and in each case, satisfactory to the Administrative Agent.

(m)    Seismic Reports.  The Administrative Agent shall have received seismic reports in respect of the Property satisfactory to the Administrative Agent.

(n)    Appraisal.  The Administrative Agent shall have received an Appraisal indicating an Appraised Value and otherwise in form and substance satisfactory to the Administrative Agent in all respects.

(o)    Settlement Statement; Amount of Initial Advance.  The Administrative Agent shall have received a copy of the settlement statement from the acquisition of the Property certified as being true and correct by the Borrower and indicating all sources and uses of funds in connection with the acquisition of the Property.  The amount of the Initial Advance shall not exceed 65% of the Total Acquisition Costs set forth on such settlement statement and a portion of the Initial Advance will be used to fund the Debt Service Escrow in accordance with **Section 2.17.**

(p)    Hotel Management Agreement.  The Administrative Agent shall have received (i) a copy of the Hotel Management Agreement, certified by the Borrower as true, complete and correct and (ii) an estoppel certificate in form and substance satisfactory to the Administrative Agent duly executed by the Hotel Operator with respect to the Hotel Management Agreement.

(q)    Material Operating Agreements.  The Administrative Agent shall have received copies of all executed Material Operating Agreements, each certified by the Borrower as true, complete and correct.

(r)    Land Use and Zoning.  The Administrative Agent shall have received evidence (including, without limitation, a zoning endorsement to the Title Insurance Policy in form and substance reasonably acceptable to the Administrative Agent) that the Property does and, upon Substantial Completion of the Additional Improvements, will comply with all applicable zoning, subdivision, land use, environmental and building Laws.

(s)    Preliminary Project Report.  The Administrative Agent shall have received the Preliminary Project Report in form and substance satisfactory to the Administrative Agent.

84069529

45

Section 3.2    <u>Conditions Precedent to Initial Construction Advance</u>.    The Obligation of each Lender to make the initial Construction Advance (the *Initial Construction Advance*) shall be subject to the following conditions precedent and each of such conditions shall be completed to the Administrative Agent's satisfaction:

(a)    <u>Plans and Specifications</u>.  The Administrative Agent shall have Approved the Plans and Specifications and shall have received two (2) complete copies of such approved Plans and Specifications, together with a certificate of a duly authorized officer of the Borrower certifying as to the completeness and the compliance with all Laws for such Plans and Specifications.

(b)    <u>Representations and Warranties</u>.  The Borrower shall have executed and delivered to the Administrative Agent a certificate containing the additional representations and warranties set forth in **Exhibit P** with respect to the construction of the Additional Improvements.

(c)    <u>Approved Project Budget</u>.  The Borrower shall have delivered to the Administrative Agent a final Project Budget setting forth all Project Costs which and the Administrative Agent shall have Approved such Project Budget in its discretion.

(d)    <u>Construction Schedule</u>.  The Administrative Agent shall have received the Construction Schedule from the Borrower and shall have Approved the same.

(e)    <u>Architect's Contract</u>.  The Administrative Agent shall have Approved the Architect and the Borrower shall have delivered to the Administrative Agent fully executed copies of the Architect's Contract and any other design professional's agreements, if any, which Architect's Contract and other agreements shall be Approved by the Administrative Agent, which Approval shall not be unreasonably withheld.

(f)    <u>Construction Agreement</u>.  The Administrative Agent shall have Approved the General Contractor and the Borrower shall have delivered to the Administrative Agent fully executed copies of the General Contractor's Agreement, which General Contractor's Agreement shall have been Approved by the Administrative Agent, which Approval shall not be unreasonably withheld.

(g)    <u>Performance Bonds</u>.  The Administrative Agent shall have received the Performance Bonds.

(h)    <u>Standard Form of Contract</u>.  The Administrative Agent and the Construction Consultant shall have received from the Borrower a copy of the standard form of contract or subcontract to be used by the General Contractor, which standard form shall be Approved by the Administrative Agent, which approval shall not be unreasonably withheld.

(i)    <u>Approval of Major Contractors/Major Subcontractors</u>.  The Administrative Agent and the Construction Consultant shall have Approved all Major Contractors and Major Subcontractors who have been, or, to the extent identified by the Borrower on or after the

46

Closing Date, will be supplying labor or materials for the construction of the Additional Improvements.

(j)     Construction Contracts.    The Borrower shall have delivered to the Administrative Agent, and the Administrative Agent shall have Approved, (i) a list of all Trade Contractors who have been or will be supplying labor or materials for the Additional Improvements and (ii) all Construction Contracts of such Trade Contractors executed on or before the Requested Advance Date.

(k)     Permits.    All Permits necessary for the commencing of construction of the Additional Improvements as contemplated by the Plans and Specifications, including, without limitation, all relevant permits, licenses and approvals, have been obtained and have been reviewed by the Construction Consultant and with respect to Permits which have not yet been obtained, a list of such Permits along with a statement from the Borrower that to the Borrower's knowledge after due inquiry, such Permits are readily achievable in due course.

(l)     Preliminary Project Report.    The Administrative Agent shall have received an update to the Preliminary Project Report, reflecting the adoption of the Plans and Specifications, Project Budget and Construction Schedule, in form and substance satisfactory to the Administrative Agent.

(m)     Consents.    The Administrative Agent shall have received an executed original of the Consents to Assignment from the Architect and the General Contractor;

(n)     Legal Opinions.    The Administrative Agent shall have received legal opinions from counsel satisfactory to the Administrative Agent with respect to (i) the compliance of the Improvements, upon completion of the Additional Improvements in accordance with the Plans and Specifications, with all Laws with respect to zoning and use of the Property, (ii) the ability of the Borrower to construct the Additional Improvements as set out in the Plans and Specifications as a "matter of right" under said Laws and (iii) such other matters as the Administrative Agent or its counsel may require, all such opinions shall be in form, scope and substance satisfactory to the Administrative Agent and the Administrative Agent's counsel in their sole discretion.

Section 3.3    Conditions Precedent to Each Advance.    The Obligation of each Lender to make any Advance of the Loan (including the Initial Advance) shall be subject to the following conditions precedent and each of such conditions shall be completed to the Administrative Agent's satisfaction:

(a)     Representation and Warranties; Compliance with Conditions.    Each of the representations and warranties of each Loan Party contained in this Agreement, any certificate delivered pursuant hereto or any other Loan Document shall be true and correct on and as of the date of this Agreement and the Requested Advance Date with the same effect as if made on and as of such date; each Loan Party shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be

47

observed or performed; and no Default or Event of Default shall have occurred and be continuing.

(b)    "Bring-Down Certificate". The Borrower shall provide to the Administrative Agent a certificate of the Borrower and the Sponsors that the representations and warranties made by each Loan Party in the Loan Documents or otherwise made by or on behalf of the Borrower and the Sponsors in connection therewith or after the date thereof shall have been true, correct and complete in all material respects on the date on which made and shall continue to be true and correct in all material respects on the applicable Requested Advance Date.

(c)    Draw Request. The Administrative Agent shall have received a Draw Request and a Rate Request complying with the provisions of this Agreement with respect to such Advance.

(d)    Certificate for Payment. To the extent applicable (i.e., if the General Contractor has performed any work or is otherwise entitled to receive or has received a payment pursuant to the terms of its General Contractor's Agreement), the Administrative Agent shall have received a Certificate for Payment (AIA Document No. G702) containing the certification of the Architect as to the accuracy of the information set forth therein, together with invoices (to the extent such items are invoiced) or other reasonably satisfactory evidence of the cost of such item, relating to all items of Project Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Improvements to the date of the Draw Request.

(e)    Construction Consultant's Report. The Administrative Agent shall have received a current report prepared by the Construction Consultant satisfactory to the Administrative Agent.

(f)    Lien Waivers. The Administrative Agent shall have received duly executed lien waivers in a form satisfactory to the Administrative Agent from all Major Contractors and Subcontractors for all work performed, and all labor or material supplied for which payment thereof has been made prior to the date of such Advance.

(g)    Affirmation of Payment. To the extent applicable (i.e., if the General Contractor has performed any work or is otherwise entitled to receive or has received a payment pursuant to the terms of its General Contractor's Agreement), the Administrative Agent shall have received a Contractor's Affidavit of Payment of Debts and Claims in the form of AIA Document G706.

(h)    Title Insurance "Date Down". The Administrative Agent shall have received a "date down" endorsement to the Title Insurance Policy and other endorsements reasonably required by the Administrative Agent, dated the date of such Requested Advance Date, insuring the Security Instrument as a first lien on the Mortgaged Property, subject only to (A) the Permitted Exceptions and (B) any other Liens consented to in writing by the Administrative Agent.

48

84069529

(i)    <u>Evidence of Sufficiency of Funds</u>.  The Borrower shall deliver to the Administrative Agent evidence satisfactory to the Administrative Agent that the proceeds of the Loan, together with Borrower's Equity Investment, will be sufficient to cover all Total Project Costs reasonably anticipated to be incurred and to satisfy the obligations of the Borrower to the Administrative Agent under this Agreement, such evidence to include an anticipated cost report in a form acceptable to the Administrative Agent prepared by the General Contractor which sets forth the anticipated costs to complete construction of the Improvements, after giving effect to costs incurred during the previous month.

(j)    <u>Borrower's Equity Investment</u>.  With respect to any Advance other than the Initial Advance, the Administrative Agent shall have received evidence reasonably satisfactory to the Administrative Agent that Borrower has expended the full amount of Borrower's Equity Investment in payment of Project Costs.

(k)    <u>Material Adverse Effect</u>.  There shall be no facts or circumstances which shall have caused or could be reasonably expected to cause a Material Adverse Effect.

(l)    <u>No Damage</u>.  The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty other than de minimis damage, unless the Administrative Agent shall have received insurance proceeds sufficient in the judgment of the Administrative Agent to effect the satisfactory restoration of the Improvements and to permit the completion of the Additional Improvements prior to the Completion Date.

(m)    <u>Major Contracts</u>.  No Advance shall be made by Lenders with regard to work done by or on behalf of any Major Contractor or Major Subcontractor unless the Borrower shall have delivered to the Construction Consultant an original fully executed contract as to such Major Contractor or Major Subcontractor, each in form and substance reasonably satisfactory to the Administrative Agent.

(n)    <u>Leases</u>.  The Administrative Agent shall have received copies of each existing Lease (if any), not already provided to the Administrative Agent, certified by the Borrower as true, complete and correct.

(o)    <u>Taxes</u>.  The Borrower shall provide evidence satisfactory to the Administrative Agent and its counsel that all Taxes in respect to the Borrower or the Improvements that are due and payable have been paid.

(p)    <u>No Injunction</u>.  No Law shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of the Administrative Agent would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loan, the construction of the Additional Improvements or the consummation of the transactions contemplated hereby.

84069529

(q)    Other Documents or Deliveries.  The Borrower shall have delivered such other documents and certificates as the Administrative Agent or its counsel may reasonably require.

Section 3.4    Conditions of Final Advance.  In addition to the conditions set forth in **Sections 3.2 and 3.3**, each Lender's Obligation to make its Ratable Share of the final Advance in respect of Retainage pursuant to this Agreement shall be subject to the following conditions precedent:

(a)    Final Completion.  Final Completion shall have occurred in accordance with the Plans and Specifications and the Construction Consultant shall have delivered a certification to the Administrative Agent that Final Completion has occurred in accordance with the Plans and Specifications.

(b)    Certificate.  The Administrative Agent shall have received the Architect's Certificate.

(c)    Lien Waivers.  The Administrative Agent shall have received duly executed final lien waivers in a form acceptable to the Administrative Agent from the General Contractor and all Trade Contractors who have performed work or provided materials or services, for the work so performed and/or the supplied labor or materials supplied.

(d)    Final Survey.  The Administrative Agent shall have received a final ALTA as-built survey (the *As-Built Survey*) acceptable to the Administrative Agent showing the as-built location of all Improvements, certified to be in conformance with the requirements of the Agent.

(e)    Payment of Costs.  The Administrative Agent shall have received evidence satisfactory to the Administrative Agent that all sums due in connection with the construction of the Additional Improvements have been paid in full (or will be paid out of the funds requested to be advanced) and that no party claims or, following payment out of such funds, will have a right to claim any statutory or common law Lien arising out of the construction of the Improvements or the supplying of labor, material and/or services in connection therewith.

(f)    Title Policy.  The Administrative Agent shall have received an endorsement to the Title Policy referencing the As-Built Survey and indicating no exceptions other than those approved by the Administrative Agent.

(g)    Other Documents.  The Administrative Agent shall have received such documents, letters, affidavits, reports and assurances, as the Administrative Agent, the Administrative Agent's counsel and the Construction Consultant may reasonably require, including, without limitation, completed AIA Form G704 (Certificate of Substantial Completion) and completed AIA Form G707 (Consent of Surety to Final Payments).

# ARTICLE 4

## ACCOUNTS/CASH MANAGEMENT

Section 4.1    Accounts/Cash Management. (a) Establishment of Accounts. The Borrower shall establish within thirty (30) days after the Closing Date and maintain, at the Depository, a segregated lockbox and concentration account with the name "Heritage House Lockbox Account pledged to WestLB AG (as agent and secured party)" (the *Lockbox Account*). The Borrower shall also establish and maintain, at the Depository, (i) a segregated lockbox and concentration account with the name "Heritage House Sales Proceeds Account pledged to WestLB AG (as agent and secured party)" (the *Sales Proceeds Account*) and (ii) a segregated operating account, with the name "Heritage House Operating Account pledged to WestLB AG (as agent and secured party)" (the *Operating Account*). The Lockbox Account, the Operating Account, the Sales Proceeds Account and the Reserve Accounts set forth in **Section 4.1(b)** are hereinafter referred to as the *Accounts*. The Administrative Agent may, in its sole discretion, rename the Accounts from time to time to reflect changes in the identity of the Administrative Agent.

(b)    Accounts. The Borrower shall establish within thirty (30) days after the Closing Date and maintain at the Depository, the following segregated securities accounts (each, a *Reserve Account* and, collectively, the *Reserve Accounts*):

(i)    an account captioned "Heritage House Tax and Insurance Account pledged to WestLB AG" for the retention of collateral in respect of tax and insurance premiums for the Property (the *Tax and Insurance Account*) into which shall be funded from the proceeds of an Advance of the Loan an amount equal to the sum of one year's real property taxes for the Property plus one year's premiums for the Required Insurance, each as reasonably estimated by the Administrative Agent; and

(ii)    an account captioned "Heritage House FF&E Reserve Account pledged to WestLB AG" (*FF&E Reserve Account*) and;

(iii)    an account captioned "Heritage House Debt Service Reserve Account pledged to WestLB AG" (the *Debt Service Reserve Account*).

(c)    The Borrower shall, within thirty (30) days after the Closing Date, (i) execute and deliver (including the completion of all schedules and exhibits and the taking of all actions contemplated in) the Depository Agreement, (ii) cause the Depository to execute and deliver the Depository Agreement, (iii) cause the Accounts to be opened in such name and with such authorized signatories thereto as shall be reasonably acceptable to the Administrative Agent, (iv) execute and deliver all notification letters required pursuant to this **Article 4**, (v) execute, deliver and file for record (including, without limitation, the payment of all fees in connection therewith) such UCC financing statements as the Administrative Agent shall reasonably require, (vi) execute and deliver such certifications and resolutions in connection with the foregoing as the Administrative Agent may reasonably require and (vii) cause an opinion of

51

84069529

counsel reasonably acceptable to the Administrative Agent to be delivered to the Administrative Agent in connection with the foregoing.

(d) <u>Type and Control of Accounts.</u>   The Borrower represents, warrants, covenants and agrees that (i) each of the Accounts shall be an Eligible Account and shall be maintained as a "securities account" (as in Section 8-501(a) of the UCC); (ii) the Administrative Agent shall be entitled to exercise the rights that comprise any financial asset credited to such Accounts; (iii) the Borrower shall have no right to give entitlement orders with respect to such Accounts and, except as provided in this Agreement, no Account Collateral shall be released to the Borrower from such Accounts; and (iv) all securities or other property underlying any financial assets credited to the Accounts shall be registered in the name of the Depository or indorsed to the Depository or in blank and in no case will any financial asset credited to the Accounts be registered in the name of the Borrower, payable to the order of the Borrower or specially indorsed to the Borrower.

(e) <u>Dominion and Control.</u>   The Accounts, and all funds deposited in the Accounts shall be under the sole dominion and control of the Administrative Agent and, subject to the terms of this Agreement, the Administrative Agent shall have the sole right to make and/or authorize withdrawals, disbursements or transfers from the Accounts and to exercise any rights of the Administrative Agent hereunder with respect to such funds.

(f) <u>Maintaining the Accounts.</u>  (i) The Borrower agrees that: (A) the Accounts shall be maintained in accordance with the terms hereof and of the Depository Agreement; and (B) prior to the indefeasible re-payment in full of the Loan and indefeasible satisfaction of the Borrower's Obligations under the Loan Documents, the Depository Agreement shall not be amended, supplemented or modified without the prior written consent of the Administrative Agent. The Borrower shall not substitute any other bank as the Depository with respect to any of the Accounts (x) without the prior written consent of the Administrative Agent and (y) unless such bank shall execute and deliver to the Administrative Agent a depository agreement in form and substance acceptable to the Administrative Agent.

(ii) So long as no Event of Default shall have occurred and be continuing, upon the written request by the Borrower (delivered not more than twice in any thirty (30 day period), the Administrative Agent shall direct the Depository to invest the funds held in the Accounts pursuant to the written direction of the Borrower, in any of the Permitted Investments, subject to the terms of the Depository Agreement. All interest or other earnings with respect to the funds held in the Accounts as a result of such investments shall be retained in the respective Accounts, shall be deemed part of the Account Collateral and shall be disbursed, invested and/or applied in accordance with the provisions of this Agreement. The Administrative Agent shall bear no responsibility for any loss occasioned by investment of the Account Collateral as herein provided, by any delays in investing or reinvesting the Account Collateral, or by any failure to achieve the maximum possible yield from the Account Collateral.

(g) <u>No Other Accounts.</u> The Borrower represents and warrants that there are no deposit, securities or similar accounts (other than the Accounts) maintained by the Borrower or any other Person with respect to the collection of Gross Revenues. The Borrower agrees that,

84069529

52

until the Loan is indefeasibly re-paid in full and the indefeasible satisfaction of the Borrower's Obligations under the Loan Documents, neither the Borrower nor any other Person shall open any accounts for the collection or holding of Gross Revenues, except for the Accounts. The foregoing shall not prohibit the Borrower from utilizing one or more separate accounts for the disbursement or retention of funds that have been transferred to the Borrower to the extent permitted under this Agreement and the other Loan Documents.

(h)  <u>Miscellaneous Account Provisions.</u>  The Accounts shall be subject to such applicable Laws, and such applicable regulations of the Board of Governors of the Federal Reserve System and of any other banking or governmental authority, as may now or hereafter be in effect.  All statements relating to the Accounts shall be issued simultaneously by the Depository to the Administrative Agent and the Borrower.  The Borrower shall be the beneficial owner of the Accounts for federal and state income tax purposes and shall report all income on the Accounts.  Returned items in the Lockbox Account will be charged against the Borrower in the succeeding month or, if later, when actually returned.  The Administrative Agent and the Lenders shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law with respect to the Account Collateral, except for those arising as a result of their gross negligence or willful misconduct.

Section 4.2  <u>Collection of Gross Revenues.</u>  (a) All Gross Revenues (including, without limitation, all Credit Card Receivables), which the Borrower may at any time hereafter directly or indirectly receive, in connection with the use and operation of the Property, shall be held in trust by the Borrower for the sole benefit of the Lenders, shall not be commingled with any other funds, and shall, within two (2) Business Days of receipt, be deposited directly into the Lockbox Account.  The Borrower hereby acknowledges and confirms that all Gross Revenues deposited in the Lockbox Account shall at all times be held and treated in accordance with the terms hereof, and the Borrower shall not have any right or authority, whether express or implied, to make use of, or withdraw all or any portion of, such Gross Revenues.  The Borrower and the Administrative Agent further acknowledge and confirm that any withdrawals of Gross Revenues from the Lockbox Account shall be made by the Administrative Agent only and any such withdrawals shall be made only in accordance with the terms, covenants and conditions of this Agreement.

(b)  The Borrower shall and shall cause the Hotel Operator to immediately notify all parties (the ***Credit Card Companies***) under any existing or future Credit Card Company Agreements of the existence of this Agreement and shall direct or cause to be directed such parties in a letter in form and substance acceptable to the Administrative Agent to deliver directly into the Lockbox Account all Credit Card Receivables and any and all other payments to which the Borrower now or hereafter may be entitled under any Credit Card Company Agreement.

(c)  The Borrower shall direct all payments, whether in the form of checks, cash, drafts, money orders or any other payments of any kind whatsoever in payment of rent or any other item payable to the Borrower (collectively, ***Rents***) from any tenants of the Property or any portion thereof (collectively, the ***Tenants***) under any Leases, whether any such Lease is presently effective or executed after the date hereof, to be made directly to the Depository for

84069529

53

deposit into the Lockbox Account, in accordance with instructions from the Administrative Agent furnished by Depository. The Borrower covenants that concurrently with the execution of any Lease, the Borrower shall direct the Tenant thereunder in form and substance acceptable to the Administrative Agent to make all payments of Rents under such Lease directly to the Depository for deposit into the Lockbox Account. If, notwithstanding the preceding actions, the Borrower, the Hotel Operator, or any Affiliate of the Borrower comes into possession of any Rents (i) the Borrower, the Hotel Operator, or such Affiliate shall be deemed to hold such funds in trust for the Administrative Agent pursuant to the terms of this Agreement, and (ii) the Borrower shall, or shall cause the Hotel Operator or such Affiliate to cause such funds to be deposited in the Lockbox Account within two (2) Business Days after their receipt by the Borrower, the Hotel Operator or such Affiliate. Upon written request from the Administrative Agent, the Borrower shall provide such further evidence as the Administrative Agent requests that Tenants are paying all Rents directly in accordance with the foregoing, and shall take such other actions as the Administrative Agent shall reasonably request in order to accomplish the same. The Borrower shall not instruct any Tenant to pay Rents other than to Depository for deposit into the Lockbox Account, or in any way amend or supersede the foregoing instructions to a Tenant, without the prior written consent of the Administrative Agent in each instance.

(d)     If the Borrower or, in connection with the Property, the Hotel Operator or any Affiliate of the Borrower shall receive, any (i) real estate tax refunds, (ii) proceeds of any business interruption insurance or any other insurance other than fire, casualty and similar property damage insurance, (iii) damages or other payments in settlement of claims by the Borrower against third parties including any cancellation or surrender payments from Tenants or (iv) any other cash revenues from the operation of the Property, then the Borrower, the Hotel Operator or such Affiliate shall be deemed to hold such funds in trust for the Administrative Agent pursuant to this Agreement and the Borrower shall cause such funds, within two (2) Business Days of such receipt, to be remitted to the Lockbox Account, and in the case of real estate tax refunds, net of any reasonable and customary fees and disbursements of tax certiorari counsel or other third party deducted from the refund to pay such counsel's or third party's fee arrangement with the Borrower.

(e)     The provisions of this **Section 4.2** constitute an assertion by the Administrative Agent of its right to collect and retain the Rents pursuant to this Agreement and the other Loan Documents, and, to the extent provided in this **Section 4.2**, the Borrower hereby waives any rights it may have to collect the Rents directly. The Borrower hereby confirms and reaffirms the assignments to the Administrative Agent of the Rents from the Property contained in the Security Instrument and the perfection thereof by virtue of the requirement of the direct payment of all Rents to the Lockbox Account in accordance with the provisions of this Agreement, and hereby ratifies all of the terms and conditions of such assignments. In furtherance thereof and in confirmation of the perfection of such assignments, the Borrower hereby further ratifies and confirms the grant to the Administrative Agent contained herein of a present perfected security interest in and to such Rents, as collateral for the payment, as and when due and payable, of all Obligations of the Borrower pursuant to the Loan Documents. The Borrower further (i) acknowledges that the Administrative Agent has directed the Borrower to send a notice to each of the Tenants, instructing such Tenants to pay all Rents payable under Leases to the Lockbox Account, (ii) confirms that it has transmitted or will transmit such notices

84069529

54

to each of such Tenants, and (iii) agrees that such direction by the Administrative Agent and transmittal by the Borrower shall constitute and be deemed an affirmative act of the Administrative Agent for purposes of establishing a perfected security interest in such Rents.

(f)    Neither the Borrower nor the Hotel Operator shall terminate, amend, revoke or alter any letter delivered pursuant to **Sections 4.2(b)** or **(c)** above by amending the Credit Card Company Agreements or any Lease or otherwise without the prior written consent of the Administrative Agent.

(g)    Upon the establishment of the Accounts, the Borrower shall pay into the Lockbox Account an amount equal to the total of Gross Revenues and Rents for the period from the Closing Date to the date of such deposit, less only such amounts as shall be approved by the Administrative Agent.

Section 4.3    Disbursement of Funds from Lockbox Account.  During the term of the Loan, so long as no DSCR Trigger or Event of Default has occurred and is continuing, the Administrative Agent shall withdraw and direct the Depository to disburse from the Lockbox Account from funds deposited herein, and the Borrower hereby consents to such disbursement, (a) prior to Re-Opening to the Operating Account on a daily basis and (b) from and after Re-Opening, the following amounts in the following order:

(i)    into the Tax and Insurance Account, an amount (the *Tax and Insurance Deposit*) equal to (A) one-twelfth (1/12) of the amount of the annual Taxes that will next become due and payable on the Property, plus (B) one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on the Required Policies, each as estimated and determined by the Administrative Agent;

(ii)    into the FF&E Reserve Account, an amount (the *FF&E Deposit*) per month sufficient to fund the obligations of the Borrower under Article 4.1(c) of the Hotel Management Agreement (that is, 1/12 of 45 of Total Sales (as defined in the Hotel Management Agreement) in the first five years then ½ of 3% of Total Sales thereafter); and

(iii)    the balance, to the Operating Account on a daily basis.

Section 4.4    Disbursements after a DSCR Trigger.  (a) In the event the Debt Service Coverage Ratio for any Test Period is determined to be less than the Hurdle DSCR, or the Borrower fails to provide sufficient evidence that the Debt Service Coverage Ratio for such Test Period is at least equal to the Hurdle DSCR for such Test Period (each being a *DSCR Trigger*), then all funds in the Lockbox Account, and all funds thereafter deposited into such Lockbox Account, shall be deposited into the Debt Service Reserve Account.  So long as no Event of Default has occurred and is continuing, the Administrative Agent shall withdraw and direct the Depository to disburse from the Lockbox Account from funds deposited herein on each Payment Date (or as soon thereafter as such funds are available), and the Borrower hereby consents to such disbursement, the following amounts in the following order:

55

84069529

(i)    to the Administrative Agent, (A) the amount of principal and interest due and payable under the Notes, and all other obligations, liabilities or sums due and payable to the Lenders under the Loan Documents (including, without limitation, Hedge Payments, Hedge Breakage, LIBOR Breakage Costs, and Unused Fee, to be applied in accordance with this Agreement, plus (B) any other amounts payable to the Administrative Agent pursuant to this Agreement, plus (C) any amounts due to the Depository under and pursuant to the Depository Agreement or in connection with the performance of any services in connection with the Loan (the *Monthly Debt Service Amount*); an amount equal to the Monthly Debt Service Amount;

(ii)    into the Tax and Insurance Account, an amount equal to the Tax and Insurance Deposit;

(iii)    into the FF&E Reserve Account, an amount equal to the FF&E Deposit;

(iv)    to the Operating Account, an amount equal to the amount specified in the Operating Budget for such month to be expended on account of Operating Expenses through the applicable calendar month (the *Monthly Budgeted Amount*); **provided** that the Borrower shall have delivered to Administrative Agent at least three (3) Business Days prior to such date a certification (the *Certification*) that all Operating Expenses previously paid to date and all Operating Expenses anticipated to be expended through the end of the current calendar year are in material compliance with the Operating Budget and that the Operating Expenses, in the aggregate, do not deviate from such Operating Budget by more than five percent (5%); and

(v)    the balance if any shall be disbursed in accordance with subsection (b) below.

(b)    In the event that following a DSCR Trigger, the applicable Hurdle DSCR is not achieved within twelve (12) months following the date of the DSCR Trigger, subject to **Section 4.5**, the Administrative Agent may transfer any balance in the Debt Service Reserve Account from time to time to the Lenders to amortize the Outstanding Principal until the Hurdle DSCR has been achieved. However, if the Hurdle DSCR is achieved and maintained for a twelve (12) month period following the date of the DSCR Trigger, as confirmed by an Approved Accountant, all funds in the Debt Service Reserve Account will be transferred to the Lockbox Account and dispersed in accordance with **Section 4.3** and the Administrative Agent will direct the Depository to no longer transfer funds from the Lockbox Account to the Debt Service Reserve Account.

Section 4.5    <u>Disbursements During an Event of Default</u>.  (a) From and after the occurrence and during the continuance of an Event of Default, on or before the first Business Day of each calendar month thereafter (or as soon thereafter as funds are available in the Lockbox Account), the Administrative Agent shall withdraw and direct the Depository to

56

disburse from the Lockbox Account from funds deposited herein, and the Borrower hereby consents to such disbursement, the following amounts in the following order:

  (i) to the Administrative Agent, an amount equal to the Monthly Debt Service Amount;

  (ii) to the Tax and Insurance Account, an amount equal to the Tax and Insurance Deposit;

  (iii) to the FF&E Reserve Account, an amount equal to the FF&E Deposit; and

  (iv) any remaining amounts to the Debt Service Reserve Account.

(b) Notwithstanding the foregoing, upon the acceleration of the Loan following the occurrence of an Event of Default, the Administrative Agent may, in its sole discretion, apply funds in the Accounts, and funds resulting from the liquidation of Permitted Investments contained in the Accounts, toward the satisfaction of the Borrower's Obligations under the Loan Documents in such manner as the Administrative Agent shall elect in its sole discretion.

Section 4.6 <u>Funding Reserve Accounts</u>.  To the extent that on any Interest payment date under this Agreement, Gross Revenues received by or on behalf of the Borrower during the immediately preceding calendar month were not sufficient to fund the Tax and Insurance Deposit and/or the FF&E Deposit for such calendar month, the Borrower shall on such Interest payment Date pay into the Tax and Insurance Account and/or the FF&E Account such amounts as shall be necessary to fully fund the Tax and Insurance Deposit and the FF&E Deposit for such preceding month.  The Borrower acknowledges and agrees hereby that its obligation to fund the monthly Tax and Insurance Deposit and FF&E Deposit is not conditional upon the Property generating adequate Gross Revenues for any particular period.

Section 4.7 <u>Disbursements from Tax and Insurance Account</u>.  So long as no Event of Default shall have occurred and be continuing, all sums in the Tax and Insurance Account shall be held in the Tax and Insurance Account to pay said Taxes and insurance premiums before the same become delinquent.  The Borrower shall be responsible for ensuring the receipt by the Administrative Agent of all bills, invoices and statements for all Taxes within ten (10) Business Days after receipt thereof, and all bills, invoices and statements for insurance premiums within thirty (30) days prior to the due date thereof, to be paid from the Tax and Insurance Account, and so long as no Event of Default has occurred and is continuing, the Administrative Agent shall cause payment to be made to the Governmental Authority or other party entitled thereto directly to the extent funds are available for such purpose in the Tax and Insurance Account.

Section 4.8 <u>Disbursements from FF&E Reserve Account</u>.  So long as no Event of Default shall have occurred and be continuing, upon the Hotel Operator's application given to the Administrative Agent no more than once in any calendar month, the Administrative Agent

shall or shall cause Depository to transfer to the Operating Account funds in the FF&E Reserve Account necessary for the renewal, replacement and addition of FF&E in accordance with the then-current Approved Operating Budget, and this Agreement. Amounts on deposit in the FF&E Reserve Account may not be used by the Borrower to fund Project Costs in connection with the Additional Improvements.

Section 4.9   Obligations Unaffected.  The Borrower's obligation to fund the foregoing accounts and make the foregoing payments under the Loan Documents shall in no way be conditioned on the existence or non-existence of funds in the Lockbox Account. Nothing contained herein shall be construed to alter, change, modify or waive the Borrower's obligation to pay any and all amounts due and payable from time to time, as and when such amounts are due, under and pursuant to the Loan and the Loan Documents, including, without limitation, any and all payments of interest, principal, fees, costs and expenses due and payable from time to time thereunder.

Section 4.10   Withdrawals.   Except as set forth in **Section 4.1(e)**, the Administrative Agent shall be the only party permitted to effect any disbursement or withdrawal from the Accounts and the Borrower shall not be permitted to and shall not effect or attempt to effect any disbursement or withdrawal from any of such accounts (unless otherwise permitted pursuant to the Administrative Agent's written instructions); provided, the Credit Card Companies shall be permitted to debit the Lockbox Account by Automated Clearing House electronic debit pursuant to their Credit Card Agreement and in accordance with customary practices in the industry.

Section 4.11   Creation of Security Interest in Accounts.  The Borrower hereby pledges, transfers and assigns to the Administrative Agent, and grants to the Administrative Agent, as additional security for the Obligations of the Borrower under the Loan Documents, a continuing perfected first priority security interest in and to, and a first lien upon:  (i) the Accounts and all amounts which may from time to time be on deposit in each of the Accounts; (ii) all of the Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited in each of the Accounts from time to time; (iii) all certificates and instruments, if any, from time to time representing or evidencing any such Account or any amount on deposit in any thereof, or any value received as a consequence of possession thereof, including all interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Accounts; (iv) all monies, chattel paper, checks, notes, bills of exchange, negotiable instruments, documents of title, money orders, commercial paper, and other security instruments, documents, deposits and credits from time to time in the possession of the Administrative Agent or the Lenders representing or evidencing such Accounts; (v) all other property, held in, credited to, or constituting part of any of the Accounts; (vi) all earnings and investments held in any Account in accordance with this Agreement; and (vii) to the extent not described above, any and all proceeds of the foregoing, (collectively, the *Account Collateral*).  This Agreement and the pledge, assignment and grant of security interest made hereby secures payment of all Obligations of the Loan Parties under the Loan Documents in accordance with the provisions set forth herein. This Agreement shall be deemed, *inter alia*, a security agreement within the meaning of the UCC.

58

Section 4.12    Certain Matters Regarding Lender following an Event of Default.
The Administrative Agent may exercise in respect of the Account Collateral all rights and
remedies available to the Administrative Agent hereunder or under the other Loan Documents, or
otherwise available at law or in equity.  If an Event of Default exists, the Administrative Agent
may exercise in respect of the Account Collateral, in addition to other rights and remedies
provided for herein or otherwise available to it, all of the rights and remedies of a secured party
upon default under the UCC then in effect in the applicable jurisdiction.  Without limiting the
generality of the foregoing, the Borrower agree(s) that, upon the occurrence and during the
continuance of an Event of Default, it will have no further right to request or otherwise require
the Administrative Agent to disburse funds from any Account in accordance with the terms of
this Agreement, it being agreed that the Administrative Agent may, at its option, (i) direct the
Depository to continue to hold the funds in the Accounts, (ii) continue, from time to time, to
apply all or any portion of the funds held in the Accounts to any payment(s) which such funds
could have been applied to prior to such Event of Default (or to pay expenses directly), to the
extent and in such order and manner as the Administrative Agent in its sole discretion may
determine, and/or (iii) direct the Depository to disburse all or any portion of the funds held in the
Reserve Accounts or other Account Collateral then or thereafter held by the Depository to the
Administrative Agent, in which event the Administrative Agent may apply the funds held in the
Accounts or other Account Collateral to the Obligations, in any order and in such manner as the
Administrative Agent may determine in its sole discretion.  If an Event of Default has occurred
and is continuing, the Administrative Agent may, at any time or from time to time:  (1) collect,
appropriate, realize upon or otherwise enforce its rights with respect to the Account
Collateral, or any part thereof, without notice to the Borrower and without the need to institute
any legal action, make demand to or upon the Borrower or any other Person, exhaust any other
remedies or otherwise proceed to enforce its rights; (2) execute (in the name, place and stead of
the Borrower) any endorsements, assignments or other instruments of conveyance which may be
required for the withdrawal and negotiation of the Account Collateral; and/or (3) exercise all
other rights and remedies available to the Administrative Agent hereunder and under any of the
other Loan Documents.  Notwithstanding anything to the contrary contained herein:  (w) the
Borrower shall remain liable under the Loan Documents to the extent set forth herein and therein
to perform all of its respective obligations thereunder, to the same extent as if this Agreement
had not been executed; (x) the exercise by the Administrative Agent of any of its rights
hereunder shall not release the Borrower from its obligations under any of the Loan Documents,
nor shall it constitute an election of remedies by the Administrative Agent or a waiver by the
Administrative Agent of any of its rights and remedies under the Loan Documents; (y) except as
expressly set forth in this Agreement or in any of the other Loan Documents, the Administrative
Agent shall not have any obligation or liability by reason of this Agreement, nor shall the
Administrative Agent be obligated to perform any of the obligations or duties of the Borrower
hereunder or to take any action, in each case, to collect or enforce any claim for payment
assigned hereunder; and (z) the Administrative Agent shall not have to resort to using the
Account Collateral before making demand upon or bringing an action against the Borrower
under any Loan Document or under any guaranty given in connection with the Loan.  No failure
on the part of the Administrative Agent to exercise, and no delay in exercising, any right under
this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any
such right preclude any other or further exercise thereof or the exercise of any other right under

this Agreement or the other Loan Documents. The remedies provided in this Agreement, the Notes and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

Section 4.13  <u>Representations and Warranties Regarding Account Collateral</u>. In addition to the other representations or warranties contained in this Agreement, the Borrower represents and warrants as follows:

(a)    Upon the execution and delivery of the Depository Agreement, the Borrower will be the legal and beneficial owner of the Account Collateral free and clear of any Lien except for the security interests in favor of the Administrative Agent created by this Agreement and the other Loan Documents. The Borrower, at its sole expense, shall defend the Borrower's and the Administrative Agent's title and interest in and to the Account Collateral against any and all third-party attachments, executions, Liens, claims, security interests or other encumbrances of any nature, however arising. Except for the Accounts, the Borrower currently does not maintain and will not open any accounts with any bank, savings and loan company, brokerage or investment services firm or related institution.

(b)    Other than the filing of the Financing Statements and the execution and delivery of the Depository Agreement, no consent of any other Person and no authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required (i) for the pledge and assignment by the Borrower of the Account Collateral pursuant to this Agreement, (ii) for the execution, delivery or performance of this Agreement by Borrower or (iii) for the perfection or maintenance of the security interests created by this Agreement.

(c)    The pledge and assignment of the Account Collateral pursuant to this Agreement creates a valid security interest in the Account Collateral securing the payment of the Obligations of the Loan Parties under the Loan Documents.

(d)    Neither the Borrower nor the Hotel Operator, as applicable will amend, modify, assign or terminate any Credit Card Company Agreement, or enter into any new Credit Card Company Agreement, without the prior written consent of the Administrative Agent; provided, that the Borrower, or Hotel Operator, as applicable, may, without the Administrative Agent's prior consent, amend, modify or terminate any Credit Card Company Agreement in accordance with industry standards for such agreements, provided such amendment, modification or termination is commercially reasonable and does not affect the Borrower's ability or obligation to deposit all Gross Revenues into the Lockbox Account within one (1) Business Day of receipt thereof.

(e)    The Borrower will not amend, modify, assign or terminate any Leases, or enter into any new Leases, without the prior written consent of the Administrative Agent.

Section 4.14  <u>Covenants Regarding Account Collateral</u>. The Borrower will not, without the prior written consent of the Administrative Agent, (a) sell, assign (by operation of law or otherwise), pledge, or grant any option with respect to, any of the Gross Revenues or any

84069529

60

interest in the Account Collateral or (b) create or permit to exist any assignment, Lien, security interest, option or other charge or encumbrance upon or with respect to any of the Gross Revenues or any Account Collateral, except for the Liens in favor of the Administrative Agent under this Agreement and the other Loan Documents. The Borrower will give the Administrative Agent not less than thirty (30) days' prior written notice of any change in the address of its chief executive office or its principal office. The Borrower agrees that all records of the Borrower with respect to the Account Collateral will be kept at the Borrower's principal office and will not be removed from such addresses without the prior written consent of the Administrative Agent. The Borrower will not make or consent to any amendment or other modification or waiver with respect to any Account Collateral, or enter into any agreement, or permit to exist any restriction, with respect to any Account Collateral. The Borrower will, at its expense, defend the Administrative Agent's right, title and security interest in and to the Account Collateral against the claims of any Person. The Borrower will not take any action which would in any manner impair the enforceability of this Agreement or the security interests created hereby. The Borrower will not enter into any credit agreement or other borrowing facility including a line of credit or overdraft line, with Depository. Nothing contained in this **Section 4.14** shall impair or otherwise limit the Borrower's obligations to timely make the payments (including Interest and principal) required by the Note and the other Loan Documents, it being understood that such payments shall be so timely made in accordance with the Loan Documents, regardless of the amounts on deposit in any Account. The Administrative Agent may, from time to time, at its sole option, perform any act which the Borrower agrees hereunder to perform and which the Borrower shall fail to perform after being requested in writing to so perform and the Administrative Agent may from time to time take any other action which Administrative Agent deems necessary for the maintenance, preservation or protection of any of the rights granted to the Administrative Agent hereunder. With respect to the powers conferred on the Administrative Agent hereunder, the Administrative Agent shall not have any duty as to the Accounts or the other Account Collateral, or any responsibility for (i) ascertaining or taking action with respect to any matters relative to the Accounts or the other Account Collateral, whether or not the Administrative Agent has or is deemed to have knowledge of such matters or (ii) taking any necessary steps to preserve rights against prior parties or any other rights pertaining to the Accounts or the other Account Collateral.

Section 4.15  Further Assurances.  The Borrower agrees that on the date hereof and at any time from time to time hereafter to execute and deliver promptly all instruments and documents (including any Financing Statement filing necessary to perfect the Administrative Agent's liens on, and security interests in, the Account Collateral), and take all further action that may be necessary or reasonably desirable or that the Administrative Agent may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Administrative Agent to exercise and enforce its rights and remedies hereunder with respect to any Account Collateral.

Section 4.16  Administrative Agent's Duties.  The powers conferred on the Administrative Agent hereunder are solely to protect its interests in the Account Collateral and shall not impose any duty upon it to exercise any such powers except as expressly provided herein. Except for the safe custody of any Account Collateral in its possession, the accounting for moneys actually received by it hereunder and its obligations to direct the Depository to make

84069529

61

disbursements hereunder, the Administrative Agent shall have no duty as to any Account Collateral as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to such Account Collateral. The Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Account Collateral in its possession if such Account Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 4.17  Cash Collateral.  In the event that the Borrower becomes the subject of a proceeding under the Bankruptcy Code, the parties hereto agree that the Account Collateral and the Rents (whether or not deposited in the Lockbox Account and whether or not then or thereafter due and payable) shall constitute "cash collateral" of the Administrative Agent under Section 363 of the Bankruptcy Code.

Section 4.18  Cash Management Fees.  All fees, costs and expenses associated with the Depository Agreement and Account Collateral shall be paid by the Borrower when due.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

The Borrower represents and warrants to the Lenders, with respect to the Borrower and the Sponsors, as the case may be, knowing that the Lenders will rely on such representations and warranties in making the Advances of the Loan, that, as of the date hereof or as of the date otherwise specified below or to the extent updated pursuant to other provisions in this Agreement or in the other Loan Documents as of such subsequent date:

Section 5.1  Organization, Status and Authority.  (a) The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware; (b) the Borrower is duly registered and qualified to do business as a foreign entity and is in good standing in the State of California; (c) the Borrower has the power, authority and legal right to own and operate its properties and assets, carry on the business now being conducted and proposed to be conducted by it, and to engage in the transactions contemplated by the Loan Documents; (d) the execution and delivery of the Loan Documents to which the Borrower is a party and the performance and observance of the provisions thereof have been duly authorized by all necessary limited liability company actions; and (e) the Borrower is a single purpose entity in compliance with the provisions of **Section 6.5.**

Section 5.2  Validity of Loan Documents.  The Loan Documents are in all respects valid and legally binding obligations of the Loan Parties, enforceable against the Loan Parties in accordance with their respective terms (subject to the effects of bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally), and grant to the Administrative Agent for the benefit of the Lenders a direct, valid and enforceable first Lien on and security interest in and to the Property, including any and all Personal Property acquired by the Borrower after the date of this Agreement, subject

62

84069529

only to the Permitted Exceptions and any other matters Approved by the Administrative Agent after the date hereof.

Section 5.3    Absence of Conflicts.    The execution and delivery of the Loan Documents by each Loan Party do not, and the performance and observance by each Loan Party of its obligations thereunder will not, contravene or result in a breach of:  (a) any provision of Loan Party's certificate of incorporation, certificate of formation, limited partnership certificate, bylaws, partnership agreement, operating agreement, the LLC Agreement or any similar constituent organizational document; (b) any Laws the breach of which would reasonably be expected to have a Material Adverse Effect; (c) any decree or judgment binding on such Loan Party; or (d) any agreement or instrument binding on such Loan Party or any of its properties the breach of which would reasonably be expected to have a Material Adverse Effect.

Section 5.4    Pending Litigation.    There are no actions, suits or proceedings pending or, to the Borrower's knowledge, threatened, which:  (a) if determined adversely to any Loan Party would have a Material Adverse Effect; (b) could materially impair the value of any Collateral taken or to be taken by the Administrative Agent in connection with this Agreement or the Loan Documents; or (c) seek to enjoin or similarly prevent the construction of the Additional Improvements or use of the Property.  No Loan Party is, in violation of any agreement, the violation of which would reasonably be expected to have a Material Adverse Effect, nor is any Loan Party in violation of any order, judgment or decree of any court, or any statute or governmental regulation to which such party is subject which would reasonably be expected to have a Material Adverse Effect.

Section 5.5    Financial Statements.    The financial statements of any Loan Party previously delivered to the Administrative Agent were prepared in accordance with GAAP, are true and complete and fairly present: (a) the financial condition of such Loan Party, as of the dates thereof and the results of its operations for the periods covered thereby; (b) that no Material Adverse Effect has occurred in respect of the assets, liabilities or financial conditions reflected therein since the dates thereof; (c) that no additional borrowings have been made by the Borrower since the date thereof other than the borrowing contemplated hereby; and (d) that each such Loan Party is Solvent.

Section 5.6    Taxes.    All federal, state and other tax returns or valid extensions thereof of each Loan Party required by Law to be filed have been filed, all Taxes upon each Loan Party or its properties which are due and payable have been paid, and each Loan Party has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods for which such return shall have been filed.

Section 5.7    Title to Property.    The Borrower will have good and marketable title to a fee estate in the Property, subject to no Liens in favor of any Person other than the Administrative Agent (and other than the Permitted Exceptions), and no conditional sale contract, chattel Security Instrument, security agreement, lease, financing statement or other title retention agreement has been or will be executed in favor of any Person other than the Administrative Agent with respect to any of the Personal Property. The Security Instrument,

63

when duly executed, delivered and recorded, will constitute a valid first Lien with respect to the Property, subject only to the Permitted Exceptions.

Section 5.8    Compliance with Laws.  The Existing Improvements comply in all material respects with all applicable Laws.

Section 5.9    Zoning.  The zoning and other land use regulations governing the Property permit the construction of the Additional Improvements thereon and the operation of the Hotel (including the restaurants and spa) as contemplated hereby, on an as-of-right basis and no variance, conditional use permit, special use permit or other similar approval which has not been obtained is required for such construction or the use of the Improvements as the Hotel.

Section 5.10    Separate Lots.  The Property is comprised of one or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot which is not a part of the Property.

Section 5.11    Assessments.  There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

Section 5.12    Flood Zone.  The Land is not in an area identified by the Federal Emergency Management Agency as a special flood hazard area.

Section 5.13    Boundaries.  All of the Improvements which are located on the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances affecting the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Insurance Policy.

Section 5.14    Availability of Utilities.  All utility services necessary and sufficient for the use and operation of the Property for its intended purposes are presently available to the boundaries of the Property through dedicated public rights of way or through perpetual private easements, including, but not limited to, water supply, storm and sanitary sewer, gas, electric and telephone facilities, and drainage.  Adequate supplies of surface and/or well water are present at the Property (taking into account any other Person that may have the right to utilize such water) to operate the Property as contemplated by this Agreement and the Borrower holds valid and enforceable rights and permits to utilize such water.

Section 5.15    Access.  The Property has adequate direct access to State Highway #1.  All curb cuts and driveway permits necessary for access to the Property from any public street or highway are existing or have been fully approved by the appropriate Governmental Authority.

Section 5.16    Condition of the Property.  Neither the Property nor any portion thereof is now damaged or injured in any material respect as a result of any fire, explosion, accident, flood or other casualty.  There are no proceedings pending, or, to the Borrower's

64

84069529

knowledge, threatened, to acquire by power of condemnation or eminent domain the Property, or any interest therein, or to enjoin or similarly prevent the construction or use of the Improvements.

Section 5.17    Insurance.    The Borrower has obtained and has delivered to the Administrative Agent original or certified copies of all Required Insurance, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any Required Insurance policies, and no Person, including the Borrower, has done, by act or omission, anything which would impair the coverage of any of the Required Insurance.

Section 5.18    Agreements.

(a)    Hotel Management Agreement. (i) The Hotel Management Agreement is in full force and effect; (ii) both the Borrower and, to the Borrower's knowledge, the Hotel Operator are in compliance in all material respects with their respective obligations under the Hotel Management Agreement; and (iii) all incentive fees payable to the Hotel Operator under the Hotel Management Agreement are effectively subordinate to all debt service payments due to Lenders under this Agreement.

(b)    Leases. Except as set forth on **Exhibit U**, there are no Leases affecting the Property as of the Closing Date. With respect to Leases set forth on **Exhibit U**: (i) the rent roll attached hereto as **Exhibit U** is true, complete and correct and the Property is not subject to any Leases other than the Leases described in **Exhibit U**, (ii) the Leases identified on **Exhibit U** are in full force and effect and there are no defaults thereunder by either party, (iii) the Borrower has delivered copies of all Leases to the Administrative Agent and the copies of the Leases delivered to the Administrative Agent are true, complete and correct, and there are no oral agreements with respect thereto, (iv) no Rent (including security deposits) has been paid more than one month in advance of its due date, (v) (A) except as set forth on **Exhibit U**, all work to be performed by the Borrower under each Lease has been performed as required as of the date that this representation is being made (or deemed remade pursuant to any other provision of this Agreement) and all such work has been accepted by the applicable Tenant, (B) except as set forth on **Exhibit U**, any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by the Borrower to any Tenant as of the date that this representation is being made (or deemed remade pursuant to any other provision of this Agreement) has already been received by such Tenant, (C) except as set forth on **Exhibit U**, all of the obligations and duties of landlord under the Leases that are due or are to be performed (as applicable) on or prior to the date hereof have been fulfilled, and there are no pending claims asserted by any Tenant for offsets or abatements against Rent or any other monetary claim, (D) except as set forth on **Exhibit U**, no brokerage or leasing commission or other compensation is or will be due or payable to any Person with respect to or on account of the current term of any of the Leases, other than in connection with (1) the leasing of any space pursuant to a right of first offer or first refusal or other right or option expressly set forth in the Lease, the effective date of which has not occurred as of the date hereof or (2) the failure timely to exercise, or the expiration of, any right to terminate or cancel any of the Leases and **Exhibit U** sets forth the commissions payable in the circumstances described in the immediately preceding clauses (1)

and (2), (vi) **Exhibit U** sets forth all security deposits and letters of credit held by or on behalf of the Borrower under the Leases; all such security deposits held by the Borrower are held in accordance with all applicable Laws and the terms of the applicable Leases; and any security deposits or letters of credit which have previously been drawn upon or applied have been redeposited with the Borrower such that the Borrower is currently holding all security deposits and letters of credit required under the applicable Leases prior to a default thereunder, (vii) the Borrower has not given or suffered any present assignment, pledge or Lien in respect of any of the Leases or its interests thereunder, except pursuant to the Loan Documents, and the Borrower has the sole right to collect Rents and other amounts due under the Leases, (viii) except as set forth on **Exhibit U**, no Tenant pursuant to any Lease is more than 30 days in arrears on its Rent or other amounts due to the landlord under its Lease and the Leases are in full force and effect and there are no other monetary or material non monetary defaults thereunder by either party thereto and, to the best of the Borrower's knowledge, there are no conditions that, with the passage of time or the giving of notice, or both, would constitute a material non monetary default thereunder and (ix) none of the Leases contains any option to purchase, right of first refusal or right of first offer to purchase or any right to terminate the Lease (except in the event of the condemnation or destruction of all or a portion of the applicable Property, as more specifically set forth in the Leases).

(c)     <u>Material Operating Agreements</u>. Except as set forth on **Exhibit V**, there are no Material Operating Agreements. Each Material Operating Agreement has been entered into by the Borrower on an arm's-length basis in the ordinary course of business and provides for the payment of fees in amounts and upon terms not less favorable to it than market rates and terms. Each of the Material Operating Agreements is the legal, valid and binding obligation of the Borrower and, to the Borrower's knowledge, each other party thereto, and enforceable against the Borrower and, to the Borrower's knowledge, each other party thereto, subject in each case to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Except as set forth on **Exhibit V**, there are no defaults, breaches or violations of any Material Operating Agreement by the Borrower or, to the Borrower's knowledge, any other party thereto, and to the Borrower's knowledge, there are no conditions that, with the passage of time or the giving of notice, or both, would constitute a default by any party thereunder. The Borrower has heretofore delivered true and complete copies of all Material Operating Agreements to the Administrative Agent.

(d)     <u>Other Contracts</u>.  The Borrower has made no contract or arrangement of any kind or type whatsoever (whether oral or written, formal or informal), the performance of which by the other party thereto could give rise to a Lien on the Property, except for contracts (all of which have been disclosed in writing to the Administrative Agent) made by the Borrower with parties who have executed and delivered to the Administrative Agent, lien waivers required or other similar certifications in form satisfactory to the Administrative Agent, and which, in the opinion of the Administrative Agent's counsel, will not create rights in existing or future Lien claimants which may be superior to the Lien of the Security Instrument, and except for matters less than FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) in the aggregate that are insured against by the Title Company pursuant to the Title Policy.

66

84069529

Section 5.19  Liquor License; Assignment of Liquor License and other Licenses and Permits. The Borrower or the Hotel Operator has a valid liquor license (the *Liquor License*) which will be sufficient to enable the Borrower to sell beer, wine and all other alcoholic beverages at the Hotel and no other license or approval is required in order for the Borrower to sell alcoholic beverages at the Property.  In the event of a foreclosure or deed in lieu of foreclosure, the Administrative Agent or its designee through the cooperation of the Borrower and the Hotel Operator (which will include, without limitation, the assignment or transfer of the Liquor License to the Administrative Agent in the event the Administrative Agent determines that such assignment or transfer is necessary) shall have all of the rights necessary to own and operate the Hotel without any delay or cessation of operations (including the ability to serve alcoholic beverages) and no governmental approval shall be required in connection therewith that would result in the delay or cessation of any of the foregoing operations.

Section 5.20  No Default. No Default or Event of Default exists and there are no facts, events or circumstances which could reasonably be expected to result in a Default or Event of Default.

Section 5.21  FIRPTA.  The Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code.

Section 5.22  SPE Provisions.  The single purpose entity requirements set forth in **Section 6.5** have been expressly set forth in the Borrower's formation document (i.e., Certificate of Formation or LLC Agreement), which such document has been duly filed with the appropriate governmental filing office of the Borrower's jurisdiction of formation.

Section 5.23  Organizational Structure.  The organizational chart, which is annexed hereto as **Exhibit W**, accurately sets forth (i) the identity of all holders of direct or indirect (i.e., through intermediate entities) beneficial interests in the Borrower and (ii) the relative percentage interests of such holders in the Borrower and such intermediate entities.

Section 5.24  Offices; Location of Books and Records.  The chief executive office or chief place of business and the jurisdiction of organization (as such terms are used in Revised Article 9 of the UCC as in effect in the State of California from time to time) of the Borrower is on **Exhibit X**, together with the organization number assigned to the Borrower in such jurisdiction and the Borrower's federal employer identification number.  The Borrower's books of accounts and records are located at its chief executive office or the chief place of its business.

Section 5.25  Filing and Recording Taxes.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Laws in connection with the transfer of the Property to the Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid under applicable Laws in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or are being paid simultaneously herewith. All taxes and governmental assessments due and owing in respect of the Property have been

67

84069529

paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Policy to be issued in connection with the Security Instrument.

Section 5.26  No Illegal Activity as Source of Funds.  No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity.

Section 5.27  Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.  The Borrower, and to the best of the Borrower's knowledge, after having made diligent inquiry, (a) each Person owning a direct or indirect interest of Twenty Percent (20%) or more in the Borrower, (b) each of the other Loan Parties, (c) the Hotel Operator and (d) each Tenant at the Property, if any: (i) is not currently identified on the OFAC List, and (ii) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States.  The Borrower has implemented procedures, and will consistently apply those procedures throughout the term of the Loan, to ensure the foregoing representations and warranties remain true and correct during the term of the Loan.

Section 5.28  Employees.  The Borrower does not have any employees or employer-related liabilities.

Section 5.29  Debt.  The Borrower is not obligated or otherwise liable for any Debt other than the Loan and any Permitted Indebtedness.  The Borrower has delivered true and complete copies of the Subordinate Loan Documents to the Administrative Agent.  The Subordinate Loan Documents are in full force and effect and have not been amended, supplemented or modified.  The Borrower is not in default under the Subordinate Loan Documents.

Section 5.30  Business Loan.  The Loan is a business loan and no portion of the proceeds of the Loan will be used for personal, family or household purposes.

Section 5.31  Federal Reserve Regulations.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Laws or by the terms and conditions of this Agreement or the other Loan Documents.

Section 5.32  Bank Holding Company.  The Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

Section 5.33   Investment Company Act.  The Borrower is not (a) an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended; or (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

Section 5.34   No Plan Assets.  (a) The Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of the Borrower constitutes "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3 101, (c) the Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (d) transactions by or with the Borrower are not subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.

Section 5.35   Accuracy of Documents.  All documents prepared by the Borrower or any of its Affiliates and furnished to the Administrative Agent as part of or in support of the loan application or pursuant to this Agreement or any of the other Loan Documents, are true, correct, and complete in all material respects and accurately represent the matters to which they pertain as of the dates made and there have been no materially adverse changes with respect to such matters since the respective dates thereof and to the Borrower's knowledge, after due inquiry, there is no material false or misleading information set forth in the third-party reports furnished to the Administrative Agent as part of or in support of the loan application or pursuant to this Agreement or any of the other Loan Documents.

Section 5.36   Brokerage Commissions.  The Lenders, on the one hand, and the Borrower, on the other hand, warrant to each other that each has had no dealings with any broker or agent in connection with the Loan, and each knows of no other broker or agent who is or might be entitled to a commission or finders or similar fee in connection with the Loan.  The Borrower agrees to and shall indemnify the Lenders from any liability, claim or loss arising by reason of any such brokerage commissions arising out of any breach by the Borrower of the warranty set forth in the first sentence of this **Section 5.36**.  The Lenders shall indemnify the Borrower from any liability, claim or loss arising by reason of any breach by the Lenders of the warranty set forth in the first sentence of this **Section 5.36**.  This **Section 5.36** shall survive the repayment of the Loan.

Section 5.37   Continuing Effectiveness.  All representations and warranties contained in any documents furnished to the Administrative Agent or any Lender by or on behalf of the Borrower, as part of or in support of the loan application or pursuant to this Agreement or any of the other Loan Documents shall be deemed continuing and in effect at all times while any of the Obligations of the Borrower or any other Loan Party pursuant to the Loan Documents remains unpaid or unsatisfied.

Section 5.38   Effect of Draw Request.  Each Draw Request submitted to the Administrative Agent shall constitute an affirmation that the representations and warranties contained in this **Article 5**, elsewhere in this Agreement and in the other Loan Documents remain true, complete and correct in all material respects as of the date thereof, and, unless the

69

Administrative Agent is notified to the contrary in writing prior to the disbursement of the requested Advance or any portion thereof, shall constitute an affirmation that the same remain true, complete and correct in all material respects on the date of such disbursement.

## ARTICLE 6

## COVENANTS OF THE BORROWER

The Borrower hereby covenants and agrees, from the date of this Agreement, and so long as Borrower remains indebted to the Lenders as follows:

Section 6.1    <u>Affirmative Covenants</u>.  The Borrower covenants and agrees that, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed:

(a)    <u>Payment of Debt</u>.  The Borrower shall duly and promptly pay all of its monetary Obligations with respect to the Loan in accordance to the terms of this Agreement, the Notes and the other Loan Documents.

(b)    <u>Comply with Other Loan Documents</u>.  The Borrower shall perform all of its Obligations under the Notes, the Security Instrument, the other Loan Documents and all other documents evidencing or securing the Loan and all other indebtedness of the Borrower to the Lenders.

(c)    <u>Application of Loan Proceeds</u>.  The Borrower shall use the proceeds of the Loan solely and exclusively for the payment or reimbursement of Project Costs in accordance herewith and in accordance with the Project Budget.  The Borrower will receive the Loan to be made hereunder and will hold the right to receive the same as a trust fund for the purpose of paying the Project Costs and it will apply the same first to such payment before using any part thereof for any other purpose.

(d)    <u>Maintain Existence</u>.  The Borrower shall maintain its existence in good standing and make no changes in its organization without the Administrative Agent's prior written consent.

(e)    <u>Compliance with Laws</u>.  The Borrower shall comply and cause the Property to comply in all material respects at all times with all Laws, perform all obligations and maintain all Permits related to the Property.

(f)    <u>Further Assurances</u>.

(i)    The Borrower shall furnish to the Administrative Agent all instruments, documents, certificates, plans and specifications, Appraisals (subject to **Section 6.1(r)**), title and other insurance, reports and agreements and each and every other document and instrument required to be furnished by the terms of this Agreement or the other Loan Documents, all at the Borrower's expense;

84069529

70

(ii)     the Borrower shall execute and deliver to the Administrative Agent documents, instruments, assignments and other writings, and to do such other acts necessary or desirable, to preserve and protect the Collateral at any time securing or intended to secure the Loan, as the Administrative Agent may reasonably require in writing; and

(iii)     the Borrower shall do and execute all and such further lawful and reasonable acts, conveyances and assurances in the law for the better and more effective carrying out of the intents and purposes of this Agreement as the Administrative Agent shall reasonably require from time to time in writing.

(g)     <u>Solvency</u>.  The Borrower shall remain, at all times, Solvent.

(h)     <u>Estoppels, Etc</u>.  The Borrower shall execute within ten (10) days after written request therefore is made by the Administrative Agent, any document required hereunder or under any Loan Document and/or any estoppel certificate reasonably requested by the Administrative Agent in connection with the Loan, without charge.

(i)     <u>Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws</u>.  The Borrower shall comply with all Laws relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect.  Upon the Administrative Agent's request from time to time during the term of the Loan, the Borrower shall certify in writing to the Administrative Agent that the Borrower's representations, warranties and obligations under **Sections 5.26** and **5.27** and this **Section 6.1(i)** remain true and correct and have not been breached.  The Borrower shall immediately notify the Administrative Agent in writing if any of such representations, warranties or covenants are no longer true or have been breached or if the Borrower has a reasonable basis to believe that they may no longer be true or have been breached.  In connection with such an event, the Borrower shall comply with all Laws and directives of any Governmental Authority and, at the Administrative Agent's request, provide to the Administrative Agent copies of all notices, reports and other communications exchanged with, or received from, any Governmental Authority relating to such an event.  The Borrower shall also reimburse the Administrative Agent any expense incurred by the Administrative Agent in evaluating the effect of such an event on the Loan and the Administrative Agent's interest in the collateral for the Loan, in obtaining any necessary license from any Governmental Authority as may be necessary for the Administrative Agent to enforce its rights under the Loan Documents, and in complying with all Laws applicable to the Administrative Agent or the Lenders as the result of the existence of such an event and for any penalties or fines imposed upon the Administrative Agent or any Lender as a result thereof.

(j)     <u>Insurance</u>.

(i)     In addition to all insurance required to be obtained and maintained by it pursuant to all of the other Loan Documents, the Borrower shall, at its sole cost and expense, obtain and maintain in effect at all times the insurance policies described on **Exhibit Y** (the **_Required Insurance_**), naming WestLB AG, as the Administrative Agent for the Lenders, as an additional insured.  The proceeds of

71

any insurance shall be applied in accordance with the terms of this Agreement. The Borrower shall also furnish the Administrative Agent with evidence or certificates from insurance companies indicating that the Architect and the Major Contractors responsible for the design or construction of the Additional Improvements are covered by professional liability insurance or other liability insurance, as applicable, as required by the applicable contract approved by the Administrative Agent, such evidence or certificates to be delivered to the Administrative Agent on or before the date of this Agreement.

(ii)     The Borrower shall duly and punctually comply, or cause compliance with, all of the material terms and conditions of any insurance policy covering or applicable to the Property (whether or not expressly required hereunder), all material requirements of the issuer of any such policy and all orders, rules and other requirements of the National Board of Fire Underwriters (or any body exercising similar functions) binding upon the Construction Borrower or applicable to or affecting the Property or any use or condition thereof.

(iii)     The Required Insurance may consist of blanket policies insuring the Property and other property of the Borrower (and its Affiliates); provided, that such policy or policies shall (x) set forth the amounts of insurance in force thereunder applicable to the Property, which amounts shall not be less than the amounts required pursuant to this Section, (y) otherwise comply with the provisions of this Section and (z) afford the same protections to the Lenders as would be provided by policies individually applicable to the Property, provided that (1) if a portion of such policy constitutes the Required Insurance, the total coverage afforded under such portion shall be on an "occurrence" basis and (2) if the Borrower converts any insurance policy from an "occurrence" to a "claims" basis (or vice versa), the Borrower shall cause the risk to be covered by such policy to be continuously insured against notwithstanding such change.

(iv)     If the Administrative Agent shall by any manner acquire the title or estate of the Borrower in or to any portion of the Property, it shall thereupon, to the extent such insurance policies are not blanket insurance policies of the Borrower, become the sole and absolute owner of all insurance policies held by or required hereunder to be obtained, affecting such portion, with the sole right to collect and retain all unearned premiums thereon, and the Borrower shall be entitled only to a credit, in reduction of the then outstanding Obligations, in the amount of any cancellation refund actually received by the Administrative Agent. To the extent applicable, the Borrower agrees, immediately upon demand, to execute and deliver such assignments or other authorizations or instruments as may be necessary or desirable to effectuate the foregoing.

(v)     The Borrower shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be obtained and maintained under this Section. Subject to the foregoing, any insurance effected

84069529

72

by the Borrower on any part of the Property whether or not required hereunder, shall be for the benefit of the Administrative Agent, the Lenders and the Borrower and shall be subject to all other provisions of this Agreement.

(k)   Fees and Expenses.  The Borrower shall pay when due the reasonable fees of the Construction Consultant, any fees due pursuant to the Mandate Letter, all reasonable out-of-pocket costs and expenses, including, without limitation, appraisal fees, recording fees and charges, abstract fees, title policy fees, escrow fees, reasonable attorneys' fees, fees of inspecting architects and engineers to the extent provided hereunder in connection with the Loan, environmental consultants to the extent provided in the Security Instrument, and all other reasonable out-of-pocket costs and expenses of every character which have been incurred or which may hereafter be incurred by each Lender in connection with the preparation and execution of the Loan Documents, including any extension, amendment or modification thereof, the funding of the Loan, the administration and enforcement of this Agreement, the Security Instrument, the Notes, and the other Loan Documents, including, without limitation, reasonable attorneys' fees in any action for the enforcement and advice in respect thereto, foreclosure of the Security Instrument and the collection of the Loan, and all such fees incurred in connection with any bankruptcy or insolvency proceeding; and the Borrower will, within twenty (20) days after demand by the Administrative Agent (together with reasonable evidence of incurrence of such expenses), reimburse each Lender for all such reasonable expenses which have been incurred; and the Borrower will indemnify and hold harmless each Lender from and against, and reimburse it for all claims, demands, liabilities, losses, damages, judgments, penalties, costs, and expenses (including, without limitation, reasonable attorneys' fees) which may be imposed upon, asserted against, or incurred or paid by any Lender by reason of, on account of or in connection with any bodily injury or property damage occurring in or upon or in the vicinity of the Property through any cause whatsoever or asserted against any Lender or the Borrower on account of any act performed or omitted to be performed hereunder or on account of any transaction arising out of or in any way connected with the Property, or with this Agreement or any of the indebtedness evidenced by the Notes, provided that the foregoing indemnity shall not apply to any such liabilities, losses, damages and expenses of any Lender to the extent arising from the willful misconduct or gross negligence of such Lender.  The foregoing indemnity shall be subject to the procedures of **Section 11.8**.   All amounts incurred or paid by any Lender under this **Section 6.1(k)**, together with interest thereon at the Default Rate from the due date until paid by the Borrower, shall be added to the indebtedness secured hereby, shall be secured by the Lien of the Security Instrument and shall be due and payable regardless of whether all or a portion of the Loan is advanced.

(l)   Inspections.   The Administrative Agent, each Lender, and their representatives shall have access to the Property at all reasonable times and shall have the right to enter the Property and to conduct such inspections thereof as they shall deem necessary or desirable for the protection of Lenders' interests, after reasonable prior notice to the Borrower (unless an uncured Event of Default exists, in which event no such notice shall be required) and without unreasonably disturbing patrons, and in compliance with all Governmental Requirements relating thereto; provided, that no party shall have the right to conduct intrusive or invasive testing unless such party reasonably believes that hazardous materials are present on the Property or that a violation of Environmental Laws exists at the Property.   However,

84069529

73

notwithstanding the foregoing, no such party shall be obligated to conduct any inspection of the Property.

(m)    ERISA.  The Borrower shall comply with all applicable requirements of ERISA.

(n)    Books and Records.  The Borrower shall keep and maintain detailed, complete and accurate books, records and accounts reflecting all items of income and expense of the Borrower in connection with the Property and the construction of the Improvements and the results of the operation thereof; and, upon the request of the Administrative Agent, to make such books, records and accounts available to the Administrative Agent and its representatives for inspection or independent audit at reasonable times upon reasonable advance notice to the Borrower.  Any independent audit conducted hereunder shall be at the Administrative Agent's expense unless such audit shall uncover a material error in statements previously delivered to the Administrative Agent, in which case the Borrower shall pay all reasonable costs related thereto.

(o)    Financing Publicity.  The Borrower shall permit the Administrative Agent and the Lenders to obtain publicity (subject to the Administrative Agent's approval) in connection with the construction of the Additional Improvements through press releases and participation in such events as ground breaking and opening ceremonies, and to give the Administrative Agent and the Lenders ample advance notice of such events and to give the Administrative Agent and the Lenders such assistance as reasonably possible in connection with obtaining such publicity as the Administrative Agent and the Lenders may reasonably request.

(p)    Operation and Maintenance of Property.  Except during the course of construction of the Additional Improvements for those portions of the Property affected by such construction, the Borrower shall operate, maintain and preserve, or cause to be operated, maintained or preserved, the Property (i) in good working order and condition, ordinary wear and tear excepted, as a full service, luxury hotel, (ii) in accordance with the performance standards set forth in the Hotel Management Agreement, (iii) in compliance with all Laws and (iv) as the "The Heritage House Spa & Resort" in accordance with the terms of the Hotel Management Agreement or such other name approved by the Administrative Agent.

(q)    Continuous Operation of the Property.  Except for those portions of the Improvements closed during any applicable phase of the construction of the Additional Improvements in accordance with the Construction Schedule and good construction practices, the Borrower shall continuously operate the Hotel as a luxury hotel subject only to required periods of closure on account of casualty, condemnation and other Force Majeure Events.

(r)    Updated Appraisals.  (i)  The Borrower agrees that the Administrative Agent shall have the right to obtain an updated Appraisal of the Property, acceptable to the Administrative Agent and at the Borrower's sole expense, (A) once in each two (2) year period commencing on the Closing Date, and (B) upon the occurrence and during the continuance of any Event of Default.

(ii)   . In the event that the Administrative Agent shall elect to obtain such an Appraisal, the Administrative Agent may immediately commission an appraiser acceptable to the Administrative Agent to prepare the Appraisal, and the Borrower shall reasonably cooperate with the Administrative Agent and the appraiser in obtaining the necessary information to prepare such an Appraisal. In the event that the Borrower fails to reasonably cooperate with the Administrative Agent in obtaining such an Appraisal, or in the event that the Borrower shall fail to pay for the cost of such an Appraisal (if it is required hereby to pay for the same), within fifteen (15) Business Days following demand, such event shall constitute an Event of Default hereunder, and the Administrative Agent shall be entitled to exercise all remedies therefore available to it hereunder.

(s)    Operating Budgets.  As soon as practicable and in any event no later than November 1 of each year during the term of the Loan, forecasts prepared by the Borrower or the Hotel Operator, in form provided by Hotel Operator in accordance with the Hotel Management Agreement, of cash flow statements for the two (2) fiscal years following such fiscal year then ending (each, an *Operating Budget*) shall be provided to the Administrative Agent for the Administrative Agent's review and Approval, such Approval not to be unreasonably withheld. Each Operating Budget shall contain such detail as is necessary to determine any monthly expenditures from or transfers of funds to the Lockbox Account. Each Operating Budget shall be reviewed and approved by the Administrative Agent. Such initial review and each subsequent review of revised proposed Operating Budgets shall be performed by the Administrative Agent within thirty (30) days of receipt of such proposed Operating Budget. To the extent that the Administrative Agent does not approve all or any portion of a proposed Operating Budget, the Administrative Agent shall provide the Borrower with its comments with respect thereto. Until an Operating Budget has been approved by the Administrative Agent, the actual expenditures made by the Borrower in the prior fiscal year (except with respect to any such expenditures that were capital in nature), increased by three percent (3%), shall govern and control expenditures from and transfer of funds to the Lockbox Account; provided, that the Borrower may make any expenditure not in excess of ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) in the aggregate to effectuate immediate action necessary for the protection of the Property or to avoid property damage or personal injury. In addition, to the extent that the Administrative Agent or such loan servicer approves individual line items in a proposed Operating Budget, such approved line items shall govern and control expenditures on account of such items until such Operating Budget is approved.

(t)    Interest Rate Protection Agreement.  The Borrower shall, within thirty (30) days after the Closing Date, enter into and thereafter maintain an Interest Rate Protection Agreement with respect to the Loan in full force and effect and in form and substance reasonably acceptable to the Administrative Agent until the Loan has been paid in full. The Borrower shall make all Hedge Payments, when due, to any Counterparty pursuant to the Interest Rate Protection Agreement and, if applicable, shall make any payments to any Counterparty pursuant to the Interest Rate Protection Agreement on account of Hedge Breakage. The Borrower shall not make any changes, modifications, substitutions, renewals or restatements of or to or enter into any new Interest Rate Protection Agreements with respect to the Loan without the Administrative Agent's prior written approval, which Approval may be granted or withheld in

the Administrative Agent's sole discretion. The Borrower shall, simultaneously with its entering into the Interest Rate Protection Agreement, execute and deliver a Collateral Assignment of Interest Rate Protection Agreement with respect thereto, execute and deliver such UCC financing statements and certifications and deliver such legal opinions with respect thereto as the Administrative Agent shall reasonably require. Borrower shall deliver to the Administrative Agent an executed counterpart of such Interest Rate Protection Agreement, and an acknowledgment and agreement (either in such Interest Rate Protection Agreement or by separate instrument, in each case in form and substance satisfactory to the Administrative Agent) of such Counterparty acknowledging such assignment and agreeing to make any payments payable under or pursuant to the Interest Rate Protection Agreement directly to the Administrative Agent (the *Counterparty Consent*). Upon any change, modification, substitution, renewal, restatement or entering into any new Interest Rate Protection Agreement with respect to the Loan, the Borrower shall provide the Administrative Agent with such information and materials and shall enter into such agreements with respect thereto and such modifications to this Agreement and the other agreements as the Administrative Agent shall reasonably require in connection therewith.

(u)     Impositions.  (i)  Subject to the contest rights set forth in clause (ii) below, the Borrower shall pay or cause to be paid all Impositions on or before the due date thereof and in any event before any fine, penalty, interest or cost may be added for non-payment. The Borrower promptly shall deliver to the Administrative Agent after payment of any Imposition and at other times, upon request, copies of official receipts or other evidence satisfactory to the Administrative Agent evidencing the payment of the Impositions. The Borrower shall not claim or demand or be entitled to any credit or credits on account of the obligations under the Loan Documents for any Imposition or any part thereof and no deduction shall otherwise be made or claimed from the taxable value of the Property or any part thereof, by reason of the Security Instrument or any of the Borrower's obligations under the Loan Documents.

(ii)     After prior notice to the Administrative Agent and provided no Default or Event of Default shall then exist, the Borrower at its sole cost and expense may contest, or cause to be contested, by appropriate legal proceedings conducted in good faith and with due diligence, the amount or validity or application, in whole or in part, of any Imposition defer the payment thereof or compliance therewith, subject, however, to the following conditions:

(1)     such proceedings shall suspend the collection thereof from the Borrower, the Administrative Agent, the Lenders and the Property;

(2)     neither the Property, any Rents nor any part thereof or interest therein, in the judgment of the Administrative Agent, would be in any danger of being sold, forfeited, terminated, canceled or lost in any respect;

(3)     the Borrower shall have furnished such security, if any, as may be required in the proceedings or as may be reasonably requested by the Administrative Agent to ensure the payment of any Imposition

84069529

76

together with any interest or penalties which may become due in connection therewith;

(4) the non-payment of the whole or any part of any Imposition or other charge during the pendency of any such action will not result in the delivery of a tax deed to the Property or any part thereof, because of such non-payment; and

(5) the payment of any sums required to be paid under this Agreement and the other Loan Documents (other than any unpaid Imposition at the time being contested in accordance with this **Section 6.1(u)**) shall not be interfered with or otherwise affected;

provided, that, the conditions set forth in clauses (1), (3) and (4) shall not be conditions to a permitted contest pursuant to this **Section 6.1(u)** if the Borrower pays or causes to be paid such Imposition.

(v)    <u>Hotel Management Agreement</u>.  The Borrower shall (i) perform or cause to be performed the Borrower's obligations under the Hotel Management Agreement, (ii) enforce the performance by Hotel Operator of all of Hotel Operator's obligations under the Hotel Management Agreement, (iii) give the Administrative Agent prompt notice and a copy of any notice of default, event of default, termination or cancellation sent or received by the Borrower, (iv) within 30 days after the Closing Date deliver to the Administrative Agent the Consent and Subordination Agreement duly executed by the Hotel Operator, GHM and the Borrower and in form satisfactory to the Administrative Agent and (v) promptly deliver to the Administrative Agent executed copies of any amendment or modification of the Hotel Management Agreement.

(w)    <u>Operating Cash</u>.  The Borrower or Hotel Operator shall maintain adequate operating cash as is customary for the operation of similar luxury hotels and as required under the Hotel Management Agreement.

(x)    <u>Liquor License</u>.    (i)    The Borrower shall maintain or cause to be maintained a liquor license for the Hotel in full force and effect until a substitute or replacement liquor license is obtained and a copy thereof is delivered to the Administrative Agent; and

(ii)    If the liquor license is not held in the name of the Borrower, the Borrower shall deliver to the Administrative Agent an assignment of such license from the holder of the license in a form reasonably satisfactory to the Administrative Agent, or, if the liquor facilities are to be leased to a third party (including, without limitation, an Affiliate of the Borrower), an assignment and subordination agreement reasonably satisfactory to the Administrative Agent, and if applicable Law requires receivables from sales of alcoholic beverages to be accounted for separately, such other documentation as is reasonably satisfactory to the Administrative Agent.

(y)     Major Contracts.  Prior to entering into any Major Contract, the Borrower shall obtain the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed.   Upon entering into any Major Contract, the Borrower and the Administrative Agent shall amend Schedule A of the Omnibus Assignment to include such Major Contract as an "Assigned Agreement" and the Borrower shall use diligent efforts to obtain the consent of the third party to such Major Contract to the assignment in the form of Exhibit A to the Omnibus Assignment.

(z)     FF&E Reserve.  The Borrower shall establish and fund the FF&E Reserve Account in accordance with the provisions of **Article 4**.  Without limiting the requirements of **Article 4**, the Borrower shall deposit, or shall cause the Hotel Operator to deposit, into the FF&E Reserve Account, all funds that the Borrower is required to reserve or expend for FF&E pursuant to the Hotel Management Agreement.

Section 6.2     Construction Covenants.  The Borrower covenants and agrees, with respect to the construction of the Additional Improvements as follows:

(a)     Construction Consultant.

(i)     The Administrative Agent shall retain the Construction Consultant, at the reasonable cost of the Borrower, to perform the following services on behalf of the Administrative Agent and the Lenders:

(1)     To review and advise the Administrative Agent whether, in the opinion of the Construction Consultant, the Plans and Specifications are satisfactory;

(2)     To review Draw Requests and Change Orders;

(3)     To review the amount and sufficiency of Borrower's Equity Investment prior to the Initial Advance of the Loan;

(4)     To make quarterly inspections for the purpose of assuring that construction of the Improvements to date is in accordance with the Plans and Specifications in all material respect and to approve the Borrower's then current Draw Request as being consistent with the Borrower's obligations under this Agreement, including, *inter alia*, an opinion as to Borrower's continued compliance with the provisions of Section 3.2(c)(x); and

(5)     To review and approve the Project Budget and any proposed revisions thereto.

(ii)     The fees of the Construction Consultant shall be paid by the Borrower within twenty (20) days after billing therefore and reasonable out-of-pocket expenses incurred by the Administrative Agent on account thereof shall be reimbursed to the Administrative Agent within twenty (20) days after request

84069529

78

therefore, but neither the Administrative Agent nor the Construction Consultant shall have any liability to the Borrower on account of:  (i) the services performed by the Construction Consultant; (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services; or (iii) any approval by the Construction Consultant of construction of the Additional Improvements. Neither the Administrative Agent nor the Construction Consultant assumes any Obligation of the Borrower or any other Person concerning the quality of construction of the Additional Improvements or the absence therefrom of defects.

(iii)    The Borrower acknowledges that: (A) the Construction Consultant has been retained by the Administrative Agent to act as a consultant and only as a consultant to the Administrative Agent and the Lenders in connection with the construction of the Additional Improvements and has no duty to the Borrower; (B) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon the Lenders; (C) the Administrative Agent reserves the right to make any and all decisions required to be made by the Administrative Agent under this Agreement or the other Loan Documents and to give or refrain from giving any and all consents or approvals required to be given by the Administrative Agent under this Agreement or the other Loan Documents and to accept or not accept any matter or thing required to be accepted by the Administrative Agent under this Agreement or the other Loan Documents, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto; (D) the Administrative Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Administrative Agent or any other Person or party; and (E) the Administrative Agent reserves the right to replace the Construction Consultant with another inspecting engineer at any time and without prior notice to or approval by the Borrower.

(b)    General Contractor's Agreement.

(i)    As soon as practicable and in any event within sixty (60) days after the date of this Agreement, the Borrower shall enter into the General Contractor's Agreement with a General Contractor Approved by the Administrative Agent;

(ii)    The Borrower shall enforce the General Contractor's Agreement in the best interests of the Project using sound business judgment;

(iii)    The Borrower shall not waive any of the material obligations of any of the General Contractor thereunder without the Administrative Agent's prior written consent; and

(iv)    The Borrower shall not take any action that would relieve General Contractor from its material obligations to construct the Additional Improvements according to the Plans and Specifications without the Administrative Agent's prior written consent.

(c)    Architect's Contract.

(i)    As soon as practicable and in any event within thirty (30) days after the date of this Agreement, the Borrower shall enter into the Architect's Contract with an Architect Approved by the Administrative Agent;

(ii)    The Borrower shall enforce the Architect's Contract in the best interest of the Project using sound business judgment;

(iii)    The Borrower shall not waive any of the material obligations of the Architect thereunder without the Administrative Agent's prior written consent; and

(iv)    The Borrower shall not take any action that would relieve the Architect from its material obligations under the Architect's Contract without the Administrative Agent's prior written consent.

(d)    Total Project Costs and Expenses.  The Borrower shall promptly pay when due (without duplication and subject to the Borrower's right to contest set forth in the following sentence):  (i) all Project Costs; (ii) all Taxes imposed upon or assessed against the Property, or any part thereof, or upon the revenue, rents, issues, income and profits of the Property, or any part thereof, or arising in respect of the occupancy, use or possession thereof; and (iii) all utility fees and charges in connection with the Property, and to provide the Administrative Agent with receipted bills therefore if requested in writing by the Administrative Agent as soon as said receipted bills are available.   The Borrower will have the right to contest the validity or application of any of the above costs by appropriate legal proceedings, so long as:  (A) such legal proceedings shall be prosecuted with diligence by the Borrower and shall operate to prevent any taking or closing or shutting down of the Property or any portion thereof, by any Governmental Authority and has the effect of staying any type of sale or forfeiture of the Property or any part thereof for failure to comply; (B) the Borrower will have deposited with the Administrative Agent cash collateral, a bond or such other security satisfactory to the Administrative Agent in each case, on such terms as may be satisfactory to the Administrative Agent, in an amount as may be deemed necessary by the Administrative Agent (in its reasonable judgment), sufficient to pay any fines, penalties, charges and interest thereon which may be awarded or assessed and which may become a charge or Lien upon the Property or which may in any way take parity with or priority over the Lien of the Security Instrument, and subject to increase at the request of the Administrative Agent when the Administrative Agent determines a greater amount may be required to make such payments; (C) such proceeding shall not subject the Administrative Agent, any Lender or the Borrower to the risk of any criminal liability; (D) the Borrower gives the Administrative Agent (y) reasonably continuous notice upon the commencement and during the continuation of any such proceeding of the status thereof, (z) confirmation on such periodic basis

as the Administrative Agent may request in writing of the continuing satisfaction of the conditions set forth in clauses (A) through (C) of this **Section 6.2(d)**; and (E) the Borrower, upon a final determination of such contest, takes all steps necessary to comply with any requirements arising therefrom. If the Borrower shall fail at any time to comply with the above conditions to contest or the Property or any part thereof is, in the reasonable judgment of the Administrative Agent, in any imminent danger of being forfeited or lost or the value of the Collateral being adversely impacted, the Administrative Agent may require the Borrower to, and the Borrower will, thereupon make the payment which is the subject of the contest. Upon the occurrence of any default under the Loan Documents, the Administrative Agent may, at its option, credit all or any part of any cash, bond or other security then held by it to the indebtedness and other sums secured by the Security Instrument in such order as the Administrative Agent may elect.

(e)  <u>Completion of Construction</u>.  The Borrower shall (i) cause the commencement of construction of the Additional Improvements to occur no later than one hundred twenty (120) days after the Closing Date, (ii) diligently pursue construction of the Additional Improvements in a good and workmanlike manner, (iii) achieve Substantial Completion and Re-Opening on or prior to the Completion Date, (iv) achieve Final Completion within ninety (90) days after Substantial Completion and (v) provide a copy of the Certificate of Occupancy for the Improvements to the Administrative Agent within five (5) days of its receipt by the Borrower, all in accordance with the Plans and Specifications and in material compliance with all restrictions, covenants and easements affecting the Property, all Laws, and all Permits, and with all terms and conditions of the Loan Documents, free from any Liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.

(f)  <u>Correction of Defects</u>.  The Borrower shall promptly correct all defects in the Additional Improvements or any material departure from the Plans and Specifications not previously approved by the Administrative Agent to the extent required hereunder

(g)  <u>Right of Administrative Agent to Inspect Property</u>.  The Borrower shall permit the Administrative Agent, the Construction Consultant and their representatives and designees, to enter upon the Property, inspect the Additional Improvements and all materials to be used in the construction thereof and to examine the Plans and Specifications which are or may be kept at the construction site at all reasonable times and with reasonable advance notice and will cooperate, and use reasonable efforts to cause the Major Contractors and the Major Subcontractors to cooperate with the Construction Consultant to enable it to perform its functions hereunder; during construction, to permit the Administrative Agent and each Lender at their sole cost (subject to the last sentence of this **Section 6.2(g)**) to maintain a customary sign or signs on the Property in a location clearly visible to the public or otherwise publicize the Administrative Agent's and each Lender's role as construction lender by reference to the Administrative Agent and the Lenders in the Borrower's signage on the Property. The Administrative Agent shall coordinate the placement and maintenance of signs on the Property, in each Lender's standard form, and no Lender shall have any independent right to display any signs on the Property. The content, layout and format of all such signs shall be subject to the Administrative Agent's sole and absolute approval.

81

(h)  Plans and Specifications; Change Orders.  As soon as practicable and in any event within ninety (90) days after the date hereof, the Borrower shall cause the Architect to prepare proposed Plans and Specifications for the Additional Improvements and shall submit such proposed Plans and Specifications to the Administrative Agent and Construction Consultant for review.  After the Plans and Specifications have been Approved by the Administrative Agent, the Borrower may request changes to the Plans and Specifications (each, a *Change Order*) consisting of additions to, deletions from or other revisions in the work provided for in the Plans and Specifications (as modified from time to time in accordance with this Section).  All Change Orders:

(i)   shall be in writing, numbered in sequence, and signed by the applicable contractor or subcontractor, include a description of the changes and a certification by the General Contractor that it has reviewed the proposed Change Order and that the applicable Additional Improvements, if constructed in accordance with the Plans and Specifications (as modified by the proposed Change Order and any prior Change Orders), will comply with all Laws; provided, that the Administrative Agent, upon receipt of any such Change Order may, in its reasonable discretion, require the Borrower to obtain from each of the Architect and the Construction Consultant, its review, approval and certification (in the same manner as required above of the General Contractor) with respect to such Change Order;

(ii)   shall contain estimates by the Borrower (supported by corresponding estimates by the applicable contractor or subcontractor) of (1) any increase or decrease in the Total Project Costs that would be caused by the Change Order (or, if the Change Order involves changes both increasing and decreasing such costs, both the amount of the increase and the decrease shall be stated) and whether such Change Order would result in any item of Project Cost exceeding any line item of the Project Budget, (2) the aggregate amount of changes in estimated costs to complete the Improvements, both increases and decreases, previously made; provided, that the Administrative Agent, upon receipt of any such Change Order may, in its reasonable discretion, require the Borrower to obtain from each of the Architect and the Construction Consultant, its review, approval and certification with respect to such Change Order;

(iii)   shall require the Administrative Agent's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, if such Change Order increases the Total Project Costs by ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00) or more in the aggregate, provided that if the Administrative Agent shall withhold its consent, the Borrower may proceed with such Change Order and pay for the costs thereof with equity in addition to Borrower's Equity Investment; and

(iv)   shall require the Administrative Agent's prior written approval if such Change Order materially modifies any design element, adversely affects any structural element.

84069529

82

(i)    Bonds. From and after the date on which the Borrower shall enter into the General Contractor's Agreement, the Borrower shall furnish to the Administrative Agent and maintain such Performance Bonds with respect to the obligations of (i) the General Contractor under such General Contractor's Agreement and (ii) each Major Subcontractor, as applicable.

Section 6.3    Reporting Requirements.  The Borrower covenants and agrees, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed:

(a)    Financial Reports. The Borrower shall cause to be prepared and delivered to the Administrative Agent and each of the Lenders, the following financial statements, each of which shall be accompanied by a certificate from the Borrower that such items being delivered are true, accurate and complete in all material respects and that each financial statement fairly presents the financial condition of each Loan Party (as applicable) as of the date thereof (except with respect to financial information provided by the Hotel Operator; **provided**, that (x) the Hotel Operator certifies as to the accuracy of such information and (y) the Borrower certifies that it has no knowledge of any inaccuracy, inconsistency or omission with respect to such information):

(i)    Monthly.  Reasonably detailed monthly operating reports to the Administrative Agent, based on information available to the Borrower, that reflect operational results of the Hotel for each month of the [Operating Year (as defined in the Hotel Management Agreement)].  The Borrower shall deliver each operating report to the Administrative Agent on or before the 20th day of the month following the month (or partial month) to which such operating report relates.  The reports shall be in the format (which may be amended from time to time) of operating reports provided to the Borrower by the Hotel Operator pursuant to the Hotel Management Agreement, and include such additional information as may reasonably be required by the Administrative Agent.  At a minimum, monthly operating reports shall include:  (i) a balance sheet including current month and prior year-end comparisons and differences in reasonable detail; (ii) an income and expense statement for the month in question and for the elapsed portion of the current Operating Year through the end of such month; (iii) a statement of net cash flow from operations in reasonable detail for such month and such elapsed portion of the current Operating Year; (iv) a statement of the amount of the Hotel Operator's Fee and any other amounts payable or expenses reimbursable to Hotel Operator; and (v) a schedule of Capital Expenses showing, in reasonable detail, items budgeted, actual expenditures to date and the amount of expenditures projected for completion.  Such reports also shall set forth variances that have occurred and that are anticipated between the applicable Operating Budget (both the initially approved Operating Budget and any amendment thereof) and actual results in a monthly variance report (along with the statement mentioned above).

(ii)    Annual.  By April 30 of each Operating Year, audited financial statements for the preceding Operating Year, consisting, at a minimum, of a

balance sheet, a statement of earnings and a statement of cash flows. The annual financial statements shall contain a certificate of the Approved Accountant in favor of the Administrative Agent to the effect that, subject to any qualifications contained therein, the financial statements fairly present, in conformity with GAAP, the financial position, results of operations and cash flows of the Hotel for the Operating Year then ended.

(iii)    No Default Certificate.    A certificate from an officer of the Borrower acceptable to the Administrative Agent certifying whether an Event of Default has occurred and is continuing under the Loan Documents shall be delivered to the Administrative Agent no later than fifteen (15) days after the last day of each of the first three (3) calendar quarters occurring during any Loan Year and no later than fifteen (15) days after the end of each Loan Year.

(iv)    Debt Service Coverage Ratio.    From and after the first (1st) anniversary of the Re-Opening, together with the monthly financial statements required by subsection (i) above, a certificate from an officer of the Borrower acceptable to the Administrative Agent certifying as to the Debt Service Coverage Ratio for the Test Period ending as of the end of the applicable month.

(b)    Manager Reports.    The Borrower shall furnish to the Administrative Agent all reports given to or received by the Borrower from the Hotel Operator pursuant to the Hotel Management Agreement within five (5) days of the Borrower's receipts.

(c)    Governmental Notices.    Borrower shall furnish to the Administrative Agent all notices given to or received from Governmental Authorities by the Borrower or the Hotel Operator and all reports on the status of any Default under any Loan Document or any matter which could reasonably be expected to result in a Material Adverse Effect, shall be delivered within three (3) days of the Borrower's receipt of such notice or report;

(d)    Contractor's Reports.    The Borrower shall from time to time, upon request by the Administrative Agent, cause the General Contractor to provide the Administrative Agent with reports in regard to the status of construction of the Additional Improvements, in such form and detail as reasonably requested by the Administrative Agent.

(e)    Architect's Reports.    The Borrower shall from time to time, upon request by the Administrative Agent cause the Architect to provide the Administrative Agent with reports in regard to the status of construction of the Additional Improvements, in such form and detail as reasonably requested by the Administrative Agent.

(f)    Hotel Operator.    The Borrower shall from time to time, upon request by Administrative Agent cause the Hotel Operator to provide the Administrative Agent with reports in regard to the management of the Property, in such form and detail as reasonably requested by the Administrative Agent.

84069529

(g)    <u>Laborers, Subcontractors and Materialmen</u>. The Borrower shall notify the Administrative Agent immediately, and in writing, if it receives any default notice, notice of Lien or demand for past due payment, written or oral, from any laborer, subcontractor or materialmen.

(h)    <u>Ownership of Personalty</u>.    The Borrower shall furnish to the Administrative Agent, if the Administrative Agent so requests, photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which the Borrower claims title to the materials, articles, fixtures and other Personal Property used or to be used in the construction or operation of the Improvements.

(i)    <u>Other Reports</u>.    The Borrower shall furnish such other reports and information (including, without limitation, bank statements) as the Administrative Agent shall reasonably require in writing which shall be delivered to the Administrative Agent as soon as practicable but in no event later than thirty (30) days after the Administrative Agent's request therefore.

Section 6.4    <u>Negative Covenants</u>. The Borrower covenants and agrees, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed that it shall not (directly or indirectly) do any of the following:

(a)    <u>No Amendments to Material Agreements</u>. Amend or otherwise modify any Major Contract, the Plans and Specifications (except as provided in **Section 6.2(h)**), the Architect Contract, the General Contractor's Agreement or any organizational document of the Borrower.

(b)    <u>No Debt</u>. Incur any Debt, other than (1) the Loan, (2) the Subordinate Loan and (3) Affiliate advances or trade payables or accrued expenses incurred in the ordinary course of the business set forth in subsection (v) above of **Section 6.5** (including equipment and capital leases). No other Debt other than the Loan may be secured (senior, subordinate or *pari passu*) by the Property other than the Subordinate Loan; **provided** that the Subordinate Loan may be secured by a subordinate Lien on the Property so long as the lender thereunder shall enter into an intercreditor agreement with the Administrative Agent on terms and conditions acceptable to the Administrative Agent in its sole discretion.

(c)    <u>No Transfers or Encumbrances</u>. (i) Permit any direct or indirect sale, conveyance, grant, lease, pledge, transfer, assignment or encumbering of the Property, or any equitable or beneficial interest therein, to any Person (including to Affiliates of the Borrower), including without limitation any transfer of the Property prohibited pursuant to the Hotel Management Agreement.

(ii)    Create, incur, assume or permit to exist any Lien on the Property (including negative pledges) except for (1) mechanic and materialmen liens that are adequately bonded or with respect to which the Title Company has provided the Administrative Agent with affirmative insurance and are less than FIFTY

84069529

85

THOUSAND AND 00/100 DOLLARS ($50,000.00) in the aggregate, and (2) the Permitted Exceptions.

(iii)    Cause or permit any direct or indirect sale, conveyance, transfer, assignment, encumbrance, pledge, hypothecation or granting of any ownership interest in or right to receive distributions from the Borrower or any Person that owns an ownership interest in Borrower or any other "upper-tier entity". The Borrower shall not merge or consolidate with or into any other firm or corporation or enter into any partnership or joint venture with any other Person.

(iv)    Subject the Property or any part thereof to any easement, restriction or covenant (including any restriction or exclusive use provision in any Lease or other occupancy agreement) without the prior approval of the Administrative Agent.

(d)    <u>No Distributions</u>.  Make any distribution or other disbursements (including direct or indirect redemptions of membership interests) to Borrower's Member, Affiliates or Persons owned by or related to Borrower's Member until the Loan has been repaid in full. Notwithstanding the immediately preceding sentence, (i) pursuant to Article 4, the Borrower may use certain funds described therein to pay Operating Expenses, interest on the Outstanding Principal and the Amortization Amount, (ii) after the first anniversary of the Re-Opening, the Borrower shall be permitted to make distributions of Net Operating Income (after payment of all Interest payable on the Outstanding Principal and all payable Amortization Amounts) so long as (a) no Default or Event of Default has occurred and is continuing, (b) all reserves required to be funded pursuant to any Loan Document have been funded prior to any distribution, and (c) the Debt Service Coverage Ratio for the Property for the applicable Reporting Period shall, both before and after giving effect to any distribution of Net Operating Income be at least equal to the Hurdle DSCR.

(e)    <u>Limits on Guaranties</u>.  Guarantee any Obligation of any Person to any other Person other than the Administrative Agent and the Lenders, except for guaranties in favor of Persons providing construction or architectural or other services in connection with the construction and operation of the Additional Improvements and under other agreements approved by the Administrative Agent.

(f)    <u>No Litigation</u>.  Initiate or participate in, without the written consent of the Administrative Agent, any material litigation, proceedings or investigations which (A) contest the consummation of the contemplated transaction or (B) could reasonably be expected to result in a Material Adverse Effect.

(g)    <u>Leases</u>.  Without the prior written consent of Administrative Agent (which consent shall not be unreasonably withheld, conditioned or delayed), in each instance, enter into, amend, modify, cancel or terminate or accept a surrender of any Lease.

84069529

86

(h)     <u>Hotel Management Agreement</u>.  Terminate, cancel, modify or amend the Hotel Management Agreement without the Administrative Agent's prior written approval, which may be granted or denied in the Administrative Agent's sole discretion.

Section 6.5     <u>Single Purpose Entity</u>.  The Borrower covenants and agrees, from the date of this Agreement, and so long as any of the Obligations under the Loan Documents remain unpaid or unperformed that it:

(a)     shall not amend, modify or otherwise change, or permit any other party to amend, modify or otherwise change the Borrower's certificate of formation, operating agreement or other formation agreement or documents without the Administrative Agent's written consent;

(b)     shall not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of, any Person;

(c)     shall not guarantee or pledge its assets for the benefit of, or otherwise become liable on or in connection with, any Obligation of any other Person;

(d)     shall not own any asset other than (i) the Property, and (ii) incidental personal and intangible property necessary for the development or operation of the Property;

(e)     shall not engage, directly or indirectly, in any business other than the acquisition, ownership, management, leasing, disposition, construction, renovation and operation of the Property as the Hotel;

(f)     except for the Hotel Management Agreement, shall not enter into any contract or agreement with Borrower's Member or any Affiliate of the Borrower or Borrower's Member without the Administrative Agent's written consent;

(g)     shall not make any loans or advances to any third party (including any Affiliate) other than trade debt incurred in the ordinary course of business;

(h)     is and will be Solvent and able to pay its Debts from its assets as the same shall become due;

(i)     will conduct and operate its business as presently conducted and as is required by the terms of the Loan Documents;

(j)     will maintain financial statements, books and records and bank accounts separate from those of its Affiliates, including Borrower's Member;

(k)     will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or of Borrower's Member);

84069529

87

(l)     will file any required tax returns;

(m)     will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(n)     will not seek the dissolution or winding up, in whole or in part, of the Borrower;

(o)     will not commingle its funds and other assets with those of any Affiliate of Borrower or Borrower's Member or any other Person;

(p)     has and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate of Borrower or Borrower's Member or any other Person;

(q)     does not and will not hold itself out to be responsible for the debts or obligations of any other Person;

(r)     will not do any act which would make it impossible to carry on its ordinary business;

(s)     will not possess or assign the Property or incidental personal property necessary for the operation of the Property for other than a business or company purpose;

(t)     will not sell, encumber or otherwise dispose of all or any portion of the Property or incidental personal property necessary for the operation of the Property;

(u)     will not hold title to its assets other than in its name; and

(v)     will not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Borrower or a substantial part of the Borrower's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action.

## ARTICLE 7

## MEMBERSHIP CLUB UNITS

Section 7.1    Membership Club Conversion Requirements.  The Borrower shall, as soon as practicable, take all actions necessary or desirable to convert not less than twelve (12) suites designated by the Borrower and approved by the Administrative Agent (the *Membership Club Units*) to a fractional ownership/membership club regime (the *Membership Club Conversion*) and market and offer Membership Club Interests for sale in accordance with the

terms and conditions of this Agreement and in compliance with all applicable Law. The Obligations of the Borrower with respect to the Membership Club Conversion shall include, but not be limited to, the following (the *Membership Club Conversion Requirements*):

(a)    Membership Club Documents.    The Borrower shall prepare or cause to be prepared and submit to the Administrative Agent for its Approval all Membership Club Documents. Without limiting the generality of the foregoing, the Membership Club Documents shall (i) establish the Membership Club as a limited liability company or other organization or association initially owned 100% by the Borrower, (ii) establish the nature and terms of the leasehold or other interest of the Membership Club in the Membership Club Units, (iii) establish the terms and conditions of any shared maintenance, management or common facilities agreements between the Membership Club Units and the remainder of the Hotel, and (iv) establish the terms, conditions, rights and obligations of each Club Membership Interest.

(b)    Amendment to Security Instrument and Loan Documents.    As a condition to the Administrative Agent's consent to the Membership Club Documents, the Borrower shall execute and deliver to the Agent a security agreement in form and substance acceptable to the Administrative Agent pursuant to which the Borrower shall assign to the Administrative Agent, as further security for the Loan all of the Borrower's right, title and interest in and to the Membership Club and to all Membership Interests. In addition, the Administrative Agent may require additional agreements, assignments and other documentation from the Borrower, including without limitation, (i) an assignment of any special declarant rights of the Borrower, (ii) a conditional assignment of the Borrower's or the declarant's (if the declarant under the applicable Membership Club Documents is other than the Borrower) rights under the Membership Club Documents, (iii) evidence that the Borrower is and will be in full compliance with all applicable Laws (including, without limitation, state and federal securities laws), and (iv) evidence that adequate provision has been made for protecting the Administrative Agent and the Lenders from any potential sponsorship liability arising in connection with the construction and sale of the Membership Club Interests.

(c)    Budgets.    The Borrower shall prepare and submit to the Administrative Agent for its Approval the first annual budgets (including, without limitation, the sufficiency of the reserves set forth therein and the funding thereof) for each of the Membership Club. All reserves shall be held in accounts held by the Membership Club. In no event shall the Borrower be permitted to access such reserves for its own use.

(d)    Legal Opinion.    At the time the Offering Plan has been approved by each applicable Governmental Authority, the Borrower shall have furnished to the Administrative Agent an opinion from counsel reasonably satisfactory to the Administrative Agent (and subject to normal and customary qualifications) to the effect that: (A) the Offering Plan has been filed in form and content required by applicable Law, and has been properly filed as a registered Offering Plan under the Timeshare Act, and based on such approval the Membership Club will be properly established and in existence as a timeshare plan, under the Timeshare Act; (B) the Borrower is authorized to commence taking reservations, enter into binding Bona Fide Sales Contracts with purchasers, accept Earnest Money Deposits in connection with the sale of the Membership Club Interests, and except as specified in the preceding clause no additional

89

84069529

approval from any Governmental Authority is required in connection with the marketing and sale of any Membership Club Units; (C) the membership Club Documents satisfy all applicable requirements of Governmental Authorities and applicable Law, including, without limitation, containing all disclosures required pursuant to the provisions of the Timeshare Act and other applicable Laws; (D) the Membership Club Documents can be recorded upon Substantial Completion without any further approvals except to the extent of any material revisions of such documents which revisions would be subject to additional approval by any applicable Governmental Authority; (E) the Membership Club Interests do not constitute a security under California law or under the Securities Act; and (F) any other opinions reasonably required by the Administrative Agent in connection with the filing of the Offering Plan or the Membership Club Conversion.

(e)    Adequate Insurance.  The Borrower shall furnish the Administrative Agent with evidence that each of the Hotel will maintain the Required Insurance after the Membership Club Conversion in accordance with the Loan Documents.

(f)    Required Bonding.   The Borrower shall procure and furnish the Administrative Agent with a copy of any bond or letter of credit required to be delivered to the any Governmental Authority under the Timeshare Act; provided, that if such bond or letter of credit is not required until the first closing of the sale of one of the Membership Club Interests, such bond or letter of credit shall be delivered to the Administrative Agent for Approval immediately prior thereto.

Section 7.2    Membership Club Interests Marketing and Conversion.  Prior to the satisfaction of all of the Membership Club Conversion Requirements, the Borrower shall not file the Offering Plan or circulate or enter into any preliminary offering or binding or non-binding sales contracts or statements of interest without first obtaining the Administrative Agent's written consent with respect to the form and content of such materials.   The Administrative Agent's Approval shall be based in part upon receipt of satisfactory evidence that such communications and agreements are in full compliance with all applicable Law.

(b)    The Borrower shall be responsible for paying for all of the costs and expenses for itself and the Administrative Agent in connection with this Article 7, including without limitation, all recording costs and taxes.

Section 7.3    Sale of Units.

(a)    The Borrower shall use commercially reasonable efforts to market and sell the Membership Club Interests and/or fractional interests therein in accordance with the terms of this Agreement, the Offering Plan and the other the Fractional Ownership Documents.

(b)    The Borrower shall comply in all material respects with all applicable Laws and the provisions of the Membership Club Documents in connection with the offering and sale of Membership Club Interests.

84069529

90

(c)     Without the prior written consent of the Administrative Agent, the Borrower shall not, directly or indirectly:

(i)     enter into any Purchase Agreement with respect to any Membership Club Interests unless (A) such purchase and sale agreement is a Bona Fide Sales Contract, (B) the sale price is greater than or equal to the Minimum Release Price, (C) the sale price is payable in full by bank or certified check or wire transfer at closing, (D) such Bona Fide Sales Contract shall require the purchaser to deposit with the Escrow Agent at contract execution, an Earnest Money Deposit in cash in an amount equal to not less than ten percent (10%) of the purchase price and shall provide that such amounts may be retained by the Borrower as liquidated damages upon default by the purchaser of its purchase obligation under such Bona Fide Sales Contract and (E) such Bona Fide Sales Contract shall be subject to no conditions upon the purchaser's obligation thereunder (other than financing contingencies, customary title conditions and rights of rescission required by Law and other matters contained in the Bona Fide Sales Contract form Approved by the Administrative Agent);

(ii)     amend, modify or supplement any Bona Fide Sales Contract in any material manner not permitted pursuant to clause (i) above, or terminate any Bona Fide Sales Contract (except for default on the part of a purchaser thereto, **provided** such termination does not have a material negative economic impact on the Hotel and Membership Club Units taken together, or except as otherwise required by Law, but in either event with prompt notice to the Administrative Agent), or permit any of the foregoing actions to be taken; or

(iii)     release any deposit under any Bona Fide Sales Contract, except in each case, in accordance with the terms of such Bona Fide Sales Contract and this Agreement.

(d)     If the purchaser under any Bona Fide Sales Contract shall default in performance of its obligations thereunder and the Borrower shall retain the deposit thereunder as liquidated damages, the Borrower shall give prompt notice to the Administrative Agent of such retention and shall prepay the Outstanding Principal in an amount equal to such deposit (net of reasonable collection expenses).

(e)     Anything to the contrary provided in this **Article 7** notwithstanding, the Borrower shall not close or permit the Membership Club to close on the sale of any Membership Club Interests prior to the earlier to occur of (i) repayment in full of the Subordinate Loan and (ii) eighteen (18) months after the Closing Date.

(f)     The Borrower shall, in addition to the insurance required elsewhere in this Agreement, comply with any additional insurance requirements of the Borrower contained in the Membership Club Documents.  The Borrower shall cause the Membership Club to furnish to the Administrative Agent, at no cost or expense to the Administrative Agent, a blanket fire insurance policy with extended coverage naming the Administrative Agents and the Membership Club, as

their respective interests may appear, as the insureds, covering all of the Improvements relating to the Membership Club Units for the full replacement value (other than foundations); said fire insurance shall at all times be in an amount equal to 100% of the insurable value of the Improvements relating to the Membership Club Units (other than foundations) and shall otherwise comply with the applicable conditions contained herein and the other Loan Documents.

Section 7.4    Release of Fractional Ownership Units.

(a)    Provided that no Event of Default shall have occurred and be continuing, the Administrative Agent shall release its Lien with respect to one or more membership Club Interests and deliver to the Borrower duly executed UCC-3 release of security interest and other such documents as may be reasonably required to release with respect to the Membership Club Interest from the Lien of the Security Documents upon satisfaction of each of the following conditions:

(i)    the Borrower shall have fully complied with the Membership Club Conversion Requirements as well as the other provisions of this **Article 7**;

(ii)    the Administrative Agent shall have received a copy of an executed Bona Fide Sales Contract with reference to the Membership Club Interest to be released ;

(iii)    the Administrative Agent shall have received not less than three (3) Business Days prior written notice of the proposed release or assignment;

(iv)    contemporaneously with such release or assignment there shall be a sale of such Membership Club Interest pursuant to an approved form of Bona Fide Sales Contract;

(v)    the Administrative Agent shall have received confirmation of payment by wire transfer of immediately available funds into the Sales Proceeds Account an amount (the *Required Release Payment*), equal to eighty-five percent (85%) of the Net Sales Proceeds for such Membership Club Interest; and

(vi)    the Administrative Agent shall have received such other documents, certificates, instruments, opinions or assurances as the Administrative Agent may reasonably request.

(b)    Amounts received by the Administrative Agent under this **Section 7.4**, including Required Release Payments, shall be applied in accordance with **Section 2.10(b)**.

Section 7.5    Purchaser Deposits.  As earnest money deposits paid by Purchasers under the Purchase Agreements (the *Earnest Money Deposits*) are made in connection with the execution of Purchase Agreements or additional deposits are made by the Membership Club Interest Purchasers from time to time, the Borrower shall cause such sums to be deposited with the Title Company or a title company reasonably acceptable to the Administrative Agent, who is

the escrow agent holding the Earnest Money Deposits (the *Escrow Agent*), and shall cause the Escrow Agent to hold the Earnest Money Deposits in an account(s) in escrow pursuant to the terms of the applicable Purchase Agreements and in accordance with applicable Law, as escrow agent in accordance with the escrow agreements (which shall be subject to the Administrative Agent's prior review and approval) with the Borrower. Such account(s) shall bear interest at a passbook rate if and to the extent required by the Bona Fide Sales Agreements or applicable Laws. The Borrower shall instruct and shall use commercially reasonable efforts to cause Escrow Agent to deliver to the Administrative Agent within seven (7) days of the end of each calendar month a statement indicating the amount of funds on deposit representing the Earnest Money Deposits, together with information on the date of deposit, and to which Membership Club Interest each such deposit applies. The Borrower shall not accept any non-cash Earnest Money Deposits. The Borrower shall not be permitted to use or apply the Earnest Money Deposits prior to the closing of the sale of a Membership Club Interest, whereupon the Earnest Money Deposit shall be considered part of the sales price and applied as set forth in Section 7.4. Earnest Money Deposits shall be segregated from other funds and shall be held, applied or returned, as applicable, in accordance with the terms of the respective Purchase Agreement and applicable Laws. To the extent the Borrower becomes entitled to retain any Earnest Money Deposits that have not been previously applied in accordance herewith (*i.e.* upon the forfeiture of any deposit by a purchaser), such amounts shall be paid to the Administrative Agent and applied to reduce the Outstanding Principal in accordance with **Section 2.10(b)**. To the extent that a Purchaser becomes entitled to return of its Earnest Money Deposit under its Purchase Agreement or under applicable Laws, so long as no Event of Default exists, the Borrower shall be entitled to notify the Escrow Agent, with a copy of such notice to be simultaneously sent to the Administrative Agent. The Escrow Agent may not be changed without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld. Notwithstanding the foregoing, the Administrative Agent hereby acknowledges and agrees that the Borrower's rights to the Earnest Money Deposits are subject to the requirements of applicable Laws, the rights of the Purchasers to such deposits as set forth in the Purchase Agreements and the escrow agreements with the Borrower, and that the Escrow Agent may be obligated to return the Earnest Money Deposits to such purchasers when and as so required even if an Event of Default exists.

Section 7.6     Additional Condominium Specific Covenants. The Borrower covenants and agrees as follows:

(a) The Borrower shall not amend or permit the board of directors or managers of the Membership Club, to the extent within the Borrower's control, to amend any of the Membership Club Documents in any material respect without the Administrative Agent's prior written consent, except as may be required by a Governmental Authority, or as may be required to cause the Membership Club Documents to comply with applicable Laws.

(b) Any time the Borrower or the board of directors or managers for the Membership Club has the right to act under or has consent rights under the Membership Club Documents or applicable Law, the Borrower shall not take or permit any such action to be taken or consent to be given without first obtaining the consent of the Administrative Agent to the extent such action or consent is material or could have a material adverse affect on the value of

the Membership Club Interests or the Hotel or the Borrower's ability to perform its obligations under the Loan Documents or the Administrative Agent's security interests thereunder.

(c)     The Borrower shall, or shall cause the board of directors or managers for the Membership Club, to the extent within its reasonable control, to promptly report to the Administrative Agent:

(i)     any sixty (60) day delinquency in the payment of assessments due from the Borrower, or in any other obligation of the Borrower as a "member" under the Membership Club Documents,

(ii)     any material damage to the Membership Club Units and of any condemnation or similar proceeding which may affect the Administrative Agent,

(iii)     any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained with respect to the Membership Club or the Membership Club Units, and

(iv)     any proposed action that requires the consent of the owners of the Membership Club Interests.

(d)     To the extent within the Borrower's control, the Administrative Agent shall be entitled to attend meetings of the Membership Club and shall have the right to speak thereat, and the Borrower and/or the Membership Club shall provide the Administrative Agent with reasonable prior written notice (but in any case not less than seven (7) days prior thereto) of any and all meetings of such association.

(e)     The annual budgets for the Membership Club and any material changes thereto, to the extent within the Borrower's control, shall not be adopted without the Administrative Agent's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(f)     The Borrower shall, to the extent within the Borrower's control, cause the Membership Club to deliver to the Administrative Agent within ten (10) days after the Administrative Agent's request an estoppel from the Membership Club in form and substance reasonably acceptable to the Administrative Agent, confirming among other things, that there are no unpaid assessments currently due and payable and that the Borrower is not in default of any of its obligations under the respective Membership Club Documents or to such association.

(g)     Without having first received the Administrative Agent's prior written consent, which may be granted or denied in the Administrative Agent's sole discretion, the Borrower shall not and, to the extent within the Borrower's control, shall not permit any of the following to occur:

(i)     By act or omission, seek to abandon or terminate any of the Membership Club Documents;

(ii)    Change the allocation of expenses or obligations between the membership Club Units and the Hotel as set forth in any of the Membership Club Documents;

(iii)    Change the number of Membership Club Units or change, modify, relocate or further subdivide the boundaries of the Membership Club Units, or designate any of the foregoing as a common element; or

(iv)    Use hazard insurance proceeds for losses to any property of the Membership Club Units for other than the repair, replacement or reconstruction of such property, or as may be required by applicable Laws or the applicable Membership Club Documents, except as otherwise permitted herein or in any of the other Loan Documents.

## ARTICLE 8

## ADMINISTRATIVE AGENT

Section 8.1    <u>Authorization and Action</u>.    WestLB AG, a German banking corporation acting through its New York branch is hereby appointed Administrative Agent under this Agreement and the other Loan Documents and each Lender hereby authorizes the Administrative Agent to act as its agent in accordance with the terms of this Agreement and the other Loan Documents. The Administrative Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. Subject to the express terms of this Agreement, each Lender irrevocably authorizes the Administrative Agent to take such action on such Lender's behalf and to exercise such powers hereunder and under the Loan Documents as are delegated to the Administrative Agent by the terms hereof and thereof, together with such powers and discretion as are reasonably incidental thereto. The Administrative Agent has only those duties and responsibilities that are expressly specified in this Agreement and the other Loan Documents and it may perform such duties by or through its agents or employees. The Administrative Agent shall not have, by reason of this Agreement or any of the other Loan Documents, a fiduciary relationship in respect of any Lender; and nothing in this Agreement or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any of the other Loan Documents except as expressly set forth herein or therein. To the extent that the consent of the Lenders, or any of them, is not expressly required pursuant to this Agreement, then the Administrative Agent shall be permitted to take such actions as it deems necessary or appropriate to fulfill it duties under this Agreement and the other Loan Documents. The Administrative Agent shall not be required to take any action that exposes the Administrative Agent to personal liability or that is contrary to this Agreement or any Law. The provisions of this **Article 8** are solely for the benefit of the Administrative Agent and the Lenders, and no Loan Party or any other Person shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement and the other Loan Documents, the Administrative Agent shall act solely as an agent of the Lenders and the Administrative Agent does not assume and shall not be deemed to have

84069529                                                                                                                95

assumed any Obligation towards or relationship of agency or trust with or for the Borrower or any other Loan Party.

Section 8.2    Administrative Agent's Reliance, Etc.    Neither the Administrative Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or omitted to be taken by any of them under or in connection with the Loan Documents, except for its or their own gross negligence or willful misconduct.  Without limitation of the generality of the foregoing, the Administrative Agent:  (a) may treat the Lender signatory to this Agreement as the holder of such Lender's Ratable Share of the Loan until the Administrative Agent receives and accepts an Assignment and Acceptance entered into by such Lender, as assignor, and an Eligible Assignee, as assignee, as provided in **Section 11.5(b)**; (b) may consult with legal counsel (including counsel for any Loan Party), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with the Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Loan Document on the part of any Loan Party or to inspect the Property (including the books and records) of any Loan Party; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any Lien or security interest created or purported to be created under or in connection with, any Loan Document or any other instrument or document furnished pursuant thereto; and (f) shall incur no liability to any Lender under or in respect of any Loan Document by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, facsimile or telex) believed by it to be genuine and signed or sent by the proper party or parties.

Section 8.3    WestLB AG and Affiliates.    In respect of the Advance made by WestLB AG, New York Branch, and the Note issued to it, WestLB AG, New York Branch shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not the Administrative Agent.  The terms "Lender" and "Lenders" shall, unless otherwise expressly indicated, include WestLB AG, New York Branch, in its individual capacity.  WestLB AG, New York Branch and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, accept investment banking engagements from and generally engage in any kind of business with, the Borrower, Borrower's Member, any Affiliate of the Borrower or of Borrower's Member, and any Person that may do business with or own securities of any such Person, all as if WestLB AG, New York Branch were not the Administrative Agent, and without any duty to account therefor to the Lenders.

Section 8.4    Lender Credit Decision.    Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on the Financial Statements referred to in **Section 6.3(a)** and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and

84069529                                                                                                    96

information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

Section 8.5   Indemnification of Administrative Agent.   (a)   Each Lender severally agrees to indemnify the Administrative Agent (to the extent not promptly reimbursed by Borrower) from and against such Lender's Ratable Share of any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and expenses of counsel) that may be imposed on, incurred by, or asserted against such the Administrative Agent in any way relating to or arising out of the Loan Documents or any action taken or omitted by such the Administrative Agent under the Loan Documents (collectively, the *Indemnified Costs*); provided, that no Lender shall be liable for any portion of such Indemnified Costs resulting from the Administrative Agent's gross negligence or willful misconduct as found in a final, non-appealable judgment by a court of competent jurisdiction. Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its Ratable Share of any costs and expenses (including, without limitation, fees and expenses of counsel) payable by Borrower under **Section 6.1(k)**, to the extent that the Administrative Agent is not promptly reimbursed for such costs and expenses by the Borrower.

(b)   In the case of any investigation, litigation or proceeding giving rise to any Indemnified Costs, this **Section 8.5** applies whether any such investigation, litigation or proceeding is brought by the Administrative Agent, any Lender, any other Lender or a third party. The failure of any Lender to reimburse the Administrative Agent promptly upon demand for its Ratable Share of any amount required to be paid by the Lenders to the Administrative Agent as provided herein shall not relieve any other Lender of its Obligation hereunder to reimburse the Administrative Agent for its Ratable Share of such amount, but no Lender shall be responsible for the failure of any other Lender to reimburse the Administrative Agent for such other Lender's Ratable Share of such amount.

(c)   Without prejudice to the survival of any other agreement of any Lender hereunder, the agreement and obligations of each Lender contained in this Section shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the other Loan Documents.

Section 8.6   Successor Administrative Agents. The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower. Upon any such resignation, the Requisite Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Requisite Lenders and shall have accepted such appointment, within thirty (30) days after the retiring Administrative Agent's giving of notice of resignation, the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least ONE HUNDRED MILLION AND 00/100 DOLLARS ($100,000,000.00). Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Loan

Documents, if any, and such other instruments or notices, as may be necessary or desirable, or as the Requisite Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Loan Documents, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents arising and accruing thereafter. In no event shall any replacement Administrative Agent or any successor Administrative Agent result in any increased or additional cost or expense to the Borrower. If within forty-five (45) days after written notice is given of the retiring Administrative Agent's resignation under this Section no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such forty-fifth (45th) day: (i) the retiring Administrative Agent's resignation shall become effective; (ii) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents; and (iii) the Requisite Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time, if any, as the Requisite Lenders appoint a successor Administrative Agent as provided above. After any retiring Administrative Agent's resignation hereunder as Administrative Agent shall become effective, the provisions of this **Article 8** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement.

Section 8.7    Collateral Documents; Secured Party Action. (a) Each Lender hereby further authorizes the Administrative Agent to enter into the Loan Documents as secured party on behalf of and for the benefit of the Lenders and agrees to be bound by the terms of the Loan Documents; provided that anything in this Agreement or the other Loan Documents to the contrary notwithstanding:

(i)    The Administrative Agent is authorized on behalf of all Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Property granted pursuant to the Loan Documents.

(ii)    Each Lender irrevocably authorizes the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any Collateral: (A) upon payment in full of the Loan and all other Obligations payable under this Agreement and under any other Loan Document; (B) which is sold or to be sold or disposed of as part of or in connection with any disposition permitted under this Agreement, so long as the Borrower is entitled to be granted such a release pursuant to this Agreement; or (C) consisting of a guaranty or an instrument evidencing debt so long as the obligations under such guaranty or such debt evidenced by such instrument has been satisfied or paid in full. Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this **Section 8.7**.

84069529

98

(b)    Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Lender shall have any right individually to realize upon any of the Collateral under the Loan Documents or make demand under the Completion Guaranty (including without limitation through the exercise of a right of set-off against call deposits of such Lenders in which any funds on deposit in accordance with the Loan Documents may from time to time be invested), it being understood and agreed that all rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent for the benefit of the Lenders in accordance with the terms thereof.

Section 8.8    Certain Actions After an Event of Default.    (a)  Upon delivery to the Administrative Agent of notice of an Event of Default pursuant to this Agreement or the Administrative Agent's otherwise obtaining actual knowledge of the existence of an Event of Default, the Administrative Agent shall promptly deliver notice of such Event of Default to the Lenders.  The Administrative Agent may thereafter, from time to time, propose various actions (or forbearance from action) (*Proposed Default Response*) in response to such Event of Default, including, without limitation, foreclosure on all or portions of the Collateral, appointment of a receiver, demand under the Completion Guaranty, or the exercise of other remedies provided in this Agreement and the other Loan Documents, and the Lenders agree that the Administrative Agent may implement such Proposed Default Response upon approval of the Requisite Lenders; provided, that (i) in the absence of any pending Proposed Default Response, beginning thirty (30) days after the notice of the Event of Default has been delivered to the Lenders or was due thereto, the Requisite Lenders may direct the Administrative Agent to exercise specific remedies under the Loan Documents; and (ii) notwithstanding anything to the contrary contained herein, the Lenders agree that the Administrative Agent at all times shall be permitted to exercise such interim remedies (including (A) making Protective Advances, and (B) appointing a receiver) as the Administrative Agent may determine in good faith to be necessary or appropriate to protect the Collateral.

(b)    If the Requisite Lenders do not approve a pending Proposed Default Response within fifteen (15) Business Days after submittal, the Proposed Default Response shall be deemed rejected and the Requisite Lenders shall then be free to direct the Administrative Agent regarding the actions to be taken or not taken in response to the Event of Default, subject to the unanimous approval rights of the Lenders pursuant to **Section 11.15.**

(c)    Notwithstanding the foregoing and anything herein to the contrary, each Lender shall be obligated to fund its Ratable Share of any and all Protective Advances in the event such Protection Advances are deemed necessary by the Administrative Agent (in its sole and absolute discretion) to preserve the Lien of the Security Instrument, the Collateral or any of Lenders' rights under any of the Loan Documents.  If and to the extent any Lender shall fund amounts in excess of the Loan Amount for any purpose, such Lender's Ratable Share of the Loan shall be adjusted from time to time based on the total amounts advanced by all of Lenders from time to time in respect of the Loan

Section 8.9    Defaulting Lender.    (a)  Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Advance that such Lender will not make available to the Administrative Agent such Lender's Ratable Share of such Advance, the

Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Advance in accordance with **Article 2**, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.

(b)    If and to the extent that any Lender (a *Defaulting Lender*) shall not have so made such Ratable Share available to Administrative Agent (individually, a *Deficiency*, and collectively, *Deficiencies*), and the Administrative Agent has advanced such amount to the Borrower, such Defaulting Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at the Default Rate. If such Defaulting Lender shall repay to the Administrative Agent such corresponding amount, such amount (excluding interest) so repaid shall constitute such Defaulting Lender's Ratable Share of the Advance and the Borrower shall have no further Obligation to repay such amount forthwith on demand, but such amount shall be treated as an Advance hereunder. Each of the Lenders agrees that the Borrower or any of the other Lenders shall have the right to proceed directly against any Defaulting Lender in respect of any right or claim arising out of the default of such Defaulting Lender hereunder. If there shall be a Deficiency in respect of any Lender, one or more of the other Lenders shall have the right, but not the Obligation, to advance all or any part of the Ratable Share of an Advance that should have been made by the Defaulting Lender, and the Defaulting Lender agrees to repay upon demand to each of the Lenders (or the Borrower, if applicable), who has advanced a portion of the Deficiency the amount advanced on behalf of the Defaulting Lender, together with interest thereon at the Default Rate. If more than one Lender elects to advance a portion of the Deficiency, such Lenders' advances shall be made based on the relative Ratable Shares of the Loan of each advancing Lender or as otherwise agreed to by such Lenders. In the event the Defaulting Lender fails to advance or repay the Deficiency (with interest at the Default Rate, if applicable) on or prior to the date of the next succeeding Advance, the entire interest of said Defaulting Lender in the Loan shall be subordinate to the interests of the other Lenders, the Defaulting Lender shall have no voting rights under the Loan Documents and all payments otherwise payable to the Defaulting Lender shall be used to advance or repay the Deficiency, as applicable, until such time such Defaulting Lender advances or repays all Deficiencies (including interest at the Default Rate, if applicable).

## ARTICLE 9

## EVENTS OF DEFAULT

Section 9.1    Events of Default.    The occurrence of any of the following events shall be an "Event of Default" hereunder (each, an *Event of Default*):

(a)    Failure to Pay.    (i) The Borrower shall fail to pay any amounts due and payable under any Loan Document (except for Outstanding Principal), including any interest on the Outstanding Principal or any Amortization Amount, within five (5) days of when such payment shall be due and payable; or (ii) the Borrower shall fail to pay any amount of Outstanding Principal (other than any Amortization Amount) when due and payable; or

(b)    <u>Misrepresentations</u>.  Any representation or warranty of any Loan Party under any of the Loan Documents or other materials submitted to the Administrative Agent or the Lenders in connection with the Loan shall have been untrue or incorrect when made in any material respect; or

(c)    <u>Failure to Complete</u>.  The Borrower shall fail to achieve Substantial Completion, Re-Opening or Final Completion in accordance with the terms of **Section 6.2(e)**, subject to delays caused by Force Majeure not to exceed 180 days in the aggregate; or

(d)    <u>Change of Control</u>.  A Change of Control shall occur; or

(e)    <u>Negative Covenants</u>.  The Borrower shall fail to perform, observe or comply with any covenant contained in **Section 6.4**; or

(f)    <u>Bankruptcy</u>.  Any Loan Party becomes subject to a Bankruptcy Event; or

(g)    <u>Insurance</u>.  The failure at any time to obtain, provide, maintain, keep in force the insurance policies required by the Loan Documents; or

(h)    <u>Attachment</u>.  The Property or any material portion thereof, shall be taken, attached or sequestered on execution or other process of law in any action against the Borrower; or

(i)    <u>Claim of Priority</u>.  Any claim of priority (except a claim based upon a Permitted Exception or any claims less than TWO HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) in the aggregate that are affirmatively insured by the Title Company) to the Security Instrument or any other document or instrument securing the obligations of Borrower under the Loan Documents by title, Lien or otherwise shall be upheld by any court of competent jurisdiction or the consenting by Borrower to any such claim of priority; or

(j)    <u>Loss of Lien</u>.  Any Loan Document granting a Lien in favor of the Administrative Agent for the benefit of the Lenders shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien on the Collateral purported to be covered thereby (subject to the Permitted Exceptions and any claims less than TWO HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00) in the aggregate that are affirmatively insured by the Title Company); or

(k)    <u>Invalid Document</u>.  Any Loan Party shall claim in writing that any Loan Document shall for any reason cease to be valid or binding on or enforceable against a Loan Party, and within thirty (30) days thereof (i) such claim shall not be withdrawn in writing by such Loan Party, or (ii) the Borrower shall not provide a replacement for such Loan Document satisfactory to the Administrative Agent in Administrative Agent's sole and absolute discretion; or

(l)    <u>Cross Default</u>.  (i) Any Event of Default (as defined in the Subordinate Loan Documents) shall occur and be continuing under the Subordinate Loan Documents or if the Subordinate Loan shall remain outstanding later than the date that is eighteen (18) months after

101

84069529

the Closing Date, (ii) Debt of any Loan Party in an aggregate amount of over FIFTY THOUSAND AND 00/100 DOLLARS ($50,000.00) shall be accelerated by reason of a default thereunder, or (iii) any event shall occur or condition shall exist and shall continue for more than the period of grace applicable thereto, if any, and shall have the effect of causing, or permitting the holder of any such Debt described in clause (i) above or any trustee or other Person or acting on behalf of such holder to cause such Debt described in clause (i) above to become due prior to its stated maturity or to realize upon any collateral given as security therefore; or

(m)    Non-monetary Judgment.  Any non-monetary judgment or order shall be rendered against any Loan Party or any Affiliate thereof that would reasonably be anticipated to have a Material Adverse Effect, and there shall be any period of ten (10) consecutive Business Days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(n)    ERISA.

(i)    ERISA Event.  Any ERISA Event shall have occurred with respect to a Plan and the sum (determined as of the date of occurrence of such ERISA Event) of the Insufficiency of such Plan and the Insufficiency of any and all other Plans with respect to which an ERISA Event shall have occurred and then exist (or the liability of the Loan Parties and the ERISA Affiliates related to such ERISA Event) exceeds FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00); or

(ii)    ERISA Withdrawal Liability.  Any Loan Party or any ERISA Affiliate of any Loan Party shall have been notified by the sponsor of a Multiemployer Plan that it has incurred Withdrawal Liability to such Multiemployer Plan in an amount that, when aggregated with all other amounts required to be paid to Multiemployer Plans by the Loan Parties and the ERISA Affiliates as Withdrawal Liability (determined as of the date of such notification), exceeds FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00) or requires payments exceeding ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) per annum; or

(iii)    Notice of Reorganization or Termination of Multiemployer Plan.  Any Loan Party or any ERISA Affiliate of any Loan Party shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA, and as a result of such reorganization or termination the aggregate annual contributions of the Loan Parties and their respective ERISA Affiliates to all Multiemployer Plans that are then in reorganization or being terminated have been or will be increased over the amounts contributed to such Multiemployer Plans for the plan years of such Multiemployer Plans immediately preceding the plan year in which such reorganization or termination occurs by an amount exceeding FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00); or

(o)    Claim of Invalid Loan Documents.  If the Borrower or any of Borrower's Member or any Affiliate of the Borrower or any Affiliate of Borrower's Member shall take the

102

position in a written communication with the Administrative Agent or in any litigation that any Loan Document is no longer the valid, binding and enforceable Obligation of the applicable Loan Party thereto, or that the Security Instrument no longer constitutes a valid and perfected first priority lien and security interest in any of the Collateral, subject only to the Permitted Exceptions and other liens and encumbrances expressly consented to by the Administrative Agent or the Lenders; or

(p)    Default of Sponsors.  Any default by any Sponsors occurs under the terms of any of the Sponsor Documents to the extent not cured within the applicable cure period set forth therein, if any; any Sponsors shall be dissolved, liquidated, wound-up or merged; any Sponsors shall for any reason contest, repudiate, or purport to revoke any of the Sponsor Documents; or any of the Sponsor Documents for any reason (except pursuant to the express terms thereof) shall cease to be in full force and effect as to any Sponsors or shall be judicially declared null and void as to any Sponsors (except as a result of action or inaction of Lenders), and the Borrower shall fail to provide within ten (10) days of any such event, a substitute Sponsor Document or Sponsor, as the case may be, satisfactory to Administrative Agent in the Administrative Agent's sole and absolute discretion; or

(q)    Borrower's - SPE Status.  The Borrower shall fail to perform, observe or comply with any covenant contained in Section 6.5; or

(r)    Hotel Management Agreement.  The Hotel Management Agreement shall lapse, terminate or expire other than with the Administrative Agent's consent; or

(s)    ERISA Plan Assets.  The assets of Borrower or any Sponsors become "plan assets" as such term is defined in the regulations of the Department of Labor set forth in 29 C.F.R. §2510.3-101 or the United States Department of Labor or the Internal Revenue Service shall assert in writing that the transactions contemplated by any Loan Document constitute a "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended from time to time; or

(t)    Equity Pledge.  Borrower's Member shall pledge or grant a Lien on any membership interest in the Borrower; or

(u)    Construction Suspended.  Construction of any Improvements shall cease or be suspended for ten (10) consecutive days (except as provided for in the Construction Schedule) for any reason other than a Force Majeure Event or any material breach by the Administrative Agent or Lenders of their obligation to make an Advance hereunder; or

(v)    Survey.  The appearance on any survey required hereunder of any material adverse condition not approved by the Administrative Agent and such condition is not remedied within sixty (60) days after notice thereof by the Administrative Agent to Borrower; or

(w)    Permits.  Any such permit, approval, or agreement obtained from or issued by any Governmental Authority is withdrawn, canceled, terminated or modified to the material detriment of the Borrower or the construction of the Improvements, unless the Borrower

reinstates and confirms in all respects such permit, approval, or agreement previously in effect within a period of twenty (20) Business Days thereafter; or

(x)    Abandonment.  The Borrower requests a termination of the Loan, or confesses in writing its inability to continue or complete construction of the Improvements in accordance with this Agreement, or ceases to do business; or

(y)    Material Adverse Change.  The occurrence of any event or the existence of any fact or circumstance resulting in a Material Adverse Effect; or

(z)    Failure to Perform.  The failure of the Borrower to perform any other term, covenant or condition of this Agreement or of any of the other Loan Documents (other than any such failure specifically enumerated in this Section 9.1) and the continuation of such default for more than thirty (30) days following the giving of notice of such default to the Borrower; provided, that (i) if such default is curable but cannot reasonably be cured within such thirty (30) day period, the Borrower shall have such reasonable period of time to cure such default, provided that (A) the Borrower shall submit to the Administrative Agent, within such thirty (30) day period, a detailed plan to cure such default reasonably satisfactory to the Administrative Agent and (B) the Borrower shall diligently pursue the curing of such default and (ii) no such extension shall be for a period in excess of sixty (60) days (*i.e.*, a total cure period of ninety (90) days), it being understood that the rights to notice and a cure period granted herein shall not be cumulative with any other rights to notice or a cure period in any other Loan Document and the giving of notice or a cure period pursuant to this paragraph shall satisfy any and all obligations of the Administrative Agent or the Lenders to grant any such notice or cure period pursuant to any of the Loan Documents.

## ARTICLE 10

## RIGHTS AND REMEDIES

Section 10.1    Remedies.  (a) Upon the occurrence and continuance of any Event of Default, the Administrative Agent may, at any time thereafter, at its option, exercise any or all of the following rights and remedies:

(b)    The Administrative Agent may declare all unpaid principal of and accrued interest on the Notes, together with all other sums payable under the Loan Documents, to be immediately due and payable, whereupon same shall become and be immediately due and payable, anything in the Loan Documents to the contrary notwithstanding, and without presentation, protest or further demand or notice of any kind, all of which are expressly hereby waived by the Borrower; provided, that upon the occurrence of any Bankruptcy Event with respect to the Borrower or any other Loan Party under the Bankruptcy Code of the United States, the unpaid principal amount of the Loan and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

84069529

(c)    The Administrative Agent may cause the Additional Improvements to be completed and may enter upon the Property and construct, equip and complete the Additional Improvements in accordance with the Plans and Specifications, with such changes therein as the Administrative Agent may, from time to time, and in its sole discretion, deem appropriate. In connection with any construction of the Additional Improvements undertaken by the Administrative Agent pursuant to the provisions of this subsection, the Administrative Agent may:

(i)    use any funds held by the Administrative Agent as security or in escrow;

(ii)    employ existing contractors, subcontractors, including Major Contractors, agents, architects, engineers, and the like, or terminate the same and employ others;

(iii)    employ security guards to protect the Property;

(iv)    make such additions, changes and corrections in the Plans and Specifications as shall, in the reasonable judgment of the Administrative Agent, be necessary or desirable;

(v)    take over and use any and all Personal Property contracted for or purchased by Borrower, if appropriate, or dispose of the same as the Administrative Agent sees fit;

(vi)    execute all applications and certificates on behalf of Borrower which may be required by any Governmental Authority or Law or contract documents or agreements;

(vii)    pay, settle or compromise all existing or future bills and claims which are or may be liens against the Property, or may be necessary for the completion of the Improvements or the clearance of title to the Property, including, without limitation, all taxes and assessments;

(viii)    undertake marketing and advertising of the Hotel, and complete the marketing and leasing of leasable space in the Improvements, enter into new Leases and occupancy agreements and modify or amend existing Leases and occupancy agreements, all as Administrative Agent shall deem to be necessary or desirable;

(ix)    prosecute and defend all actions and proceedings in connection with the construction of the Additional Improvements or in any other way affecting the Property; and

(x)    take such other action hereunder, or refrain from acting hereunder, as Administrative Agent may, in its sole and absolute discretion, from time to time determine, and without any limitation whatsoever, to carry out the intent of

84069529

this Section 10.1(c). The Borrower shall be liable to the Administrative Agent for all costs paid or incurred for the construction, completion and equipping of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section 10.1 or otherwise, and all payments made or liabilities incurred by the Administrative Agent hereunder of any kind whatsoever shall be deemed Advances made to the Borrower under this Agreement and shall be secured by the Security Instrument and the other Loan Documents.

To the extent that any costs so paid or incurred by the Administrative Agent pursuant to this Section 10.1(c), together with all other Advances made by the Lenders hereunder, exceed the Loan Amount, such excess costs shall be paid by the Borrower to the Administrative Agent on demand, with interest thereon at the Default Rate until paid; and the Borrower shall execute such notes or amendments to the Notes as may be requested by the Administrative Agent to evidence the Borrower's Obligation to pay such excess costs and until such notes or amendments are so executed by the Borrower, the Borrower's Obligation to pay such excess costs shall be deemed to be evidenced by this Agreement. In the event the Administrative Agent takes possession of the Property and assumes control of such construction as aforesaid, the Administrative Agent shall not be obligated to continue such construction longer than the Administrative Agent shall see fit and may thereafter, at any time, change any course of action undertaken by it or abandon such construction and decline to make further payments for the account of the Borrower whether or not the Property shall have been completed. For the purpose of this Section 10.1(c), the construction, equipping and completion of the Property shall be deemed to include any action necessary to cure any Event of Default by the Borrower under any of the terms and provisions of any of the Loan Documents.

(d)    The Administrative Agent may appoint or seek appointment of a receiver, without notice and without regard to the solvency of the Borrower or the adequacy of the security, for the purpose of preserving the Property, preventing waste, and to protect all rights accruing to Lender by virtue of this Agreement and the other Loan Documents, and expressly to do any further acts as the Administrative Agent may determine to be necessary to complete the development and construction of the Additional Improvements. All expenses incurred in connection with the appointment of such receiver, or in protecting, preserving, or improving the Property, shall be charged against the Borrower and shall be secured by the Security Instrument and enforced as a Lien against the Property.

(e)    The Administrative Agent may accelerate maturity of the Notes and any other Debt of the Borrower to the Lenders, and demand payment of the principal sum due thereunder, with interest, advances, costs and reasonable attorneys' fees and expenses (including those for appellate proceedings), and enforce collection of such payment by foreclosure of the Security Instrument or the enforcement of any other Collateral, or other appropriate action.

(f)    The Administrative Agent may, to the extent permitted by applicable Law, at any time and from time to time, without notice (any such notice being expressly waived), without regard to the adequacy of any Collateral, set off and apply any and all deposits (general or specific, time on demand, provisional or final, regardless of currency, maturity, or the branch of Administrative Agent where the deposits are held) at any time held or other sums credited by

or due from Lenders to Borrower against any and all liabilities, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Borrower to the Lenders.

Section 10.2    Power of Attorney.  For the purposes of carrying out the provisions and exercising the rights, powers and privileges granted by or referred to in this Agreement, from and after an Event of Default the Borrower hereby irrevocably constitutes and appoints the Administrative Agent its true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and do and perform any acts which are referred to in this Agreement, in the name and on behalf of the Borrower.  The power vested in such attorney-in-fact is, and shall be deemed to be, coupled with an interest and irrevocable.

Section 10.3    Remedies Cumulative.    Upon the occurrence of any Event of Default, the rights, powers and privileges provided in this **Article 10** and all other remedies available to the Administrative Agent and the Lenders under this Agreement or under any of the other Loan Documents or at Law or in equity may be exercised by the Administrative Agent and the Lenders at any time and from time to time and shall not constitute a waiver of the Administrative Agent's or any of the Lenders' other rights or remedies thereunder, whether or not the Loan shall be due and payable, and whether or not the Administrative Agent shall have instituted any foreclosure proceedings or other action for the enforcement of its rights under the Loan Documents.

Section 10.4    Waivers.  The Borrower hereby waives to the extent not prohibited by applicable Law:  (a) all presentments, demands for payment or performance, notices of nonperformance (other than those expressly provided in the Loan Documents), protests and notices of dishonor; (b) any requirement of diligence or promptness on the Lenders' part in the enforcement of its rights (but not fulfillment of its obligations) under the provisions of this Agreement or any other Loan Document; and (c) any and all notices of every kind and description which may be required to be given by any statute or rule of law.

Section 10.5    Course of Dealing, Etc.  No course of dealing and no delay or omission by the Lenders or the Borrower in exercising any right or remedy hereunder shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  No waiver or consent shall be binding upon the Lenders unless it is in writing and signed by the Administrative Agent.  The Administrative Agent's exercise of the Administrative Agent's right to remedy any default by the Borrower to the Lenders or any other Person shall not constitute a waiver of the default remedied, a waiver of any other prior or subsequent default by the Borrower or a waiver of the right to be reimbursed for any and all of its expenses in so remedying such default.

Section 10.6    Limitation of Liability.  The liability of the Borrower shall be limited to its assets.  The Lenders shall not be entitled to, and shall not enforce, the liability and obligation of the Borrower to perform and observe the Obligations contained in this Agreement, the Notes or in any of the other Loan Documents by any action or proceeding wherein personal

liability shall be sought for the Borrower's obligations against any partners or members (or other constituent party(ies)), principals of the Borrower or any officers, shareholders, directors, agents, employees or servants thereof or of any Person comprising the Borrower (the *Exculpated Parties*). The provisions of this Section shall not, however, (i) constitute a waiver, release or impairment of any Obligation evidenced or secured by this Agreement, the Security Instrument, the Notes or any of the other Loan Documents; (ii) impair the right of the Administrative Agent or the Lenders to name the Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of the Environmental Indemnity or any guaranty made in connection with the Loan or any of the rights and remedies of the Administrative Agent or the Lenders thereunder; (iv) impair the right of the Administrative Agent or the Lenders to obtain the appointment of a receiver; (v) impair the enforcement of the assignment of leases provided in the Security Instrument; or (vi) constitute a waiver of the right of the Administrative Agent or the Lenders to enforce the liability and obligation of the Borrower against the Borrower, by money judgment or otherwise, to the extent of any actual loss, damage, cost, expense, liability, claim or other obligation incurred by the Lenders (including reasonable attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(a)    Any failure by the Borrower to deliver to the Administrative Agent any rents, receipts, sale proceeds, insurance proceeds or condemnation payments covering all or a portion of the Property in accordance with the Loan Documents or any failure by the Borrower to apply any such proceeds in accordance with the Loan Documents;

(b)    Any failure to procure or maintain policies of insurance as required by the Loan Documents;

(c)    Any failure to pay amounts necessary to pay real estate taxes and assessments or any other liability which would rank senior to the Loan with regard to payment or security on the Property;

(d)    Any fraud, tortious conduct or material misrepresentation by the Borrower or Borrower's Member or any other Loan Party in connection with the Loan, any of the Loan Documents or any of the Collateral;

(e)    Any failure by the Borrower to perform the Borrower's environmental obligations under the Environmental Indemnity or the other Loan Documents;

(f)    Any filing of a voluntary bankruptcy proceeding by the Borrower or an involuntary proceeding by any member of the Borrower not dismissed within the time period(s) set forth in the Loan Documents;

(g)    Any failure to pay all LIBO Breakage Costs due to any Lender;

(h)    All costs of compliance with the ADA and similar state and/or local Laws;

(i)    Any transfer in violation of the Loan Documents;

(j)    Any failure by the Borrower to maintain unencumbered marketable title to the Property;

(k)    Any costs incurred in connection with the enforcement of remedies in connection with the Loan; and

(l)    Any challenge by the Borrower or any Loan Party to any foreclosure procedure or other exercise of remedies by the Administrative Agent in connection with the Loan.

## ARTICLE 11

### GENERAL CONDITIONS

Section 11.1    <u>Rights of Third Parties</u>.  All conditions of the obligations of each Person hereunder, including the Obligations and Lenders' obligation to make Advances, are imposed solely and exclusively for the benefit of Lenders and their successors and assigns and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will make Advances in the absence of strict compliance with any or all thereof and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by the Administrative Agent at any time if in its sole discretion it deems it desirable to do so.  In particular, the Lenders make no representations and assume no obligations as to third parties concerning the quality of the construction by the Borrower of the Improvements or the absence therefrom of defects.

Section 11.2    <u>Relationship</u>.    The relationship between the Lenders and the Borrower is solely that of a lender and borrower, and nothing contained herein or in any of the other Loan Documents shall in any manner be construed as making the parties hereto partners, joint venturers or any other relationship other than lender and borrower.  In addition, no Lender is the agent or representative of the Borrower and this Agreement shall not make any Lender liable to materialmen, contractors, craftsmen, laborers or others for goods delivered to or services performed by them upon the Property, or for debts or claims accruing to such parties against the Borrower and there is no contractual relationship, either express or implied, between any Lender and any materialmen, subcontractors, including Major Contractors, craftsmen, laborers, or any other Person supplying any work, labor or materials for the Improvements.

Section 11.3    <u>Evidence of Satisfaction of Conditions</u>.    Any condition of this Agreement which requires the submission of evidence of the existence or nonexistence of a specified fact or facts implies as a condition the existence or non-existence, as the case may be, of such fact or facts and the Administrative Agent shall, at all times, be free independently to establish to its satisfaction and in its absolute discretion such existence or nonexistence, except where the Administrative Agent expressly agrees hereunder to be reasonable.

Section 11.4    <u>Notices</u>.    (a)    Any notice, report, demand, approval or other instrument authorized or required by this Loan Agreement and the other Loan Documents, to be

given or furnished shall be in writing and shall be deemed given or furnished (i) when addressed to the party intended to receive the same, at the address of such party as set forth below, and delivered at such address, (ii) three (3) days after the same is deposited in the United States mail as first class certified mail, return receipt requested, postage paid, (iii) when delivered by nationwide commercial courier service, one (1) business day after the date of delivery of such notice to the courier service, or (iv) when transmitted by facsimile to the facsimile number set forth below, to the party intended to receive same, provided that such transmission is confirmed by duplicate notice in such other manner as permitted above, upon receipt at such facsimile number (any facsimile notice delivered after 5:00 P.M. EST being deemed delivered on the next Business Day):

<u>Administrative Agent</u>:

    WestLB AG, New York Branch, as administrative agent
    for itself and other co-lenders
    1211 Avenue of the Americas
    New York, New York 10036
    Attention: Bruce F. Davidson, Global Structured Finance - Infrastructure
    Facsimile: (212) 921-5947

<u>with a copy to</u>:

    Katten Muchin Rosenman LLP
    575 Madison Avenue
    New York, New York 10022-2585
    Attention: Sheri Chromow, Esq.
    Facsimile: (212) 894-5527

<u>Borrower</u>:

    Lantana Mendocino, LLC
    1 Riverwalk Center, Suite 100
    110 South Poplar Street
    Wilmington, DE 19801
    Attention: David J. Wilk

with a copy to:

Duane D. Werb, Esq.
Werb & Sullivan
300 Delaware Avenue, Suite 1018
Wilmington, DE 19801

and to:

Walter Wetterman, Esq.
44570 Gordon Lane
Mendocino, CA 95460

(b)     Any party may change the address to which any such notice, report, demand or other instrument is to be delivered or mailed, by furnishing written notice of such change to the other parties, but no such notice of change shall be effective unless and until received by such other parties. Rejection or refusal to accept, or inability to deliver because of changed address or because no notice of changed address was given, shall be deemed to be receipt of any such notice.

Section 11.5   Assignment. (a)   The Borrower may not assign this Agreement or any of its rights or obligations hereunder without the prior approval of the Administrative Agent.

(b)     Each Lender may assign its rights and obligations under this Agreement (including, without limitation, such portion of the Advances owing to it and the Note or Notes held by it); provided, that (i) each such assignment shall require the consent of Administrative Agent, which consent shall not be unreasonably withheld or delayed, (ii) each such assignment shall be to an Eligible Assignee, (iii) the parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance and recording in the Register, an Assignment and Acceptance in the form set forth on **Exhibit 11.5(b)**, together with the Note or Notes subject to such assignment and a processing and recordation fee of THREE THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($3,500.00) payable to the Administrative Agent, and (iv) except in the case of an assignment to a Person that, immediately prior to such assignment, was a Lender or an Affiliate of any Lender or an assignment of all of a Lender's rights and obligations under this Agreement, the aggregate value of the rights being assigned to such assignee pursuant to such assignment (determined as of the date of the Assignment and Acceptance with respect to such assignment) shall in no event be less than ONE MILLION AND 00/100 DOLLARS ($1,000,000.00) and shall be in an integral multiple of TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00); provided, that the Administrative Agent shall not be subject to the foregoing dollar amount restrictions in connection with any assignments it makes in syndicating the Loan.

(c)     Upon such execution, delivery, acceptance and recording, from and after the effective date specified in such Assignment and Acceptance, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to

84069529                                                                        111

and assumed by it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it and assumed by the assignee pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations (to the extent arising or accruing after the effective date of the assignment) under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(d)     By executing and delivering an Assignment and Acceptance, each Lender assignor thereunder and each assignee thereunder confirm to and agree with each other and the other parties thereto and hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of, or the perfection or priority of any Lien or security interest created or purported to be created under or in connection with, this Agreement or any other Loan Document or any other instrument or document furnished pursuant hereto or thereto; (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any other Loan Party or the performance or observance by any Loan Party of any of its obligations under any Loan Document or any other instrument or document furnished pursuant thereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the Financial Statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon Administrative Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the Administrative Agent to take such action as the Administrative Agent on its behalf and to exercise such powers and discretion under the Loan Documents as are delegated to the Administrative Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(e)     Within five (5) Business Days after the Borrower receives notice from the Administrative Agent that the recording set forth in Section 11.5(b) has been completed, the Borrower, at its own expense, shall execute and deliver to the Administrative Agent, in exchange for each surrendered Note, a new Note to the order of such Eligible Assignee in an amount equal to the amount assumed by such Eligible Assignee pursuant to the applicable Assignment and Acceptance and, if the assigning Lender has retained some portion of its obligations hereunder, a new Note to the order of the assigning Lender in an amount equal to the amount retained hereunder. Such new Notes shall provide that they are replacements for the surrendered Notes, shall be in an aggregate principal amount equal to the aggregate principal amount of the surrendered Notes, shall be dated the effective date of such Assignment and Acceptance and

shall otherwise be substantially the form of the assigned Notes. The surrendered Notes shall be canceled and returned to the Borrower and the new Notes shall not be deemed delivered by the Borrower until the Borrower has received such cancelled or surrendered Notes. Each Lender shall be permitted only one Note for the full amount of its Ratable Share.

(f)     The Administrative Agent shall maintain a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the names and addresses of the Lenders under the Loan Documents of, and the Outstanding Principal amount of the Loan owing under the Loan Documents to, each Lender from time to time (the *Register*). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, together with the Note or Notes requested by the assignee subject to such assignment, the Administrative Agent shall:  (i) accept such Assignment and Acceptance; (ii) record the information contained therein in the Register; and (iii) give prompt notice thereof to the Borrower.

(h)     Each Lender may sell participations in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of the Loan owing to it and the Note or Notes held by it) to any Person other than any Loan Party or any Affiliate of a Loan Party; provided, that (i) such selling Lender's obligations under this Agreement shall remain unchanged, (ii) such selling Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such selling Lender shall remain the holder of such portion of the Loan and such Note for all purposes of this Agreement, (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom. Notwithstanding the occurrence of any secondary transaction, the Borrower shall be entitled to communicate solely with the Administrative Agent or an experienced servicer as the sole point of contact on behalf of the Lenders.

(i)     Any Lender may, in connection with any assignment or participation or proposed assignment or participation pursuant to this **Section 11.5**, disclose to the assignee or participant or proposed assignee or participant, any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower.

(j)     Notwithstanding any other provision set forth in this Agreement, any Lender may at any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Advances owing to it and the Note or Notes held by it) in favor of any Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

84069529                                                                                        113

Section 11.6   <u>Usury Savings</u>.  All agreements herein are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Lenders or the holder hereof for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable Laws.  If, for any circumstances whatsoever, fulfillment of any provision hereof at the time performance of such provisions shall be due, shall involve transcending the limit of validity prescribed by law which a court of competent jurisdiction may deem applicable hereto, then, *ipso facto*, the Obligation to be fulfilled shall be reduced to the limit of such validity, and if for any circumstance the Lenders or the holder hereof shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest.

Section 11.7   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which, when executed and delivered, shall be an original, but such counterparts shall together constitute one and the same instrument.

Section 11.8   <u>Indemnification</u>.   (a)   The Borrower (in such capacity, the *Indemnitor*) shall defend, indemnify and hold harmless the Administrative Agent, each of the Lenders, each Affiliate of any of the foregoing and the respective directors, officers, partners, participants, employees and agents of each of the foregoing, and each other Person controlling any of the foregoing within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20 of the Securities Exchange Act of 1934, as amended (each, an *Indemnified Party*) from and against, and shall reimburse the affected Indemnified Party for, any and all losses, claims, damages, costs, expenses (including without limitation reasonable attorney fees' and expenses), liabilities, fines, penalties and charges of any kind (collectively, the *Losses*), in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of this Agreement or any other Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) the Loan, or the use or proposed use of the proceeds thereof; or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) (a *Claim*), regardless of whether any Indemnified Party is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of any Indemnified Party; provided, that the Indemnitor shall have no Obligation to indemnify any Indemnified Party for any Losses to the extent that a court of competent jurisdiction has determined that the same resulted from the gross negligence or willful misconduct of such Indemnified Party.  In case any such Claim is brought against an Indemnified Party in respect of which indemnification may be sought by such Indemnified Party pursuant hereto, the Administrative Agent shall give prompt written notice thereof to the Indemnitor; provided, that the failure of the Administrative Agent to so notify the Indemnitor shall not limit or affect such Indemnified Party's rights to be indemnified pursuant to this **Section 11.8** except to the extent the Indemnitor is materially prejudiced by such failure.

(b)    Upon receipt of such notice of Claim described in Section 11.8(a), the Indemnitor shall, at its sole cost and expense, in good faith defend any such Claim with counsel reasonably satisfactory to the Administrative Agent and such Indemnified Party. The Indemnitor may settle any Claim against such Indemnified Party without such Indemnified Party's consent, provided (i) such settlement is without any liability, cost or expense whatsoever to such Indemnified Party, (ii) the settlement does not include or require any admission of liability or culpability by such Indemnified Party under any Law and (iii) the Indemnitor obtains an effective written release of liability for such Indemnified Party from the party to the Claim with whom such settlement is being made, which release must be acceptable to such Indemnified Party in such Indemnified Party's sole discretion, and a dismissal with prejudice with respect to all claims made by the party against such Indemnified Party in connection with such Claim. The Administrative Agent and such Indemnified Party shall reasonably cooperate with the Indemnitor, at the Indemnitor's sole cost and expense, in connection with the defense or settlement of any Claim in accordance with the terms hereof.

(c)    If at any time in Indemnified Party's judgment (i) Indemnitor shall fail diligently to investigate, prosecute, negotiate or defend, as applicable, any Claim or (ii) Indemnitor shall fail to keep the Indemnified Parties fully apprised of the status of any Claim, such Indemnified Party may elect, by notice to the Indemnitor thereof, to conduct its own defense through counsel of its own choosing and at the expense of the Indemnitor. If such Indemnified Party elects to defend such Claim by counsel of its own choosing, the Indemnitor shall be responsible for any settlement of such Claim entered into by such Indemnified Party.

(d)    Nothing contained herein shall be construed as requiring the Administrative Agent or any Indemnified Party to expend funds or incur costs to defend any Claim in connection with the matters for which the Administrative Agent or any Indemnified Party is entitled to indemnification pursuant to this Section 11.8. The Obligations of the Indemnitor hereunder shall specifically include the Obligation to expend its own funds, to incur costs in its own name and to perform all actions as may be necessary to protect the Administrative Agent or any Indemnified Party from the necessity of expending its own funds, incurring cost or performing any actions in connection with the matters for which each Lender is entitled to indemnification hereunder.

Section 11.9    Successors and Assigns Included in Parties.    Whenever in this Agreement one of the parties hereto is named or referred to, the heirs, legal representatives, successors and assigns of such parties shall be included and all covenants and agreements contained in this Agreement by or on behalf of the Borrower or by or on behalf of any Lender shall bind and inure to the benefit of their respective heirs, legal representatives, successors and assigns, whether so expressed or not.

Section 11.10    Headings.    The headings of the Articles, Sections and subsections of this Agreement are for the convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect any of the terms hereof.

Section 11.11    Invalid Provisions to Affect No Others.    If fulfillment of any provision hereof or any transaction related hereto at the time performance of such provisions

84069529

115

shall be due, shall involve transcending the limit of validity presently prescribed by law, with regard to obligations of like character and amount, then, *ipso facto*, the Obligation to be fulfilled shall be reduced to the limit of such validity; and if any clause or provision herein contained operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision only shall be held for naught, as though not herein contained, and the remainder of this Agreement shall remain operative and in full force and effect.

Section 11.12 <u>Computation of Time Periods</u>. In this Agreement, with respect to the computation of periods of time from a specified date to a later specified date, the word "from" means both "from and including" and the words "to" and "until" both mean "to but excluding".

Section 11.13 <u>Governing Law</u>. This Agreement shall be construed in accordance with and this Agreement and all matters arising out of this Agreement (whether in contract, tort or otherwise) shall be governed by and law of the State of New York.

Section 11.14 <u>Consent to Jurisdiction</u>. The Borrower and the Lenders hereby irrevocably and unconditionally (a) submit to personal jurisdiction in the State of New York over any suit, action or proceeding arising out of or relating to this Agreement and (b) waive any and all personal rights under the laws of any state (i) to the right, if any, to trial by jury or (ii) to object to jurisdiction within the State of New York or venue in any particular forum within the State of New York. Nothing contained herein, however, shall prevent the Administrative Agent or any Lender from bringing any suit, action or proceeding or exercising any rights against any security and against the Borrower, and against any property of the Borrower, in any other state. Initiating such suit, action or proceeding or taking such action in any state shall in no event constitute a waiver of the agreement contained herein that the laws of the State of New York shall govern the rights and obligations of the Borrower and any Lender hereunder or the submission herein by the Borrower and any Lender to personal jurisdiction within the State of New York.

Section 11.15 <u>Amendments</u>. Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. Moreover, no amendment or waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by the Borrower or any other Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Requisite Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no amendment, waiver or consent shall, unless in writing and signed by all of the Lenders, do any of the following at any time: (a) waive any of the conditions specified in **Article 4** hereof, (b) change the designated percentage that constitutes the Requisite Lenders, (c) release any material portion of the Collateral in any transaction or series of related transactions or permit the creation, incurrence, assumption or existence of any Lien on any material portion of the Collateral in any transaction or series of related transactions to secure any obligations other than obligations owing to the Administrative Agent and the Lenders under the Loan Documents, (d) amend this **Section 11.15**, (e) release Sponsors from the Completion Guaranty, (f) alter the Ratable Share of any Lender,

(g) reduce the principal of, or interest or interest rate on, the Loan payable to any Lender or any fees or other amounts payable to such Lender, or (h) postpone any date scheduled for any payment of principal of, or interest on, the Loan payable to such Lender. Notwithstanding the foregoing, the Borrower shall deal directly with, and be entitled to rely on the Administrative Agent's signature, in connection with all matters related to the Loan Documents.

Section 11.16  <u>Right of First Refusal</u>.  In the event that during the term of the Loan, the Borrower shall decide to develop the Phase II Parcel, neither the Borrower nor any of its Affiliates shall enter into any agreement with any lender with respect to such lender providing construction financing for such development until and unless the Borrower shall offer to West LB AG the opportunity to provide such construction financing on the same terms and conditions as the Borrower (or its Affiliate) would grant to such third party lender.  If West LB does not agree to provide such construction financing within thirty (30) days after its receipt of a notice from the Borrower setting forth the terms and conditions of such construction financing, the Borrower shall be entitled to obtain such financing from another lender; provided that the terms and conditions granted to such lender shall be no more favorable to the lender than the terms and conditions offered to West LB AG.

## ARTICLE 12

## CASUALTY/CONDEMNATION PROCEEDS

Section 12.1  <u>Casualty; Condemnation; Assignment of Proceeds</u>.  (a)  <u>Casualty</u>.  (i)  <u>Notice; Restoration</u>.  The Borrower shall give the Administrative Agent prompt written notice of the occurrence of any casualty affecting the Property or any portion thereof.  In the event of any casualty affecting the Property, Borrower shall promptly commence and diligently prosecute Restoration of the Property.

(ii)  <u>Availability of Proceeds for Restoration</u>.  If there is a casualty to the Property, (A) and (x) the Restoration of the Property can be reasonably completed no later than six (6) months prior to the Maturity Date (such determination to be made solely by the Administrative Agent) (such period to be measured from the date of such casualty), or (y) the reasonably estimated cost of the Restoration is not more than FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00) and (B) all of the conditions and deliveries set forth in **Section 12.2(a)** are satisfied, then the Net Proceeds shall be disbursed by the Administrative Agent to the Borrower for Restoration in accordance with the terms and manner set forth in **Section 12.2**.

If the Net Proceeds are not required to be made available for Restoration pursuant to the foregoing subparagraph, all Net Proceeds may be retained by the Administrative Agent in accordance with the terms of **Section 12.2(b)**.

(b)  <u>Condemnation</u>.  (i)  <u>Notice; Restoration</u>.  The Borrower shall give the Administrative Agent written notice of the actual or threatened commencement of any Partial Condemnation or Total Condemnation affecting the Property promptly following the Borrower's

receipt of notice thereof and shall deliver to the Administrative Agent copies of any and all documents received or prepared by the Borrower in connection therewith. The Borrower shall, at its expense, diligently prosecute any such proceeding. The Administrative Agent shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the Interest Rate provided for herein. If the Property or any portion thereof is the subject of a Partial Condemnation or Total Condemnation, all Condemnation Proceeds relating thereto shall be paid to the Administrative Agent and the Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of **Section 12.2.**

        (ii)    <u>Partial Condemnation</u>. If, in the event of Partial Condemnation, (A) (x) the Restoration of the Property can be reasonably completed no later than six (6) months prior to the Maturity Date (such determination to be made solely by the Administrative Agent) (such period to be measured from the date of such casualty), or (y) at any time during the term of the Loan, and the reasonably estimated cost of the Restoration is not more than FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00), and (B) all of the conditions and deliveries set forth in **Section 12.2(a)** are satisfied, the Net Proceeds shall then be disbursed by the Administrative Agent to the Borrower for Restoration in accordance with the terms and manner set in **Section 12.2**. If the Net Proceeds are not required to be made available for Restoration pursuant to the foregoing subparagraph, all Net Proceeds may be retained by the Administrative Agent in accordance with the terms of **Section 12.2(b).**

        (iii)    <u>Total Condemnation</u>. In the event of a Total Condemnation, all Net Proceeds shall be retained by the Administrative Agent in accordance with the terms of **Section 12.2(b).**

        (c)    <u>Assignment of Proceeds; Adjustment of Claims</u>. All Insurance Proceeds and Condemnation Proceeds relating to the Property are hereby irrevocably assigned to and shall be paid to the Administrative Agent for the benefit of the Lenders, and the Administrative Agent shall deposit such amounts received hereunder into an escrow account designated by the Administrative Agent for disbursement in accordance with this Article. The Administrative Agent may participate in any action, suit or proceeding relating to any such proceeds, causes of action, claims, compensation, awards or recoveries, and during the first ninety (90) days after such casualty or condemnation, the Borrower and the Administrative Agent shall jointly attempt to settle or adjust any insurance claim or condemnation award and thereafter, if the Borrower and the Administrative Agent are unable to either adjust such claim or award for any reason, the Administrative Agent is hereby authorized, in its own name or in the Borrower's name, to adjust any loss covered by insurance, or any Partial Condemnation or Total Condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and the Borrower shall from time to time deliver to the Administrative Agent any instrument required to permit such participation or further evidence such.

        (d)    <u>No Effect on Obligations</u>. Notwithstanding any Partial Condemnation or Total Condemnation, the Borrower shall continue to make all payments required to be made

pursuant to this Agreement at the time and in the manner provided for herein and the Outstanding Principal shall not be reduced until any Net Proceeds shall have been actually received and applied by the Administrative Agent to the reduction or discharge of the Outstanding Principal.

(e)    Sale of Property Prior to Receipt of Proceeds.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by the Administrative Agent of the Insurance Proceeds or Condemnation Proceeds (as applicable), the Administrative Agent shall have the right, whether or not a deficiency judgment shall have been sought, recovered or denied, to receive such Insurance Proceeds or Condemnation Proceeds (as applicable), or a portion thereof sufficient to pay the Outstanding Principal, plus all other amounts owed by the Borrower under the Loan Documents.

Section 12.2    Disbursement of Net Proceeds.  (a)    Requirements; Manner of Disbursement.  If Net Proceeds are required to be made available for Restoration pursuant to either Section 12.1(a) or 12.1(b) above, the Administrative Agent shall make such Net Proceeds available for Restoration in accordance with the following:

(i)    The Net Proceeds shall be made available to the Borrower for the Restoration provided that each of the following conditions are met:

(A)    no Default or Event of Default shall have occurred and be continuing (other than a Material Adverse Effect resulting from a casualty or condemnation);

(B)    neither the Hotel Management Agreement nor any material Lease shall be terminated as a result of such casualty or Partial Condemnation (as applicable) and the Borrower has received no notice of termination relating to any such termination (or otherwise has no knowledge that a party to any of the foregoing agreements intends upon terminating such agreement);

(C)    the Borrower promptly commences Restoration and diligently pursues the same to the Administrative Agent's satisfactory completion;

(D)    the Property and the use thereof after Restoration will be in material compliance with and permitted under applicable Laws;

(E)    Restoration is done and diligently completed by the Borrower in material compliance with all applicable Laws;

(F)    the quality and character of the Property after Restoration shall be at least equivalent to the quality and character of the Property immediately prior to such casualty or Partial Condemnation;

84069529

119

(G)    (i) the estimated time to complete the Restoration, as estimated by the Construction Consultant, does not exceed the effective period of business interruption insurance available to the Administrative Agent on account of such casualty or Partial Condemnation, or (ii) the Borrower provides the Administrative Agent with evidence satisfactory to the Administrative Agent, in its sole and absolute discretion, that, at all times during Restoration, the Debt Service Coverage Ratio shall be at least equal to the Hurdle DSCR;

(H)    the Borrower delivers to the Administrative Agent a written undertaking that it will expeditiously commence and satisfactorily complete with due diligence Restoration in accordance with the terms of this Agreement; and

(I)    evidence that the Net Proceeds, together with any Net Proceeds Deficiency, are sufficient to cover all costs of the Restoration as determined by the Construction Consultant.

In the event any of the foregoing conditions are not satisfied at any time, the disbursement of Net Proceeds shall be paid in accordance with **Section 12.2(b)**.

(ii)    The Net Proceeds shall be held in an escrow account designated by the Administrative Agent, and until disbursed in accordance with the provisions of this Section shall constitute additional security for repayment of the Obligations. The Administrative Agent shall deposit the Net Proceeds in an interest bearing account and all interest earned thereon shall be added to and become part of the Net Proceeds. The Net Proceeds shall be disbursed by the Administrative Agent to the Borrower from time to time during the course of Restoration, upon receipt of evidence (including lien waivers) satisfactory to the Administrative Agent, provided that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same (other than notices of lien or other inchoate liens with respect to amounts not yet due and payable), or any other liens or encumbrances of any nature whatsoever effecting the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of the Administrative Agent and discharged of record or in the alternative fully insured to the satisfaction of the Administrative Agent by the Title Company insuring the lien of the Security Instrument.

(iii)    All plans and specifications required in connection with any Restoration shall be reviewed and reasonably approved by the Administrative Agent. The Administrative Agent shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in

connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in such Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and approval by the Administrative Agent and the Construction Consultant. All out-of-pocket costs and expenses incurred by the Administrative Agent in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable attorney's fees and disbursements and the Construction Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Administrative Agent be obligated to make disbursements of Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Construction Consultant, minus the Casualty Retainage. *Casualty Retainage* means an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Construction Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until (A) thirty (30) days after the Construction Consultant certifies to the Administrative Agent that (y) the Restoration has been completed in accordance with the provisions of this Section, and (z) all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, (B) the Administrative Agent receives evidence satisfactory to the Administrative Agent that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, and (C) the Administrative Agent receives and approves an endorsement to the Title Insurance Policy insuring that the lien of the Security Instrument has not changed; provided that the Administrative Agent will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Construction Consultant certifies to the Administrative Agent that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested in writing by the Administrative Agent or by the Title Company insuring the lien of the Security Instrument and such Title Company issues its endorsement insuring that the priority of the lien of the Security Instrument has not changed.

(v)    The Administrative Agent shall not be obligated to make disbursements of the Net Proceeds more frequently than once in any calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not be sufficient to pay the balance of the total costs which are estimated by the Construction Consultant to be incurred in connection with the completion of the Restoration, the Borrower shall promptly deposit with the Administrative Agent cash or cash equivalents in an amount equal to the deficiency (the *Net Proceeds Deficiency*) before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with the Administrative Agent shall be held by the Administrative Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section shall constitute additional security for the Obligations.

(vii)    Provided no Default or Event of Default shall have occurred and be continuing, if at any time the Net Proceeds, together with any Net Proceeds Deficiency, or the undisbursed balance thereof, shall be in excess of the balance of the total costs which are estimated by the Construction Consultant to be incurred in connection with the completion of the Restoration, the Administrative Agent shall pay such excess to Borrower.  No payment made to the Borrower pursuant to this Section shall in any event prevent the Administrative Agent from requiring the Borrower to make further Net Proceeds Deficiency deposits in the event same shall be required pursuant to the foregoing Section.

(viii)    Any excess of Net Proceeds (together with any earnings thereon) and the remaining balance, if any, of the Net Proceeds Deficiency deposited with the Administrative Agent (together with any earnings thereon) shall be remitted by the Administrative Agent to the Borrower, provided no Default or Event of Default shall have occurred and be continuing under this Agreement, after the Construction Consultant certifies to the Administrative Agent that Restoration has been substantially completed in accordance with the provisions of this Section and the receipt by the Administrative Agent of evidence satisfactory to the Administrative Agent that all costs incurred in connection with Restoration have been paid in full.

(b)    <u>Retention of Net Proceeds by Administrative Agent</u>.  All Net Proceeds (together with any earnings thereon) not required (i) to be made available for the Restoration, or (ii) to be returned to the Borrower as excess Net Proceeds pursuant to **Section 12.2(a)(vii)** or **(viii)** hereof, may be retained and applied by the Administrative Agent after such funds are received toward the payment of the Outstanding Principal of the Loan and all other amounts provided for under this Agreement or any of the other Loan Documents, whether or not then due and payable or, at the discretion of the Administrative Agent, the same may be paid, either in whole or in part, to the Borrower.  If the Administrative Agent shall receive and retain Net Proceeds, the lien of the Security Instrument shall be reduced only by the amount thereof received and retained by the Administrative Agent and actually applied by the Administrative Agent in reduction of the Outstanding Principal or such other amounts.

**(signatures on next page)**

**IN WITNESS WHEREOF,** the Borrower and the Lenders have executed this Agreement on the date first above written.

BORROWER:

**LANTANA MENDOCINO, LLC,**
a Delaware limited liability company

BY: Heritage House Resort, Inc.
    its Manager

By: _____
    Name: David J. Wilk
    Title: President

LENDER:

WestLB AG, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By: _____
Andrew B. Stein
Managing Director

By: _____
Bruce F. Davidson
Director

**Signature Page to Loan Agreement**

**IN WITNESS WHEREOF**, the Borrower and the Lenders have executed this Agreement on the date first above written.

<u>BORROWER</u>:

LANTANA MENDOCINO, LLC
a Delaware limited liability company

By:

By:_____
Name:
Title:

<u>LENDER</u>:

WestLB AG, acting by and through its New York Branch, individually as Lender and as Administrative Agent

By:_____
Andrew B. Stein
Managing Director

By:_____
For  Bruce F. Davidson
Director

**Signature Page to Loan Agreement**

EXHIBIT B

RECEIVED

SEP 1 5 2005

22-60

# PROMISSORY NOTE

Maximum principal            New York, New York
amount: US $19,500,000.00       Dated: as of August 26, 2005

    FOR VALUE RECEIVED, the undersigned, LANTANA MENDOCINO, LLC, a Delaware limited liability company, having an address at c/o David J. Wilk, Lantana Group, One Riverwalk Center, Suite 100, 110 South Poplar Street, Wilmington, Delaware 19801 (the *Borrower*) hereby promises to pay to WESTLB AG, New York Branch, a German banking corporation acting through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036 (the *Lender*), pursuant to that certain Loan and Security Agreement, dated of even date herewith, by and between the Borrower, WestLB AG, New York Branch, as Administrative Agent (the *Administrative Agent*), and such other co-lenders thereto from time to time (as the same may hereinafter be amended, modified, extended and/or assigned from time to time, the *Loan Agreement*), the aggregate principal amount of up to NINETEEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($19,500,000.00) (the *Note Amount*) owing to the Administrative Agent and the Lenders by the Borrower pursuant to the Loan Agreement on the dates and in the amount specified in the Loan Agreement. Capitalized terms that are not defined herein have the meanings given to each in the Loan Agreement.

    The Borrower promises to pay to the Lender or its registered assigns, the unpaid principal amount of the Note Amount as well as interest on the unpaid principal amount of the Note Amount from the date the Loan is advanced until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Loan Agreement.

    Both principal and interest are payable in lawful money of the United States of America to the Administrative Agent, at its account as set forth in the Loan Agreement, immediately available funds.

    This Promissory Note is entitled to the benefits of the Loan Agreement. The Loan Agreement, among other things, (i) provides for the making of advances (the *Loan*) by the Lenders, to the Borrower in an aggregate amount not to exceed the Note Amount, the indebtedness of the Borrower resulting from such Loan being evidenced, in part, by this Promissory Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified. The obligations of the Borrower under this Promissory Note are secured by the Collateral as provided in the Loan Documents.

    All parties now and hereafter liable with respect to this Promissory Note hereby waive presentment, demand, protest, dishonor and all other notices of any kind, except as may otherwise be set forth in the Loan Documents.

    This Promissory Note shall be construed in accordance with, and this Promissory Note and all matters arising out of or relating in any way whatsoever to this Promissory Note (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York.

Notwithstanding anything to the contrary in this Promissory Note or any other Loan Document, the Lender shall not be deemed to have waived any right which the Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Loan secured by the Deed of Trust (as defined in the Loan Agreement) or to require that all Collateral shall continue to secure all of the Loan owing to the Lender.

This Promissory Note may not be amended, modified, waived, changed or discharged orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, amendment or discharge is sought. This Promissory Note shall be binding upon and shall inure to the benefit of the Administrative Agent and the Borrower and their respective successors and assigns permitted hereunder or under the Loan Agreement.

The rights and recourse of the Lender under this Promissory Note are limited to the extent provided in Section 10.6 of the Loan Agreement, which Section is hereby incorporated herein by reference as if fully set forth herein.

(SIGNATURE APPEARS ON NEXT PAGE)

2

IN WITNESS WHEREOF, the Borrower has duly executed this Promissory Note as of the date first written above.

**BORROWER:**

**LANTANA MENDOCINO, LLC,**
a Delaware limited liability company

BY:     Heritage House Resort, Inc.
        its Manager

By: _____
        Name: David J. Wilk
        Title: President

84043022_4.DOC

**EXHIBIT C**

2005-19275
Pg: 1/45

2005-19275
Recorded at the request of
REDWOOD EMPIRE TITLE
09/01/2005 03:09P
Fee: 160.00 No of Pages: 45

OFFICIAL RECORDS
Marsha A Wharff, Clerk-Recorder
Mendocino County, CA

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attention: Timothy G. Little, Esq.

## DEED OF TRUST AND LEASEHOLD DEED OF TRUST WITH SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

THIS DEED OF TRUST AND LEASEHOLD DEED OF TRUST WITH SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (this *Deed of Trust*) is executed effective as of the 26th day of August, 2005, by LANTANA MENDOCINO, LLC, a Delaware limited liability company, whose address is c/o David J. Wilk, Lantana Group, One Riverwalk Center, Suite 100, 110 South Poplar Street, Wilmington, Delaware 19801, as trustor (the "*Trustor*"), in favor of REDWOOD EMPIRE TITLE COMPANY OF MENDOCINO COUNTY, a California corporation, whose address is 376B. Gobbi Street P.O. Box 238, Ukiah, California 95482, as trustee (together with its successors and assigns, *Trustee*), in trust for the benefit of WESTLB AG, a German banking corporation acting through its New York branch, whose address is 1211 Avenue of the Americas, New York, New York 10036, in its capacity as administrative agent for each of the Lenders (as defined in the Loan Agreement (as hereinafter defined)) (together with any successor agent appointed in accordance with the Loan Agreement, *Beneficiary*).

### R E C I T A L S :

A.     This Deed of Trust is given to secure a loan (the *Loan*) in the principal amount of NINETEEN MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($19,500,000.00) advanced pursuant to that certain Loan and Security Agreement, dated as of the date hereof, among Trustor, Beneficiary and the Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the *Loan Agreement*) and evidenced by those certain promissory notes made by the Trustor in favor of the Lenders (such promissory note(s), together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter collectively referred to as the *Note*);

B.     The Trustor, as lessee, and HH LLC, a California limited liability company, as lessor, have entered into that certain Lease Option Agreement, dated as the date hereof (as the same may be amended, modified or supplemented from time to time (the *Lease Option Agreement*) with respect to the Leased Property (as hereinafter defined);

84043032_6.DOC

C.    As a condition precedent to the Lenders making, and the Beneficiary administering, the Loan, the Trustor has agreed to execute and deliver this Deed of Trust in order to create a lien on the Trust Property (as hereinafter defined) and to secure the payment and the performance of the Trustor's Obligations (as hereinafter defined) under the Loan Documents (as hereinafter defined), including the payment of all Obligations when due pursuant to the Notes, the Loan Agreement and the other Loan Documents; and

D.    This Deed of Trust is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Trustor of its Obligations under the Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement and the Notes are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Deed of Trust.

1.    **DEFINITIONS**

As used herein, the following terms shall have the following meanings, provided that capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement:

*Indebtedness* means collectively,

(1) the payment of the indebtedness evidenced by the Notes in lawful money of the United States of America;

(2) the payment of interest (including interest accrued at the Default Rate, if applicable), and all other sums (including the Commitment Fee, LIBOR Breakage and Late Charges, if applicable), payable pursuant to the Loan Agreement, the Notes or the other Loan Documents;

(3) the payment of any amounts payable by the Trustor under any Interest Rate Protection Agreement; and

(4)    to the extent the Trustor is obligated to pay same pursuant to the Notes, the Loan Agreement or the other Loan Documents, the payment of all sums advanced and costs and expenses incurred by the Beneficiary in connection with the Indebtedness or any part thereof, any renewal, extension, or change of or substitution for the Indebtedness or any part thereof, or the acquisition or perfection of any security therefor, whether made or incurred at the request of Trustor or Beneficiary.

*Loan Documents* means, collectively, this Deed of Trust, the Loan Agreement, the Notes, the Environmental Indemnity, the Completion Guaranty, the Collateral Assignment of Interest Rate Protection Agreement, the Consent and Acknowledgement, the Omnibus Assignment, the Equity Pledge and Security Agreement, the Recourse Liability Agreement, the Consent and Subordination of Operating Agreements, all Financing Statements in connection with the foregoing, and all other agreements,

instruments and documents evidencing or securing the Indebtedness, as all of the aforesaid may from time to time hereafter be modified or replaced.

*Obligations* means, collectively, the Trustor's obligations for the payment of the Indebtedness and the performance of each of its other obligations under any Loan Document.

*Trust Property* means:

(1)    all right, title and interest of the Trustor in the real property described in **Exhibit A** attached hereto and made a part hereof and all the privileges, royalties and appurtenances to said land, now or hereafter belonging or in title, interest in, to or under any agreement or right granting, conveying or creating, for the benefit of said land, any easements, rights-of-way, gaps, strips of land adjoining said land or any parcel thereof, ways, alleys, vaults, gores, sewers, sewer rights, waters, water courses, Water Rights (as hereinafter defined), privileges, tenements, hereditaments and rights (including development rights) or license in any way affecting other property and in, to or under any streets, or in or to the air space or development rights over said Land (all of the foregoing hereinafter collectively referred to herein as the *Fee Property*);

(2)    all right, title and interest of the Trustor in, to and under the leasehold and other estates created by the Lease Option Agreement, in those certain plots, pieces and parcels of land described on **Exhibit B** attached hereto and made a part hereof (the *Leased Property*, the Fee Property and the Leased Property being collectively referred to herein as the *Land*) and all amendments, modifications, extension, replacements, guaranties and renewals of, and all credits, deposits and option under the Lease Option Agreement and all privileges, rights and interests of Trustor under the Lease Option Agreement and to all or any portion of the Leased Property;

(3)    all water rights appurtenant to the Land, including, but not limited to, License for Diversion and Use of Water 9511 (Application 20820-D), License for Diversion and Use of Water 11788 (Application 25413), License for Diversion and Use of Water 11789 (Application 25414) and Permit for Diversion and Use of Water 20709 (Application 29984), together with all pumping plants, pipes, flumes and ditches, and all rights in ditches for irrigation relating to the Land (all of the foregoing hereinafter collectively referred to herein as the *Water Rights*);

(4)    all damages, royalties and revenue of every kind, nature and description whatsoever that Trustor may be entitled to receive, either before or after any Event of Default, from any person or entity owning or having or hereafter acquiring a right to the oil, gas or mineral rights and reservations of the Land, with the right in Beneficiary to receive and apply the same to the Indebtedness pursuant to this Deed of Trust and the other Loan Documents;

(5)    all buildings, structures and improvements of every kind and description now or hereafter erected or placed upon the Land; and all landscaping and planted

84043032_6.1    **2005-19275**
**Pg:3/45**

vegetation now or hereafter located on the Land and all of such things whether now or hereafter placed thereon being hereby declared to be real property (the *Improvements*);

(6) all of Trustor's right, title and interest in and to the Suites (the *Suites*), the restaurants, the medical wellness and the spa (all of the foregoing, collectively, the *Premises*);

(7) all right, title and interest of the Trustor in all materials, machinery, supplies, equipment, fixtures, apparatus and other items of personal property now owned or hereafter acquired by the Trustor and now or hereafter attached to, installed in or used in connection with any of the Improvements or the Land, including, without limitation, any and all partitions, dynamos, window screens and shades, drapes, rugs and other floor coverings, awnings, motors, engines, boilers, furnaces, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, swimming pools, heating ventilating, plumbing, lighting, communications and elevator fixtures, laundry, incinerating, air conditioning and air cooling equipment and systems, gas and electric machinery and equipment, disposals, dishwashers, furniture, refrigerators and ranges, securities systems, art work, recreational and pool equipment and facilities of all kinds, water, gas, electrical, storm and sanitary sewer facilities of all kinds, and all other utilities whether or not situated in easements together with all accessions, replacements, betterments, and substitutions for any of the foregoing (the *Fixtures*);

(8) all present and future right, title and interest of Trustor in and to all inventory, equipment, fixtures and other goods (as those terms are defined in the UCC (as defined below)) now or in the future located at, upon or about, or affixed or attached to or installed in, the Improvements, or used or to be used in connection with or otherwise relating to the Improvements or the ownership, use, development, construction, maintenance, management, operation, marketing, leasing or occupancy of the Improvements, including, without limitation, machinery, supplies (whether stored at or off the Land and/or Improvements) furniture, furnishings, equipment, fittings, electronic business machines and equipment, culinary equipment and other articles of personal property of every kind and nature whatsoever now or at any time hereafter affixed to, or attached to, or placed upon, or used or usable in any way in connection with the use, enjoyment, occupancy, management or operation of the Improvements, including, but without limiting the generality of the foregoing, all heating, lighting, laundry, incinerating, landscaping, loading, unloading, garage and power equipment and supplies, engines, pipes, pumps, tanks, motors, conduits, switchboards, plumbing, lifting, cleaning, fire prevention, fire extinguishing, sprinkler systems, refrigerating, ventilating, communications apparatus, air cooling and air conditioning apparatus, elevators, escalators, storm doors and windows, stoves, attached cabinets, partitions, ducts, compressors, shades, blinds, curtains, drapes, awnings, screens, rugs, carpets and other floor coverings, hall and lobby equipment, beds, chairs, desks, tables, lamps, chandeliers, kitchen utensils, silverware, kitchen appliances and restaurant equipment and supplies, glassware, dishware, napery, paintings, pictures, tapestries, pottery and all other works of art, vacuum cleaning systems, cash registers, telephone and reservation systems, electronic data processing and word processing equipment and software, partitions, ducts

2005-19275
Pg: 4/45

and compressors, bed frames, springs, mattresses, sheets, pillow cases, blankets, bed curtains, televisions, radios, lamps, mirrors, wall hangings, decorations, bathroom fixtures, shower curtains, towels, medicine cabinets, hotel cleaning equipment and supplies, and all replacements of and additions to all or any of the foregoing and all other types of tangible personal property of any kind or nature, and all accessories, additions, attachments, parts, proceeds, products, repairs, replacements and substitutions of or to any of such property (collectively, the *FF&E*);

(9)    all right, title and interest of Trustor in and to all goods, accounts, general intangibles, instruments, documents, accounts receivable (including receivables relating to parking revenues), chattel paper, customer contracts and all other personal property of any kind or character, including such items of personal property as defined in the UCC, now owned or hereafter acquired by Trustor and now or hereafter affixed to, placed upon, used in connection with, arising from or otherwise related to the Land and/or the Improvements or which may be used in or relating to the planning, development, financing or operation of the Land and/or the Improvements, including, without limitation, furniture, furnishings, equipment, machinery, money, insurance proceeds, condemnation awards, accounts, contract rights, trademarks, goodwill, chattel paper, documents, trade names, licenses and/or franchise agreements, rights of Trustor under leases of Fixtures or other personal property or equipment, inventory, all refundable, returnable or reimbursable fees, deposits or other funds or evidence of credit or indebtedness deposited by or on behalf of Trustor with any governmental authorities, boards, corporations, providers of utility services, public or private, including specifically, but without limitation, all refundable, returnable or reimbursable tap fees, utility deposits, commitment fees and development costs and all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments against the Trust Property as a result of tax certiorari or any applications or proceedings for reduction (the *Personalty*);

(10)    all right, title and interest of Trustor in all reserves, escrows or impounds required under the Loan Agreement and all unrestricted deposit accounts (including tenant security deposits (subject, however, to the rights of the tenants with respect thereto and to applicable law) and any deposits with respect to utility services furnished or to be furnished to the Premises) maintained by the Trustor with respect to the Trust Property;

(11)    all right, title and interest of Trustor in all plans, specifications, shop drawings and other technical descriptions prepared for construction, repair or alteration of the Improvements, and all amendments and modifications thereof (the *Plans*);

(12)    all right (including the rights to enforce, whether at law or in equity or by any other means, all provisions and options thereof), title and interest of the Trustor in all leasehold estates, real property, equipment leases, (including, without limitation, all leases relating to the extraction and production of oil, gas and other hydrocarbons from below the surface of the Land), subleases, sub-subleases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect and every modification, amendment or other agreement relating thereto) including every



2005-19275
Pg:5/45

guarantee of the performance and observation of the covenants, conditions and agreements to be performed and observed by the other party thereto which grant a possessory interest in, or the right to use or occupy, all or any part of the Trust Property, together with all related security and other deposits; (all of the foregoing hereinafter collectively referred to herein as the *Leases*);

(13) subject to the revocable licenses in favor of Trustor contained in Section 4.2 hereof, all right, title and interest of Trustor in (i) all of the rents, revenues, income, proceeds, issues, profits (including, without limitation, any oil or gas or other mineral royalties and bonuses), security (subject, however, to the rights of the tenants with respect thereto and to applicable law) and other types of deposits, and other benefits paid or payable and to become due or payable by parties to the Leases other than Trustor or using, leasing, licensing, possessing, occupying, operating from, residing in, selling or otherwise enjoying any portion or portions of the Trust Property, (including any claims (A) based on holdover by any lessee, (B) for damages sustained by Trustor, (C) in settlement for any claims of Trustor under or relating to any Leases, (D) any fees or other amounts paid for the cancellation, surrender or early termination of any Lease, or (E) arising under any Federal, state or other Law as a result of or in connection with the bankruptcy or insolvency of any lessee) including all amounts received as claims of any damages under any Leases (collectively, the *Rents*), (ii) all rights, dividends and/or claims of any kind whatsoever relating to any Leases, including, without limitation, any and (A) tax refunds, abatements and claims in tax certiorari proceedings, (B) utility deposits, credits or refunds, (C) surrender, termination, take-back or takeover fees, charges or payments, however characterized relating to any Leases and (D) rights to recoupment of (1) allowances, non-accountable contributions, payments or other consideration paid, or the value of construction or work performed, (2) free rent conceded or allowed, (3) take-over, take-back or other assumption secured obligations paid, (4) the cost of any other payments or inducements to or for the benefit of any tenant and (5) brokerage commissions paid or incurred, by Trustor from any tenant or other party under any lease, and all proceeds resulting therefrom, and together with the right to take any action or file any papers or process in any court of competent jurisdiction, which may in the opinion of Beneficiary be necessary to preserve, protect or enforce such rights or claims, including the filing of any proof of claim in any insolvency proceeding under any state, Federal or other Laws and any rights, claims or awards accruing to or to be paid to Trustor in its capacity as landlord under any of the Leases, (iii) income, royalties, fees, revenues, issues, profits, proceeds, accounts receivable and other benefits now or hereinafter arising directly or indirectly from the Trust Property, or the operations of the Trust Property or any part thereof, (iv) amounts received due to services to, and rentals, percentage rentals and other fees, payments and charges received from tenants, sub-tenants, licenses, concessionaires and occupants of commercial, hotel, public and retail space located at the Trust Property, calculated on a cash basis, whether in cash or in credit, (v) proceeds of the sale of food and beverages, proceeds of rentals of dining rooms, conference rooms and banquet facilities, telephone services, laundry, vending, television and parking services at the Trust Property, the fair market value of any barter transaction and other fees and charges resulting from the operations by Trustor in the

ordinary course of business, health club receipts, and other receipts, annual membership dues, the proceeds of the sale of any property of Trustor in the ordinary course of business, proceeds, if any, from business interruption or other loss of income insurance (net of the costs of collection thereof), income derived from securities and other property acquired and held by Trustor for investment and proceeds of any business interruption insurance; and; (vi) all other payments arising from the operation of the Trust Property as a hotel for goods sold or leased or for services rendered, whether or not yet earned by performance, including, without limiting the generality of the foregoing, (x) all accounts arising from the operation of the Trust Property and (y) all rights to payment from any consumer credit/charge card organization or entity (such as, or similar to, the organization or entities which sponsor and administer the American Express Card, the Visa Card, the MasterCard, the Carte Blanche Card, or the Discover Card), whether now existing or hereafter created, substitutions therefor, proceeds (whether cash or non-cash, movable or immovable, tangible or intangible) received upon the sale, exchange, transfer, collection or other disposition or substitution thereof and any and all of the foregoing and proceeds therefrom (collectively the *Rents and Profits*);

(14)    all right, title and interest of the Trustor in any interest rate protection arrangement to which the Trustor is a party, including any Lender Interest Rate Protection Agreement, and all agreements, instruments, documents and contracts now or hereafter entered into by the Trustor with respect to any such interest rate protection arrangement;

(15)    all right, title and interest of the Trustor in all other agreements, such as the Fractional Ownership Documents, construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, marketing agreements, listing agreements, reciprocal easement or operating agreements, declarations, development agreements, parking agreements, service contracts, permits, licenses, certificates and entitlements in any way relating to the development, construction, use, occupancy, operating, maintenance, enjoyment, acquisition or ownership of the Trust Property or the sale of goods or services produced in or relating to the Trust Property (the *Property Agreements*);

(16)    all right, title and interest of the Trustor in all certificates, including certificates of occupancy and certificates of compliance, authorizations, franchises, consents and approvals given by and licenses and permits issued by Governmental Authorities, and other rights and privileges issued by any and all Governmental Authorities and any other Persons in connection with the ownership, operation, construction, use, management, leasing or occupancy of the Premises;

(17)    all rights, privileges, titles, interests, liberties, tenements, hereditaments, rights-of-way, easements, sewer rights, water, water courses, air rights and development rights, licenses, permits and construction and equipment warranties, appendages and appurtenances appertaining to the foregoing, and all right, title and interest, if any, of the Trustor in and to any streets, ways, alleys, underground vaults, passages, strips or gores of land adjoining the Land or any part thereof;

(18)    subject to the rights of Trustor hereunder or under the Loan Agreement, all insurance policies, unearned premiums therefore and proceeds from such policies, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, covering any of the above property now or hereafter acquired by Trustor;

(19)    all right, title and interest of Trustor in all environmental tests, studies and reports, current and future environmental claims and rights of action including tort claims and rights of indemnity and contribution under any Environmental Law against the prior owners, neighboring owners, tenants, consultants, advisors and third parties;

(20)    to the extent assignable, all permits, licenses (including, but not limited to, any operating licenses and liquor licenses, governmental approvals and authorizations relating to the Trust Property;

(21)    all names, including, but not limited to, "The Heritage House Spa and Resort", "Heritage House Inn" or variations thereof, under or by which any portion of the Land and/or the Improvements may at any time be operated or known, and all rights to carry on business under any such names or any variant thereof, and all trademarks, trade names, patents pending and goodwill relating to the Land and/or Improvements (collectively, *Trademarks*);

(22)    all mineral, riparian, littoral, water, oil and gas rights now or hereafter acquired and relating to all or any part of the Trust Property;

(23)    all of the Trustor's right, title and interest in and to any awards, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any Governmental Authority pertaining to the Land, Improvements, Fixtures or Personalty;

(24)    all accessories, replacements, renewals, additions and substitutions for any of the foregoing; and

(25)    all products and proceeds of all or any of the foregoing.

*UCC* means the Uniform Commercial Code as the same may be amended, modified or recodified from time to time in the State of California and such other jurisdictions where Financing Statements shall be filed from time to time to indicate Beneficiary's security interest in all or any portion of the Collateral.

2.    **GRANT**

2.1    To secure the payment, performance and discharge of the Obligations, Trustor, by these presents, hereby grants, assigns, mortgages, transfers and conveys unto the Trustee, IN TRUST, WITH POWER OF SALE for the use and benefit of Beneficiary, with right of entry and possession (to the extent permitted by applicable law), the Trust Property, to

have and to hold the Trust Property unto Trustee, its successors, substitutes and assigns forever. Trustor hereby binds itself, and Trustor's successors, substitutes and assigns, to warrant and forever defend unto Beneficiary, its successors and assigns, the title to the Land and Improvements, together with all other rights of Trustor in and to the balance of the Trust Property, subject to the Permitted Encumbrances in connection with the Trust Property.

3.    SECURITY AGREEMENT AND FIXTURE FILING

**Security Agreement**

3.1    This Deed of Trust constitutes both a real property deed of trust and a "Security Agreement" on personal property within the meaning of the UCC and other applicable law and with respect to the Personalty, Fixtures, Plans, Permits Leases, Rents and Property Agreements (said portion of the Trust Property subject to the UCC, the *UCC Collateral*). The Trust Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Trustor in the Trust Property. Trustor, by executing and delivering this Deed of Trust, hereby grants to Beneficiary, a first and prior security interest in the Personalty, Fixtures, Plans, Permits, Leases, Rents and Profits and Property Agreements and all other Trust Property which is personal property to secure the payment of the Indebtedness and performance of the Obligations and agrees that Beneficiary shall have all the rights and remedies of a secured party under the UCC with respect to such property including, without limiting the generality of the foregoing, the right to take possession of the UCC Collateral or any part thereof, and to take such other measures as Beneficiary may deem necessary for the care, protection and preservation of the Collateral. During the continuance of an Event of Default, upon request or demand of Beneficiary, Trustor shall, at its expense, assemble the UCC Collateral and make it available to Beneficiary at the Land. Trustor shall pay to Beneficiary, on ten (10) Business Days' written notice, any and all expenses, including actual reasonable legal expenses and attorneys' fees, incurred or paid by Beneficiary in protecting the interest in the UCC Collateral and in enforcing the rights hereunder with respect to the UCC Collateral. Any notice of sale, disposition or other intended action by Beneficiary with respect to the UCC Collateral sent to Trustor in accordance with the provisions hereof at least ten (10) Business Days prior to such action, shall constitute commercially reasonable notice to Trustor. The proceeds of any disposition of the UCC Collateral, or any part thereof, shall, except as otherwise required by law, be applied by Beneficiary in accordance with Section 6.7 hereof.

Trustor's chief executive office and principal place of business is at the address set forth in the first paragraph of this Deed of Trust; Trustor shall promptly notify Beneficiary of any change in such address.

**Fixture Filing**

3.2    This Deed of Trust shall constitute also a fixture filing under Section 9502 of the UCC and any other applicable Uniform Commercial Code, each as amended and

84043032_6.DOC

recodified from time to time, with respect to all Fixtures. Beneficiary shall have all rights with respect to the fixtures afforded to it by the applicable Uniform Commercial Code, in addition to, but not in limitation of, the other rights afforded Beneficiary by the Loan Documents. A carbon, photographic or other reproduction of this Deed of Trust shall be sufficient as a financing statement. Beneficiary shall have the right at any time to file a manually executed counterpart or a carbon, photographic or other reproduction of this Deed of Trust as a financing statement in either the central or local UCC records of any jurisdiction wherein the Trust Property is located, but the failure of Beneficiary to do so shall not impair (a) the effectiveness of this Deed of Trust as a fixture filing as permitted by the applicable Uniform Commercial Code, or (b) the validity and enforceability of this Deed of Trust in any respect whatsoever. The following information is included for purposes of meeting the requirements of a financing statement.

(a) The name of the debtor is Lantana Mendocino, LLC, a Delaware limited liability company;

(b) The mailing address of the debtor is c/o David J. Wilk, Lantana Group, one Riverwalk Center, Suite 100, 110 South Poplar Street, Wilmington, Delaware 19801;

(c) The debtor's organizational identification number is 20-1640795;

(d) The name of the secured party is WestLB AG, a German banking corporation acting through its New York branch; and

(e) The address of the secured party is 1211 Avenue of the Americas, 23rd Floor, New York, New York 10036, Attention: Bruce F. Davidson.

**Attorney-in-Fact**

3.3 Trustor hereby irrevocably appoints Beneficiary, its successors and assigns, as its attorney-in-fact, which appointment is irrevocable and coupled with an interest, after the occurrence and during the continuance of an Event of Default and upon written notice to Trustor (a) to execute and/or record any notices of completion, cessation of labor or any other notices that Beneficiary deems appropriate to protect Beneficiary's interests, if Trustor shall fail to do so within ten (10) days after written request by Beneficiary; (b) upon the issuance of a deed and/or assignment of lease pursuant to the foreclosure of this Deed of Trust or the delivery of a deed and/or assignment of lease in lieu of foreclosure, to execute all instruments of assignment, conveyance or further assurance with respect to the Leases, Rents, Personalty, Fixtures, Plans and Property Agreements in favor of the grantee of any such deed and as may be necessary or desirable for such purpose; (c) to prepare, execute and file or record financing statements, continuation statements, applications for registration and like papers necessary to create, perfect or preserve Beneficiary's security interests and rights in or to any of the Collateral; and (d) to perform any obligation of Trustor hereunder; however: (1) Beneficiary shall not, under any circumstances, be obligated to perform any obligation of Trustor; (2) any sums advanced by Beneficiary in such performance shall be included in the Indebtedness and

shall bear interest at the Default Rate; (3) Beneficiary as such attorney-in-fact shall only be accountable for such funds as are actually received by Beneficiary; and (4) Beneficiary shall not be liable to Trustor or any other person or entity for any failure to take any action which it is empowered to take under this Section 3.3. Beneficiary shall provide Trustor with copies of any notices, instruments or filings executed by Trustor in accordance with this Section 3.3.

4.    ASSIGNMENT OF RENTS AND LEASES AND AGREEMENTS

**Assignment of Rents and Leases**

4.1    Trustor does hereby absolutely and unconditionally assign to Beneficiary, Trustor's right, title and interest in all current and future Leases and the absolute, unconditional and continuing right to receive and collect all Rents, it being intended by Trustor that, to the greatest extent permitted by applicable law, this assignment constitutes a present, outright, immediate, continuing and absolute assignment and not an assignment for additional security only. Such assignment to Beneficiary shall not be construed to bind Beneficiary to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise impose any obligation upon Beneficiary. Beneficiary shall have no responsibility on account of this assignment for the control, care, maintenance, management or repair of the Trust Property, for any dangerous or defective condition of the Trust Property, or for any negligence in the management, upkeep, repair or control of the Trust Property. Trustor agrees to execute and deliver to Beneficiary such additional instruments, in form and substance reasonably satisfactory to Beneficiary, as may hereafter be requested by Beneficiary to further evidence and confirm such assignment.

**License**

4.2    Notwithstanding that Trustor hereby presently grants to Beneficiary an outright, immediate, continuing and absolute assignment of the Rents and Leases and not merely the collateral assignment of, or the grant of a lien or security interest in, the Rents and Leases, Beneficiary hereby grants to Trustor and its successors and not to any lessee or any other person, a license, revocable in accordance with the terms hereof, to collect and receive the Rents and to retain, use and enjoy the same and otherwise exercise all rights as landlord under any Lease, in each case subject to the terms hereof and of the Loan Agreement. Upon the occurrence and during the continuance of an Event of Default, the license granted herein to Trustor shall immediately and automatically cease and terminate and shall be void and of no further force or effect; in each case, Trustor at the request of Beneficiary shall notify in writing all tenants and subtenants under any of the Leases that all Rent due thereunder should be paid to Beneficiary at its address set forth in the Loan Agreement, or at such other place as Beneficiary shall notify Trustor in writing. Notwithstanding said license, Trustor agrees that Beneficiary, and not Trustor, shall be deemed to be the creditor of each tenant or subtenant under any Lease in respect of assignments for the benefit of creditors and bankruptcy, reorganization, insolvency, dissolution or receivership proceedings affecting such tenant or subtenant (without

obligation on the part of Beneficiary, however, to file or make timely filings of claims in such proceedings or otherwise to pursue creditors' rights therein), with an option in favor of Beneficiary to apply in accordance with the Loan Documents any money received by Beneficiary as such creditor in reduction of any amounts due under the Loan Documents. Upon the occurrence and during the continuance of an Event of Default, any portion of the Rents held by Trustor shall be held in trust for the benefit of Beneficiary for use in the payment of the Indebtedness. Upon the occurrence and during the continuance of an Event of Default, Beneficiary shall immediately be entitled to possession of all Rents, whether or not Beneficiary enters upon or takes control of the Trust Property, provided that if such Event of Default ceases to exist, the license shall automatically be reinstated.

### Certain Rights of Beneficiary

4.3    Subject to the revocable license granted above, upon the occurrence and during the continuance of an Event of Default, Beneficiary shall have the immediate and continuing right, power and authority, either in person or by agent, without bringing any action or proceeding, or by a receiver appointed by a court, without the necessity of taking possession of the Trust Property in its own name, and without the need for any other authorization or action by Trustor, hereunder, under the Loan Agreement, any other Loan Documents and as otherwise available at law or in equity, (a) to notify any lessee or other person that the Leases have been assigned to Beneficiary, and that all Rents are to be paid directly to Beneficiary, whether or not Beneficiary has commenced or completed foreclosure or taken possession of the Trust Property; (b) to settle, compromise, release, extend the time of payment of, and make allowances, adjustments and discounts of any Rents or other obligations in, to and under the Leases; (c) to demand, sue for or otherwise collect, receive, and enforce payment of Rents, including those past-due and unpaid and other rights under the Leases, prosecute any action or proceeding, and defend against any claim with respect to the Rents and Leases; (d) to enter upon, take possession of and operate the Trust Property whether or not foreclosure under this Deed of Trust has been instituted and without applying for a receiver; (e) to lease all or any part of the Trust Property; and/or (f) to perform any and all obligations of Trustor under the Leases and exercise any and all rights of Trustor therein contained to the full extent of Trustor's rights and obligations thereunder.

### Irrevocable Instruments to Tenants

4.4    At Beneficiary's request, Trustor shall delivery a copy of this Deed of Trust to each tenant under a Lease and to each manager and managing agent or operator of the Trust Property, and Beneficiary shall have the continuing right to do so. Trustor irrevocably directs any tenant, manager, managing agent, or operator of the Trust Property, without any requirement for notice to or consent by Trustor, to comply with all demands of Beneficiary under this Article 4 and to turn over to Beneficiary on demand all Rents which it receives. Trustor hereby acknowledges and agrees that payment of any Rents by a person to Beneficiary as hereinabove provided shall constitute payment by such person, as fully and with the same effect as if such Rents had been paid to Trustor. Beneficiary is hereby granted and assigned by Trustor the right, at its option, upon

revocation of the license granted herein, upon an Event of Default that is continuing, to enter upon the Trust Property in person or by agent, without bringing any action or proceeding, or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license shall, subject to applicable law, be applied in accordance with the provisions of the Loan Agreement. Neither the enforcement of any of the remedies under this Article 4 nor any other remedies or security interests afforded to Beneficiary under the Loan Documents, at law or in equity shall cause Beneficiary to be deemed or construed to be a mortgagee in possession of the Trust Property, to obligate Beneficiary to lease the Trust Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise. Trustor shall, and hereby agrees to indemnify Beneficiary for, and to hold Beneficiary harmless from and against, any and all claims, liability, expenses, losses or damages which may or might be asserted against or incurred by Beneficiary solely by reason of Beneficiary's status as an assignee pursuant to the assignment of Rents and Leases contained herein, excluding any claim to the extent caused by such Beneficiary's fraud, bad faith, gross negligence or willful misconduct. Should Beneficiary incur any such claim, liability, expense, loss or damage, the amount thereof, including all actual expenses and reasonable fees of attorneys, shall constitute Indebtedness secured hereby, and Trustor shall reimburse Beneficiary therefor ten (10) Business Days after written demand.

**Unilateral Subordination**

4.5    Beneficiary may, at any time and from time to time by specific written instrument intended for the purpose, unilaterally subordinate the lien of this Deed of Trust to any Lease, without joinder or consent of, or notice to, Trustor, any tenant or any other person, and notice is hereby given to each tenant under a Lease of such right to subordinate. No such subordination shall constitute a subordination to any lien or other encumbrance, whenever arising, or improve the right of any junior lienholder, and nothing herein shall be construed as subordinating this Deed of Trust to any Lease.

**Assignment of Agreements**

4.6    All of Trustor's right, title and interest in and to the Property Agreements are hereby absolutely and irrevocably assigned to Beneficiary to be applied against the Obligations. Trustor hereby appoints Beneficiary its true and lawful attorney-in-fact with the right, at Beneficiary's option at any time, to demand, receive and enforce performance and payment of, to give receipts, releases and satisfactions for, and to sue, either in Trustor's or Beneficiary's name, for all amounts due under and performance required by the Property Agreements during the continuance of an Event of Default. Notwithstanding the foregoing assignment, but subject to the terms and conditions of the Loan Agreement, so long as no Event of Default has occurred which remains uncured, Trustor may collect, receive, take use or enjoy all rights under the Property Agreements and collect receive and retain for its own benefit all monies due or to become due under (but not more than one month in advance thereof) and the Trustor may exercise all other rights set forth in the Property Agreements (subject to any express restrictions set forth

2005-19275
Pg:13/45

herein or in the other Loan Documents). The foregoing assignment shall be fully operative without any further action on the part of either party. Trustor shall from time-to-time within fifteen (15) days after request by Beneficiary, execute, acknowledge and deliver any additional instruments Beneficiary may reasonably request to further evidence the assignment and transfer to Beneficiary of Trustor's interest in any Property Agreements.

**No Merger of Leasehold Estates**

4.7    If both the lessor's and lessee's estate under any Lease, or any portion thereof, becomes vested at any time in one owner, this Deed of Trust and the Lien created hereby shall not be adversely affected by the application of the doctrine of merger unless Beneficiary so elects in writing by recording a written declaration so stating. Unless and until Beneficiary so elects, Beneficiary and any lessor and lessee shall continue to have and enjoy all of the rights and privileges to the separate estates. If Beneficiary does so elect, the Lien created by this Deed of Trust shall attach to Trustor's resultant fee interest in the previously leased portion of the Trust Property, and Trustor agrees to comply with Section 7.1 to execute any documentation necessary and cooperate with Beneficiary in all respects to evidence such attachment. In addition, upon the foreclosure of the Lien created by this Deed of Trust on the Trust Property, any Leases then existing and affecting all or any portion of the Trust Property shall not be destroyed or terminated by merger or by the foreclosure unless, subject to the terms of the Leases and subordination, non-disturbance and attornment agreements to which Beneficiary is a party, Beneficiary or any purchaser at the sale so elects. No act by or on behalf of Beneficiary or such purchaser shall constitute a termination of any Lease unless Beneficiary gives written notice thereof to the tenant or subtenant affected.

**Right to Assign Leases**

4.8    Trustor represents that it has the right to assign the Leases and Property Agreements to Beneficiary and such assignment is free and clear of any prior assignment, Liens, charges, encumbrances, security interests and adverse claims whatsoever, except for any Permitted Encumbrances. Without limiting the generality of the foregoing, Trustor represents that it has not executed any presently effective prior assignment of the Leases or the Property Agreements, or of its right, title and interest therein, or the Rents accruing under the Leases.

**Assignment to Beneficiary Controlling**

4.9    The rights of Trustee in the Leases, Rents and Property Agreements created under Article 2 shall be subject to the rights of Beneficiary in the Leases and Material Agreements created under this Article 4.

5.    **WARRANTY**

5.1    This Security Instrument is the legal, valid and binding obligation of the Trustor, enforceable against the Trustor in accordance with its terms.

5.2    Trustor represents and warrants that attached hereto as **Exhibit C** is a true, correct and complete copy of the Lease Option Agreement.

5.3    Trustor represents and warrants that the Lease Option Agreement is in full force and effect and there are no defaults of either party thereunder and no event has occurred or is occurring which after notice or passage of time or both will result in such a default.

5.4    Trustor represents and warrants that no basic rent, additional rent or rent of any other type is currently due under the Lease Option Agreement. The term of the Lease Option Agreement commenced on August 1, 2005 and expires on July 31, 2015.

5.5    Trustor represents and warrants that (a) it is not aware of (i) any plans for any condemnation or similar eminent domain action affecting any part of the Land and (ii) any plans by any Governmental Authority to affect access of the Trust Property to a dedicated public roadway and (b) it has not received any notice, and has no knowledge of, of any action pending or threatened by any Governmental Authority or other Person which would effect the intended use of the Land as contemplated by the Loan Agreement.

5.6    Trustor represents and warrants that if the Beneficiary or any designee thereof shall succeed to the rights of the Borrower under the Lease Option Agreement, according to the terms of the Lease Option Agreement HH LLC shall recognize such Person as the lessee and such Person shall be entitled to all of the rights and benefits of the lessee under the Lease Option Agreement.

6.    **FORECLOSURE AND REMEDIES**

**Remedies**

6.1    If an Event of Default exists and is continuing, Beneficiary may, at its option, by or through Trustee or otherwise, exercise one or more or all of the following remedies, all to the fullest extent permitted by applicable law:

(a)    **Acceleration.**  Declare the unpaid portion of the Obligations to be immediately due and payable, without further notice or demand (each of which hereby is expressly waived by Trustor), whereupon the same shall become immediately due and payable.

(b)    **Entry Upon Trust Property.**  Enter upon the Trust Property and take possession thereof and of all books, records and accounts relating thereto.

(c)    **Operation of Trust Property.**  Hold, lease, operate or otherwise use or permit the use of the Trust Property, or any portion thereof, in such manner, for such

84043032_6.DOC

**2005-19275**
**Pg: 15/45**

time and upon such terms as Beneficiary may deem to be in its best interest (making such repairs, alterations, additions and improvements thereto, from time to time, as Beneficiary shall deem necessary or desirable) and collect and retain all earnings, rents, profits or other amounts payable in connection therewith.

(d)    **Judicial Proceedings.** (1) Foreclose this Deed of Trust judicially, in the same manner as a mortgage; (2) cause the Trustee to exercise its power of sale in accordance with the provisions of this Deed of Trust; or (3) sue on the Notes or Loan Agreement according to law. To the extent permitted by law, Beneficiary shall have the right to seek and obtain a deficiency judgment following the completion of a judicial foreclosure or a trustee's sale of all or part of the Trust Property.

(e)    **Trustee's Sale of Trust Property.** The procedure for exercise of the Trustee's power of sale shall be as follows:

(1)    Upon written request therefore by Beneficiary specifying the nature of the default, or the nature of the several defaults, and the amount or amounts due and owing, Trustee shall execute a written notice of default and election to sell the Trust Property to satisfy the Obligations secured hereby, and shall cause such notice to be recorded and otherwise given according to law.

(2)    Notice of sale having been given as then required by law and not less than the time then required by law having elapsed after recordation of such notice of breach, Trustee, without demand on Trustor, shall sell all or any part of the Trust Property at the time and place of sale specified in the notice, as provided by statute, either as a whole or in separate parcels and in such order as it may determine, at public auction to the highest and best bidder for cash in lawful money of the United States, payable at time of sale. Trustor agrees that such a sale (or sheriff's sale pursuant to judicial foreclosure) of all the Trust Property as real estate constitutes a commercially reasonable disposition thereof, but that with respect to all of any part of the Trust Property which may be personal property, Trustee shall have and exercise, at Beneficiary's sole election, all the rights and remedies of a secured party under the UCC. Whenever notice is permitted or required hereunder or under the UCC, except as otherwise required under applicable law ten (10) days shall be deemed reasonable. Trustee may postpone sale of all or any portion of the Trust Property, and from time to time thereafter may postpone such sale, as provided by statute. Trustee shall deliver to the purchaser its deed and bill of sale conveying the property so sold, but without any covenant or warranty, express or implied. The recital in such deed and bill of sale of any matters or facts shall be conclusive proof of the

truthfulness thereof. Any person other than Trustee, including Trustor or Beneficiary, may purchase at such sale.

(3)   After deducting all costs, fees and expenses of Trustee, and of this trust, including the cost of evidence of title search and reasonable counsel fees in connection with such sale, in each case to the extent permitted by applicable law, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof not then repaid, with accrued interest at the Default Rate; all other sums then secured hereby; and the remainder, if any, to any party entitled thereto as their rights may appear.

(f)   **Receiver.** Beneficiary shall be entitled, as a matter of strict right, without notice and ex parte except as otherwise required by applicable law, and without regard to the value or occupancy of the security, or the solvency of Trustor, or the adequacy of the Trust Property as security for the Obligations, to itself enter upon and take possession of the Trust Property, collect the Rents and profits therefrom, if any, and apply the same as the court may direct, or, at its option, Beneficiary may have a receiver appointed to do the same, such receiver to have all the rights and powers permitted under the laws of the jurisdiction in which the Trust Property is located. Trustor hereby waives any requirements on the receiver or Beneficiary to post any surety or other bond. Beneficiary or the receiver may also take possession of, and for these purposes use, any and all Fixtures and Personalty which is a part of the Trust Property and used by Trustor in the rental or leasing thereof, or any part thereof. All costs and expenses (including reasonable receiver's fees, counsel fees, costs and Agent's compensation) incurred pursuant to the powers herein contained shall constitute Indebtedness and shall be secured by this Deed of Trust. Beneficiary shall (after payment of all costs and expenses incurred) apply such Rents, issues and profits received by it on the Obligations in the order set forth in Section 6.7. The right to enter and take possession of the Trust Property, to manage and operate the same, and to collect the Rents, issues and profits thereof, whether by receiver or otherwise, shall be cumulative to any other right or remedy hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof. Beneficiary shall be liable to account only for such Rents, issues and profits actually received by Beneficiary.

(g)   **Additional Rights and Remedies.** With or without notice, and without releasing Trustor from the Obligations, and without becoming a mortgagee in possession, Beneficiary shall have the right to cure any breach or default of Trustor (after the expiration of any applicable notice and cure periods) and, in connection therewith, (i) to enter upon the Trust Property and to do such acts and things as Beneficiary or Trustee deem necessary or desirable to protect the security hereof including, but without limitation, to appear in and defend any action or proceedings purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee hereunder; (ii) to pay, purchase, contest or compromise any encumbrance, charge, Lien or claim of Lien which, in the judgment of either Beneficiary or



Trustee, is prior or superior hereto, the judgment of Beneficiary or Trustee being conclusive as between the parties hereto; (iii) to institute an action, suit or proceeding in equity for the specific performance of any covenants, conditions or agreements contained herein or in the Notes, the Loan Agreement or any other Loan Document; (iv) to obtain insurance; (v) to pay any premiums or charges with respect to insurance required to be carried hereunder; and (vi) to employ counsel, accountants, contractors and other appropriate persons to assist them. All costs and expenses (including, reasonable attorneys' fees) incurred by Trustee or Beneficiary in accordance with this Section 6.1(g) shall constitute Indebtedness and shall be secured by this Deed of Trust.

(h)    **Beneficiary as Purchaser.**    Beneficiary shall have the right to become the purchaser at any sale held by the Trustee or by any court, receiver or public officer, and Beneficiary shall have the right to credit upon the amount of the bid made therefor, the amount of indebtedness payable to it out of the net proceeds of such sale. Beneficiary, upon any such purchase, shall acquire good title to the Trust Property so purchased, free from the Lien of this Deed of Trust and, subject to applicable law, free of all rights of redemption, if any, in Trustor. Recitals contained in any conveyance made to any purchaser at any sale made hereunder shall presumptively establish the truth and accuracy of the matters therein stated, including, without limiting the generality of the foregoing, nonpayment of the unpaid principal sum of, and the interest accrued on, the Notes after the same have become due and payable, advertisement and conduct of such sale in the manner provided herein or appointment of any successor Trustee hereunder; and Trustor does hereby ratify and confirm any and all acts that said Beneficiary or its successors may lawfully do in the premises by virtue of the terms and conditions of this instrument.

(i)    **Receipt to Purchaser.**    Upon any sale, whether made under the power of sale herein granted and conferred or by virtue of judicial proceedings, the receipt of the Trustee, or of the officer making the sale under judicial proceedings shall be sufficient discharge to the purchaser or purchasers at any sale for his or their purchase money, and such purchaser or purchasers, his or their assigns or personal representatives, shall not, after paying such purchase money and receiving such receipt of the Trustee or of such officer therefor, be obliged to see to the application of such purchase money, or be in anyway answerable for any loss, misapplication or nonapplication thereof.

(j)    **Effect of Sale.**    Any sale or sales of the Trust Property, whether under the power of sale herein granted and conferred or by virtue of judicial proceedings conducted in accordance with applicable law, shall, subject to applicable law, operate to divest all right, title, interest, claim, and demand whatsoever either at law or in equity, of Trustor of, in, and to the premises and the property sold, and shall be a perpetual bar, both at law and in equity, against Trustor, Trustor's successors, and against any and all persons claiming or who shall thereafter claim all or any of the property sold from, through or under Trustor, or Trustor's

2005-19275
Pg:18/45

successors or assigns; nevertheless, Trustor, if requested by the Trustee to do so, shall join in the execution and delivery of all proper conveyances, assignments and transfers of the properties so sold.

(k)  **Remedies Under UCC.** Upon the occurrence and during the continuance of an Event of Default, Beneficiary may exercise its rights of enforcement, if they can be exercised without a breach of the peace, with respect to the UCC Collateral under the applicable provisions of the UCC, or under other applicable California law, and in conjunction with, in addition to or in substitution for those rights and remedies:

(1)  Beneficiary may enter upon Trustor's premises to take possession of, assemble and collect the UCC Collateral and any and all books related to the Trust Property;

(2)  Beneficiary may require Trustor to assemble the UCC Collateral or any part thereof and make same available at a place Beneficiary designates which is mutually convenient to allow Beneficiary to take possession or dispose of such UCC Collateral;

(3)  Written notice mailed to Trustor as provided herein at least ten (10) days prior to the date of public sale of any part of the UCC Collateral or prior to the date after which private sale of such UCC Collateral shall be made shall constitute reasonable notice;

(4)  Any sale made pursuant to the provisions of this Subsection shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with and upon the same notice as required for the sale of the Trust Property under power of sale as provided in Section 6.1(e);

(5)  In the event of a foreclosure sale, whether made by the Trustee under the terms hereof, or under judgment of a court, the Trust Property may, at the option of Beneficiary, be sold as a whole;

(6)  It shall not be necessary that Beneficiary take possession of the UCC Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this section is conducted and it shall not be necessary that the UCC Collateral or any part thereof be present at the location of such sale;

(7)  Prior to application of proceeds of disposition of any part of the UCC Collateral to the Obligations, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Beneficiary;

(8)    Any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of the Obligations or as to the occurrence of any Event of Default, or to Beneficiary having declared all of such Obligations to be due and payable, or as to notice of time, place and terms of sale and of the Trust Property to be sold having been duly done by Beneficiary, shall be taken as prima facie evidence of the truth of the facts so stated and recited;

(9)    Beneficiary may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Beneficiary, including the sending of notices and the conduct of the sale, but in the name and on behalf of Beneficiary; and

(10)   (A) Notwithstanding anything to the contrary herein or elsewhere in the Loan Documents, but subject to clause (B) below, prior to foreclosure of the portion of the Trust Property which is real property (the *Real Property*), Beneficiary shall not sell or dispose of any UCC Collateral or cause any such UCC Collateral to be sold or disposed of; and (B) if a reinstatement shall occur with respect to this Deed of Trust or if a pre-foreclosure redemption shall occur by payment of all outstanding indebtedness and any other amounts owed to Beneficiary under the Loan Documents, then to the extent that Beneficiary shall have taken possession of any portion of the Trust Property or caused such possession to be taken by a receiver or agent, Beneficiary shall cause such portion of the Trust Property to be returned to Trustor. Nothing contained in this Subsection (10) shall (x) require Beneficiary to return any money to Trustor which shall have been applied to any of the Obligations or to the preservation or operation of the Trust Property; or (y) impair Beneficiary's rights with respect to Rents as otherwise provided in this Deed of Trust.

(l)    **Entry on and Operation of Property by Beneficiary.** In addition to all other rights herein conferred on Beneficiary, Beneficiary (or any person, firm or corporation designated by Beneficiary) shall have the right and power, but shall not be obligated to enter upon and take possession of any of the Trust Property, and of all books, records, and accounts relating thereto and to exclude Trustor, and Trustor's agents or servants, wholly therefrom, and to hold, lease, operate, use, administer, manage, and operate the same to the extent that Trustor shall be at the time entitled and in his place and stead for such time, and upon such terms as Beneficiary may deem to be in its best interest (making such repairs, alterations, additions, and improvements thereto, from time to time, as Beneficiary shall deem necessary or desirable) and collect and retain all earnings, rents, profits, or other amounts payable in connection therewith. Beneficiary, or any person, firm or

corporation designated by Beneficiary, may operate the same without any liability to Trustor in connection with such operations, except to use ordinary care in the operation of said properties, and Beneficiary or any person, firm or corporation designated by them, shall have the right to collect, receive and receipt for all Rents from the Trust Property, to make repairs, purchase machinery and equipment, and to exercise every power, right and privilege of Trustor with respect to the Trust Property. All costs, expenses and liabilities of every character incurred by Beneficiary in managing, operating, maintaining, protecting or preserving the Trust Property, respectively, shall constitute a demand obligation owing by Trustor to Beneficiary and shall bear interest from date of expenditure until paid at the same rate as is provided in the Notes for interest on past due principal, all of which shall constitute a portion of the Obligations and shall be secured by this Deed of Trust and by any other instrument securing the Obligations. If necessary to obtain the possession provided for above, the Beneficiary, as the case may be, may invoke any and all remedies to dispossess Trustor including specifically one or more actions for forcible entry and detainer, trespass to try title and restitution. When and if the expenses of such operation have been paid and the Obligations paid, the Trust Property shall, if there has been no sale or foreclosure, be returned to Trustor.

(m)    **Change in Laws.**  If any statute now applicable in any state in which any of the Trust Property is now located provides, or shall hereafter be amended to provide, a different procedure for the sale of real property under a power of sale in a deed of trust or mortgage, Beneficiary may, in its sole discretion, if same be permitted by applicable law, follow the sale procedure set forth in this Article 5 or that prescribed in such statute, as amended.

(n)    **Sale.**  Cause the Trust Property and all estate, right, title and interest, claim and demand therein, or any part thereof to be sold as follows:

(1)    Beneficiary may proceed as if all of the Trust Property were real property, in accordance with Section 6.1(e), or Beneficiary may elect to treat any of the Trust Property which consists of a right in action or which is property that can be severed from the premises without causing structural damage thereto as if the same were personal property, and dispose of the same in accordance with subparagraph (3) below, separate and apart from the sale of real property, with the remainder of the Trust Property being treated as real property at the sale.

(2)    Subject to subsection (3) of this Section 6.1(n), Beneficiary may cause any such sale or other disposition to be conducted immediately following the expiration of any grace period, if any, herein provided (or required by law) or Beneficiary may delay any such sale or other disposition for such period of time as Beneficiary deems to be in its best interest.  Should Beneficiary

2005-19275
Pg:21/45

desire that more than one sale or other disposition be conducted, Beneficiary may, at its option, cause the same to be conducted simultaneously, or successively on the same day, or at such different days or times and in such order as Beneficiary may deem to be in its best interest.

(3)  Subject to the provisions of Section 6.1(k)(10), should Beneficiary elect to cause any of the Trust Property to be disposed of as personal property as permitted by subparagraph (1) above, it may dispose of any part thereof in any manner now or hereafter permitted by Article 9 of the UCC or in accordance with any other remedy provided by law.  Both Trustor and Beneficiary shall be eligible to purchase any part of all of such property at any such disposition.  Any such disposition may be either public or private as Beneficiary may so elect, subject to the provisions of the UCC, Beneficiary shall give Trustor at least ten (10) business days prior written notice of the time and place of any public sale or other disposition of such property or of the time at or after which any private sale or any other intended disposition is to be made, and if such notice is sent to Trustor, it shall constitute reasonable notice to Trustor.

(o)  **Partial Foreclosure.**  With or without entry and, to the extent permitted, and pursuant to the procedures provided by, applicable law, the Beneficiary may institute proceedings for the partial foreclosure of this Deed of Trust for the portion of the indebtedness secured hereby then due and payable, subject to the lien of this Deed of Trust continuing unimpaired and without loss of the priority so as to secure the balance of the Indebtedness secured hereby not then due.

(p)  **Assembly of the Trust Property.**  The Beneficiary may require the Trustor to assemble the Trust Property, or any part thereof, and make it available to the Beneficiary at the Premises or at such other place as the Beneficiary may reasonably designate.

(r)  **Surrender of Insurance Policies.**  In the event of the transfer of the Trust Property pursuant to a foreclosure, deed in lieu of foreclosure, or otherwise, and subject to the terms and conditions of the Loan Agreement, the Beneficiary may surrender the insurance policies maintained pursuant to the terms of the Loan Documents, or any part thereof, and receive and apply the unearned premiums as a credit on the Obligations, and in connection therewith, the Trustor hereby authorizes the Beneficiary to collect such premiums.

(s)  **Other.**  Exercise any other remedy specifically granted under the Loan Documents, or now or hereafter existing in equity, at law, by virtue of statute or otherwise, including all rights described herein, an action for specific performance

of any covenant contained in any Loan Document or a judgment on the Notes either before, during or after any proceeding to enforce this Deed of Trust.

**Separate Sales**

6.2    Any real estate or any interest or estate therein sold pursuant to any writ of execution issued on a judgment obtained by virtue of the Notes, this Deed of Trust or the other Loan Documents, or pursuant to any other judicial proceedings under this Deed of Trust, or pursuant to the power of sale granted herein, may be sold in one parcel, as an entirety or in such parcels and in such manner or order as Beneficiary, in its sole discretion, may elect.

**Remedies Cumulative and Concurrent**

6.3    The rights and remedies of Beneficiary as provided in the Notes, this Deed of Trust and in the Loan Documents shall be cumulative and concurrent and may be pursued separately, successively or together against Trustor or against other obligors or against the Trust Property, or any one or more of them, at the sole discretion of Beneficiary, and may be exercised as often as occasion therefor shall arise. The failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof, nor shall the choice of one remedy be deemed an election of remedies to the exclusion of other remedies.

**No Cure or Waiver**

6.4    Neither Beneficiary's nor any receiver's entry upon and taking possession of all or any part of the Trust Property nor any collection of rents, issues, profits, insurance proceeds, condemnation proceeds or damages, other security or proceeds of other security, or other sums, nor the application of any collected sum to any Obligations, nor the exercise of any other right or remedy by Beneficiary or Trustee or any receiver shall impair the status of the security, or cure or waive any default or notice of default under this Deed of Trust, or nullify the effect of any notice of default or sale (unless all Obligations which are then due have been paid and performed and Trustor has cured all other defaults), or prejudice Beneficiary or Trustee in the exercise of any right or remedy, or be construed as an affirmation by Beneficiary of any tenancy, lease or option or a subordination of the Lien of this Deed of Trust.

**Payment of Costs, Expenses and Attorneys' Fees**

6.5    Trustor agrees to pay to Beneficiary immediately and without demand all reasonable costs and expenses (including reasonable attorneys' fees and expenses) incurred by Trustee and Beneficiary in enforcing this Deed of Trust, all of which shall constitute Indebtedness and shall be secured by this Deed of Trust.

**Waiver of Redemption, Notice, Marshalling, Etc.**

6.6    To the extent permitted by applicable law, Trustor hereby waives and releases: (a) all benefit that might accrue to Trustor by virtue of any present or future law exempting the Trust Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any redemption or extension of time for payment; (b) unless specifically required herein or in the other Loan Documents, all notices of Trustor's default or of Beneficiary's election to exercise, or Beneficiary's actual exercise, of any option or remedy under the Notes or the Loan Documents; (c) any right to have the Liens against the Trust Property or any other collateral in which Beneficiary holds an interest as security for the Obligations marshaled; and (d) the right to plead or assert any statute of limitations as a defense or bar to the enforcement of the Notes or the Loan Documents.

**Application of Proceeds**

6.7    The proceeds of any sale of all or any portion of the Trust Property and the amounts generated by any holding, leasing, operation or other use of the Trust Property shall be applied by Beneficiary in the following order:

(a)    to the payment of the reasonable costs and expenses of taking possession of the Trust Property and of holding, using, leasing, repairing, improving and selling the same, including, without limitation (1) receiver's fees and expenses; (2) court costs; (3) reasonable attorneys', accountants', appraisers', environmental consultants', engineers' and other experts' fees and expenses; (4) costs of advertisement; (5) costs of procuring title searches, title policies and similar data and assurance with respect to title; and (6) the payment of all ground rent, real estate taxes and assessments except any taxes, assessments or other charges subject to which the Trust Property shall have been sold;

(b)    to the payment of all amounts, other than the unpaid principal balance of the Notes and accrued but unpaid interest on such principal balance, which may be due under the Loan Documents;

(c)    to the payment of the Indebtedness in such manner and order of preference as Beneficiary in its sole discretion may determine; and

(d)    the balance, if any, to the payment of the persons legally entitled thereto.

If Beneficiary shall be ordered, in connection with any bankruptcy, insolvency or reorganization of Trustor, to restore or repay to or for the account of Trustor or its creditors any amount theretofore received under this Section 6.7, the amount of such restoration or repayment shall be deemed to be a part of the Indebtedness so as to place Beneficiary in the same position it would have been in had such amount never been received by Beneficiary.

**Strict Performance**

6.8     Any failure by Beneficiary to insist upon strict performance by Trustor of any of the terms and provisions of the Loan Documents or of the Notes shall not be deemed to be a waiver of any of the terms or provisions of the Loan Documents or the Notes and Beneficiary shall have the right thereafter to insist upon strict performance by Trustor of any and all of them.

**No Conditions Precedent to Exercise of Remedies**

6.9     Neither Trustor nor any other person now or hereafter obligated for payment of all or any part of the Indebtedness or performance of any of the other Obligations shall be relieved of such obligation by reason of the failure of Beneficiary to comply with any request of Trustor or of any other person so obligated to take action to foreclose on this Deed of Trust or otherwise enforce any provisions of the Loan Documents or the Notes, or by reason of the release, regardless of consideration, of all or any part of the security held for the payment of the Indebtedness or performance of any other Obligations, or by reason of any agreement or stipulation between any subsequent owner of the Trust Property and Beneficiary extending the time of payment or modifying the terms of the Loan Documents or Notes (except to the extent that such modification (i) increases the principal amount of the Indebtedness or the interest rate incurred under the Loan Agreement, (ii) reduces the term of the Loan, or (iii) otherwise makes the terms and provisions of the Loan Documents less favorable to Trustor) without first having obtained the consent of Trustor or such other person, and in the latter event, Trustor and all such other persons shall continue to be liable to make payment according to the terms of any such extension or modification agreement (except to the extent such modification (i) increases the principal amount of the Indebtedness or the interest rate incurred under the Loan Agreement, (ii) reduces the term of the Loan, or (iii) otherwise makes the terms and provisions of the Loan Documents less favorable to Trustor), unless expressly released and discharged in writing by Beneficiary.

**Release of Collateral**

6.10     Beneficiary may release, regardless of consideration, any part of the security held for the payment of any of the Indebtedness or performance of any of the other Obligations without, as to the remainder of the security, in any way impairing or affecting the Liens of the Loan Documents or their priority over any subordinate Lien.  Without affecting the liability of Trustor or any other person (except any person expressly released in writing) for payment of any Indebtedness secured hereby or for performance of any Obligations contained herein, and without affecting the rights of Beneficiary with respect to any security not expressly released in writing, Beneficiary may, at any time and from time to time, either before or after maturity of said Note, and without notice or consent: (a) release any person liable for payment of all or any part of the Indebtedness, or for performance of any of the other Obligations; (b) make any agreement extending the time or otherwise altering terms of payment of all or any part of the Indbedtedness, or modifying or waiving any of, the other Obligations, or subordinating, modifying or

otherwise dealing with the Lien hereof; (c) exercise or refrain from exercising or waive any right Beneficiary may have; (d) accept additional security of any kind; or (e) release or otherwise deal with any property, real or personal, securing the Obligations, including all or any part of the Trust Property.

**Other Collateral**

6.11    For payment of the Obligations, Beneficiary may resort to any other security therefor held by Beneficiary in such order and manner as Beneficiary may elect.

**Discontinuance of Proceedings**

6.12    In the event Beneficiary shall have proceeded to enforce any right under the Loan Agreement, the Notes or the other Loan Documents and such proceedings shall have been discontinued or abandoned for any reason, then in every such case, Trustor and Beneficiary shall be restored to their former positions and the rights, remedies and powers of Beneficiary shall continue as if no such proceedings had taken place.

**Release of Liability**

6.13    Without affecting the liability of any person (other than any person released pursuant to the provisions of this section) for payment of any of the Indebtedness secured hereby or performance of any of the other Obligations secured hereby, and without affecting or impairing in any way the priority or extent of the Liens of the Loan Documents upon any property not specifically released pursuant hereto, Beneficiary may at any time and from time to time (a) release any person liable for payment of any of the Indebtedness secured hereby or performance of any of the other obligations secured hereby, (b) extend the time or agree to alter the terms of payment of any of the Indebtedness or the performance of any of the other Obligations, (c) accept additional security of any kind, (d) release any property securing the Obligations, or (e) consent to the creation of any easement on or over the Trust Property or any covenants restricting the use or occupancy thereof.

**Retention of Copies of Books and Records**

6.14    Without limiting any of Beneficiary's rights and remedies at law or in equity, including under this Deed of Trust, in the event Beneficiary elects to foreclose or otherwise realize upon its security interest in any of the UCC Collateral, nothing herein shall be deemed to prohibit Trustor from retaining copies of its books and records (including computer-readable copies thereof), **provided that the originals thereof are** delivered to Beneficiary or the purchaser of such UCC Collateral at a foreclosure sale, as applicable.



2005-19275
Pg:26/45

84043032_6.DOC

**Waiver of Lien**

6.15   In accordance with, and subject to the limitations of, California Code of Civil Procedure Section 726.5, Beneficiary may waive its lien against the Trust Property or any portion thereof, together with fixtures or personal property thereon, if such property is found to be environmentally impaired, and may exercise any and all rights and remedies of an unsecured creditor against Trustor and all of Trustor's assets and property for the recovery of any deficiency, including, without limitation, seeking an attachment order under California Code of Civil Procedure Section 483.010.  No such waiver shall be final or binding on Beneficiary unless and until a final money judgment is obtained against Trustor.  As between Beneficiary and Trustor, for purposes of California Code of Civil Procedure Section 726.5, Trustor shall have the burden of proving that the release or threatened release was not knowingly or negligently caused or contributed to, or knowingly or willfully permitted or acquiesced to by Trustor or any related party (or any affiliate or agent of Trustor or any related party) and that Trustor made written disclosure of the release to Beneficiary or that Beneficiary otherwise obtained actual knowledge thereof prior to the making of the loan evidenced by the Notes.   Notwithstanding anything to the contrary contained in this Deed of Trust or the other Loan Documents, Trustor shall be fully and personally liable for all judgments and awards entered against Trustor pursuant to California Code of Civil Procedure 726.5 and such liability shall be an exception to any non-recourse or exculpatory provision in this Deed of Trust or the other Loan Documents and shall not be limited to the original principal amount of the Obligations secured by this Deed of Trust.  Trustor's Obligations hereunder shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Trust Property or this Deed of Trust.  For the purpose of any action brought under this Section, Trustor hereby waives the defense of laches and any applicable statute of limitations.  For purposes of California Code of Civil Procedure 726.5, the acts, knowledge and notice of each "726.5 Party" (as hereinafter defined), shall be attributed to and be deemed to have been performed by the party or parties then obligated on and liable for payment of the Notes.  As used herein, *726.5 Party* shall mean Trustor, any successor owner to Trustor of all or any portion of the Property, any related party of Trustor or any such successor and any affiliate or agent of Trustor, any such successor or any such related party.

**Action for Environmental Claims**

6.16   In accordance with, and subject to the limitations of, California Code of Civil Procedure Section 736, Beneficiary may seek a judgment that Trustor has breached its covenants, representations and/or warranties with respect to the environmental matters contained in this Deed of Trust or the other Loan Documents (the *Environmental Provisions*), and may commence and maintain an action or actions in any court of competent jurisdiction for enforcement of the Environmental Provisions and/or recovery of any or all costs, damages, expenses, fees, penalties, fines, judgments, indemnification payments to third parties, and other out-of-pocket costs or expenses (including, without limitation, court costs, consultants' fees and attorneys' fees, whether incurred in litigation or not and whether before or after judgment), incurred or advanced by Beneficiary

pursuant to the Environmental Provisions (collectively, the *Environmental Costs*), excluding, however, any Environmental Costs not permitted to be recovered pursuant to Section 736 of the California Code of Civil Procedure. Environmental Costs that are not permitted to be recovered pursuant to Section 736 may be referred to hereinafter as the *Unsecured Environmental Costs* and Environmental Costs other than the Unsecured Environmental Costs may be referred to hereinafter as the *Secured Environmental Costs*. Any Unsecured Environmental Costs shall not be secured by this Deed of Trust; however, nothing herein shall prevent Beneficiary from recovering any Unsecured Environmental Costs pursuant to the Environmental Indemnity Agreement to the extent they are recoverable in accordance with said Environmental Indemnity Agreement. All Secured Environmental Costs incurred by Beneficiary shall bear interest at the Default Rate. All Secured Environmental Costs together with interest thereon at the rate then in effect under the Notes shall be secured by this Deed of Trust and shall enjoy the same priority as the original principal amount of the Notes. Trustor acknowledges and agrees that notwithstanding any term or provision contained in this Deed of Trust or in the other Loan Documents, Environmental Costs shall be exceptions to any nonrecourse or exculpatory provision, if any, and Trustor shall be fully and personally liable for Environmental Costs. Such liability shall not be limited to the original principal amount of the obligations secured by this Deed of Trust. Trustor's obligations hereunder shall survive foreclosure, deed in lieu of foreclosure, release, reconveyance or any other transfer of the Trust Property or this Deed of Trust. For the purposes of any action brought under this subparagraph, Trustor hereby waives the defense of laches and any applicable statute of limitations.

## 7.    MISCELLANEOUS

### Further Assurances

7.1    Trustor, upon the reasonable written request of Beneficiary, shall execute, acknowledge and deliver or file, or, with respect to persons or entities within Trustor's control, arrange for the execution, acknowledgment and delivery or filing of, such further reasonable instruments (including, without limitation, financing statements, estoppel certificates and declarations of no set-off, attornment agreements and acknowledgments of the Assignment) and do such further acts as may be reasonably necessary, desirable or proper to carry out more effectively the purpose of the Loan Documents, to facilitate the assignment or transfer of the Notes and the Loan Documents and to subject to the Liens of the Loan Documents any property intended by the terms thereof to be covered thereby, and any renewals, additions, substitutions, replacements or betterments thereto. Upon any failure of Trustor to execute and deliver such instruments, certificates and other documents on or before 15 days after receipt of written request therefor, Beneficiary may make, execute and record any and all such instruments, and certificates and Trustor irrevocably appoints Beneficiary the agent and attorney-in-fact of Trustor to do so.



2005-19275
Pg:28/45

84043032_6.DOC

**Recording and Filing**

7.2    Trustor, at its expense, shall cause the Loan Documents, all supplements thereto and any financing statements at all times to be recorded and filed and re-recorded and re-filed in such manner and in such places as Beneficiary shall reasonably request, and shall pay all such recording, filing, re-recording and re-filing taxes, fees and other charges.

**Notice**

7.3    All notices, demands, requests and other communications required under the Loan Documents and the Notes shall be in writing and shall be delivered in accordance with Section 11.4 of the Loan Agreement.

**Estoppels.**

7.4    Trustor shall within ten days after demand from the Beneficiary deliver to the Beneficiary a certificate that the Lease Option Agreement is unmodified and in full force and effect and the date to which the rentals and other charges payable thereunder have been paid and stating whether there is any default by either party under the Lease Option Agreement, and if there is any such default, providing details of such default.

**Beneficiary's Right to Perform the Obligations**

7.5    If Trustor shall fail to make any payment or perform any act required by the Notes or the Loan Documents, which is not cured on or before expiration of any applicable cure period, then Beneficiary may make such payment or perform such act for the account of and at the expense of Trustor, and shall have the right to enter the Trust Property for such purpose and to take all such action thereon and with respect to the Trust Property as may be necessary or appropriate for such purpose in accordance with the Loan Agreement. All sums so paid by Beneficiary, and all reasonable costs, and expenses, including, without limitation, reasonable attorneys' fees and expenses so incurred together with, interest thereon at the Default Rate, from the date of payment or incurring, constitute additions to the Obligations secured by the Loan Documents, and shall be paid by Trustor to Beneficiary, on demand. If Beneficiary shall elect to so pay any Taxes, Beneficiary may do so in reliance on any bill, statement or assessment procured from the appropriate public office, without inquiring into the accuracy thereof or into the validity of such Taxes. Trustor shall indemnify Beneficiary for all reasonable losses and expenses, including reasonable attorneys' fees, incurred by reason of any acts performed by Beneficiary pursuant to the provisions of this Section 7.5 or by reason of the Loan Documents, and any funds expended by Beneficiary to which it shall be entitled to be indemnified, together with interest thereon at the Default Rate from the date of such expenditures, shall constitute additions to the Obligations and shall be secured by the Loan Documents and shall be paid by Trustor to Beneficiary upon demand.

84043032_6.DOC

**Severability**

7.6    Any provision of this Deed of Trust which is prohibited or unenforceable in the State of California or in any other jurisdiction in the United States shall be, as to the State of California or such other jurisdiction in the United States, ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction..

**Modification**

7.7    The Loan Documents and the terms of each of them may not be changed, waived, discharged or terminated orally, but only by an instrument or instruments in writing signed by the party against which enforcement of the change, waiver, discharge or termination is asserted.

7.8    Trustor shall not amend, modify, supplement or otherwise modify the Lease Option Agreement in any manner without the prior approval of the Beneficiary. Trustor shall not release, surrender or terminate the Lease Option Agreement without the prior approval of the Beneficiary.

**Non-Assumable**

7.9    The Loan evidenced by the Notes and secured by this Deed of Trust is personal to Trustor, and Beneficiary made such Loan to Trustor, based upon the credit of Trustor, and Beneficiary's judgment of the ability of Trustor to repay the entire Obligations and therefore this Deed of Trust may not be assumed by any subsequent holder of an interest in the Trust Property without Beneficiary's prior written consent.

**Tax on Obligations or Deed of Trust**

7.10    In the event of the passage, after the date of this Deed of Trust, of any law deducting from the value of land for the purposes of taxation, any Lien thereon, or imposing upon Beneficiary the obligation to pay the whole, or any part, of the taxes or assessments or charges or Liens herein required to be paid by Trustor, or changing in any way the laws relating to the taxation of deeds of trust, mortgages or debts as to affect this Deed of Trust or the Obligations, Trustor shall pay Beneficiary any such additional amounts necessary to compensate Beneficiary, on an after-tax basis, for such additional costs in accordance with the terms and provisions of the Loan Agreement.

**Maximum Rate of Interest**

7.11    All agreements between Trustor and Beneficiary, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity of the Notes or otherwise, shall the amount paid, or agreed to be paid to Beneficiary for the use, forbearance, or detention of the money to be loaned under the Notes or otherwise or for

the payment or performance of any covenant or obligation contained herein or in the Notes, exceed the Maximum Rate. The term *Maximum Rate* as used herein shall mean the higher of the maximum interest rate allowed by applicable United States or New York law as amended from time to time, in effect on the date for which a determination of interest accrued hereunder is made. If from any circumstances whatsoever fulfillment of any provision hereof or of any such other documents, at the time performance of such provisions shall be due, shall involve transcending the limit of validity prescribed by applicable usury law, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance, Beneficiary shall have ever received interest or anything which might be deemed interest under applicable law which would exceed the Maximum Rate, such amount which would be excessive interest shall be applied to the reduction of the principal amount owing on account of the Notes or the amounts owing on other obligations of Trustor to Beneficiary hereunder (all without payment of any prepayment premium) and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal of the Notes and the amounts owing on other obligations of Trustor to Beneficiary hereunder as the case may be such excess shall be refunded to Trustor. All sums paid or agreed to be paid to Beneficiary for the use, forbearance or detention of the Obligations of Trustor to Beneficiary shall, to the extent permitted by applicable law, (i) be amortized, prorated, allocated and spread throughout the full term of such Obligations until payment in full so that the actual rate of interest on account of such Obligations does not exceed the Maximum Rate throughout the term thereof, (ii) be characterized as a fee, expense or other charge other than interest, or (iii) exclude any voluntary prepayments and the effects thereof.

### Survival of Warranties and Covenants

7.12   The warranties, representations, covenants and agreements set forth in the Loan Documents shall survive the making of the Loan and the execution and delivery of the Notes, and shall continue in full force and effect until the Obligations shall have been paid in full, except such obligations as specified in the Loan Agreement which shall survive.

### APPLICABLE LAW

7.13   THIS DEED OF TRUST SHALL BE CONSTRUED IN ACCORDANCE WITH, AND THIS DEED OF TRUST AND ALL MATTERS ARISING OUT OF THIS DEED OF TRUST (WHETHER IN CONTRACT, TORT OR OTHERWISE) SHALL BE GOVERNED BY, THE LAW OF THE STATE OF CALIFORNIA.

### Prior Agreements

7.14   THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS CONTAIN THE ENTIRE AGREEMENT OF THE PARTIES HERETO AND THERETO IN RESPECT OF THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, AND ALL PRIOR AGREEMENTS AMONG OR BETWEEN SUCH PARTIES, WHETHER ORAL OR WRITTEN, INCLUDING ANY TERM SHEETS AND

84043032_6.DOC



2005-19275
Pg:31/45

COMMITMENT LETTERS, ARE SUPERSEDED BY THE TERMS OF THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS.

**Substitution of Trustee**

7.15   Beneficiary may appoint a substitute or successor trustee or trustees in place of the Trustee or Trustees with or without any reason, by instrument in writing, which any without other formality than a designation in writing of a substitute or successor. Beneficiary may exercise this irrevocable appointment power at any time without specifying any reason therefor. The power of appointment of a successor Trustee or Trustees may be exercised as often as and whenever the Beneficiary may choose, and the exercise of the power of appointment, no matter how often, shall not be an exhaustion thereof. Whenever in this Deed of Trust reference is made to the Trustee or Trustees, it shall be construed to mean the Trustee or Trustees for the time being, whether original or successors in trust; and all title, estate, rights, powers, trusts, and duties hereunder given or appertaining to or devolving upon the Trustee or Trustees shall be in each of the Trustees so that any action hereunder or purporting to be hereunder of any one of the original or any successor Trustee shall for all purposes be considered to be as effective as the action of all the Trustees.

**No Representations by Beneficiary**

7.16   By accepting or approving anything required to be observed, performed or fulfilled or to be given to Beneficiary, pursuant to the Loan Documents, including (but not limited to) any officer's certificate, survey, appraisal or insurance policy, Beneficiary shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term provision or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Beneficiary.

**Acceptance of Trust**

7.17   Trustee accepts the trust created by this Deed of Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law. At any time or from time to time, without liability therefor and without notice, and without releasing or otherwise affecting the liability of Trustor for the Obligations, Trustee, upon written request of Beneficiary, may reconvey any part of the Trust Property, consent to the making of any map or plat thereof or join in granting any easement thereon.

**Reconveyance**

7.18   Upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust and the Notes to Trustee for cancellation and retention, and upon payment of its fees, Trustee shall release the lien of this Deed of trust and the other Loan Documents. The recitals in any such release of any matters or facts shall be conclusive proof of the matters set forth therein.

**Headings**

7.19    The headings and captions of various Sections of this Deed of Trust have been inserted for convenience only and are not to be construed as defining, modifying, limiting or amplifying, in any way, the scope of intent of the provisions hereof..

**Relationship Between Parties**

7.20    Nothing contained in the Notes, this Deed of Trust or the other Loan Documents shall be construed as creating a joint venture or partnership between Beneficiary and Trustor, and Beneficiary shall have no right of control or supervision over Trustor except as Beneficiary may exercise its rights and remedies under this Deed of Trust and the other Loan Documents. Trustor further disclaims any fiduciary or quasi fiduciary relationship between it or any of its partners and Beneficiary.

**Waivers Pertaining to Notes**

7.21    Trustor in its capacity as Trustor under this Deed of Trust and not as maker of the Notes waives presentation, demand, protest and notice of nonpayment of the Notes (except for notices required hereunder or under the other Loan Documents), and consents to delays, changes in time of payment and the amount of installments due under the Notes, and to the reduction or increase of the interest rates thereof based upon changes in the LIBO Rate or Base Rate.

**Jurisdiction**

7.22    Trustor agrees that any action or proceeding arising out of or relating to this Deed of Trust may be commenced in any court located in the State of California. Trustor hereby irrevocably submits to the jurisdiction of the United States District Court for the Central District of California over any action or proceeding arising out of or relating to this Deed of Trust, and does hereby irrevocably waive, to the fullest extent it may effectively do so the defense of an inconvenient forum to the maintenance of such action or proceeding.

**Release**

7.23    Upon payment in full of the Indebtedness and performance in full of the Obligations the estate hereby granted shall cease, terminate and be void and Beneficiary, at Trustor's expense, shall release or cause the release or reconveyance of the liens and security interests created by this Deed of Trust. If Trustor shall arrange for repayment of the entire Indebtedness by a third party, at Trustor's request and at Trustor's sole cost and expense, Beneficiary shall assign the Notes, this Deed of Trust and any other Loan Documents (to the extent requested by Trustor) to such third party, without recourse, representation or warranty (except that (i) Beneficiary owns the Notes; (ii) Beneficiary has not encumbered the Notes, except for liens to be discharged concurrently with such



**2005-19275**
**Pg:33/45**

84043032_6.DOC

assignment; and (iii) Beneficiary shall make a representation with respect to accrued interest and the principal balance of the Notes).

**Third Parties**

7.24    Nothing in this Agreement is intended to confer any rights or remedies on any persons other than Trustor, Trustee, Beneficiary and each Lender and their respective successors and assigns.

**WAIVER OF JURY TRIAL**

7.25    TRUSTOR AND BENEFICIARY HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS DEED OF TRUST, ANY OF THE LOAN DOCUMENTS, OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION AND LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.    TRUSTOR AND BENEFICIARY ALSO WAIVE ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF TRUSTOR OR BENEFICIARY.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  TRUSTOR AND BENEFICIARY ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS DEED OF TRUST AND THAT EACH SHALL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.    TRUSTOR AND BENEFICIARY FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT    AMENDMENTS,    RENEWALS,    SUPPLEMENTS    OR MODIFICATIONS TO THIS DEED OF TRUST, THE LOAN DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOAN.  IN THE EVENT OF LITIGATION, THIS DEED OF TRUST MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Maximum Amount of Indebtedness**

7.26    Notwithstanding anything contained herein to the contrary, the maximum amount of principal indebtedness secured by this Deed of Trust at the time of execution hereof or which under any contingency may become secured by this Deed of Trust at any time

84043032_6.DOC    2005-19275
Pg:34/45

hereafter is 200% of the amount of the Loan, plus (a) taxes, charges or assessments which may be imposed by law upon the Trust Property; (b) premiums on insurance policies covering the Trust Property; and (c) expenses incurred in upholding and enforcing the Lien of this Deed of Trust, including, but not limited to (1) the expenses of any litigation to prosecute or defend the rights and Lien created by this Deed of Trust; (2) any amount, cost or charges to which the Deed of Trust becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority; (3) interest at the Default Rate (or the interest rate); and (4) any sums expended by Beneficiary pursuant to Section 7.5.

**Delivery of Recorded Deed of Trust**

7.27    If California Civil Code Section 3110.5 is applicable to Trustor in connection with the Loan, as soon as practicable following recordation of this Deed of Trust, Trustor shall deliver to any general contractor a copy of the recorded Deed of Trust, certified by the county recorder and shall otherwise fully comply with said Section 3110.5.

**Request for Notice**

7.28    Trustor hereby requests that any notice of default and any notice of sale hereunder be mailed to it at its address set forth in the Preamble to this Deed of Trust.

**Lien Absolute**

7.29    Trustor acknowledges that this Deed of Trust and a number of other Loan Documents and those documents required by the Loan Documents together secure the Obligations. Trustor agrees that, to the extent permitted by law, the lien of this Deed of Trust and all obligations of Trustor hereunder shall be absolute and unconditional and shall not in any manner be affected or impaired by:

(a)    any lack of validity or enforceability of the Loan Agreement or any other Loan Document, any agreement with respect to any of the Indebtedness or Obligations or any other agreement or instrument relating to any of the foregoing;

(b)    any acceptance by Beneficiary of any security for or guarantees of any of the Indebtedness or the performance of any of the other Obligations;

(c)    any failure, neglect or omission on the part of Beneficiary to realize upon or protect any of the Indebtedness or any of the collateral security therefor, including the Loan Documents, or due to any other circumstance which might otherwise constitute a defense available to, or a discharge of, Trustor in respect of the Indebtedness and Obligations hereby secured or any collateral security therefor, including the Loan Documents, or due to any other circumstance which might otherwise constitute a defense available to, or a discharge of, Trustor in respect of the Indebtedness or Obligations or this Deed of Trust (other than the indefeasible payment in full in cash of all the Indebtedness and Obligations hereby secured);

2005-19275
Pg:35/45

(d)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Indebtedness or Obligations;

(e)     any release (except as to the property released), sale, pledge, surrender, compromise, settlement, nonperfection, renewal, extension, indulgence, alteration, exchange, modification or disposition of any of the Indebtedness or Obligations hereby secured or of any of the collateral security therefor;

(f)     any amendment or waiver of or any consent to any departure from the Loan Agreement or any other Loan Documents or of any guaranty thereof, if any, and Beneficiary may, in its discretion foreclose, exercise any power of sale, or exercise any other remedy available to it under any or all of the Loan Documents without first exercising or enforcing any of its rights and remedies hereunder; and

(g)     any exercise of the rights or remedies of Beneficiary hereunder or under any or all of the Loan Documents.

**Real Estate Taxes**

7.30     The Trustor shall not be entitled to any credit upon the Indebtedness or deduction from the assessed value of the Trust Property by virtue of payment of real estate taxes on the Trust Property.  If any law is enacted or adopted or amended after the date of this Deed of Trust which deducts the Indebtedness from the value of the mortgaged property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Indebtedness or Beneficiary's interest in the Trust Property (but mortgagor will not be required to pay Beneficiary's other income or franchise taxes), Trustor will pay such tax, with interest and penalties thereon, if any.  In the event that the payment of such tax or interest and penalties by Trustor would be unlawful or taxable to Beneficiary or unenforceable or provide the basis for a defense of usury, then in any such event, Beneficiary shall have the option, by written notice of not less than two-hundred and seventy (270) days, to declare the Indebtedness immediately due and payable.

**Exculpation; Casualty and Condemnation**

7.31     All obligations of Trustor under this Deed of Trust shall be limited by the provisions of Section 10.6 of the Loan Agreement.  The provisions of such Section 10.6, as well as all other provisions of the Loan Agreement (including, without limitation, the provisions regarding casualties and condemnations), are hereby incorporated herein by this reference.

**Counterparts**

7.32     This Deed of Trust may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Deed of Trust to produce or account for more than one such counterpart.

**Construction of Provisions**

7.33    The following rules of construction shall be applicable for all purposes of this Deed of Trust and all documents or instruments supplemental hereto, unless the context otherwise requires:

(a)    All references herein to numbered Articles or Sections or to lettered Exhibits are references to the Articles and Sections hereof and the Exhibits annexed to this Deed of Trust, unless expressly otherwise designated in context. All Article, Section and Exhibit captions herein are used for reference only and in no way limit or describe the scope or intent of, or in any way affect, this Deed of Trust.

(b)    The terms "include", "including" and similar terms shall be construed as if followed by the phrase "without being limited to".

(c)    The terms "Land", "Improvements" and "Trust Property" shall be construed as if followed by the phrase "or any part thereof".

(d)    The terms "Indebtedness" and "Obligations" shall be construed as if followed by the phrase "or any other sums secured hereby, or any part thereof".

(e)    The word "or" shall be construed as inclusive.

(f)    Words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders, and words importing the singular number shall mean and include the plural number, and *vice versa*.

(g)    The term "person" shall include natural persons, firms, partnerships, corporations and any other public and private legal entities.

(h)    The term "provisions", when used with respect hereto or to any other document or instrument, shall be construed as if preceded by the phrase "terms, covenants, agreements, requirements, conditions and/or".

(i)    The cover page of and all recitals set forth in, and all Exhibits to, this Deed of Trust are hereby incorporated in this Deed of Trust.

(j)    All obligations of Trustor hereunder shall be performed and satisfied by or on behalf of Trustor at Trustor's sole cost and expense.

(k)    The term "lease" shall mean "tenancy, subtenancy, lease or sublease", the term "lessor" shall mean "landlord, sublandlord, lessor and sublessor" and the term "lessee" shall mean "tenant, subtenant, lessee and sublessee".

(l)    No inference in favor of or against any party shall be drawn from the fact that such party has drafted any portion hereof.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, Trustor has executed this Deed of Trust effective as of the date first above written.

**TRUSTOR:**

**LANTANA MENDOCINO, LLC**
a Delaware limited liability company

BY:     Heritage House Resort, Inc.
        its Manager

By:     _____
        Name: David J. Wilk
        Title: President

## ACKNOWLEDGMENT

STATE OF *California* )
                              ) SS
COUNTY OF *San Francisco* )

On *August 25th*, 2005, before me, *April M. Johnson, Notary Public*
                                    (Name, Title of Officer, e.g., "Jane Doe, Notary Public")

personally appeared *David J. Wilk*
                      (Name(s) of Signer(s))

☐        personally known to me -OR-

☒        proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity/ies, and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which person(s) acted, executed the instrument.

Witness my hand and official seal.



(Signature of Notary)

(SEAL)

> APRIL M. JOHNSON
> COMM. #1330172
> NOTARY PUBLIC-CALIFORNIA
> SAN FRANCISCO COUNTY
> My Comm. Expires Nov. 13, 2005
> PC01

My Commission expires:

*11·13·05*

2005-19275
Pg:39/45

84043032_6.DOC

EXHIBIT "A" DESCRIPTION OF FEE PROPERTY
**LEGAL DESCRIPTION**

All that certain real property situated in the unincorporated area, County of Mendocino, State of California described as follows:

TRACT ONE:

PARCEL ONE:

Commencing at an iron T-bar monument marking the Southwestern corner of that certain parcel of land described in the deed to Joseph S. Simon, et ux, of record in Volume 638 at Page 115 of Official Records of Mendocino County, which said point is on the Westerly line of that certain parcel of land described in the deed to Stuart Rhodes, of record in Volume 472 of Official Records, Page 489, said Mendocino County Records, and running thence along the boundary of said Rhodes parcel as follows: South, 384
.07 feet; West, 24.90 feet; North 46° 44' West, 134.31 feet; North 86° 16' West, 85.03 feet; and South, 277.59 feet to the Southwesterly corner of said Rhodes Parcel, which said point is an angle in the boundary of that certain parcel of land described in the deed to Kenneth Taplin, et ux, of record in Volume 472 of Official Records, Page 489, said Mendocino County Records; thence along said Taplin boundary the following courses and distances: West, 34.19 feet to a T-bar near the Northerly edge of State Highway One; North 39° 55' West, 159.00 feet to a 1/2" iron pipe; North 24° 46' West 103.32 feet to a 1/2" iron pipe; North 16° 03' West, 131.19 feet to an iron pipe below ground; North 73° 49' West 27.22 feet to an iron pipe below ground; North 12° 41' East, 137.78 feet to an iron pipe; and North 21° 23' East, 42.65 feet to a T-bar marking the Southwestern corner of that certain parcel of land described in the deed to H.L. Byrd, et ux, of record in Volume 577, at Page 49 of Official Records of said Mendocino County, thence along the boundary of said Byrd parcel East, 196.10 feet and North 40.50 feet to the Southwestern corner of that certain parcel of land described in the deed to Katherina Smith, of record in Volume 144 of Official Records, Page 418, said Mendocino County Records; and thence East and along the Southerly line thereof 207.52 feet to the point of commencement.

PARCEL TWO:

Commencing at an iron T-bar monument marking the Southwestern corner of that certain parcel of land described in the deed to Joseph S. Simon, et ux, of record in Volume 638, at Page 115 of Official Records of said Mendocino County, and running thence East and along the Southerly line of said Simon parcel 198.94 feet to a T-bar marking the Southeastern corner thereof, which said point is on the Westerly line of that certain parcel of land described in the deed to Kenneth L. Taplin, of record in Volume 421 of Official Records, Page 115, said Mendocino County Records; thence South 00° 17' 30" West and along said last mentioned line 305.00 feet; thence South 34° 01' 38" West, 312.60 feet; thence West 230.00 feet to an angle in the boundary of that certain parcel of land described in the deed to Kenneth L. Taplin, et ux, of record in Volume 472 of Official Records, Page 488, said Mendocino County Records; thence along said boundary the following courses and distances; North, 277.59 feet; South, 86° 16' East, 85.03 feet; South 46° 44' East, 134.31 feet; East, 24.90 feet; and North, 384.07 feet to the point of commencement.

121-130-13

Excepting from the above described Parcels One and Two, that portion described in the deeds to the State of California, recorded January 30, 1973, in Book 913, Official Records, Pages 424 and 427.

TRACT TWO:

All those portions of Lot 4, Section 17, and of Lot 1, Section 20, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, described as follows:

Beginning on the West line of said Lot 4 at the Southwest corner of the land conveyed by Charlotte E. Johnston to Ray H. Wolfe, et ux, by deed dated June 5, 1944, recorded in Liber 176 of Official Records, Page 189, Mendocino County Records; thence Southerly and Southeasterly along the Westerly line of said Lot 4 and the Westerly line of said Lot 1, to the most Westerly corner of the land conveyed by Mrs. Katherina Smith to Mrs. Frances Woodhead, by deed dated March 27, 1936, recorded in Liber 106 of Official Records, Page 188, Mendocino County Records; thence following the Northwesterly line of said Woodhead land North 44° East, 325.5 feet to the North line of the above mentioned Lot 1; thence East along said North line 54.5 feet; thence continuing along said Northwesterly line of the Woodhead land North 62° 30' East, 96.5 feet; thence North 64° East, 98.2 feet; North 38° 30' East, 159.5 feet to the centerline of the Shoreline Highway; thence Northwesterly and Northerly along the centerline of said Shoreline Highway to a point where said highway intersects the land of Ray H. Wolfe abovementioned; thence along the Southerly line of said Wolfe land, South 23° West, 122 feet; thence South 65° 09' West, 896.62 feet to the point of beginning.

2005-19275
Pg: 40/45

EXCEPTING THEREFROM that portion described in the deed from Edd Johnson, et ux, to Vivian M. Jorgensen, et al, recorded January 26, 1954 in Liber 362 of Official Records, Page 433, Mendocino County Records.

ALSO EXCEPTING THEREFROM those portions described in the deeds to the State of California, recorded January 30, 1973 in Volume 913 of Official Records, Pages 421, 424 and 427, Mendocino County Records.

ALSO EXCEPTING THEREFROM any portion lying within Tract Three described herein.

121-130- 33 and ptn 34

TRACT THREE:

All those portions of Lot 4, Section 17 and Lot 1, Section 20, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, described as follows:

Beginning at the most Westerly corner of the land conveyed by Mrs. Katherina Smith to Mrs. Francis Woodhead by deed dated March 27, 1936, and recorded in Liber 106 of Official Records at Page 188, Mendocino County Records; thence North 54° 07' 33" East (North 44° East, previous Deed), 57.42 feet, more or less, to a 3/4 inch diameter rebar tagged LS 3184; thence South 21° 22' 30" East, 58.93 feet, more or less, to the Southwest corner of that parcel of land deeded to the La Brie-Gray Parties by the Dennen Trustees in Boundary Adjustment CDB 14-96, thence along said boundary and bearing North 63° 02' 37" East, 114.79 feet to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence North 38° 14' 50" East, 105.00 feet, more or less, to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence North 46° 40' 30" East, 75.00 feet, more or less, to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence leaving said La Brie-Gray Parties boundary and bearing North 45° 07' 35" West, 36.87 feet, more or less, to a brass washer stamped LS 3184, said washer set in a concrete utility box lid; thence North 44° 00' East, 57.5 feet; thence East, 54.5 feet; thence North 62° 30' East, 96.5 feet; thence North 64° East, 98.2 feet; thence North 38° 30' East, 159.5 feet to the centerline of the Shoreline Highway; thence meandering the centerline of the Shoreline Highway, South 74° 45' West, 178.9 feet; thence West, 70.0 feet to a point in the centerline of the Shoreline Highway; thence leaving the centerline of the Shoreline Highway and being South 60° West, 185.00 feet; thence South 44° West, 362.0 feet; thence South 27° 13' 22" East, 50.14 feet (South 65° East, 111.0 feet, previous Deed), more or less, to the Point of Beginning.

Excepting Therefrom that portion conveyed to the State of California by deed recorded August 9, 1972 in Book 896, Official Records, page 101, #27219, Mendocino County Records.

121-130-34

TRACT FOUR:

Beginning at a point North 88° 38' 15" West, 951.72 feet (West, 949.2 feet, previous Deed) of a point common to corners of Sections 16, 17, 20 and 21, Township 16 North, Range 17 West, Mount Diablo Base and Meridian; thence running South, 66.4 feet; thence South 19° East, 34 feet to the center of Smith Gulch; thence following the meanders of Smith Gulch to the ocean as follows: South 66° 30' West, 287.6 feet; thence South 43° West, 43.7 feet; thence South 82° West, 70.3 feet to the Pacific Ocean, making the centerline of said Smith Gulch the Southern property line, thence along the bank of the Pacific Ocean as follows: South 45° West, 145.0 feet; thence South 57° 30' West, 206.7 feet; thence North 26° West, 134.9 feet; thence South 80° West, 129.4 feet; thence North 54° 30' West, 5 feet; thence North 75° 28' 12" West, 59.80 feet, more or less, to the Southeast corner of that parcel of land deeded to the La Brie-Gray Parties by the Dennen Trustees in Boundary Adjustment CDB 14-96; thence leaving the Pacific Ocean and along said La Brie-Gray property boundary, North 49° 04' 35" East, 312.50 feet, more or less, to a 3/4 inch rebar tagged LS 3184 herein referred to as Deed Point "A", thence continuing along said boundary, North 45° 07' 35" West, 113.10 feet, more or less, to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence leaving said La Brie-Gray boundary and bearing North 45° 07' 35" West, 36.87 feet, more or less, to a brass washer stamped LS 3184, said washer set in the lid of a concrete utility box; thence North 44° 00' East, 57.5 feet; thence East, 54.5 feet; thence North 62° 30' East, 96.5 feet; thence North 64° East, 98.2 feet; thence North 38° 30' East, 159.5 feet; thence North 76° 00' East, 108.3 feet; thence South 86° 30' East, 266.6 feet; thence South 51° 30' East, 52.8 feet; thence South 15° 00' East, 64.5 feet; thence South 15° 30' West, 64.0 feet; thence South 26° 03' 59" West, 72.93 feet; (South 25° 45' West, 73.8 feet, previous Deed), more or less, to the Point of Beginning.

Excepting therefrom that portion described in the deed to the State of California recorded October 17, 1972 in Book 903, Official Records, Page 344, Mendocino County Records.



2005-19275
Pg:41/45

Also excepting therefrom that portion described in the deed to the State of California recorded January 30, 1973 in Book 913, Official Records, Page 427, Mendocino County Records.

TOGETHER WITH :

That portion of the land conveyed to Larry Jay Richmond, et al, by deed recorded May 15, 1996, in Book 2332, Official Records, page 193, Mendocino County Records, described as follows:

All that portion of the former State Highway in the Southeast quarter of the Southeast quarter of Section 17 and the Northeast quarter of the Northeast quarter of Section 20 Township 16 North, Range 17 West, Mount Diablo Base and Meridian, lying Westerly of and adjacent to the following described line:

Commencing at the Northeast corner of said Section 20, thence South 87° 42' 54" West (South 86° 35' 58" West True Meridian), 950.79 feet to a point that bears North 77° 50' 29" West, 74.96 feet from Engineer's Station 15+01.65 P.O.T. of the Department of Transportation (formerly Public Works) Survey between 1.4 and 1.7 miles North of Albion River (State Highway 01-men-01-PM 45.3/45.6), said point being the TRUE POINT OF BEGINNING; thence North 43° 38' 31" East, 76.52 feet; thence North 12° 09' 31" East, 49.21 feet; thence, along a tangent curve to the left having a radius of 145 feet, through an angle of 59° 16' 17", a distance of 150 feet.

121-130-14
123-010-33

TRACT FIVE:

PARCEL ONE:

All that portion of Lot 1, Section 20, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, more particularly described as follows:

Starting at a point 949.2 feet West of the common corner to Sections 16, 17, 20 and 21, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, running thence South 66.4 feet; thence South 19° East, 34 feet to center of gulch known as Smith Gulch; thence on the exterior boundary of the land herein described by the following courses and distances, following the meander of Smith Gulch, South 66° 30' West, 287.0 feet; South 43° West, 43.7 feet; South 82° West, 70.3 feet to Pacific Coast; thence meandering the shore of the Pacific Ocean South 22° 15' East, 42.8 feet; South 39° West, 249 feet; North 76° 15' East, 141 feet; South 53° East, 373 feet; South 18° East, 78 feet to the point on the North bank of Dark Gulch; thence meandering up Dark Gulch South 74° 30' East, 56 feet; South 81° East, 36 feet; thence South 87° 45' East, 5.20 feet to the most Westerly corner of property conveyed by deed from John R. Chisholm and wife, dated August 19, 1943, recorded August 27, 1943 in Book 164, Official Records, Page 336, Mendocino County Records; thence North 41° 20' East along the Northwesterly line of property above referred to; thence North 41° 20' East to the South side of State Highway, being the most Northerly corner of Carlson property above referred to; thence meandering the South side of State Highway North 51° 30' West, 290 feet; thence North 19° West, 177 feet; thence North 24° 30' West, 55 feet to the point of beginning.

PARCEL TWO:

Beginning at the most Westerly corner of that parcel conveyed from John R. Chisholm, et ux, to Edwin A. Carlson, et ux, dated August 19, 1943 and recorded in Book 164, Official Records, Page 336, Mendocino County Records, proceed North 41° 20' East, 23.47 feet to an iron pipe; thence continuing North 41° 20' East, 374.03 feet to a fence corner marking the most Northerly corner of said parcel described by deed recorded in Book 164, Official Records, Page 336; thence South 40° 13' 49" West, 372.05 feet to a three quarter inch iron pipe with brass disc stamped LS 3117, from which a brass disc stamped LS 3117 in a 10" diameter pine scribed "BT" bears North 56° 13' East, 79.15 feet; thence South 40° 13' 49" West, 19.40 feet; thence North 87° 45' West, 9.71 feet to the point of beginning.

Excepting therefrom those portions of the above described property as described in deeds to the State of California, recorded October 17, 1972 in Book 903, Official Records, Pages 344 and 347, Mendocino County Records.

123-010-18



TRACT SIX:

Starting at a point 949.2 feet West of the common corner to Sections Sixteen (16) and Seventeen (17), Twenty (20) and Twenty-one (21), Township Sixteen (16) North, Range Seventeen (17) West, Mount Diablo Base and Meridian and running thence South 66.4 feet; thence South 19° East, 34 feet to the center of a gulch known as Smith Gulch; thence South 24° East, 55 feet; thence South 19° East, 177 feet; thence South 51° 30' East, 290 feet to and for the true point of beginning. Thence around the exterior boundaries of the land herein conveyed by the following courses and distances; South 51° 30' East, 149.98 feet, more or less, to a 5/8" steel rod tagged LS 3117 and marking the Northwest corner of that easement shown on the Record of Survey recorded in Map Case 2, Drawer 34, Page 73, Mendocino County Records; thence continuing South 51° 30' East, 12.00 feet; thence South 44° 46' 27" West along an existing picket fence, 199.70 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 41° 20' 00" West, 53.26 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 11° 23' 10" West, 81.41 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 33° 58' 35" East, 64.35 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence North 66° 19' 15" East, 32.55 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 69° 43' 15" East, 114.59 feet to a 1/2 inch diameter rebar tagged RCE 18341, on the Westerly boundary of the lands granted from Ruth Carlson to Phyllis M. Shields in Book 651, Page 124, Mendocino County Official Records; thence along said property line and bearing South 36° 19' 55" West, 62.43 feet, more or less, to the center of Dark Gulch Creek; thence continuing along said property line and Dark Gulch Creek, North 69° 43' 15" West, 73.11 feet; thence South 66° 19' 15" West, 41.48 feet; thence North 55° 50' 49" West, 105.40 feet; thence North 20° 15' 18" West, 27.18 feet; thence continuing along said Shields property line and bearing North 62° 26' West, 72.09 feet; thence North 89° 17' 01" West, 55.98 feet; thence North 75° 55' West, 135.79 feet; thence leaving said Shields property and meandering Northerly along the mean high water line of the Pacific Ocean to a point on the North bank of Dark Gulch described in the deed from Frank McGrew, Anna McGrew and A.E. Johnston to John R. Chisholm and Ida B. Chisholm, in Book 152, Page 298, Mendocino County Official Records; thence along said Chisholm property line, South 74° 30' East, 56 feet; thence South 81° East, 36 feet, more or less, to the Southwest corner of that property described in a deed from John R. Chisholm and Ida B. Chisholm to Edwin A. Carlson and Ruth E. Carlson, in Book 164, Page 336, Mendocino County Official Records; thence along said property line, North 41° 20' East, 397.5 feet, more or less, to the true point of beginning.

123-010-31

TRACT EIGHT:

BEGINNING at the section corner common to sections 16, 17, 20 and 21, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, Mendocino County, California; thence South 88° 28' 04" West, 1,673.56 feet, more or less, to a 1/2-inch rebar with plastic cap stamped RCE 18341, said rebar marking the True Point of Beginning of this description; thence South 45° 07' 35" East, 113.10 feet, more or less, to a 3/4-inch diameter rebar tagged LS 3184, herein referred to as Deed Point "A"; thence South 49° 04' 35" West, 267.62 feet to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, herein referred to as Deed Point "B"; thence continuing South 49° 04' 35" West, 44.88 feet, more or less, to the Pacific Ocean; thence along the bank of the Pacific Ocean and bearing North 44° 28' 10" West, 64.92 feet; thence North 21° 22' 30" West, 56.07 feet to a Point; thence leaving the bank of the Pacific Ocean and bearing North 63° 02' 37" East, 22.32 feet, more or less, to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, herein referred to as Deed Point "C"; thence continuing North 63° 02' 37" East, 92.47 feet, more or less, to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, thence North 38° 14' 50" East, 105.00 feet, more or less, to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, thence North 46° 40' 30" East, 75.00 feet, more or less, to the True Point of Beginning.

Excepting therefrom any portion of the above described property lying outside of the line of ordinary high tide.

123-010-32

TRACT NINE:

As an appurtenance to Tracts One thru Six:
The right to install, replace, repair, remove and maintain a 2-inch pipeline transversely under the State Highway at Engineer's Station 19+78, and a 2-inch pipeline transversely under the State Highway at Engineer's Station 22+65 and a 2-inch pipeline transversely under the State Highway at Engineer's Station 26+95 as reserved in the deed from L.D. Dennen, et al to the State of California recorded January 30, 1973 in Book 913, Official Records, Page 427, Mendocino County Records. These underground facilities shall be installed beneath the surface of the highway within a conduit at Engineer's Station 19+78, Engineer's Station 22+65 and at Engineer's Station 26+95 to be constructed, owned and maintained by the grantee transversely across the State Highway.

EXHIBIT B

DESCRIPTION OF THE LEASED PROPERTY

Our No.: 01201792-SD          LEGAL DESCRIPTION

All that certain real property situated in the unincorporated area, County of Mendocino,
State of California, described as follows:

TRACT ONE:

PARCEL THREE:

That portion of the Southwest quarter of the Southeast quarter of Section Seventeen (17) in
Township Sixteen (16) North, Range Seventeen (17) West, Mount Diablo Base and Meridian, and
more particularly described as follows, to wit:

Beginning at a point which is the intersection of the centerlines of the present Shoreline Highway
and the Old Abandoned County Coast Road, from which point the Southwest corner of the
Southeast quarter of the Southeast quarter of Section Seventeen (11), Township Sixteen (16)
North, Range Seventeen (11) West, Mount Diablo Base and Meridian, bears South 225.9 feet, and
East 17.2 feet; thence along the said center line of the Old Abandoned County Coast Road and
leaving the said center line of the present Shoreline Highway by the following courses and
distances: North 39° 55' West, 171.0 feet to a point marked by a 3/4 inch iron pipe; thence North
25° 00' West, 103.0 feet to a point marked by a 3/4 inch iron pipe; thence North 15° 55' West,
131.0 feet to a point marked by a 3/4 inch iron pipe; thence leaving the said center line of the Old
Abandoned County Coast Road, North 73° 00' West 51.0 feet to a point in the said center line of
the present Shoreline Highway; thence along the said center line of the present Shoreline
Highway which runs in a generally, partially Southwesterly and partially Southeasterly direction
to the point of beginning.

121-130-10

Excepting from the above described Parcels One through Three, that portion described in the
deeds to the State of California, recorded January 30, 1973, in Book 913, Official Records, Pages
424 and 427.

*  *  *

TRACT SEVEN:

PARCEL ONE:

Parcel 7, as shown on that certain Parcel Map P 5-72, which map was filed for record in the office
of the recorder of the County of Mendocino, State of California, on February 28, 1973 in Map
Case 2 Drawer 20, Page 67.

84043032_6.DOC          2005-19275
Pg: 44/45

Excepting therefrom that portion conveyed in the deed to The Trust for Public Land a charitable nonprofit California corporation, recorded December 30, 1974 in Book 986 Official Records, Page 289, Mendocino County Records, described as follows:

Being a portion of the Northeast one-quarter of Section 21., Township 16 North, Range 17 West, Mount Diablo Base and Meridian, more particularly described as follows:

Beginning at the North quarter corner of said Section 21 as delineated and shown on that certain Parcel Map filed in Map Case 2, drawer 20, Page 67, Mendocino County Records-thence South 0° 37' 16" West, along the North-South centerline of said Section 21 to the intersection with tile centerline of the creek known as Dark Gulch; thence Easterly and Northerly along said centerline of Dark Gulch to the North line of said Section 21. thence North 88° 49' 07" West to the point of beginning.

Also excepting therefrom that portion conveyed in the deed to the State of California recorded April 10, 1990 in Book 1821. Official Records, Page 410, Mendocino County Records.

123-020-20

A Non-exclusive easement, appurtenant to Parcel One of Tract Seven, for roadway purposes over that portion of Parcel 8 designated as "Road R/W" on that certain parcel map filed for record in the office of the Recorder of the County of Mendocino, State of California on February 28, 1973 in Map Case 2, Drawer 20, Page 67, Mendocino County Records

84043032_6.DOC

2005-19275
Pg:45/45

EXHIBIT D

## GLOBAL SETTLEMENT AND FORBEARANCE AGREEMENT

This Global Settlement and Forbearance Agreement (this "Agreement") is entered into as of August 2, 2007 by and among WestLB AG, New York Branch (the "Lender"), Lantana Mendocino, LLC (the "Borrower"), David J. Wilk ("Wilk"), and Duane D. Werb ("Werb"; together with Wilk, the "Guarantor"; the Borrower and the Guarantor are collectively, the "Obligor").

### Recitals

The following recitals form the basis for and are a material part of this Agreement:

WHEREAS, the Lender and the Borrower entered into that certain Loan and Security Agreement, dated as of August 26, 2005 (the "Loan Agreement");

WHEREAS, in connection with the Loan Agreement, the Borrower made to the Lender that certain Promissory Note, dated as of August 26, 2005, in the face amount of $19,500,000 (the "Note");

WHEREAS, the Borrower executed that certain Deed of Trust and Leasehold Deed of Trust With Security Agreement, Assignment of Leases and Rents And Fixture Filing, dated as of August 26, 2005 and recorded on September 1, 2005, in favor of the Lender (the "Deed of Trust"; the real property that is the subject of the Deed of Trust collectively, the "Premises");

WHEREAS, on August 26, 2005, the Guarantor made that certain Completion Guaranty in favor of the Lender (the "Completion Guaranty");

WHEREAS, on August 26, 2005, the Guarantor made that certain Recourse Liability Agreement in favor of the Lender (the "Recourse Agreement");

WHEREAS, on August 26, 2005, the Lender, the Guarantor, Laird Bunch, Jerold K. Karabensh, and GHM (USA) LLC entered into that certain Equity Pledge and Security Agreement (the "Pledge Agreement"; together with the Loan Agreement, the Note, the Deed of Trust, the Completion Guaranty, the Recourse Agreement, and all other documents, instruments, and agreements arising from or related thereto, collectively, the "Loan Documents");

WHEREAS, pursuant to the Loan Documents, among other things, the Lender agreed to make certain loans and other financial accommodations to the Borrower, and, to secure payment of the Borrower's obligations to the Lender under the Loan Documents (collectively, the "Obligations"), the Borrower granted to the Lender security interests in and liens upon (collectively, the "Security Interest") all of the Borrower's assets and property, including, without limitation, the Premises (collectively, the "Collateral");

WHEREAS, certain Events of Default (as defined in the Loan Agreement) have occurred and are continuing under the following Sections of the Loan Agreement: 9.1(a)(i); 9.1(c); 9.1(e); 9.1(l); 9.1(u); 9.1(y); and 9.1(z) (collectively, the "Events of Default");

WHEREAS, the Guarantors are in default of the Completion Guaranty for failure to satisfy their respective obligations thereunder (the "Guaranty Defaults"; together with the Events of Default, the "Defaults");

WHEREAS, certain Recourse Liability Events (as defined in the Recourse Agreement) have occurred under the Recourse Agreement pursuant to Sections 1(a), (c), (i), and (j) thereof;

WHEREAS, as of the date hereof, the pecuniary Obligations aggregate no less than $19,500,000 (exclusive of attorneys' fees, costs and expenses and all other costs and expenses that are due and payable by the Borrower pursuant to the Loan Documents);

WHEREAS, on December 15, 2006, the Borrower and the Lender executed that certain letter agreement regarding certain proposed, additional financing (the "Letter Agreement");

WHEREAS, on May 18, 2007, the Borrower filed a lawsuit against the Lender in the United States District Court, Southern District of New York, Case No. 07 CV 3915 (the "Lawsuit");

WHEREAS, the Obligor has requested that the Lender: (i) extend additional financing to the Borrower under the Loan Documents; and (ii) forbear from exercising its rights and remedies under the Loan Documents and applicable law as a result of the Defaults, and the Lender, subject to the terms and conditions of this Agreement, has agreed to such forbearance.

NOW, THEREFORE, for valuable consideration received to their satisfaction, the parties hereto agree as follows:

### Agreement

1.      Recitals. The Recitals are incorporated herein by reference.

2.      Acknowledgments and Agreements. The Obligor acknowledges and agrees that:

    (a)      the Obligations are due and payable in full;

    (b)      the Defaults and the Recourse Liability Events are true and correct;

    (c)      as a result of the Defaults, the Lender may exercise all of its rights and remedies under the Loan Documents or otherwise;

    (d)      the Lender has fully performed and satisfied its duties and obligations under the Letter Agreement and the Loan Documents;

    (e)      the Lender has no obligation or otherwise to extend any loans, financial accommodations or otherwise to the Obligor;

    (f)      before execution and delivery of this Agreement, the Lender had no obligation to modify, extend, or otherwise amend the terms and conditions of the Loan Documents or to negotiate with the Obligor or any other person or entity concerning any of the

foregoing or the Letter Agreement. The Obligor agrees that the Lender's execution of this Agreement does not create any such obligation, other than as expressly set forth herein;

(g)    the Obligor does not have any claims or set-offs against the Obligations, nor does it have any defenses to, or counterclaims respecting, the enforcement or administration of its obligations evidenced by the Loan Documents or under applicable law;

(h)    the Obligor has made its own decisions regarding all of its operations and its incurrence and payment of all third party debt;

(i)    the Lender and the Lender's agents have acted at all times in a fair and reasonable manner, and in good faith, in connection with their administration and enforcement of the Loan Documents and the Letter Agreement, their dealings with the Obligor with respect to the Loan Documents and the Letter Agreement, and their negotiations in connection with this Agreement, the Letter Agreement, and all other transactions related to the other Loan Documents. The execution and delivery of this Agreement by the Obligor was and is its free and voluntary act and deed, without any misapprehension as to the effect thereof, and without any coercion, duress, overreaching or any other misconduct by the Lender or any agent of the Lender;

(j)    the Security Interest is valid, properly perfected, and in first priority;

(k)    all representations and warranties set forth in the Loan Documents were accurate when made, are accurate as of the date of this Agreement, and shall remain true until the Obligations are fully and indefeasibly satisfied;

(l)    if the Obligor breaches or defaults under this Agreement, any such breach or default shall be deemed an Event of Default (as defined in the Loan Agreement); and

(m)    this Agreement is hereby deemed included in the defined term "Loan Documents".

3.    Reaffirmation.  The parties hereto agree that all of the Loan Documents remain and shall continue in full force and effect, except as expressly modified hereby, and are valid and enforceable, and the Obligor hereby ratifies, affirms and confirms the Loan Documents and all of its respective duties and obligations thereunder.

4.    Forbearance.  Subject to the Obligor's compliance with each of the terms and conditions of this Agreement, the Lender, without waiving, curing or ceasing the continuance of the Defaults, agrees not to exercise or enforce any right or remedy to which the Lender is entitled in respect of the Loan Documents from the date hereof through December 31, 2007 (the "Payment Date"; such period of time from the date hereof through the Payment Date, the "Forbearance Period"); provided, that such forbearance shall in no way: (a) relieve the Obligor from any liability under the Loan Documents; or (b) constitute a waiver of the Lender's right to exercise any and all remedies available to it upon termination of the Forbearance Period. The Forbearance Period shall terminate on the Payment Date.  Notwithstanding the foregoing, if at any time any Event of Default shall occur under the Loan Documents, the Forbearance Period automatically and immediately shall terminate.  Upon termination of the Forbearance Period,

whether by passage of time or after the occurrence of any such Event of Default, all of the Obligations automatically and immediately shall become due and owing and the Lender shall be free to exercise all of its rights and remedies under the Loan Documents, applicable law or otherwise, including, without limitation, the remedies identified in Section 13 hereof.

5. <u>Material Adverse Effect</u>. The occurrence of any event or condition that, in the Lender's sole and absolute judgment, reasonably could be expected to be a Material Adverse Effect (as defined below) shall be deemed to be a default and a breach under this Agreement. "Material Adverse Effect" means: (a) a material adverse effect on the business, operations, results of operations, assets, liabilities or condition (financial or otherwise) of an Obligor; (b) the material impairment of (i) an Obligor's ability to perform his or its obligations under the Loan Documents, or hereunder, to which he or it is a party or (ii) the ability of the Lender to enforce the Obligations or realize upon the Collateral; and (c) a material adverse effect on the value of the Collateral or the amount that the Lender would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of the Collateral.

6. <u>Amendments to the Loan Documents</u>.

(a) <u>Loan Agreement</u>. The Loan Agreement hereby is amended as follows:

(i) *Loan Amount.* All references to $19,500,000, including, without limitation, in the defined term Loan Amount, are hereby deleted and replaced with $24,000,000.

(ii) *Maturity Date.* Subsection (b) of the defined term Maturity Date hereby is deleted and is replaced with: "December 31, 2007."

(iii) *Interest Payments.*

(A) In lieu of the Borrower's monthly interest payment obligations under the Loan Documents for the period from July 2, 2007 through December 31, 2007, the Lender shall retain $900,000 of the Additional Financing (as defined below in Section 7(a)) (the "<u>Capitalized Interest Amount</u>") to satisfy such obligations. Notwithstanding the foregoing, if the Capitalized Interest Amount is not sufficient to fully satisfy such obligations, then the difference between such obligations and the Capitalized Interest Amount shall be added to the aggregate amount of the Obligations.

(B) Upon the occurrence of the earlier to occur of an Event of Default and the Payment Date, the Lender may apply the remaining balance of the Capitalized Interest Amount, if any, to the Obligations in its sole and absolute discretion.

(b) <u>Note</u>. The Note hereby is amended as follows: all references to $19,500,000, including, without limitation, in the defined term Note Amount, are hereby deleted and replaced with $24,000,000.

(c) <u>Deed of Trust</u>. Attached hereto as <u>Exhibit A</u> and incorporated herein by reference is the First Amendment to the Deed of Trust (the "<u>Amendment</u>"). The Borrower agrees to execute and deliver the Amendment to the Lender on the date hereof, prior to the

4

Lender providing the Borrower with the Additional Financing, and the Lender will record such instrument subsequent to its receipt thereof.

(d)    Other Loan Documents. To the extent not specifically addressed herein, all of the other Loan Documents hereby are amended to incorporate the terms and conditions set forth in this Section 6.

7.    Additional Financing.

(a)    Subject to the terms and conditions set forth herein and in the other Loan Documents, the Lender hereby agrees to provide the Borrower with additional financing in an amount equal to $4,500,000 (the "Additional Financing"). The Additional Financing will be provided to the Borrower within three (3) business days of the date hereof. For clarity, as set forth in Section 6(a)(iii)(A) above, the amount of the Additional Financing actually to be provided to the Borrower is $3,600,000.

(b)    The Additional Financing solely shall be used by the Borrower for the purposes and in the amounts identified on Exhibit B that is attached hereto and is incorporated herein by reference. Upon the Lender's written request, the Borrower promptly will provide the Lender with written evidence of any disbursement of the Additional Financing. Further, the Borrower represents that Exhibit B was provided to the Lender by the Borrower, and the Borrower has made its own decisions, based upon its budgets, regarding the purposes for and the amounts of the disbursements of the Additional Financing. Finally, the Borrower agrees it will not pay HH LLC more than $570,000 of the Additional Financing.

8.    Refinancing Process and Timeline. The Borrower has engaged both Sonnenblick Goldman, LLC and Molinaro Koger (collectively, the "Investment Banker") to conduct a situational analysis and formulate a plan for the refinancing of the Borrower's secured debt obligations and for the sale, divestiture or other disposition of the Borrower's equity (in any event, the "Liquidity Plan"). The Borrower shall instruct and permit the Investment Banker to directly and promptly respond to inquiries and information requests concerning the Liquidity Plan and its implementation from the Lender and the Lender's representatives. Beginning on the date that is three (3) business days after the date hereof and every other week thereafter (or more frequently as may be requested by the Lender), the Borrower and the Investment Banker shall provide to the Lender an oral report and a written report (in a form acceptable to the Lender) on the status of the Liquidity Plan and its implementation. In addition, the Borrower shall satisfy and comply with the following deadlines: (i) with respect to the entry into a letter of intent and/or commitment letter and delivery of a copy thereof to the Lender, on or before October 1, 2007; (ii) with respect to the entry into definitive documents and delivery of a copy thereof to the Lender, on or before November 30, 2007; and (iii) with respect to the closing of any such agreement or document contemplated in foregoing clause (iii), on or before the Payment Date.

9.    Release of the Lender. The Obligor and any person claiming through it hereby releases and discharges the Lender and its predecessors, successors, assigns, directors, officers, members, agents, employees, representatives, affiliates, and attorneys (collectively, the "Releasees") of and from, and hereby waives and covenants not to bring any action against the

5

Releasees regarding, any and all claims, rights, actions, demands, injuries, damages, compensation, or causes of action of every kind and nature, whether foreseen or unforeseen, contingent or actual, liquidated or unliquidated, known or unknown, whether in tort or contract, which the Obligor has against any of the Releasees, or which might or could arise under state, federal, or local law, including common law, from the beginning of the world up to the date hereof (the "Claims"). As a consequence of this paragraph and for the purpose of implementing a general, full and complete release and discharge of the Releasees, the Obligor expressly acknowledges that its release is intended to include, without limitation, Claims of which it is unaware or does not expect to exist in its favor, and that this release contemplates the release and discharge of any and all of the Claims. The Obligor acknowledges and agrees that the possibility that unknown Claims may exist, being known and understood by it, has been explicitly considered and taken into account in its execution hereof, for the purpose of implementing a full and complete release and discharge of the Releasees. On the Payment Date, the last clause of the first sentence of this Section (i.e., "from the beginning of the world up to the date hereof") automatically shall be deleted and replaced with "from the beginning of the world up to the Payment Date."

10.    Release of the Obligor. On the Payment Date, provided an Event of Default has not occurred, the Forbearance Period has not terminated, the Lender has received the indefeasible payment of the Obligations, in full, in cash, and all of the other terms and conditions hereunder have been satisfied (in the Lender's sole and absolute discretion), the Lender and any person claiming through it hereby agrees to release and discharge the Obligor and its respective predecessors, successors, assigns, directors, officers, members, agents, employees, representatives, and attorneys (collectively, the "Obligor Releasees") of and from, and hereby agrees to waive and covenant not to bring any action against the Obligor Releasees regarding, any and all claims, rights, actions, demands, injuries, damages, compensation, or causes of action of every kind and nature, whether foreseen or unforeseen, contingent or actual, liquidated or unliquidated, known or unknown, whether in tort or contract or which might or could arise under state, federal, or local law, including common law, arising from or related to the Loan Documents or the Letter Agreement, which the Lender then has against any of the Obligor Releasees, from the beginning of the world up to the Payment Date (the "Obligor Claims"). As a consequence of this paragraph and for the purpose of implementing a general release and discharge of the Obligor Releasees arising from or related to the Loan Documents and the Letter Agreement, the Lender expressly acknowledges that its release is intended to include, in its effect, without limitation, Obligor Claims of which it is unaware or does not expect to exist in its favor, and that this release contemplates the release and discharge of any and all of the Obligor Claims. The Lender acknowledges and agrees that the possibility that unknown Obligor Claims may exist, being known and understood by it, has been explicitly considered and taken into account in its execution hereof, for the purpose of implementing a full release and discharge of the Obligor Releasees arising from or related to the Loan Documents and the Letter Agreement.

11.    Release of Security Interests; Termination of Obligations. On the Payment Date, provided an Event of Default has not occurred, the Forbearance Period has not terminated, the Lender has received the indefeasible payment of the Obligations, in full, in cash, and all of the other terms and conditions hereunder have been satisfied (in the Lender's sole and absolute discretion): (a) the Security Interest shall be deemed to automatically have been terminated and released and the Lender will execute and deliver to the Obligor statements and other releases,

terminations and satisfactions of the Security Interest as are necessary to the terms and conditions hereof; and (b) the Obligor's obligations to the Lender shall be deemed satisfied in full and all arrangements between the Obligor and the Lender shall be terminated. Notwithstanding the foregoing, any right, duty, commitment or other obligation that by its terms survives termination of the Loan Documents shall survive such termination.

12.    Lawsuit.  On the date hereof, the Borrower will dismiss, with prejudice, the Lawsuit.

13.    Remedies.  Upon the occurrence of an Event of Default, the Obligor hereby agrees that it will give its full and complete cooperation and assistance to the Lender in its exercise of all or any combination of its remedies afforded by this Agreement, the other Loan Documents or applicable law including, without limitation, those remedies set forth below (and the Obligor hereby agrees not to object to or otherwise oppose any such exercise):

(a)    Appointment of a Receiver.  Without notice to the Obligor (such notice being hereby expressly waived) and without reference to the value of the assets of the Obligor or to the solvency or insolvency of the Obligor, the Obligor consents to and supports the immediate appointment, whether by the Lender or pursuant to the order of any court, of one or more receivers for all or any of the Collateral, and further agrees to take all necessary steps to immediately, completely and effectively transfer all of its right, title and interest in the Collateral to any such receiver(s). The appointment of a receiver(s) shall be for the benefit of the Lender and such receiver(s) shall be vested with the power to take immediate possession of the Collateral, to manage the assets and business of the Borrower, and to collect any and all rents, issues, profits, accounts or proceeds of the property and assets of the Borrower, and any and all such rents, issues, profits, accounts or proceeds when collected, may be applied toward the payment of the Obligations, and the costs, attorneys' fees, taxes, insurance or other items necessary for the protection and preservation of the Collateral, including the expenses of such receivership(s).  Such receiver(s) shall be directed to sell the Collateral as promptly as is commercially reasonable, subject to court approval, if necessary, and shall apply the proceeds of such sale(s) against the Obligations;

(b)    Deed-In-Lieu.  Within two (2) business days of the written request of the Lender, the Borrower shall execute and deliver to the Lender a deed-in-lieu of foreclosure for the Premises (the "Deed"; the form and substance of the Deed shall be acceptable to the Lender in its sole and absolute discretion), and the Lender, in its sole and absolute discretion, may record, hold or otherwise transfer the Deed.  Thereafter, the Obligor agrees to promptly execute and deliver all such documents and instruments and do all such other acts and things as may be necessary and appropriate to carry out the provisions of this Section;

(c)    Foreclosure.  Without notice to the Obligor (such notice being hereby expressly waived), the Obligor consents to and supports the Lender's judicial or non-judicial foreclosure of the Premises (including, without limitation, the sale of the Premises), whether by the Lender, the trustee under the Deed of Trust, any other person or entity, or pursuant to the order of any court; and/or

7

(d)    Other Remedies. The Lender may exercise all or any other remedies to which it is entitled under the Loan Documents, applicable law, equity and/or otherwise.

14.    Representations and Warranties.

(a)    Each of the parties hereto represents and warrants that the concepts embodied in this Agreement have been voluntarily and independently negotiated by and between the parties hereto, including their respective, sophisticated legal counsel, this Agreement is satisfactory to each of the parties to this Agreement, and each such party understands the terms of this Agreement and intends to fully perform and be bound by this Agreement.

(b)    Each of the parties hereto that is an entity represents and warrants that it is duly created, validly existing and in good standing under the laws of the state of its organization and that the party signing on behalf of it is authorized on its behalf to execute and deliver this Agreement, and any other instrument executed and delivered in connection herewith, and upon such execution and delivery each such entity shall be bound by all such instruments.

(c)    Each of the parties hereto represents and warrants that such party has the legal right, power, capacity and authority to enter into and perform such party's covenants, obligations and agreements under this Agreement and the other instruments referenced herein and delivered pursuant hereto, all corporate, company, partnership and other actions required in connection with the authorization, execution, delivery and performance of this Agreement by such party have been duly taken and, when executed and delivered by such party, this Agreement shall constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

(d)    Each of the parties hereto represents and warrants that neither the execution and delivery of this Agreement, nor consummation of any of the transactions contemplated herein, nor compliance with the terms and provisions hereof, will contravene any provision of law, statute, rule or regulation to which such party is subject or any judgment, decree, license, order or permit applicable to such party, or will conflict or will be inconsistent with, or will result in any breach of any of the terms of the covenants, conditions or provisions of, or constitute a delay under any other obligation of such party.

(e)    Except as set forth in Section 28 below, each of the parties hereto represents and warrants that no consent, approval, authorization or order of any court or governmental authority or third party is required in connection with the execution, delivery and performance by any party to this Agreement.

(f)    The Obligor hereby represents and warrants that it is solvent as of the date hereof and, after giving effect to the transactions contemplated hereby, the Obligor will not have incurred, and does not intend to incur, debts beyond its ability to pay as they become due and has sufficient capital with which to conduct its affairs.

## Miscellaneous

15.    No Waiver. No failure or delay on the part of the Lender in exercising any of its rights or remedies under this Agreement, the other Loan Documents or existing at law or in

8

equity shall operate as a waiver of any right or remedy of the Lender with respect to any obligations, including, without limitation, the Obligations, owed to it, and no single or partial exercise of any right or remedy hereunder shall operate as a waiver or a preclusion to the exercise of any other rights or remedies the Lender may have under any agreement, document or instrument.

      16.    <u>Severability</u>. If any provision of this Agreement is held to be unenforceable, in whole or in part, such holding will not affect the validity of the other provisions of this Agreement.

      17.    <u>Notices</u>. All notices given under this Agreement shall be made as set forth in the Loan Documents, except that all such notices to the Lender shall be given to:

          Keith Min
          WestLB AG, New York Branch
          1211 Avenue of the Americas
          New York, NY 10036
          Fax: 212.852.6374

          with a copy to:

          Mike Rupe
          Katten Muchin Rosenman LLP
          525 West Monroe Street
          Chicago, IL 60661
          Fax: 312.577.4581

      18.    <u>Descriptive Headings</u>.  Headings used herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

      19.    <u>Parties in Interest</u>. This Agreement shall be binding upon and inure to the benefit of each party hereto and each of their respective successors and assigns, and nothing in this Agreement is intended to confer upon any other person, whether or not named herein, any rights or remedies of any nature whatsoever under or by reason of this Agreement.

      20.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, by original or facsimile signature, each of which when executed and delivered shall be deemed an original, and such counterparts together shall constitute one instrument.

      21.    <u>Further Actions</u>. The parties hereto hereby agree to execute and deliver all such documents and instruments and do all such other reasonable acts and things as may be necessary and appropriate to carry out the provisions of this Agreement.

      22.    <u>Amendment</u>. This Agreement may not be amended except by an instrument in writing signed by the parties hereto.

9

23. <u>Contemporaneous Exchange</u>.    Each of the parties hereto agree that the transactions contemplated hereby constitute a contemporaneous exchange for new value.

24. <u>Course of Dealing</u>.  The parties hereto recognize that the Obligor has not fully complied with the terms of the Loan Documents in that, without limitation, the Obligor has not timely arranged for repayment in full of the Obligations.  No course of dealing between the parties hereto is established by virtue of the Obligor's non-compliance therewith and the Lender's failure to exercise any of its legal rights responsive thereto.  The Obligor understands that the Loan Documents will be strictly enforced going forward, and that the Lender's failure to insist on strict performance to date shall not be interposed as a defense to the Lender's exercise of its legal rights, nor shall it constitute a waiver of any thereof.

25. <u>Time is of the Essence</u>.  The Obligor acknowledges that TIME IS OF THE ESSENCE with respect to the time for performance of the terms and conditions of this Agreement.  Notwithstanding anything to the contrary in the Loan Documents, the Obligor shall not be given any grace period within which to cure any default or breach under this Agreement or the other Loan Documents.

26. <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY STATE OTHER THAN THE STATE OF NEW YORK.

27. <u>Warrant of Attorney</u>.  The Obligor irrevocably authorizes any attorney-at-law to appear for it in any court of record upon the occurrence of any Event of Default under this Agreement or any other Loan Document and waive the issuing and service of process and confess judgment against the Obligor in favor of the Lender for the amount then due and owing, together with costs of suit and any other amounts due the Lender under or in connection with this Agreement or any other Loan Document, and thereupon to waive all errors and all rights of appeal and stay of execution.  The foregoing warrant of attorney shall survive any judgment, and if any judgment is vacated for any reason, the Lender may hereafter use the foregoing warrant of attorney to obtain any additional judgments against the Obligor.  The Obligor agrees that the Lender's attorneys may confess judgment pursuant to the foregoing warrant of attorney.

28. <u>HH LLC Consent</u>.  This Agreement shall not be effective, binding, or enforceable unless and until HH LLC consents to this Agreement and reaffirms the subordination of its subordinated credit facility, and its security interests and liens related thereto, to the Obligations (including, without limitation, the Additional Financing) and the Security Interest.  Such consent must be: (a) in writing; (b) acceptable to the Lender, in its sole and absolute discretion; and (c) provided to the Lender on or before 5 p.m. PST on August 3, 2007.

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date first above written.

WESTLB AG, NEW YORK BRANCH

By: _____
Name:
Title: A Duly Authorized Signatory

E. KEITH MIN
EXECUTIVE DIRECTOR

By: _____
Name:
Title: A Duly Authorized Signatory

LANTANA MENDOCINO, LLC
By: Heritage House Resort, Inc., its Manager

By: _____
David J. Wilk, President

By: _____
David J. Wilk, as a guarantor

By: _____
Duane D. Werb, as a guarantor

*Signature page to Global Settlement and Forbearance Agreement dated August ___, 2007*

33

## EXHIBIT A

**Amendment to Deed of Trust**

(Attached hereto.)

## EXHIBIT B

### Additional Funding

| Additional Funding Purpose | Amount |
|---|---|
| Payment of Capitalized Interest Amount pursuant to Section 6(a)(iii)(A) hereof. | $900,000 |
| Payment to fully extinguish and release all mechanics' liens and all other liens, claims and encumbrances filed against the Borrower or the Premises other than by the Lender or HH LLC (including the liens filed by Headlands Construction and LSA). | $1,700,000 |
| Payment to HH LLC. | $500,000 |
| Payment of construction costs and expenses to complete construction of the spa facility on the Premises. | $400,000 |
| Payment of certain miscellaneous items, which items include payment and full satisfaction of all taxes levied against or otherwise incurred by the Borrower or the Premises. | $1,000,000 |
| **TOTAL:** | **$4,500,000** |

13

**EXHIBIT E**



2007-15673
Pg:1/11

RECORDING REQUESTED BY

*Return To :*

**Corporation Service Company**
P.O. Box 2969
Springfield, IL 62708

*444478-1  CS4*

2007-15673
Recorded at the request of
C S C
08/21/2007 10:45A
Fee: 37.00 No of Pages: 11

OFFICIAL RECORDS
Marsha A Wharff, Clerk-Recorder
Mendocino County, CA

## FIRST AMENDMENT TO DEED OF TRUST AND LEASEHOLD DEED OF TRUST WITH SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING

**THIS FIRST AMENDMENT TO DEED OF TRUST AND LEASEHOLD DEED OF TRUST WITH SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING** (this *Amendment*) is executed effective as of the 3rd day of August, 2007, by **LANTANA MENDOCINO, LLC**, a Delaware limited liability company, whose address is c/o David J. Wilk, Lantana Group, One Riverwalk Center, Suite 100, 110 South Poplar Street, Wilmington, Delaware 19801, as trustor (the "*Trustor*"), in favor of **REDWOOD EMPIRE TITLE COMPANY OF MENDOCINO COUNTY**, a California corporation, whose address is 376E. Gobbi Street P.O. Box 238, Ukiah, California 95482, as trustee (together with its successors and assigns, *Trustee*), in trust for the benefit of **WESTLB AG**, a German banking corporation acting through its New York branch, whose address is 1211 Avenue of the Americas, New York, New York 10036, in its capacity as administrative agent for each of the Lenders (as defined in the Loan Agreement (as hereinafter defined)) (together with any successor agent appointed in accordance with the Loan Agreement, *Beneficiary*).

### R E C I T A L S :

A.    On August 26, 2005, Trustor made that certain DEED OF TRUST AND LEASEHOLD DEED OF TRUST WITH SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (the "*Deed*") in favor of Trustee in trust for the benefit of Beneficiary. *Recorded # 2005-19275, dt 9-1-05.*

B.    Trustor, Beneficiary and certain other credit parties have entered into that certain Global Settlement and Forbearance Agreement, dated as of the date hereof (the "*Agreement*"), whereby, among other things, Beneficiary has agreed to extend additional financial accommodations to Trustor.

C.    To induce Beneficiary to enter into the Agreement, Trustor hereby executes this Amendment.

NOW, THEREFORE, in addition to the foregoing, for valuable consideration received to Trustor's satisfaction, Trustor hereto agrees as follows:

1.    Recitals. The Recitals are incorporated herein by reference.

2.    Amendments to the Deed.

(a)    Recital A hereby is deleted in its entirety and hereby is replaced with:

"This Deed of Trust is given to secure a loan (the *Loan*) in the principal amount of TWENTY FOUR MILLION AND NO/100 DOLLARS ($24,000,000.00) advanced pursuant to that certain Loan and Security Agreement, dated as of the date hereof, among Trustor, Beneficiary and the Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the *Loan Agreement*) and evidenced by those certain promissory notes made by the Trustor in favor of the Lenders (such promissory note(s), together with all extensions, renewals, replacements, restatements or modifications thereof being hereinafter collectively referred to as the *Note*);"

(b)    The defined term Loan Documents is deleted in its entirety and hereby is replaced with:

"*Loan Documents* means, collectively, this Deed of Trust, the Loan Agreement, the Notes, the Environmental Indemnity, the Completion Guaranty, the Collateral Assignment of Interest Rate Protection Agreement, the Consent and Acknowledgement, the Omnibus Assignment, the Equity Pledge and Security Agreement, the Recourse Liability Agreement, the Consent and Subordination of Operating Agreements, all Financing Statements in connection with the foregoing, and all other agreements, instruments and documents evidencing or securing the Indebtedness, as all of the aforesaid may from time to time hereafter be modified or replaced, including, without limitation, that certain Global Settlement and Forbearance Agreement, dated as of August 3 , 2007."

3.    Reaffirmation. Trustor agrees that the Deed remains and shall continue in full force and effect, except as expressly modified hereby, and is valid and enforceable, and Trustor hereby ratifies, affirms and confirms the Deed and all of its respective duties and obligations thereunder.

4.    Representations and Warranties.

(a)    All of Trustor's representations and warranties set forth in the Deed were accurate when made and are accurate as of the date hereof.

(b)    Trustor represents and warrants that the concepts embodied in this Amendment are satisfactory to Trustor and Trustor understands the terms of this Amendment and intends to fully perform and be bound by this Amendment.

**2007-15673**
**Pg:2/11**

(c)     Trustor represents and warrants that it is duly created, validly existing and in good standing under the laws of the state of its organization and that the party signing on behalf of it is authorized on its behalf to execute and deliver this Amendment, and any other instrument executed and delivered in connection herewith, and upon such execution and delivery each such entity shall be bound by all such instruments.

(d)     Trustor represents and warrants that it has the legal right, power, capacity and authority to enter into and perform its covenants, obligations and agreements under this Amendment, all corporate, company, partnership and other actions required in connection with the authorization, execution, delivery and performance of this Amendment by Trustor has been duly taken and, when executed and delivered by Trustor, this Amendment shall constitute the legal, valid and binding obligation of Trustor, enforceable against Trustor in accordance with its terms.

(e)     Trustor represents and warrants that neither the execution and delivery of this Amendment, nor consummation of any of the transactions contemplated herein, nor compliance with the terms and provisions hereof, will contravene any provision of law, statute, rule or regulation to which such party is subject or any judgment, decree, license, order or permit applicable to Trustor, or will conflict or will be inconsistent with, or will result in any breach of any of the terms of the covenants, conditions or provisions of, or constitute a delay under any other obligation of Trustor.

(f)     Trustor represents and warrants that no consent, approval, authorization or order of any court or governmental authority or third party is required in connection with the execution, delivery and performance by it to this Amendment.

2007-15673
Pg:3/11

IN WITNESS WHEREOF, Trustor has executed this First Amendment to Deed of Trust effective as of the date first above written.

TRUSTOR:

**LANTANA MENDOCINO, LLC**
a Delaware limited liability company

BY:    Heritage House Resort, Inc.
       its Manager

By:    _____
       Name: David J. Wilk
       Title: President

**ACKNOWLEDGMENT**

STATE OF _Delaware_ )
COUNTY OF _New Castle_ ) SS

On _August 2nd_, 2007, before me, _Amy D Brown, Esq_
<span style="font-style:italic">(Name, Title of Officer, e.g., "Jane Doe, Notary Public")</span>

personally appeared _David Wik_
<span style="font-style:italic">(Name(s) of Signer(s))</span>

☑ personally known to me -OR-

☐ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity/ies, and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which person(s) acted, executed the instrument.

Witness my hand and official seal.

_(signature)_
(Signature of Notary)

(SEAL)

AMY D. BROWN
Attorney at Law
Notary Public pursuant to
29 Del.C. § 4323(a)(3)

My Commission expires:

_n/a_

2007-15673
Pg:5/11

## EXHIBIT "A" DESCRIPTION OF FEE PROPERTY
### LEGAL DESCRIPTION

All that certain real property situated in the unincorporated area, County of Mendocino, State of California described as follows:

TRACT ONE:

PARCEL ONE:

Commencing at an iron T-bar monument marking the Southwestern corner of that certain parcel of land described in the deed to Joseph S. Simon, et ux, of record in Volume 638 at Page 115 of Official Records of Mendocino County, which said point is on the Westerly line of that certain parcel of land described in the deed to Stuart Rhodes, of record in Volume 472 of Official Records, Page 489, said Mendocino County Records, and running thence along the boundary of said Rhodes parcel as follows: South, 384

.97 feet; West, 24.90 feet; North 46° 44' West, 134.31 feet; North 86° 16' West, 85.03 feet; and South, 277.59 feet to the Southwesterly corner of said Rhodes Parcel, which said point is an angle in the boundary of that certain parcel of land described in the deed to Kenneth Teplin, et ux, of record in Volume 472 of Official Records, Page 489, said Mendocino County Records; thence along said Teplin boundary the following courses and distances:  West, 34.19 feet to a T-bar near the Northerly edge of State Highway One; North 39° 55' West, 159.00 feet to a 1/2" iron pipe; North 24° 46' West 103.32 feet to s 1/2" iron pipe; North 16° 03' West, 131.19 feet to an iron pipe below ground; North 73° 49' West 27.22 feet to an iron pipe below ground; North 12° 41' East, 137.78 feet to an iron pipe; and North 21° 23' East, 42.65 feet to a T-bar marking the Southwestern corner of that certain parcel of land described in the deed to H.L. Byrd, et ux, of record in Volume 577, at Page 49 of Official Records of said Mendocino County, thence along the boundary of said Byrd parcel East, 196.10 feet and North 40.50 feet to the Southwestern corner of that certain parcel of land described in the deed to Katherina Smith, of record in Volume 144 of Official Records, Page 418, said Mendocino County Records; and thence East and along the Southerly line thereof 207.52 feet to the point of commencement.

PARCEL TWO:

Commencing at an iron T-bar monument marking the Southwestern corner of that certain parcel of land described in the deed to Joseph S. Simon, et ux, of record in Volume 638, at Page 115 of Official Records of said Mendocino County, and running thence East and along the Southerly line of said Simon parcel 198.94 feet to a T-bar marking the Southeastern corner thereof, which said point is on the Westerly line of that certain parcel of land described in the deed to Kenneth L. Teplin, of record in Volume 421 of Official Records, Page 115, said Mendocino County Records; thence South 00° 17' 30" West and along said last mentioned line 305.00 feet; thence South 34° 01' 38" West, 312.60 feet; thence West 230.00 feet to an angle in the boundary of that certain parcel of land described in the deed to Kenneth L. Teplin, et ux, of record in Volume 472 of Official Records, Page 488, said Mendocino County Records; thence along said boundary the following courses and distances; North, 277.59 feet; South, 86° 16' East, 85.03 feet; South 46° 44' East, 134.31 feet; East, 24.90 feet; and North, 384.97 feet to the point of commencement.

121-130-13

Excepting from the above described Parcels One and Two, that portion described in the deeds to the State of California, recorded January 30, 1973, in Book 913, Official Records, Pages 424 and 427.

TRACT TWO:

All those portions of Lot 4, Section 17, and of Lot 1, Section 20, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, described as follows:

Beginning on the West line of said Lot 4 at the Southwest corner of the land conveyed by Charlotte E. Johnston to Ray H. Wolfe, et ux, by deed dated June 5, 1944, recorded in Liber 176 of Official Records, Page 189, Mendocino County Records; thence Southerly and Southeasterly along the Westerly line of said Lot 4 and the Westerly line of said Lot 1, to the most Westerly corner of that land conveyed by Mrs. Katherina Smith to Mrs. Frances Woodhead, by deed dated March 27, 1936, recorded in Liber 106 of Official Records, Page 188, Mendocino County Records; thence following the Northwesterly line of said Woodhead land North 44° East, 325.5 feet to the North line of the above mentioned Lot 1; thence East along said North line 54.5 feet; thence continuing along said Northwesterly line of the Woodhead land North 62° 30' East, 96.5 feet; thence North 64° East, 98.2 feet; North 38° 30' East, 159.5 feet to the centerline of the Shoreline Highway; thence Northwesterly and Northerly along the centerline of said Shoreline Highway to a point where said highway intersects the land of Ray H. Wolfe abovementioned; thence along the Southerly line of said Wolfe land, South 23° West, 122 feet; thence South 65° 09' West, 896.62 feet to the point of beginning.



2007-15673
Pg: 6/11

EXCEPTING THEREFROM that portion described in the deed from Edd Johnson, et ux, to Vivian M. Jorgensen, et al, recorded January 26, 1954 in Liber 362 of Official Records, Page 433, Mendocino County Records.

ALSO EXCEPTING THEREFROM those portions described in the deeds to the State of California, recorded January 30, 1973 in Volume 913 of Official Records, Pages 421, 424 and 427, Mendocino County Records.

ALSO EXCEPTING THEREFROM any portion lying within Tract Three described herein.

121-130- 33 and ptn 34

TRACT THREE:

All those portions of Lot 4, Section 17 and Lot 1, Section 20, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, described as follows:

Beginning at the most Westerly corner of the land conveyed by Mrs. Katherina Smith to Mrs. Francis Woodhead by deed dated March 27, 1936, and recorded in Liber 106 of Official Records at Page 188, Mendocino County Records; thence North 54° 07' 35" East (North 44° East, previous Deed), 57.42 feet, more or less, to a 3/4 inch diameter rebar tagged LS 3184; thence South 21° 22' 30" East, 58.93 feet, more or less, to the Southwest corner of that parcel of land deeded to the La Brie-Gray Parties by the Dennen Trustees in Boundary Adjustment CDB 14-96, thence along said boundary and bearing North 63° 02' 57" East, 114.79 feet to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence North 38° 14' 50" East, 105.00 feet, more or less, to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence North 46° 40' 30" East, 75.00 feet, more or less, to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence leaving said La Brie-Gray Parties boundary and bearing North 45° 07' 35" West, 36.87 feet, more or less, to a brass washer stamped LS 3184, said washer set in a concrete utility box lid; thence North 44° 00' East, 57.5 feet; thence East, 54.5 feet; thence North 62° 30' East, 96.5 feet; thence North 64° East, 98.2 feet; thence North 38° 30' East, 159.5 feet to the centerline of the Shoreline Highway; thence meandering the centerline of the Shoreline Highway, South 74° 45' West, 178.9 feet; thence West, 70.0 feet to a point in the centerline of the Shoreline Highway; thence leaving the centerline of the Shoreline Highway and being South 60° West, 185.00 feet; thence South 44° West, 362.0 feet; thence South 27° 13' 22" East, 50.14 feet (South 65° East, 111.0 feet, previous Deed), more or less, to the Point of Beginning.

Excepting Therefrom that portion conveyed to the State of California by deed recorded August 9, 1972 in Book 896, Official Records, page 101, #27219, Mendocino County Records.

121-130-34

TRACT FOUR:

Beginning at a point North 88° 38' 15" West, 951.72 feet (West, 949.2 feet, previous Deed) of a point common to corners of Sections 16, 17, 20 and 21, Township 16 North, Range 17 West, Mount Diablo Base and Meridian; thence running South, 66.4 feet; thence South 19° East, 34 feet to the center of Smith Gulch; thence following the meanders of Smith Gulch to the ocean as follows: South 66° 30' West, 287.6 feet; thence South 43° West, 43.7 feet; thence South 82° West, 70.3 feet to the Pacific Ocean, making the centerline of said Smith Gulch the Southern property line, thence along the bank of the Pacific Ocean as follows: South 45° West, 145.0 feet; thence South 57° 30' West, 206.7 feet; thence North 26° West, 134.9 feet; thence South 80° West, 129.4 feet; thence North 54° 30' West, 5 feet; thence North 75° 28' 12" West, 59.80 feet, more or less, to the Southeast corner of that parcel of land deeded to the La Brie-Gray Parties by the Dennen Trustees in Boundary Adjustment CDB 14-96; thence leaving the Pacific Ocean and along said La Brie-Gray property boundary, North 49° 04' 35" East, 312.50 feet, more or less, to a 3/4 inch rebar tagged LS 3184 herein referred to as Deed Point "A", thence continuing along said boundary, North 45° 07' 35" West, 113.10 feet, more or less, to a 1/2 inch diameter rebar with plastic cap stamped RCE 18341; thence leaving said La Brie-Gray boundary and bearing North 45° 07' 35" West, 36.87 feet, more or less, to a brass washer stamped LS 3184, said washer set in the lid of a concrete utility box; thence North 44° 00' East, 57.5 feet; thence East, 54.5 feet; thence North 62° 30' East, 96.5 feet; thence North 64° East, 98.2 feet; thence North 38° 30' East, 159.5 feet; thence North 76° 00' East, 108.3 feet; thence South 86° 30' East, 266.6 feet; thence South 51° 30' East, 52.8 feet; thence South 15° 00' East, 64.5 feet; thence South 15° 30' West, 64.0 feet; thence South 26° 03' 59" West, 72.93 feet; (South 25° 45' West, 73.8 feet, previous Deed), more or less, to the Point of Beginning.

Excepting therefrom that portion described in the deed to the State of California recorded October 17, 1972 in Book 903, Official Records, Page 344, Mendocino County Records.

Also excepting therefrom that portion described in the deed to the State of California recorded January 30, 1973 in Book 913, Official Records, Page 427, Mendocino County Records.

TOGETHER WITH :

That portion of the land conveyed to Larry Jay Richmond, et al, by deed recorded May 15, 1996, in Book 2332, Official Records, page 193, Mendocino County Records, described as follows:

All that portion of the former State Highway in the Southeast quarter of the Southeast quarter of Section 17 and the Northeast quarter of the Northeast quarter of Section 20 Township 16 North, Range 17 West, Mount Diablo Base and Meridian, lying Westerly of and adjacent to the following described line:

Commencing at the Northeast corner of said Section 20, thence South 87° 42' 54" West (South 86° 35' 58" West True Meridian), 950.79 feet to a point that bears North 77° 50' 29" West, 74.96 feet from Engineer's Station 15401.65 P.O.T. of the Department of Transportation (formerly Public Works) Survey between 1.4 and 1.7 miles North of Albion River (State Highway 01-men-01-PM 45.3/45.6), said point being the TRUE POINT OF BEGINNING; thence North 43° 38' 31" East, 76.52 feet; thence North 12° 09' 31" East, 49.21 feet; thence, along a tangent curve to the left having a radius of 145 feet, through an angle of 59° 16' 17", a distance of 150 feet.

121-130-14
123-010-33

TRACT FIVE:

PARCEL ONE:

All that portion of Lot 1, Section 20, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, more particularly described as follows:

Starting at a point 949.2 feet West of the common corner to Sections 16, 17, 20 and 21, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, running thence South 66.4 feet; thence South 19° East, 34 feet to center of gulch known as Smith Gulch; thence on the exterior boundary of the land herein described by the following courses and distances, following the meander of Smith Gulch, South 66° 30' West, 287.0 feet; South 43° West, 43.7 feet; South 82° West, 70.3 feet to Pacific Coast; thence meandering the shore of the Pacific Ocean South 22° 15' East, 42.8 feet; South 39° West, 249 feet; North 76° 15' East, 141 feet; South 53° East, 373 feet; South 18° East, 78 feet to the point on the North bank of Dark Gulch; thence meandering up Dark Gulch South 74° 30' East, 56 feet; South 81° East, 36 feet; thence South 87° 45' East, 5.20 feet to the most Westerly corner of property conveyed by deed from John R. Chisholm and wife to Edwin A. Carlson and wife, dated August 19, 1943, recorded August 27, 1943 in Book 164, Official Records, Page 336, Mendocino County Records; thence North 41° 20' East along the Northwesterly line of property referred to, a distance of 397.5 feet to the South side of State Highway, being the most Northerly corner of Carlson property above referred to; thence meandering the South side of State Highway North 51° 30' West, 290 feet; thence North 19° West, 177 feet; thence North 24° 30' West, 55 feet to the point of beginning.

PARCEL TWO:

Beginning at the most Westerly corner of that parcel conveyed from John R. Chisholm, et ux, to Edwin A. Carlson, et ux, dated August 19, 1943 and recorded in Book 164, Official Records, Page 336, Mendocino County Records, proceed North 41° 20' East, 23.47 feet to an iron pipe; thence continuing North 41° 20' East, 374.03 feet to a fence corner marking the most Northerly corner of said parcel described by deed recorded in Book 164, Official Records, Page 336; thence South 40° 13' 49" West, 372.05 feet to a three quarter inch iron pipe with brass disc stamped LS 3117, from which a brass disc stamped LS 3117 in a 10" diameter pine scribed "BT" bears North 56° 13' East, 79.15 feet; thence South 40° 13' 49" West, 19.40 feet; thence North 87° 45' West, 9.71 feet to the point of beginning.

Excepting therefrom those portions of the above described property as described in deeds to the State of California, recorded October 17, 1972 in Book 903, Official Records, Pages 344 and 347, Mendocino County Records.

123-010-18



2007-15673
Pg:8/11

**TRACT SIX:**

Starting at a point 949.2 feet West of the common corner to Sections Sixteen (16) and Seventeen (17), Twenty (20) and Twenty-one (21), Township Sixteen (16) North, Range Seventeen (17) West, Mount Diablo Base and Meridian and running thence South 66.4 feet; thence South 19° East, 34 feet to the center of a gulch known as Smith Gulch; thence South 24° East, 55 feet; thence South 19° East, 177 feet; thence South 51° 30' East, 290 feet to and for the true point of beginning. Thence around the exterior boundaries of the land herein conveyed by the following courses and distances; South 51° 30' East, 149.98 feet, more or less, to a 5/8" steel rod tagged LS 3117 and marking the Northwest corner of that easement shown on the Record of Survey recorded in Map Case 2, Drawer 34, Page 73, Mendocino County Records; thence continuing South 51° 30' East, 12.00 feet; thence South 44° 46' 27" West along an existing picket fence, 199.70 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 41° 20' 00" West, 53.26 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 11° 23' 10" West, 81.41 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 33° 58' 35" East, 64.35 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence North 66° 19' 15" East, 32.55 feet to a 1/2 inch diameter rebar tagged RCE 18341; thence South 69° 43' 15" East, 114.59 feet to a 1/2 inch diameter rebar tagged RCE 81341, on the Westerly boundary of the lands granted from Ruth Carlson to Phyllis M. Shields in Book 651, Page 124, Mendocino County Official Records; thence along said property line and bearing South 36° 19' 55" West, 62.43 feet, more or less, to the center of Dark Gulch Creek; thence continuing along said property line and Dark Gulch Creek, North 69° 43' 15" West, 73.11 feet; thence South 66° 19' 15" West, 41.48 feet; thence North 55° 50' 40" West, 105.40 feet; thence North 20° 15' 18" West, 27.18 feet; thence continuing along said Shields property line and bearing North 62° 26' West, 72.09 feet; thence North 89° 17' 01" West, 55.98 feet; thence North 75° 55' West, 135.79 feet; thence leaving said Shields property and meandering Northerly along the mean high water line of the Pacific Ocean to a point on the North bank of Dark Gulch described in the deed from Frank McGrew, Anna McGrew and A.E. Johnston to John R. Chisholm and Ida B. Chisholm, in Book 152, Page 298, Mendocino County Official Records; thence along said Chisholm property line, South 74° 30' East, 56 feet; thence South 81° East, 36 feet, more or less, to the Southwest corner of that property described in a deed from John R. Chisholm and Ida B. Chisholm to Edwin A. Carlson and Ruth E. Carlson, in Book 164, Page 336, Mendocino County Official Records; thence along said property line, North 41° 20' East, 397.5 feet, more or less, to the true point of beginning.

123-010-31

**TRACT EIGHT:**

BEGINNING at the section corner common to sections 16, 17, 20 and 21, Township 16 North, Range 17 West, Mount Diablo Base and Meridian, Mendocino County, California; thence South 88° 28' 04" West, 1,673.56 feet, more or less, to a 1/2-inch rebar with plastic cap stamped RCE 18341, said rebar marking the True Point of Beginning of this description; thence South 45° 07' 35" East, 113.10 feet, more or less, to a 3/4-inch diameter rebar tagged LS 3184, herein referred to as Deed Point "A"; thence South 49° 04' 35" West, 267.62 feet to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, herein referred to as Deed Point "B"; thence continuing South 49° 04' 35" West, 44.88 feet, more or less, to the Pacific Ocean; thence along the bank of the Pacific Ocean and bearing North 44° 28' 10" West, 64.92 feet; thence North 21° 22' 30" West, 56.07 feet to a 1/2-inch diameter rebar leaving the bank of the Pacific Ocean and bearing North 63° 02' 37" East, 22.32 feet, more or less, to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, herein referred to as Deed Point "C"; thence continuing North 63° 02' 37" East, 92.47 feet, more or less, to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, thence North 38° 14' 50" East, 105.00 feet, more or less, to a 1/2-inch diameter rebar with plastic cap stamped RCE 18341, thence North 46° 40' 30" East, 75.00 feet, more or less, to the True Point of Beginning.

Excepting therefrom any portion of the above described property lying outside of the line of ordinary high tide.

123-010-32

**TRACT NINE:**

As an appurtenance to Tracts One thru Six:

The right to install, replace, repair, remove and maintain a 2-inch pipeline transversely under the State Highway at Engineer's Station 19+78, and a 2-inch pipeline transversely under the State Highway at Engineer's Station 22+65 and a 2-inch pipeline transversely under the State Highway at Engineer's Station 26+95 as reserved in the deed from L.D. Dennen, et al to the State of California recorded January 30, 1973 in Book 913, Official Records, Page 427, Mendocino County Records. These underground facilities shall be installed beneath the surface of the highway within a conduit at Engineer's Station 19+78, Engineer's Station 22+65 and at Engineer's Station 26+95 to be constructed, owned and maintained by the grantee transversely across the State Highway.



2007-15673
Pg: 9/11

**EXHIBIT B**

**DESCRIPTION OF THE LEASED PROPERTY**

Our No.: 01201792-SD

**LEGAL DESCRIPTION**

All that certain real property situated in the unincorporated area, County of Mendocino, State of California, described as follows:

TRACT ONE:

PARCEL THREE:

That portion of the Southwest quarter of the Southeast quarter of Section Seventeen (17) in Township Sixteen (16) North, Range Seventeen (17) West, Mount Diablo Base and Meridian, and more particularly described as follows, to wit:

Beginning at a point which is the intersection of the centerlines of the present Shoreline Highway and the Old Abandoned County Coast Road, from which point the Southwest corner of the Southeast quarter of the Southeast quarter of Section Seventeen (11), Township Sixteen (16) North, Range Seventeen (11) West, Mount Diablo Base and Meridian, bears South 225.9 feet, and East 17.2 feet; thence along the said center line of the Old Abandoned County Coast Road and leaving the said center line of the present Shoreline Highway by the following courses I and distances: North 39° 55' West, 171.0 feet to a point marked by a 3/4 inch iron pipe; thence North 25° 00' West, 103.0 feet to a point marked by a 3/4 inch iron pipe; thence North 15° 55' West, 131.0 feet to a point marked by a 3/4 inch iron pipe; thence leaving the said center line of the Old Abandoned County Coast Road, North 73° 00' West 51.0 feet to a point in the said center line of the present Shoreline Highway; thence along the said center line of the present Shoreline Highway which runs in a generally, partially Southwesterly and partially Southeasterly direction to the point of beginning.

121-130-10

Excepting from the above described Parcels One through Three, that portion described in the deeds to the State of California, recorded January 30,1973, in Book 913, Official Records, Pages 424 and 427.

\* \* \*

TRACT SEVEN:

PARCEL ONE:

Parcel 7, as shown on that certain Parcel Map P 5-72, which map was filed for record in the office of the recorder of the County of Mendocino, State of California, on February 28, 1973 in Map Case 2 Drawer 20, Page 67.

84043032_6.DOC

2007-15673
Pg:10/11

Excepting therefrom that portion conveyed in the deed to The Trust for Public Land a charitable nonprofit California corporation, recorded December 30, 1974 in Book 986 Official Records, Page 289, Mendocino County Records, described as follows:

Being a portion of the Northeast one-quarter of Section 21., Township 16 North, Range 17 West, Mount Diablo Base and Meridian, more particularly described as follows:

Beginning at the North quarter corner of said Section 21 as delineated and shown on that certain Parcel Map filed in Map Case 2, drawer 20, Page 67, Mendocino County Records-thence South 0° 37' 16" West, along the North-South centerline of said Section 21 to the intersection with the centerline of the creek known as Dark Gulch; thence Easterly and Northerly along said centerline of Dark Gulch to the North line of said Section 21. thence North 88° 49' 07" West to the point of beginning.

Also excepting therefrom that portion conveyed in the deed to the State of California recorded April 10, 1990 in Book 1821. Official Records, Page 410, Mendocino County Records.

123-020-20

A Non-exclusive easement, appurtenant to Parcel One of Tract Seven, for roadway purposes over that portion of Parcel 8 designated as "Road R/W" on that certain parcel map filed for record in the office of the Recorder of the County of Mendocino, State of California on February 28, 1973 in Map Case 2, Drawer 20, Page 67, Mendocino County Records



2007-15673
Pg: 11/11

84043032_6.DOC

**EXHIBIT F**

# Katten

KattenMuchinRosenman LLP

575 Madison Avenue
New York, NY 10022-2585
212.940.8800  tel
212.940.6400  fax

MIKE RUPE
Mike.rupe@kattenlaw.com
212.940.8518 direct
212.894.5521 fax

October 10, 2007

<u>**Via Overnight Delivery**</u>

Lantana Mendocino, LLC
1 Riverwalk Center, Suite 100
Wilmington, DE 19801
Attention: David J. Wilk

Re:    Those certain loan documents, agreements, and instruments (collectively, the "<u>Loan Documents</u>") by and among WestLB AG (the "<u>Lender</u>"), Lantana Mendocino, LLC (the "<u>Borrower</u>"), and the other credit parties thereto (such credit parties and the Borrower collectively, the "<u>Credit Parties</u>"); that certain Global Settlement and Forbearance Agreement, dated as of August 2, 2007, by and among the Lender, the Borrower, Duane D. Werb, and David J. Wilk (the "<u>Forbearance Agreement</u>").

Dear David:

Please be advised that certain additional defaults and events of default under the Loan Documents have occurred and are continuing including, without limitation, pursuant to:

(i)    Section 5 of the Forbearance Agreement as a result of General Hotel Management LTD no longer managing or otherwise being affiliated with the Borrower;

(ii)    Section 7(b) of the Forbearance Agreement as a result of the Borrower's failure to: (a) provide the Lender with written evidence of the full payment and satisfaction of all taxes levied against or otherwise incurred by the Borrower or the Premises (as defined in the Forbearance Agreement) (collectively, the "<u>Taxes</u>"); and (b) fully pay and satisfy the Taxes; and

(iii)    Section 8(i) of the Forbearance Agreement as a result of the Borrower's failure to enter into a letter of intent or commitment letter on or before October 1, 2007. To date, the Lender only has received a draft term sheet.

With respect to (ii), it is unsettling that:

•    On August 13, 2007, in response to the undersigned's August 6 and 9, 2007 emails requesting information regarding the satisfaction of the Taxes, the Borrower, in

NEW YORK  CHARLOTTE  CHICAGO  IRVING  LONDON  LOS ANGELES  PALO ALTO  WASHINGTON, DC  WWW.KATTENLAW.COM
LONDON AFFILIATE: KATTEN MUCHIN ROSENMAN CORNISH LLP

A limited liability partnership including professional corporations



**Katten**
KattenMuchinRosenman LLP

Lantana Mendocino, LLC
October 10, 2007
Page 2

writing, provided: "I am planning to go to the County offices myself on [August 15, 2007] to finalize and remove any tax liens."

●       On each of August 14, 2007 and August 17, 2007, the Borrower, in writing, implied that the satisfaction of the Taxes was imminent and complete, respectively.

●       On September 14, 2007, in response to the undersigned's September 13, 2007 email stating that it appeared the Taxes were not satisfied based on a recent lien search against the Premises, the Borrower, in writing, provided:

"The county occupancy tax should be a recording issue. I placed a call to the office with whom I arranged this payment and my contact's message said she is out until Monday. I will call you as soon as she gets back to me."

"The real estate taxes we had owed were $98,577.26 and checks were sent out for this amount. They have not been presented to our bank yet so we will follow up and report back to you."

●       On September 17, 2007, the Borrower verbally assured the Lender and the undersigned that the Taxes had been satisfied and that the tax liens remained only because the Mendocino County tax recorder's office was tardy in filing the tax lien releases.

●       On October 9, 2007, the Borrower told the undersigned that only certain Taxes, in fact, had been satisfied – not all of the Taxes, as required by the Forbearance Agreement.

Please be further advised that, pursuant to Section 2(I) of the Forbearance Agreement, the foregoing breaches, defaults, and events of default constitute Events of Default under the Loan Agreement (as each such term is defined in that certain Loan and Security Agreement, dated as of August 26, 2005, by and between the Lender and the Borrower). The foregoing Events of Default are collectively, the "Defaults".

Please be further advised that, as a result of the Defaults, the Lender, pursuant to the Loan Documents, is entitled to exercise any and all of its rights and remedies under the Loan Documents, at law, in equity or otherwise, including, without limitation, all of its rights and remedies pursuant to Section 13 of the Forbearance Agreement.

Please be further advised that, notwithstanding the Defaults and the termination of the Forbearance Period (as defined in the Forbearance Agreement), the Lender, in its sole and absolute discretion, will forbear from exercising its rights and remedies under the Loan Documents, applicable law, equity and/or otherwise, on a day-to-day basis, until further notice.



Lantana Mendocino, LLC
October 10, 2007
Page 3

On or before **Friday, October 12, 2007 at 5:00 p.m. EST**, the Lender hereby demands that the Borrower provide the undersigned with written evidence, satisfactory to the Lender, that: (i) the Taxes have been fully satisfied; and (ii) the Borrower did not pay HH LLC more than $570,000 of the Additional Financing (as defined in the Forbearance Agreement).

The Lender hereby reserves and preserves in all respects any and all rights, claims, remedies and causes of action that it may have against any person or entity including, without limitation, the Credit Parties and their affiliates, members, officers and directors, arising from or related to the Loan Documents, applicable law, equity and/or otherwise. Nothing herein shall be construed or interpreted as a waiver of any of the Lender's rights, claims, remedies or causes of action against any person or entity, whether under the Loan Documents, applicable law, equity and/or otherwise.

Very truly yours,
**KATTEN MUCHIN ROSENMAN LLP**

Mike Rupe

cc:    Keith Min
       Duane D. Werb, Esq. (via FedEx to Werb & Sullivan, 300 Delaware Avenue, Suite 1018, Wilmington, DE, 19801)
       Walter Wetterman, Esq. (via FedEx to 44570 Gordon Lane, Mendocino, CA 95460)



**Katten**

Katten Muchin Rosenman LLP

575 Madison Avenue
New York, NY 10022-2585
212.940.8800 tel
212.940.6400 fax

MIKE RUPE
Mike.rupe@kattenlaw.com
212.940.8518 direct
212.894.5521 fax

December 5, 2007

**Via Overnight Delivery**

Lantana Mendocino, LLC
1 Riverwalk Center, Suite 100
Wilmington, DE 19801
Attention: David J. Wilk

Re:     Those certain loan documents, agreements, and instruments (collectively, the "Loan
        Documents") by and among WestLB AG (the "Lender"), Lantana Mendocino, LLC
        (the "Borrower"), and the other credit parties thereto (such credit parties and the
        Borrower collectively, the "Credit Parties"); that certain Global Settlement and
        Forbearance Agreement, dated as of August 2, 2007, by and among the Lender, the
        Borrower, Duane D. Werb, and David J. Wilk (the "Forbearance Agreement").

Dear David:

Please be advised that certain additional defaults and events of default under the Loan
Documents have occurred and are continuing including, without limitation, pursuant to:

(i)     Section 6.4(c) of that certain Loan and Security Agreement, dated as of August
        26, 2005 (the "Loan Agreement"), by and between the Lender and the Borrower
        as a result of the Borrower's failure to pay occupancy taxes ("Default A"); and

(ii)    Section 8(ii) of the Forbearance Agreement as a result of the Borrower's failure to
        enter into definitive documents in connection with the Liquidity Plan on or before
        November 30, 2007 ("Default B"; together with Default A, the "Defaults").

Please be further advised, pursuant to Section 9.1(e) of the Loan Agreement and Section 2(l) of
the Forbearance Agreement, respectively, the Defaults constitute Events of Default (as such term
is defined in the Loan Agreement).

Please be further advised, as a result of the Defaults, the Lender, pursuant to the Loan
Documents, is entitled to exercise any and all of its rights and remedies under the Loan
Documents, at law, in equity or otherwise, including, without limitation, all of its rights and
remedies pursuant to Section 13 of the Forbearance Agreement.



December 5, 2007
Page 2

Please be further advised, notwithstanding the Defaults, the Lender, in its sole and absolute discretion, will forbear from exercising its rights and remedies under the Loan Documents, applicable law, equity and/or otherwise, on a day-to-day basis, until further notice.

The Lender hereby reserves and preserves in all respects any and all rights, claims, remedies and causes of action that it may have against any person or entity including, without limitation, the Credit Parties and their affiliates, members, officers and directors, arising from or related to the Loan Documents, applicable law, equity and/or otherwise. Nothing herein shall establish a custom or course of dealing, nor shall anything herein be construed or interpreted as a waiver of any of the Lender's rights, claims, remedies or causes of action against any person or entity, whether under the Loan Documents, applicable law, equity and/or otherwise.

Very truly yours,
KATTEN MUCHIN ROSENMAN LLP


Mike Rupe

cc:    Keith Min
       Duane D. Werb, Esq. (via FedEx to Werb & Sullivan, 300 Delaware Avenue, Suite 1018, Wilmington, DE, 19801)
       Walter Wetterman, Esq. (via FedEx to 44570 Gordon Lane, Mendocino, CA 95460)

# Katten

**Katten Muchin Rosenman LLP**

575 Madison Avenue
New York, NY 10022-2585
212.940.8800 tel
212.940.6400 fax

MIKE RUPE
Mike.rupe@kattenlaw.com
212.940.8518 direct
212.894.5521 fax

January 16, 2008

**Via Overnight Delivery**

Lantana Mendocino, LLC
1 Riverwalk Center, Suite 100
Wilmington, DE 19801
Attention: David J. Wilk

Re:     Those certain loan documents, agreements, and instruments (collectively, the "Loan Documents"; the Loan Agreement (as defined below) is included in the term Loan Documents) by and among WestLB AG (the "Lender"), Lantana Mendocino, LLC (the "Borrower"), and the other credit parties thereto (such credit parties and the Borrower collectively, the "Credit Parties"); that certain Global Settlement and Forbearance Agreement, dated as of August 2, 2007, by and among the Lender, the Borrower, Duane D. Werb, and David J. Wilk (the "Forbearance Agreement"); terms not otherwise defined herein shall have the meanings ascribed thereto in that certain Loan and Security Agreement, dated as of August 26, 2005 (the "Loan Agreement").

Dear David:

Please be advised that, in addition to the Defaults and Events of Default identified in those certain letters dated October 10, 2007, and December 5, 2007 (collectively, the "Prior Defaults"), additional Defaults and Events of Default under the Loan Documents have occurred and are continuing: (a) as a result of the Borrower's failure to fully satisfy the Obligations (as defined in the Forbearance Agreement) on or before December 31, 2007; and (b) pursuant to Section 8(iii) of the Forbearance Agreement, as a result of the Borrower's failure to consummate and close the Liquidity Plan on or before December 31, 2007 (collectively, the "Additional Defaults"; together with the Prior Defaults, the "Defaults").

Please be further advised, as a result of the Defaults, the Lender, pursuant to the Loan Documents, is entitled to exercise any and all of its rights and remedies under the Loan Documents, at law, in equity or otherwise, including, without limitation, all of its rights and remedies pursuant to Section 13 of the Forbearance Agreement and Section 2.3(b) of the Loan Agreement.



January 16, 2008
Page 2

The Lender hereby reserves and preserves in all respects any and all rights, claims, remedies and causes of action that it may have against any person or entity including, without limitation, the Credit Parties and their affiliates, members, officers and directors, arising from or related to the Loan Documents, applicable law, equity and/or otherwise. Nothing herein shall establish a custom or course of dealing, nor shall anything herein be construed or interpreted as a waiver of any of the Lender's rights, claims, remedies or causes of action against any person or entity, whether under the Loan Documents, applicable law, equity and/or otherwise.

Very truly yours,
KATTEN MUCHIN ROSENMAN LLP

Mike Rupe

cc:    Keith Min
       Duane D. Werb, Esq. (via FedEx to Werb & Sullivan, 300 Delaware Avenue, Suite 1018, Wilmington, DE, 19801)
       Walter Wetterman, Esq. (via FedEx to 44570 Gordon Lane, Mendocino, CA 95460)